Risa M. Rosenberg
Thomas J. Matz
Jeremy C. Hollembeak
MILBANK, TWEED, HADLEY & MᶜCLOY LLP
1 Chase Manhattan Plaza
New York, NY 10005
Telephone: (212) 530-5000

Andrew M. Leblanc (admitted *pro hac vice*)
MILBANK, TWEED, HADLEY & MᶜCLOY LLP
1850 K Street, NW
Suite 1100
Washington, DC 20006
Telephone: (202) 835-7500

*Attorneys for Alejandro Francisco Sánchez-Mujica as*
*Foreign Representative of Vitro, S.A.B. de C.V.*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>VITRO, S.A.B. de C.V.,<br><br>    Debtor in a Foreign Proceeding. | Chapter 15<br><br>Case No. 11-11754 (SCC) |
| VITRO, S.A.B. de C.V.,<br><br>    Plaintiff,<br><br>v.<br><br>ACP MASTER, LTD.; AD HOC GROUP OF VITRO NOTEHOLDERS; AURELIUS CAPITAL MASTER, LTD.; AURELIUS CONVERGENCE MASTER, LTD.; ELLIOTT INTERNATIONAL L.P.; THE LIVERPOOL LIMITED PARTNERSHIP; and DOES 1-1000,<br><br>    Defendants. | Adversary No. 11-_____ (___)<br><br><br>**VERIFIED COMPLAINT FOR TEMPORARY RESTRAINING ORDER AND INJUNCTIVE RELIEF** |

Alejandro Francisco Sánchez-Mujica, as the duly-appointed foreign representative (in such capacity, the "Foreign Representative") of Vitro, S.A.B. de C.V. ("Vitro SAB" or "Plaintiff"), the debtor in the above-captioned chapter 15 case (the "Chapter 15 Case"), by and through his undersigned counsel, Milbank, Tweed, Hadley & McCloy LLP, hereby brings this action for a temporary restraining order (the "TRO") and injunctive relief (the "Preliminary Injunction"), and, for his Complaint (the "Verified Complaint"), alleges as follows:

## NATURE OF ACTION

1.      This action for a temporary restraining order and injunctive relief is brought pursuant to sections 105, 1519 and 1521 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532, (as amended, the "Bankruptcy Code"), Rule 65 of the Federal Rules of Civil Procedure, made applicable to this adversary proceeding by Rule 7065 of the Federal Rules of Bankruptcy Procedure (as amended, the "Bankruptcy Rules"), and Bankruptcy Rule 7001.

2.      Vitro SAB is a debtor in a voluntary judicial reorganization proceeding (the "Voluntary Mexican Proceeding") commenced on December 13, 2010 under the *Ley de Concursos Mercantiles* (the "Mexican Business Reorganization Act") in the Federal District Court for Civil and Labor Matters for the State of Nuevo León, the United States of Mexico (the "District Court of Nuevo León") and, by filing the Chapter 15 Case, has applied to this Court for recognition of the Voluntary Mexican Proceeding as a "foreign main proceeding" under sections 1515 and 1517 of the Bankruptcy Code.[1]

3.      Vitro SAB respectfully requests that the Court immediately issue a temporary restraining order pursuant to sections 105(a) and 1519 of the Bankruptcy Code restraining and

---

[1]      As a result of the motion (the "Venue Transfer Motion") to transfer the venue of the Chapter 15 Case to the Bankruptcy Court for the Northern District of Texas (the "Texas Bankruptcy Court") currently pending in the Texas Bankruptcy Court, it will be either this Court or the Texas Bankruptcy Court (any such court, the "Appropriate Court") that will ultimately consider the issue of recognition of the Chapter 15 Case under sections 1515 and 1517 of the Bankruptcy Code.

enjoining all holders of Restructured Debt (including the Old Notes, as each such term is defined below), as well as their respective agents, attorneys and all persons acting in concert or participation with the foregoing (collectively, the "Creditors"), from commencing or continuing any and all litigation (including the NYS Actions, as such term is defined below) or actions to collect (including pursuant to the Attachment Orders, as such term is defined below) (collectively, the "Actions") against Vitro SAB and the Old Guarantors (as defined below) that are not already protected by the automatic stay under section 362 of the Bankruptcy Code[2] (the "Protected Guarantors" and, together with Vitro SAB, the "Protected Parties") or their respective Property,[3] including:

(1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against any Protected Party that was or could have been commenced before the commencement of the Chapter 15 Case, or to recover (including pursuant to the Attachment Orders) a claim against any Protected Party that arose before the commencement of the Chapter 15 Case;

(2) the enforcement, against any Protected Party or against Property of any Protected Party, of a judgment (or a prejudgment remedy, including the Attachment Orders) obtained before the commencement of the Chapter 15 Case;

(3) any act to obtain possession of Property of any Protected Party or of Property from any Protected Party or to exercise control over Property of any Protected Party, including pursuant to the Attachment Orders;

(4) any act to create, perfect, or enforce any lien against Property of any Protected Party;

---

[2]  To the extent any Old Guarantor has lost, or loses, the protection of the automatic stay during the pendency of the Chapter 15 Case, Vitro SAB requests that such Old Guarantor be deemed a Protected Guarantor and be granted the protection of the TRO and/or Preliminary Injunction.

[3]  A party's "Property" shall mean any of its property wheresoever located within the United States or its territories, and whether held by such party in whole or in part, directly or indirectly, as principal or as nominee, beneficially or otherwise, and without limiting the generality of the foregoing, including any and all real property, personal property and intellectual property of the party, and any and all securities, instruments, debentures, notes or bonds issued to, or held by or on behalf of such party.

(5)      any act to create, perfect, or enforce against Property of any Protected Party any lien to the extent that such lien secures a claim that arose before the commencement of the Chapter 15 Case;

(6)      any act to collect, assess, or recover a claim against any Protected Party that arose before the commencement of the Chapter 15 Case, including pursuant to the Attachment Orders; and

(7)      the setoff of any debt owing to any Protected Party that arose before the commencement of the Chapter 15 Case against any claim against such Protected Party.

Vitro SAB additionally requests that, in accordance with the foregoing, notwithstanding the Attachment Orders, all Garnishees (as defined below) shall, from and after the date the TRO is entered, remit all payments to the applicable Protected Parties in accordance with the ordinary practices that existed between each such Garnishee and the applicable Protected Party prior to their being served with the applicable Attachment Order.

4.      Vitro SAB further requests that the Court schedule a hearing prior to the expiration of the initial 14 day term of the TRO with respect to entering the Preliminary Injunction pursuant to sections 105(a) and 1519 of the Bankruptcy Code, substantially on the same terms as the TRO, to remain in effect until a decision is rendered with respect to recognition of the Voluntary Mexican Proceeding as the "foreign main proceeding" pursuant to section 1517 of the Bankruptcy Code.

5.      Finally, Vitro SAB requests that, if and when the Appropriate Court recognizes the Voluntary Mexican Proceeding as the "foreign main proceeding," the Appropriate Court enter an order pursuant to sections 105(a), 1507(b) and 1521(a)(6) of the Bankruptcy Code extending the Preliminary Injunction as it relates to the Protected Guarantors through the conclusion of the Voluntary Mexican Proceeding. Alternatively, Vitro SAB requests that the Appropriate Court extend the automatic stay to any Actions by the Creditors against the

Protected Guarantors that are not then otherwise so protected for the duration of this Chapter 15 Case.

**JURISDICTION AND VENUE**

6.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding under 28 U.S.C. § 157(b)(2)(P).  Venue is proper before this Court pursuant to 28 U.S.C. § 1410.

**THE PARTIES**

7.      Plaintiff is a corporation with variable capital (*sociedad anónima bursátil de capital variable*) organized under the laws of Mexico and is a holding company that conducts substantially all of its operations through multiple subsidiaries in the Americas and in Europe (collectively with such subsidiaries, "Vitro").  Plaintiff believes that Vitro, based on its consolidated net sales in 2010, is the largest manufacturer of glass containers and flat glass in Mexico.  Plaintiff maintains its principal place of business in the state of Nuevo León, Mexico.

8.      Upon information and belief, Defendant ACP Master, Ltd. is an exempted company with limited liability incorporated in the Cayman Islands and is a holder of Old Notes.

9.      Upon information and belief, Defendant Ad Hoc Group of Vitro Noteholders (the "Steering Committee") is an *ad hoc* committee of entities purporting that they or their affiliates collectively are the advisors to or beneficial owners of, or the holders or managers of, various accounts with investment authority or voting authority for approximately $773 million in principal amount of Old Notes.

10.      Upon information and belief, Defendant Aurelius Capital Master, Ltd. is an exempted company with limited liability incorporated in the Cayman Islands and is a holder of Old Notes.

5

11.     Upon information and belief, Defendant Aurelius Convergence Master, Ltd. is an exempted company with limited liability incorporated in the Cayman Islands and is a holder of Old Notes.

12.     Upon information and belief, Defendant Elliott International L.P. is a Limited Partnership organized in the Cayman Islands and is a holder of Old Notes.

13.     Upon information and belief, Defendant Liverpool Limited Partnership is a Limited Partnership organized in Bermuda and is a holder of Old Notes.

14.     Upon information and belief, Defendants Does 1-1000 include all Creditors other than the Defendants named above.

## BACKGROUND[4]

### VITRO SAB'S BUSINESS

15.     Vitro is the largest manufacturer of glass containers and flat glass in Mexico, with consolidated net sales in 2010 of Ps. 23,360 million ($1,849 million).[5]  It has manufacturing facilities in 11 countries and distribution centers throughout the Americas and Europe, and exports its products to more than 50 countries worldwide.  In 2010, 51% of Vitro's consolidated net sales were made in Mexico, with the remainder made primarily in the United States and Europe.  Vitro's operations are organized into two operating business units:  (1) the Glass

---

[4]     The facts set forth in this section are more fully set forth in the Declaration of Alejandro Francisco Sánchez-Mujica, as Foreign Representative of Vitro, S.A.B. de C.V., in Support of Chapter 15 Petition for Recognition of Foreign Main Proceeding and Request for Related Relief, filed in the Chapter 15 Case [Docket No. 3] (the "Foreign Representative Declaration").  The Foreign Representative Declaration, and the documents attached as exhibits thereto, are incorporated herein by reference.

[5]     Vitro SAB reports its quarterly and annual financial results in pesos, and certain of its indebtedness, as issued, is denominated in pesos.  Throughout this Verified Complaint, such financial results and indebtedness are presented in U.S. dollars, using the fixed exchange rate published by *Banco de Mexico* at the end of each applicable reporting period.  Additionally, some of the financial results and indebtedness presented herein are unaudited and subject to adjustment in Vitro SAB's 2010 audited financial results, which have not been finalized as of the date hereof.

Containers business unit and (2) the Flat Glass business unit, representing approximately 53% and 46%, respectively, of Vitro's consolidated net sales in 2010.

## VITRO SAB'S INDEBTEDNESS

16.     As of December 31, 2010, on an unaudited basis Vitro SAB's aggregate outstanding third-party consolidated indebtedness was approximately $1.710 billion,[6] consisting of:

- $1.216 billion in outstanding principal amount under the 2012 Notes, 2017 Notes and 2013 Notes (each as defined below and, together, the "Old Notes");

- $254.8 million in outstanding agreed amounts owing in settlement of obligations and litigation relating to certain derivative financial instruments (the "DFI Claims");

- $59.5 million in outstanding principal amount under the *Certificados Bursátiles* and the ABN Note (each as defined below and, together, the "Other Debt" and, together with the Old Notes and the DFI Claims, the "Restructured Debt"); and

- $186.8 million of additional indebtedness that Vitro SAB does not plan to restructure or discharge in the Voluntary Mexican Proceeding.

The circumstances giving rise to Vitro SAB's indebtedness with respect to the Restructured Debt are discussed below.  In addition, as of December 31, 2010, on an unaudited basis Vitro SAB's aggregate outstanding indebtedness to its direct and indirect subsidiaries (the "Intercompany Claims") was approximately $2.022 billion.

## A.     Old Notes

17.     On October 22, 2003 and on February 1, 2007, respectively, Vitro SAB issued (i) $225 million aggregate principal amount of 11.75% Senior Notes due 2013 (the "2013 Notes"), and (ii) $1.0 billion of Senior Notes, comprised of $300 million aggregate principal amount of 8.625% Senior Notes due 2012 (the "2012 Notes") and $700 million aggregate

---

[6]     This amount reflects amortizable discounts of approximately $6.9 million and does not include past-due interest in an aggregate approximate amount of $308 million.

principal amount of 9.125% Senior Notes due 2017 (the "2017 Notes") under separate indentures (as each has been supplemented from time to time, collectively, the "Indentures"). The Old Notes are general unsecured obligations of Vitro SAB, guaranteed, on an unsecured basis, by substantially all of Vitro SAB's wholly-owned direct and indirect subsidiaries (in such capacities, the "Old Guarantors").

**B.     DFI Claims**

18.     Vitro is an international enterprise, with significant exposures to fluctuations in the interest and currency exchange-rates caused by its commitments on U.S. dollar-denominated indebtedness, as well as fluctuations in the price of natural gas, its main energy input. To mitigate these exposures, and in response to market trends during the first seven months of 2008, Vitro SAB and certain of its subsidiaries (collectively, the "Vitro DFI Parties") entered into certain derivative financial instruments (the "DFIs"), including (i) interest rate swap agreements to hedge future interest payments, (ii) currency swap and option agreements to hedge exposure to foreign currency exchange rate variations and (iii) forwards and other derivative agreements to hedge its exposure to natural gas price variations. As discussed further below, the DFI Claims stem from the Vitro DFI Parties' defaults under the DFIs in early 2009.

**C.     Other Debt**

19.     On February 13, 2003, Vitro SAB issued a *Certificados Bursátiles* note (the "*Certificados Bursátiles Vitro 03*") at an annual floating interest rate of 3.25% over the rate on 182-day *Certificados de la Tesorería de la Federación* (i.e., notes issued by the government of Mexico). On July 2, 2008, Vitro SAB issued another *Certificados Bursátiles* note (the "*Certificados Bursátiles Vitro 08*" and, together with the *Certificados Bursátiles Vitro 03*, the "*Certificados Bursátiles*") at an annual floating interest rate of 2.50% over the 28-day TIIE. As of September 30, 2010, the aggregate principal amount outstanding under the *Certificados*

*Bursátiles Vitro 03* and *Certificados Bursátiles Vitro 08* was Ps. 150 million ($12.0 million) and

Ps. 400 million ($32.0 million), respectively.  The *Certificados Bursátiles* are senior unsecured

obligations of Vitro SAB, and are not guaranteed by any of its subsidiaries.

20.     On September 29, 2008, Vitro SAB issued a promissory note (the "ABN Note")

in favor of ABN Amro Bank N.V. ("ABN") in the principal amount of $15 million, which is

guaranteed by certain of its subsidiaries.

## EVENTS PRECIPITATING COMMENCEMENT OF VOLUNTARY MEXICAN PROCEEDING

**A.      Global Recession**

21.     The global economic and financial crisis, and the severe economic recession

which began in the second half of 2008, affected each of Vitro's major markets, Mexico, the

United States and Spain, and significantly affected its businesses.  The sharp decline in demand

for new cars and trucks in the automobile industry, for new homes and buildings in the

construction industry and reduced beer bottle demand from the main client of Vitro's Glass

Containers unit resulted in a 36.8% decline in Vitro's consolidated operating income for 2008

compared to 2007, and a further 22.3% decline in Vitro's operating income for 2009 compared

to 2008.  Income before taxes decreased from Ps. 175 million in 2007 to a loss of

Ps. 7,857 million in 2008 and a loss of Ps. 1,352 million in 2009.  Net income decreased from

Ps. 131 million in 2007 to a loss of Ps. 5,682 million in 2008 and a loss of Ps. 754 million in

2009.  Even though the economy generally showed moderate signs of recovery in 2010, some of

Vitro's markets continued to experience contraction and excess capacity, including the

construction sector in the United States and Spain.  For the twelve-month period ended

December 31, 2010, Vitro's consolidated net sales decreased 2.6% from the same period ended

December 31, 2009.

**B.** **DFI Litigation**

22.      In the second half of 2008, the DFI positions of the Vitro DFI Parties were materially and adversely impacted by the high volatility in commodity and currency markets, resulting in margin calls by their counterparties ("Counterparties") forcing the Vitro DFI Parties to post $85 million in collateral deposits.  To eliminate further liquidity deterioration related to additional margin calls, in the fourth quarter of 2008, the Vitro DFI Parties restructured their DFI portfolio and unwound the majority of their open positions to guarantee their ability to continue their normal course of operations.  Thereafter, in the first quarter of 2009, six out of the seven Counterparties commenced actions (collectively, the "DFI Litigation") against the Vitro DFI Parties in the Supreme Court of the State of New York demanding payment of approximately $240.3 million plus interest and fees allegedly payable under the DFIs.  On April 13, 2010, the Supreme Court of New York granted these Counterparties' motions as to the Vitro DFI Parties' liability and referred the matter of damages to a special referee.

**C.** **Default under Old Notes and Other Debt**

23.      Vitro's defaults under the DFIs resulted in events of default under each Indenture. To preserve the cash necessary to continue its operations, Vitro SAB stopped making scheduled interest payments on the Old Notes, beginning with missed payments on the 2012 Notes and 2017 Notes due February 2009.  As discussed further below, beginning in November 2010, multiple litigations were commenced against Vitro SAB and certain of the Old Guarantors in the United States and Mexico by certain purported beneficial holders of the Old Notes.  Vitro SAB also did not make scheduled payments and/or is the subject of pending litigation with respect to

the New Promissory Notes (as defined below) issued as a result of the settlement of the DFI

Litigation, *Certificados Bursátiles Vitro 03*,[7] *Certificados Bursátiles Vitro 08,* and ABN Note.

**D.    Restructuring Negotiations**

24.    As a result of all of the foregoing, in February 2009, Vitro SAB announced its

intention to restructure all of the Restructured Debt, and thereafter engaged in good faith in

negotiations regarding a potential restructuring with certain holders of the Restructured Debt,

including the Steering Committee (the "Original Restructuring Negotiations").  Specifically,

between August 2009 and July 2010, Vitro SAB submitted three restructuring proposals to the

Steering Committee, each of which was rejected.  Additionally, in January of 2010, certain

purported holders of the Old Notes served Vitro SAB with purported notices of acceleration in

respect of the 2012 Notes and 2017 Notes.  Ultimately, while Vitro SAB was hopeful that

negotiations with the Steering Committee would result in a consensual resolution, the continued

recalcitrance of the members of the Steering Committee, in conjunction with certain other

developments (including the adverse rulings in the DFI Litigation and a purported acceleration of

the 2013 Notes by a letter on the letterhead of the trustee under the relevant Indenture in April

2010) led Vitro SAB to explore alternative means to implement a restructuring.

25.    Vitro also engaged in negotiations with Fintech Investments Ltd. (together with

any affiliate and/or investment vehicle thereof, "Fintech"), a significant holder of Restructured

Debt as the purchaser of the rights of six out of the seven Counterparties under the DFIs.  In

September 2010, Vitro reached a settlement with Fintech, which ultimately resulted in Vitro

SAB's issuance of promissory notes to Fintech in the aggregate amount of approximately

---

[7]    As part of the negotiations with respect to the Offers (as defined below), the holders of the *Certificados Bursátiles Vitro 03* agreed to end litigation previously initiated by the common representative (*representante común*) of the *Certificados Bursátiles Vitro 03* "without prejudice" until Vitro completes its restructuring.

$191.4 million (the "New Promissory Notes") in exchange for settlement of the DFI Litigation.

Vitro SAB also engaged in negotiations with Fintech with respect to the restructuring proposal

Vitro SAB had formulated for the Steering Committee in July 2010.

**E.** **Formulation of *Concurso* Plan and Offers**

26.     As a result of its negotiations with Fintech, Vitro SAB developed a restructuring

proposal (as amended from time to time, the "*Concurso* Plan").  Vitro does not have the means

to repay the Restructured Debt, nor does it believe that it will be able to find a material source of

financing to refinance the Restructured Debt.  Thus, the principal objectives of the *Concurso*

Plan are to lower Vitro SAB's principal and interest payments on, and extend the maturity dates

of, the Old Notes and the other Restructured Debt, while providing a fair recovery to the holders

thereof.

27.     The *Concurso* Plan is intended to be effectuated through a prepackaged voluntary

judicial reorganization proceeding in Mexico.  To meet the requirements for a prepackaged

proceeding under the Mexican Business Reorganization Act and implement the *Concurso* Plan in

the quickest and cost efficient manner possible, Vitro SAB formulated two alternative offers to

the holders of the Old Notes:  a tender offer to purchase the Old Notes (the "Tender Offer") and

an exchange offer and solicitation of consents to an in-court restructuring under the Mexican

Business Reorganization Act (the "Exchange Offer and Consent Solicitation" and, together with

the Tender Offer, the "Offers").  Respectively, the Offers provided holders the opportunity to sell

their Old Notes for cash in an amount of no less than $500 but no more than $575 per $1,000

principal amount of Old Notes tendered (the "Tender Offer Consideration"), or exchange their

Old Notes for the consideration provided by the *Concurso* Plan plus a cash consent payment (the

"Consent Payment") no less than 5% but no more than 10% of the principal amount of Old Notes

exchanged.

28.     Under the *Concurso* Plan, the Restructured Debt will be exchanged for (i) $850 million in aggregate principal amount of new unsecured notes due 2019 (the "New 2019 Notes"), (ii) $100 million (subject to adjustment) in aggregate principal amount of new convertible debt obligations, which will mandatorily convert into 15% of Vitro SAB's equity interests (on a fully diluted basis) if not paid in full at maturity or upon the occurrence of certain events of default (the "New MCDs"), and (iii) certain cash consideration (the "Restructuring Cash" and, together with the New 2019 Notes and New MCDs, the "Restructuring Consideration").  In addition, Vitro SAB's obligations under the New 2019 Notes, including any repurchase obligation resulting from a Change of Control and other mandatory prepayment provisions thereunder will be unconditionally guaranteed (the "New Guarantees"), jointly and severally, on an unsecured basis, by Vitro SAB's direct and indirect subsidiaries that are currently guarantors of the Old Notes (each, a "New Guarantor").

29.     Accordingly, under the *Concurso* Plan, each holder will be entitled to receive, in exchange for every $1,000 principal amount of Old Notes:

- $561 principal amount of New 2019 Notes;

- $66 principal amount of New MCDs; and

- a *pro rata* portion of the Restructuring Cash.

Vitro SAB believes that the issuance of the New 2019 Notes and New MCDs alone represent a 55.2% net present value nominal recovery to the holders of the Old Notes on the face amount of their claims, representing a significant premium relative to the recovery they could potentially achieve through litigation or the average market price of the Old Notes for the twelve month period immediately preceding the launch of the Offers.  Moreover, Vitro SAB believes that the holders of the Old Notes who participated in the Exchange Offer and Consent Solicitation stand to receive a greater recovery of between 68% to 73% of the face amount of their claims.

30.     In exchange for their providing the Restructuring Consideration and the New Guarantees, under the terms of the *Concurso* Plan, all obligations of Vitro SAB and its subsidiaries with respect to the Restructured Debt (including all accrued interest and all guarantee obligations of the Old Guarantors) will be cancelled regardless of whether or not any particular holder of the Restructured Debt votes to accept the *Concurso* Plan. The holders of Intercompany Claims will not receive any Restructuring Consideration on account of such claims.

## F.     Launch of Offers

31.     On November 1, 2010, Vitro SAB launched the Offers, publicly disclosing its intention to commence the Voluntary Mexican Proceeding at the conclusion thereof. From the outset, the Steering Committee has opposed the Offers and the *Concurso* Plan. In fact, six days prior to the launch of the Offers, the Steering Committee issued a press release urging the holders of the Old Notes not to participate in the proposed restructuring and denouncing the yet-to-be-publicly-disclosed terms of the *Concurso* Plan as allegedly providing an "unacceptably poor economic outcome" for the holders of the Old Notes. Thereafter, during the pendency of the Offers, several members of the Steering Committee commenced various legal proceedings in multiple jurisdictions against Vitro SAB and substantially all of the Old Guarantors.

### i.     Commencement of Involuntary Chapter 11 Cases
### Against Vitro SAB's U.S. Old Guarantors

32.     On November 17, 2010, involuntary cases (the "U.S. Involuntary Cases") under Chapter 11 of the Bankruptcy Code were commenced in the Texas Bankruptcy Court by four members of the Steering Committee (the "U.S. Petitioning Creditors")[8] – together holding a

---

[8]     The U.S. Petitioning Creditors are: (i) Knighthead Master Fund, L.P., (ii) Brookville Horizons Fund, L.P., (iii) Davidson Kempner Distressed Opportunities Fund L.P., and (iv) Lord Abbett Bond-Debenture Fund, Inc.

mere 6% of the Restructured Debt – against fifteen of Vitro SAB's U.S. subsidiaries, all of which are Old Guarantors (the "U.S. Alleged Debtors").[9]

33.     Less than 24 hours after filing the involuntary petitions, the U.S. Petitioning Creditors filed an emergency motion pursuant to section 303(f) of the Bankruptcy Code seeking restrictions on the U.S. Alleged Debtors' ability to enter into transactions with their non-U.S. affiliates or participate in Vitro SAB's yet-to-be-commenced reorganization proceeding in Mexico.  However, on November 24, 2010, the Texas Bankruptcy Court denied the requested restrictions in their entirety, finding, among other things, that the U.S. Petitioning Creditors had failed to demonstrate that any harm would result from the U.S. Alleged Debtors' participation in the Offers or the *Concurso* Plan, and that the U.S. Petitioning Creditors' unsubstantiated allegations and expressed distrust of Mexican law failed to justify the requested relief.

34.     Thereafter, the U.S. Alleged Debtors continued to operate their businesses in the ordinary course, and were authorized by the Texas Bankruptcy Court to continue (i) utilizing an existing working capital facility with their secured lender, Bank of America, and (ii) incurring indebtedness from Vitro SAB and certain of its Mexican subsidiaries on an unsecured basis consistent with their prepetition practices.  On December 9, 2010, the U.S. Alleged Debtors filed an answer to the involuntary petitions, denying most allegations made therein and asserting certain affirmative defenses.  On March 31 and April 1, 2011, a trial was held on whether orders for relief should be entered against the U.S. Alleged Debtors, after which the Texas Bankruptcy Court took the matter under advisement.

---

[9]     The U.S. Alleged Debtors were:  Vitro Asset Corp., Vitro Chemicals, Fibers & Mining, LLC ("Chemicals"), Vitro America, LLC ("Vitro America"), Troper Services, Inc., Super Sky Products, Inc. ("Super Sky Products"), Super Sky International, Inc. ("Super Sky International"), VVP Holdings, LLC, Amsilco Holdings, Inc., B.B.O. Holdings, Inc., Binswanger Glass Company, Crisa Corporation, VVP Finance Corporation ("VVP Finance"), VVP Auto Glass, Inc. ("Auto Glass"), V-MX Holdings, LLC, and Vitro Packaging, LLC ("Packaging").

35.     By the time of the trial, the negative impact on the business operations of the U.S. Alleged Debtors caused by the commencement of the U.S. Involuntary Cases and their pendency for more than four months had become severe.  On April 6, 2011, Vitro America, Super Sky International, Super Sky Products, and VVP Finance (together, the "Consenting Debtors"), moved for entry of orders for relief, and the Texas Bankruptcy Court entered such orders on that same date.  Thereafter, the Consenting Debtors filed pleadings requesting authority to sell substantially all of their assets pursuant to section 363 of the Bankruptcy Code, and have indicated that certain additional non-operating U.S. Alleged Debtors may consent to orders for relief in connection therewith.  The remaining U.S. Alleged Debtors continued to oppose entry of orders for relief against them.

36.     On April 11, 2011, the Texas Bankruptcy Court issued an order (the "First Denial Order"), denying entry of orders for relief against Chemicals, Packaging and Auto Glass, finding that these U.S. Alleged Debtors were generally paying their debts as they became due, although it did not finally determine whether the claims of the U.S. Petitioning Creditors were contingent as to liability or subject to a *bona fide* dispute as to liability or amount.

37.     Subsequently, on April 21, 2011, the Texas Bankruptcy Court issued an order and memorandum opinion (together, the "Second Denial Order"), denying entry of orders for relief for the remaining eight U.S. Alleged Debtors (together with Chemicals, Packaging and Auto Glass, the "Former Alleged Debtors").  In the Second Denial Order, the Texas Bankruptcy Court found that the claims of the U.S. Petitioning Creditors against the Former Alleged Debtors were contingent as to liability because no demand for payment had been made at the time the U.S. Involuntary Cases were commenced.

### ii. Commencement of Litigation in New York State Court Against Vitro SAB and Certain Protected Guarantors

38.     On December 2, 2010 and December 9, 2010, respectively, two members of the Steering Committee (the "NYS Plaintiffs") commenced substantially identical law suits (the "NYS Actions") in the Supreme Court of the State of New York (the "New York State Court") against Vitro SAB and 49 of its subsidiaries in their capacities as Old Guarantors (together, the "NYS Defendants") for breach of contract and payment of accelerated principal and accrued interest with respect to their beneficial holdings of Old Notes.[10]  In each case, the respective NYS Plaintiff obtained an *ex parte* order of attachment (together, the "Attachment Orders") with respect to all property of any NYS Defendant located in the State of New York.

39.     The NYS Actions and the use to which the NYS Plaintiffs put the Attachment Orders have caused significant disruptions to Vitro's businesses and reorganization efforts (which, as Vitro SAB believes, was the NYS Plaintiffs' intention).  Specifically, shortly after they were obtained, the Attachment Orders were served by the NYS Plaintiffs on D.F. King & Co., Inc. ("D.F. King"), the Depository for the Tender Offer and the Information and Exchange Agent for the Exchange Offer and Consent Solicitation, causing D.F. King to refuse to take certain steps necessary to effectuate the transfer of the Old Notes tendered in the Tender Offer or

---

[10]     See Verified Complaint in Index No. 652146/2010 (the "Aurelius Complaint") of ACP Master, Ltd., Aurelius Capital Master, Ltd., and Aurelius Convergence Master, Ltd. (collectively, "Aurelius"), three funds managed or controlled by Aurelius Capital Management, LP., and Verified Complaint in Index No. 652223/2010 (the "Elliott Complaint") of Elliott International L.P. and The Liverpool Limited Partnership (collectively, "Elliott"), two funds managed or controlled by Elliott Management Corp.  Aurelius alleges that it holds, in the aggregate, more than $206 million in face amount of Old Notes, and seeks damages in the aggregate amount of more than $257 million for unpaid principal and accrued interest.  (See Aurelius Complaint ¶ 1.)  Elliott alleges that it holds, in the aggregate, more than $85 million in face amount of Old Notes, and seeks damages in the aggregate amount of more than $106 million for unpaid principal and accrued interest.  (See Elliott Complaint ¶ 1.)  Both Aurelius Capital Management, LP. and Elliott Management Corp. are members of the Steering Committee, although neither is a U.S. Petitioning Creditor.

disburse the Consent Payment to those holders of the Old Notes that consented to the *Concurso*

Plan.[11]

40.     Additionally, in the more than four months since they obtained *ex parte* the

Attachment Orders, the NYS Plaintiffs have (i) caused copies thereof to be served on numerous

Vitro customers in an attempt to garnish accounts payable owed to Vitro entities, and

(ii) delivered correspondence directly to Vitro customers, enclosing the Attachment Orders and

incorrectly stating that they broadly apply to any accounts payable to the Vitro SAB's Mexican

subsidiaries – relief unquestionably beyond that which the Attachment Orders actually provide.

In response, some of these customers suspended payments on account of goods and services

being provided by the NYS Defendants – including payments on account of receivables

previously assigned by certain NYS Defendants to a trust[12] – pending an order by the New York

State Court vacating the Attachment Orders or otherwise clarifying that such payments were not

subject thereto.

41.     On February 8, 2011, Justice Kornreich of the New York State Court heard

argument on cross-motions by the NYS Plaintiffs to confirm and the NYS Defendants to vacate

the Attachment Orders, as well as an order to show cause by Invex seeking entry of an order

clarifying that payments due to the Flat Glass Payment Trust from customers on account of

receivables generated by Automotríz were not subject to the Attachment Orders.  At the

conclusion of the hearing, Justice Kornreich took the cross-motions under advisement and

---

[11]     Ultimately – after nearly two weeks of expedited litigation before the New York State Court and the New York Appellate Division – an order was entered clarifying that the Attachment Orders did not apply to the Old Notes tendered or exchanged as part of the Offers.  Subsequently, D.F. King took the requisite actions and the Offers were completed.

[12]     Several NYS Defendants, including Automotríz , established an independent trust, pursuant to a *contrato de fideicomiso* signed on August 3, 2005 in Mexico (the "Flat Glass Payment Trust"), to which they sold and assigned their trade receivables.  The trustee of the Flat Glass Payment Trust is Banco Invex, S.A., Institución de Banca Múltiple, Division Fiduciaria Invex Grupo Financiero ("Invex").

entered an order on Invex's order to show cause (the "Partial *Vacatur* Order") vacating the Attachment Orders with respect to the Flat Glass Payment Trust receivables. Justice Kornreich briefly stayed the Partial *Vacatur* Order and the NYS Plaintiffs appealed. On February 10, 2011, the New York Appellate Division, First Department denied plaintiffs' application for a stay pending appeal and the Partial *Vacatur* Order became final.

42. As of the date hereof, Justice Kornreich has not issued a further ruling confirming or denying the Attachment Orders and the NYS Actions remain pending. On March 9, 2011 and March 18, 2011, respectively, the NYS Plaintiffs submitted substantially identical motions for partial summary judgment (the "Partial SJ Motions") on the portions of their respective claims relating only to unpaid interest. On March 28, 2011, the NYS Defendants filed their consolidated opposition to the Partial SJ Motions and, on April 4, 2011, the NYS Plaintiffs submitted their replies in further support of the motions. Oral argument on the Partial SJ Motions is scheduled for May 3, 2011.

### iii. Commencement of Involuntary Mexican Proceedings Against Vitro SAB and Certain Protected Guarantors

43. On December 10, 2010, certain members[13] of the Steering Committee filed an involuntary *concurso* petition in the District Court of Nuevo León against Vitro SAB and, beginning on December 15, 2010, also filed involuntary *concurso* petitions against certain of its Mexican subsidiaries who are Old Guarantors. The Mexican District Judge (as defined below) has entered orders admitting the involuntary petitions for further proceedings (each, an "Involuntary Mexican Proceeding") against Vitro SAB and 17 Protected Guarantors (together, the "Mexican Alleged Debtors").

---

[13] The relevant members of the Steering Committee include the U.S. Petitioning Creditors Brookville Horizons Fund, L.P., Davidson Kempner Distressed Opportunities Fund L.P., and Knighthead Master Fund L.P., as well as Moneda, S.A. Administradora de Fondos de Inversión como Administradora del Fondo de Inversión and Moneda Deuda Latinoamericana Fondo de Inversión.

44.     As of the date hereof, the *visitador* appointed in the Involuntary Mexican Proceedings pending against the Mexican Alleged Debtors other than Vitro SAB has submitted his reports, finding that the requirements set forth in the Mexican Business Reorganization Act for declaration of a *concurso* were met with respect to eight of the seventeen Vitro SAB subsidiaries who are Mexican Alleged Debtors, but were not met with respect to the other nine. The period for parties to submit final allegations and additional evidence in all of these proceedings is ongoing.  Vitro SAB anticipates that decisions on whether to deny involuntary *concurso mercantil* declarations against its subsidiary Mexican Alleged Debtors will not be issued for several weeks.

## G.     Results of Offers

45.     As noted above, on November 1, 2010, Vitro SAB launched the Tender Offer and Exchange Offer and Consent Solicitation.  Vitro SAB believes that participation in the Offers by the holders of Restructured Debt was negatively impacted by the actions of the members of the Steering Committee and certain other holders of Old Notes during the pendency of the Offers.[14] Both Offers have expired in accordance with their respective terms, and the payment of the Tender Offer Consideration and the Consent Payments has since been made.  Old Notes in the aggregate principal amount of approximately $44 million were tendered pursuant to the Tender Offer, and other Restructured Debt in the aggregate principal amount of $520 million was

---

[14]     On April 14, 2011, Vitro SAB commenced a civil lawsuit in the New York State Court against certain holders of Old Notes for breach of confidentiality agreements entered into in connection with the Original Restructuring Negotiations and interference with economic benefits.  (See Summons and Complaint filed in Vitro S.A.B. de C.V. v. Aurelius Capital Mgmt., L.P., et al. (Case No. 650997/2011) (the "Summons and Complaint"))  Moreover, the complaint alleges that the defendants may have also used Vitro's non-public information to illegally trade in Vitro's securities and/or may have disclosed that information to others who traded in Vitro's securities.  As evidenced by the Summons and Complaint, Vitro believes that the defendants' actions have damaged the value of Vitro's businesses and threaten to destroy its ability to emerge as an ongoing enterprise through the restructuring process.

tendered in the Exchange Offer and Consent Solicitation.

**H.    Voluntary Mexican Proceeding**

46.    On December 13, 2010, Vitro SAB commenced the Voluntary Mexican
Proceeding by filing with the District Court of Nuevo León a petition requesting a *concurso
mercantil* declaration under the Mexican Business Reorganization Act (the "Voluntary *Concurso*
Petition*,"*) together with its prepackaged *Concurso* Plan which was executed by Vitro SAB and
creditors representing more than 40% in amount of its outstanding liabilities (including
Intercompany Claims, as permitted under the Mexican Business Reorganization Act).  The
*Concurso* Plan is supported by more than 650 beneficial holders of the Old Notes and of other
Restructured Debt.

47.    The Voluntary *Concurso* Petition was assigned to Judge Francisco Eduardo Flores
Sánchez (the "Mexican District Judge") of the Fourth Federal District Court in Nuevo León in
Monterrey, Mexico.  On January 7, 2011, the Mexican District Judge issued a resolution denying
Vitro SAB's request for a *concurso mercantil* declaration, which, on January 28, 2011, Vitro
SAB, its subsidiaries and the holders of the Old Notes and *Certificados Bursátiles* that support
the *Concurso* Plan appealed.  On April 8, 2011, the Mexican Appellate Court issued its decision,
reversing the January 7, 2011 resolution of the Mexican Bankruptcy Judge and holding that Vitro
SAB's Voluntary *Concurso* Petition and *Concurso* Plan satisfied the requirements for a
prepackaged *concurso* proceeding under the Mexican Business Reorganization Act and,
therefore, issued a declaration of *concurso mercantil* (the "*Concurso* Declaration") in the
Voluntary Mexican Proceeding.

48.    On April 14, 2011, the Foreign Representative commenced the Chapter 15 Case
by filing a chapter 15 petition in this Court on behalf of Vitro SAB.

49.     Vitro SAB initially filed a chapter 15 petition on December 14, 2010, immediately after it first initiated the Voluntary Mexican Proceeding (Case No. 10-16619 (SHL), the "Prior Chapter 15 Case").  However, following the January 7, 2011 denial of Vitro SAB's request for a *concurso mercantil* declaration by the Mexican District Judge, Vitro SAB reached an agreement with the Steering Committee to withdraw its chapter 15 petition without prejudice and close the Prior Chapter 15 Case, which the Court so-ordered on January 26, 2011 (the "Withdrawal Order").  Pursuant to the Withdrawal Order, Vitro SAB agreed, so long as the U.S. Involuntary Cases remained pending in the Texas Bankruptcy Court on the date any subsequent chapter 15 petition was filed in any court other than the Texas Bankruptcy Court, to "comply with the stay that would have been imposed by [Bankruptcy] Rule 1014(b) . . . for three business days following the filing of the Subsequent Chapter 15 Petition regardless of whether a motion to transfer venue pursuant to Bankruptcy Rule 1014(b) will have been filed."  (See Withdrawal Order at 2.)

50.     As mentioned above, during this three business days voluntary stay to which Vitro SAB had agreed, the U.S. Petitioning Creditors filed the Venue Transfer Motion, which is currently pending before the Texas Bankruptcy Court.  The effect of the motion to transfer venue was, pursuant to Rule 1014(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to stay all proceedings in the Chapter 15 Case.  Thus, on April 21, 2011, Vitro SAB filed a motion for relief from the Bankruptcy Rule 1014(b) stay, which the Texas Bankruptcy Court granted by order dated April 26, 2011.  Based on the foregoing, Vitro SAB could not commence this adversary proceeding or otherwise seek injunctive relief before today.

## I.     Imminent Harm to Vitro's Restructuring Efforts

51.     If the Creditors are not enjoined from commencing or continuing any Actions against any of the Protected Parties until the Appropriate Court recognizes the Voluntary

Mexican Proceeding as the foreign main proceeding, Vitro SAB's restructuring pursuant to the *Concurso* Plan would be jeopardized. Such Actions, if commenced against Vitro SAB, would force it to expend its resources on litigation in the United States that is either duplicative of the matters that will likely be litigated either in Mexico or this Chapter 15 Case and/or would have the effect of improving certain Creditors' positions relative to other identically situated Creditors.

52.     Vitro SAB is justifiably concerned that Creditors may similarly attempt to collect the Restructured Debt from the Protected Guarantors directly, including through attachment of assets of the Protected Guarantors located in the United States. Indeed, counsel to the Steering Committee acknowledged the imminent threat of such actions at a recent status conference in the Texas Bankruptcy Court, stating the following:

> what the ruling is going to engender with the [U.S. Protected Guarantors' chapter 11] cases getting dismissed is everybody going and proceeding under state law rights and filing dozens of suits around the country. There's not just going to be the one action in New York. There will be actions everywhere where bondholders seek, and we don't represent all the bondholders, and we certainly don't control all the bondholders, where people go out and start exercising state court remedies because the bankruptcy forum has been denied to them.

Transcript of Hearing on April 12, 2011 before Texas Bankruptcy Court (the "April 12 Transcript"), at 46:17-47 (a true and correct copy of which is attached to the U.S. Counsel Declaration as Exhibit B). Any Action to enforce any rights in respect of the Restructured Debt against any Protected Guarantor would likewise undermine the relief that Vitro SAB hopes to obtain in the Voluntary Mexican Proceeding, thus undercutting the vital principles of comity.

53.     The balance of harms weighs in favor of granting injunctive relief. The Actions sought to be enjoined here would jeopardize the global restructuring that Vitro SAB is seeking and hoping to obtain in the Voluntary Mexican Proceeding. Conversely, the harm to the

Creditors will be minimal. The imposition of the TRO and Preliminary Injunction would not result in a waiver of any of the rights or remedies available to the Creditors in the Voluntary Mexican Proceeding, including the right to object to, vote for or against, and, if such plan is approved, receive distributions under, the *Concurso* Plan or be heard in the District Court of Nuevo León. The Creditors, who voluntarily purchased debt obligations of a Mexican issuer, cannot plead harm stemming from the necessity of litigating any legal issues concerning such debt obligations in a Mexican court.

54. The public interest also weighs in favor of granting the Preliminary Injunction. By protecting the Protected Parties from piecemeal litigation in the United States with respect to the same obligations that are being restructured in a global process in Mexico, the requested injunctive relief furthers the stated goals of chapter 15 and the principles of comity. Vitro SAB is a Mexican entity, subject to a pending Mexican restructuring proceeding. The *Concurso* Plan should be permitted to move forward unobstructed by creditor actions against Vitro SAB and the other Protected Parties in the United States. Actions related to the Restructured Debt should be resolved in the Voluntary Mexican Proceeding where all of the Restructured Debt will be restructured pursuant to the *Concurso* Plan.

55. Application of the TRO and Preliminary Injunction to all Protected Parties, including the Protected Guarantors, is critical to maintaining the *status quo* until the period in which the Appropriate Court determines whether recognition of the Voluntary Mexican Proceeding under chapter 15 is proper.

## COUNT 1

## TEMPORARY RESTRAINING ORDER AND INJUNCTIVE RELIEF PRIOR TO RECOGNITION OF VOLUNTARY MEXICAN PROCEEDING
**(By Vitro SAB against all Defendants for Injunctive Relief Pursuant to
11 U.S.C. §§ 105 and 1519 and Fed. R. Bankr. P. 7065)**

56.     Vitro SAB incorporates by reference paragraphs 1 through 55, as though fully alleged herein.

57.     Vitro SAB requests, pursuant to 11 U.S.C. §§ 105 and 1519(a)(l) and Bankruptcy Rule 7065, that the Court enter the TRO and the Preliminary Injunction to protect all of the Protected Parties and their Property pending the Appropriate Court's ruling on whether to recognize the Voluntary Mexican Proceeding as the foreign main proceeding under sections 1515 and 1517 of the Bankruptcy Code.

58.     On April 26, 2011, Vitro SAB served all of the papers supporting the Motion and the Verified Complaint on (i) the United States Trustee, (ii) counsel to the Steering Committee, (iii) counsel to Fintech, (iv) counsel to Elliot, (v) counsel to Aurelius, and (vi) the trustees under the Indentures governing the Old Notes (or their counsel, if known). Additional notice should not be required for the issuance of the TRO under these circumstances. Advance notice to other Creditors may trigger immediate actions to commence enforcement proceedings and other actions against the Protected Parties before such actions are enjoined by the TRO. Those Creditors, on notice that Vitro SAB has sought to put a halt to their enforcement efforts, would accelerate such efforts and may proceed on an expedited and/or *ex parte* basis themselves.

## COUNT 2

### INJUNCTIVE RELIEF AND/OR EXTENSION OF AUTOMATIC STAY AFTER RECOGNITION OF VOLUNTARY MEXICAN PROCEEDING
**(By Vitro SAB against all Defendants for Injunctive Relief Pursuant to 11 U.S.C. §§ 105, 1507(b) and 1521(a)(6) and Fed. R. Bankr. P. 7065)**

59.     Vitro SAB incorporates by reference paragraphs 1 through 58, as though fully alleged herein.

60.     Vitro SAB requests that, pursuant to 11 U.S.C. §§ 105(a) and 1521(a)(6) of the Bankruptcy Code, as well as the principles of comity under 11 U.S.C. § 1507(b), after the recognition of the Voluntary Mexican Proceeding as the foreign main proceeding, the injunctive relief should be extended to the Protected Guarantors.

61.     All matters related to the Restructured Debt should be resolved in the Voluntary Mexican Proceeding where all of the Restructured Debt will be restructured pursuant to the *Concurso* Plan.  The Mexican Business Reorganization Act (i) treats all creditors and interest holders justly, (ii) protects United States creditors against prejudice and inconvenience in processing their claims, (iii) prevents preferential and fraudulent distributions, and (iv) provides a scheme governing the distribution of the estate to secured, administrative, other priority and unsecured creditors.

62.     Thus, extension of the injunctive relief to the Protected Guarantors after recognition of the Voluntary Mexican Proceeding is warranted under sections 105(a) and 1521(a)(6) of the Bankruptcy Code, which permits the Court, upon recognition of the foreign proceeding, to "grant any appropriate relief, including … extending relief granted under section 1519(a)."

63.     The pendency of the Voluntary Mexican Proceeding constitutes unusual circumstances that warrant extension of the automatic stay under section 362 of the Bankruptcy

Code to any Actions against the Protected Guarantors. Indeed, principles of comity require that the Appropriate Court permit the District Court of Nuevo León to resolve all issues related to the Restructured Debt by enjoining any Actions that would undermine the restructuring in the Voluntary Mexican Proceeding.

64.     Moreover, should Creditors be permitted to bring Actions against Protected Guarantors, which are direct and indirect subsidiaries of Vitro SAB, the value of these subsidiaries may be significantly diminished, thereby diminishing the value of Vitro SAB's estate.


[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

# DEMAND FOR RELIEF

WHEREFORE, Vitro SAB respectfully requests

     (a)     that the Court immediately enter the TRO and that a hearing be scheduled prior to the expiration of the initial 14 day term of the TRO,

     (b)     that after such hearing the Court enter the Preliminary Injunction, substantially on the same terms as the TRO, to remain in effect until a decision is rendered with respect to recognition by this Court of the Voluntary Mexican Proceeding as the "foreign main proceeding" pursuant to section 1517 of the Bankruptcy Code,

     (c)     that if and when the Voluntary Mexican Proceeding is recognized, the Appropriate Court extend the existing injunctive relief, or the automatic stay, to all Protected Parties not otherwise protected by the automatic stay until further order of the Appropriate Court; and

     (d)     any other relief that is just and proper, including an award of attorneys fees to Vitro SAB.

Dated: New York, New York
       April 26, 2011

/s/ Risa M. Rosenberg
Risa M. Rosenberg
Thomas J. Matz
Jeremy C. Hollembeak
MILBANK, TWEED, HADLEY & M$^c$CLOY LLP
1 Chase Manhattan Plaza
New York, NY 10005
Telephone: (212) 530-5000


Andrew M. Leblanc (admitted *pro hac vice*)
MILBANK, TWEED, HADLEY & M$^c$CLOY LLP
1850 K Street, NW
Suite 1100
Washington, DC 20006
Telephone: (202) 835-7500


*Attorneys for Alejandro Francisco Sánchez-Mujica*
*as Foreign Representative of Vitro, S.A.B. de C.V.*

<u>**VERIFICATION**</u>

I, Alejandro Francisco Sánchez-Mujica, solely in my capacity as the duly-appointed representative of Vitro, S.A.B. de C.V., hereby verify under penalty of perjury under the laws of the United States of America that the Verified Complaint for Temporary Restraining Order and Injunctive Relief and the statements contained therein are, to the best of my knowledge, true and correct.

Executed on April 26, 2011 at Monterrey, Mexico.

<u>/s/ Alejandro Francisco Sánchez Mujica</u>
Alejandro Francisco Sánchez-Mujica