Risa M. Rosenberg
Thomas J. Matz
Jeremy C. Hollembeak
MILBANK, TWEED, HADLEY & MᶜCLOY LLP
1 Chase Manhattan Plaza
New York, NY 10005
Telephone:  (212) 530-5000

Andrew M. Leblanc (admitted *pro hac vice*)
MILBANK, TWEED, HADLEY & MᶜCLOY LLP
1850 K Street, NW
Suite 1100
Washington, DC 20006
Telephone:  (202) 835-7500

*Attorneys for Alejandro Francisco Sánchez-Mujica as
Foreign Representative of Vitro, S.A.B. de C.V.*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | ) |
| | ) |
| | ) Chapter 15 |
| VITRO, S.A.B. de C.V., | ) |
| | ) Case No. 11-11754 (SCC) |
| Debtor in a Foreign Proceeding. | ) |
| | ) |
| | ) |
| VITRO, S.A.B. de C.V., | ) |
| | ) Adversary No. 11-_____ (___) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| ACP MASTER, LTD.; AD HOC GROUP OF | ) **MOTION FOR A TEMPORARY** |
| VITRO NOTEHOLDERS; AURELIUS | ) **RESTRAINING ORDER AND** |
| CAPITAL MASTER, LTD.; AURELIUS | ) **PRELIMINARY INJUNCTION** |
| CONVERGENCE MASTER, LTD.; ELLIOTT | ) |
| INTERNATIONAL L.P.; THE LIVERPOOL | ) |
| LIMITED PARTNERSHIP; and DOES 1- | ) |
| 1000, | ) |
| | ) |
| Defendants. | ) |

# TABLE OF CONTENTS

I.    PRELIMINARY STATEMENT ....................................................................... 2

II.   BACKGROUND ............................................................................................. 3

III.  JURISDICTION AND VENUE ..................................................................... 3

IV.   RELIEF REQUESTED..................................................................................... 4

V.    ARGUMENT.................................................................................................... 6

    A.    This Court Should Grant the TRO and Preliminary Injunction Pending
          Recognition of the Voluntary Mexican Proceeding.................................. 6
          1.    The Protected Parties Are Entitled to the TRO........................... 7
               a.    The Actions Vitro SAB Seeks to Enjoin Would Burden Vitro
                     SAB's Reorganization Process ...................................... 8

               b.    No Further Notice Is Necessary.................................... 11

          2.    The Protected Parties Are Entitled to the Preliminary Injunction ............ 12
               a.    Vitro SAB Is Likely to Complete a Successful Reorganization... 12

               b.    Vitro SAB Faces Imminent and Irreparable Harm in the Absence
                     of Preliminary Injunction............................................. 13

               c.    The Balance of Harms Weighs Heavily in Favor of Issuing the
                     Preliminary Injunction ................................................. 17

               d.    The Public Interest Weighs Heavily in Favor of Issuing the
                     Preliminary Injunction ................................................. 18

    B.    If and When the Voluntary Mexican Proceeding is Recognized, the Appropriate
          Court Should Extend the Preliminary Injunction or the Automatic Stay to the
          Protected Guarantors.............................................................................. 19
          1.    Extension of the Preliminary Injunction is Warranted Under Sections
              105(a) and 1507(b) of the Bankruptcy Code and Principles of Comity ... 19
          2.    In the Alternative, Extension of Preliminary Injunction is Warranted
              Under Sections 105(a) and 1521(a)(6) of the Bankruptcy Code ............. 22
          3.    Finally, Unusual Circumstances Warrant Extension of Automatic Stay to
              Protected Guarantors............................................................... 23
VI.   CONCLUSION............................................................................................. 25

# TABLE OF AUTHORITIES

Page(s)

**CASES**

3V Capital Master Fund Ltd. v. Official Comm. of Unsecured Creditors (In re TOUSA, Inc.), Nos. 10–60017–CIV/GOLD, 10–61478, 10–62032, 10–62035, 10–62037, 2011 WL 522008, at *30, n.43 (S.D. Fla. Feb. 11, 2011) ..........................................................16 n.8

A.P. Esteve Sales, Inc. v. Manning (In re Manning), 236 B.R. 14 (9th Cir. BAP 1999) ............................................................21

Adelphia Commc'ns Corp. v. Am. Channel, LLC (In re Adelphia Commc'ns Corp.), No. 06-1528, 2006 WL 1529357 (Bankr. S.D.N.Y. June 5, 2006) ..........................................7

Argo Fund Ltd. v. Bd. of Dirs. of Telecom Arg., S.A. (In re Bd. of Dirs. of Telecom Arg., S.A.), 528 F.3d 162 (2d Cir. 2008).......................................................18, 19 n.9

Celotex Corp. v. Edwards, 514 U.S. 300 (1995)....................................................................3 n.3

E. Air Lines v. Rolleston (In re Ionosphere Clubs, Inc.), 111 B.R. 423 (Bankr. S.D.N.Y. 1990) ..........................................................7

Fogerty v. Petroquest Res., Inc. (In re Condor Ins. Ltd.), 601 F.3d 319 (5th Cir. 2010) .................................................18

Garrity v. Leffler (In re Neuman), 71 B.R. 567 (S.D.N.Y. 1987), aff'd 88 B.R. 30 (S.D.N.Y. 1988)..........................................13

Goldin v. Primavera Familienstiftung Tag Assocs., Ltd. (In re Granite Partners L.P.), 194 B.R. 318 (Bankr. S.D.N.Y. 1996)....................................................13

Haw. Structural Ironworkers Pension Trust Fund v. Calpine Corp., Inc., 2006 WL 3755175 (S.D.N.Y. Dec. 20, 2006) ......................................12

Hilton v. Guyot, 159 U.S. 113 (1895)..........................................................18

In re Adelphia Commc'ns Corp., 298 B.R. 49 (S.D.N.Y. 2003)....................................................6

In re Atlas Shipping A/S, 404 B.R. 726 (Bankr. S.D.N.Y. 2009) ..................................................21

In re Avila, 296 B.R. 95 (Bankr. S.D.N.Y. 2003)..............................................21, 22

In re Chateaugay Corp.,
    201 B.R. 48 (Bankr. S.D.N.Y. 1996)................................................................19 n.10

In re Compania Mexicana de Aviacion, S.A. de C.V.,
    Case No. 10-14182 (Bankr. S.D.N.Y. Aug. 18, 2010), ECF No. 140 .....................15

In re Metcalfe & Mansfield Alternative Invs.,
    421 B.R. 685 (Bankr. S.D.N.Y. 2010).................................................................20

In re Metrofinanciera S.A.P.I. de C.V., Sociedad Financiera de Objeto Multiple, E.N.R.,
    Case No. 10-20666 (Bankr. S.D. Tex. filed Aug. 30, 2010).....................................15

In re Pro-Fit Int'l Ltd.,
    391 B.R. 850 (Bankr C.D. Cal. 2008)....................................................................6

In re Vuitton et Fils, S.A.,
    606 F.2d 1 (2d Cir. 1979) ..................................................................................11

Johns-Mansville Corp. v. Asbestos Litig. Grp. (In re Johns-Mansville Corp.),
    26 B.R. 420 (Bankr. S.D.N.Y. 1983), vacated in part, 41 B.R. 926 (S.D.N.Y. 1984) ....19 n.10

Koreag, Controle et Revision S.A. v. Refxo F/X Assocs., Inc. (In re Koreag, Controle et
    Revision S.A.), 961 F.2d 341 (2d Cir. 1992)........................................................21

Licensing by Paolo v. Sinatra (In re Gucci),
    126 F.3d 380 (2d Cir. 1997)...............................................................................23

Lyondell Chem. Co. v. CenterPoint Energy Gas Servs, Inc. (In re Lyondell Chem. Co.),
    402 B.R. 571 (Bankr. S.D.N.Y. 2009)...........................................................12, 16

Marley Orchards Income Fund I, Ltd. P'ship v. Walker (In re Marley Orchards Income
    Fund I, Ltd. P'ship), 120 B.R. 566 (Bankr. E.D. Wash. 1990)................................13

Nev. Power Co. v. Calpine Corp. (In re Calpine Corp.),
    365 B.R. 401 (S.D.N.Y. 2007)......................................................................12, 13

Nixon Mach. Co. v. Roy Energy, Inc. (In re Nixon Mach. Co.),
    27 B.R. 871 (Bankr. E.D. Tenn. 1983) ..........................................................19 n.10

Official Comm. of Unsecured Creditors v. PSS S.S. Co. (In re Prudential Lines, Inc.),
    107 B.R. 832 (Bankr. S.D.N.Y. 1989), aff'd, 119 B.R. 430 (S.D.N.Y. 1990), aff'd,
    928 F.2d 565 (2d Cir. 1991).................................................................................8

Productos Carnic, S.A. v. Cent. Am. Beef & Seafood Trading Co.,
    621 F.2d 683 (5th Cir. 1980) .............................................................................12

Queenie, Ltd. v. Nygard Int'l,
    321 F.3d 282 (2d Cir. 2003)...............................................................................23

Robert Plan Corp. v. Liberty Mut. Fire Ins. Co.,
 No. 09-1930, 2010 WL 1193151 (E.D.N.Y. Mar. 23, 2010)...................................................23

Schimmelpenninck v. Byrne (In re Schimmelpenninck),
 183 F.3d 347 (5th Cir. 1999) ..........................................................................................22, 24

Truvo USA LLC v. Bank of New York Mellon Corp. (In re Truvo USA LLC),
 Case. No. 10-03341 (AJG) (Bankr. S.D.N.Y. July 1, 2010)............................................8, 9, 16

STATUTES AND RULES

11 U.S.C. § 105(a) ................................................................................................... passim

11 U.S.C. § 304..............................................................................................20, 21, 22

11 U.S.C. § 362....................................................................................................... passim

11 U.S.C. § 1501...............................................................................................................18

11 U.S.C. § 1507..................................................................................................... passim

11 U.S.C. § 1508...............................................................................................................18

11 U.S.C. § 1515.................................................................................................................2

11 U.S.C. § 1517.............................................................................................................2, 5

11 U.S.C. § 1519..................................................................................................... passim

11 U.S.C. § 1521..................................................................................................... passim

28 U.S.C. §§ 157 and 1334 ...............................................................................................3

28 U.S.C. § 1410..............................................................................................................3

FED. R. BANKR. P. 7065 ...........................................................................................1, 4, 7

FED. R. CIV. P. 65...........................................................................................1, 4, 7, 8

OTHER AUTHORITIES

Allan L. Gropper, Current Developments in International Insolvency Law: A United
 States Perspective, 887 PLI/Comm 815, 830 (2006)...............................................20

House Report No. 109-31, Pt. 1, 109th Cong., 1st Sess. (2005)............................18, 21

Ley de Concursos Mercantiles...........................................................................................1

Alejandro Francisco Sánchez-Mujica, as the duly-appointed foreign representative (in such capacity, the "Foreign Representative") of Vitro, S.A.B. de C.V. ("Vitro SAB"), the debtor in (i) a voluntary judicial reorganization proceeding (the "Voluntary Mexican Proceeding") commenced on December 13, 2010 under the *Ley de Concursos Mercantiles* (the "Mexican Business Reorganization Act") and currently pending before the Federal District Court for Civil and Labor Matters for the State of Nuevo León, the United Mexican States (the "District Court of Nuevo León"), and (ii) the above-captioned chapter 15 case (the "Chapter 15 Case"), hereby submits this motion (the "Motion"), on behalf of Vitro SAB, pursuant to sections 105(a), 1507(b), 1519(a) and 1521 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code"), and Rule 65 of the Federal Rules of Civil Procedure, made applicable to this adversary proceeding through Rule 7065 of the Federal Rules of Bankruptcy Procedure, for a temporary restraining order substantially in the form attached hereto as Exhibit A (the "TRO") and a preliminary injunction substantially in the form attached hereto as Exhibit B (the "Preliminary Injunction") enjoining all actions against the Protected Parties (as defined below).[1]  In support of this Motion, Vitro SAB relies on and incorporates herein by reference (a) the Verified Complaint for Temporary Restraining Order and Injunctive Relief filed concurrently herewith (the "Verified Complaint"); (b) the Declaration of Risa M. Rosenberg in Support of the Motion filed concurrently herewith (the "U.S. Counsel Declaration"); (c) the Declaration of Homer D. Parkhill in Support of the Motion filed concurrently herewith (the "Rothschild Declaration"); (d) the Declaration of Alejandro Francisco Sánchez-Mujica, as Foreign Representative of Vitro SAB, in Support of Chapter 15 Petition for Recognition of Foreign Main Proceeding and Request for Related Relief, filed in the Chapter 15

---

[1]     A proposed Order to Show Cause in connection with the TRO is attached hereto as Exhibit C.

Case [Docket No. 3] (the "<u>Foreign Representative Declaration</u>"); and (e) the Declaration of

Alfonso Rivera Gaxiola, as Mexican Counsel to Vitro SAB, in Support of Chapter 15 Petition for

Recognition of Foreign Main Proceeding and Request for Related Relief, filed in the Chapter 15

Case [Docket No. 4] (the "<u>Mexican Counsel Declaration</u>" and, together with the U.S. Counsel

Declaration, the Rothschild Declaration, the Foreign Representative Declaration, and all exhibits

to the foregoing, the "<u>Declarations</u>").[2]  In further support of the requested relief, Vitro SAB

respectfully states as follows:

## I.  PRELIMINARY STATEMENT

1.      By this Motion, Vitro SAB seeks imposition of the TRO and the Preliminary

Injunction during the "gap period," *i.e.* while (i) the Texas Bankruptcy Court determines whether

venue is proper in this Court or its own, and (ii) the court with proper venue (any such court, the

"<u>Appropriate Court</u>") considers whether to grant recognition of the Voluntary Mexican

Proceeding as a foreign main proceeding under sections 1515 and 1517 of the Bankruptcy Code.

Additionally, if and when the Appropriate Court grants recognition of the Voluntary Mexican

Proceeding, thereby providing the protections of the automatic stay under section 362 of the

Bankruptcy Code applicable to Vitro SAB and its property within the territorial jurisdiction of

the United States pursuant to section 1520(a) of the Bankruptcy Code, Vitro SAB further seeks

an extension of the above injunctive relief and/or of the automatic stay under section 362 of the

Bankruptcy Code to certain non-debtor entities.

2.      Absent the requested relief, Vitro SAB's global restructuring efforts underway in

Mexico will be vulnerable to continued piecemeal attacks by creditors who seek to undermine

the relief Vitro SAB hopes to obtain in the Voluntary Mexican Proceeding.  Certain creditors

---

[2]      All capitalized terms not otherwise defined herein have the respective meanings ascribed to them in the Declarations.

have already engaged in such attacks and, as acknowledged by counsel for the *ad hoc* committee of prepetition noteholders, "dozens of suits around the country" will be brought by bondholders now that the involuntary chapter 11 petitions have been denied against certain of the Protected Guarantors.[3] Thus, the relief requested herein is urgently needed to prevent further harm that will result from these and any other actions that are likely to follow. The TRO, the Preliminary Injunction and additional relief sought in this Motion are necessary to maintain the *status quo* and permit Vitro SAB to restructure its business in a holistic and orderly manner under Mexican law.

## II.     BACKGROUND

3.     Vitro SAB respectfully incorporates the factual background set forth in the Verified Complaint and the Declarations.

## III.     JURISDICTION AND VENUE

4.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.[4] This is a core proceeding under 28 U.S.C. § 157(b)(2)(P). Venue is proper before this Court pursuant to 28 U.S.C. § 1410.

---

[3]     See Transcript of Hearing on April 12, 2011 before Texas Bankruptcy Court (the "April 12 Transcript"), at 46:17-47 ("what the ruling is going to engender with the [U.S. Protected Guarantors'] cases getting dismissed is everybody going and proceeding under state law rights and filing dozens of suits around the country. There's not just going to be the one action in New York. There will be actions everywhere where bondholders seek, and we don't represent all the bondholders, and we certainly don't control all the bondholders, where people go out and start exercising state court remedies because the bankruptcy forum has been denied to them"). A true and correct copy of the April 12 Transcript is attached to the U.S. Counsel Declaration as Exhibit B.

[4]     With respect to the injunctive relief sought for Protected Guarantors, the Court has "related to" subject matter jurisdiction under 28 U.S.C. §§ 1334(b) and 157(a) because any action against a Protected Guarantor will likely affect Vitro SAB's administration of its estate. See Celotex Corp. v. Edwards, 514 U.S. 300, 308 (1995) ("An action is related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively), and which in any way impacts upon the handling and administration of the bankrupt estate.") (citations omitted).

# IV.    RELIEF REQUESTED

5.      Vitro SAB requests that the Court immediately enter a temporary restraining order substantially in the form of the TRO, pursuant to sections 105(a) and 1519(a) of the Bankruptcy Code, Federal Rule 65 and Bankruptcy Rule 7065, restraining and enjoining all holders of the Restructured Debt (including the Old Notes), as well as their respective agents, attorneys and all persons acting in concert or participation with the foregoing (collectively, the "Creditors"), from commencing or continuing any and all litigation (including the NYS Actions) or actions to collect (including pursuant to the Attachment Orders) (collectively, the "Actions") against Vitro SAB and the Old Guarantors that are not already protected by the automatic stay under section 362 of the Bankruptcy Code [5] (the "Protected Guarantors," and together with Vitro SAB, the "Protected Parties") or their respective Property,[6] including:

> (1)    the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against any Protected Party that was or could have been commenced before the commencement of the Chapter 15 Case, or to recover (including pursuant to the Attachment Orders) a claim against any Protected Party that arose before the commencement of the Chapter 15 Case;

> (2)    the enforcement, against any Protected Party or against Property of any Protected Party, of a judgment (or a prejudgment remedy, including the Attachment Orders) obtained before the commencement of the Chapter 15 Case;

> (3)    any act to obtain possession of Property of any Protected Party or of Property from any Protected Party or to exercise control over

---

[5]    To the extent any Old Guarantor has lost, or loses, the protection of the automatic stay during the pendency of the Chapter 15 Case, Vitro SAB requests that such Old Guarantor be deemed a Protected Guarantor and be granted the protection of the TRO and/or the Preliminary Injunction.

[6]    A party's "Property" shall mean any of its property wheresoever located within the United States or its territories, and whether held by such party in whole or in part, directly or indirectly, as principal or as nominee, beneficially or otherwise, and without limiting the generality of the foregoing, including any and all real property, personal property and intellectual property of the party, and any and all securities, instruments, debentures, notes or bonds issued to, or held by or on behalf of such party.

Property of any Protected Party, including pursuant to the Attachment Orders;

(4)     any act to create, perfect, or enforce any lien against Property of any Protected Party;

(5)     any act to create, perfect, or enforce against Property of any Protected Party any lien to the extent that such lien secures a claim that arose before the commencement of the Chapter 15 Case;

(6)     any act to collect, assess, or recover a claim against any Protected Party that arose before the commencement of the Chapter 15 Case, including pursuant to the Attachment Orders; and

(7)     the setoff of any debt owing to any Protected Party that arose before the commencement of the Chapter 15 Case against any claim against such Protected Party.

Vitro SAB additionally requests that, in accordance with the foregoing, notwithstanding the Attachment Orders, all Garnishees shall, from and after the date the TRO is entered, remit all payments to the applicable Protected Parties in accordance with the ordinary practices that existed between each such Garnishee and the applicable Protected Party prior to their being served with the applicable Attachment Order.

6.      Vitro SAB further requests that the Court schedule a hearing prior to the expiration of the initial 14 day term of the TRO with respect to entering the Preliminary Injunction, substantially on the same terms as the TRO, to remain in effect until a decision is rendered by the Appropriate Court with respect to recognition of the Voluntary Mexican Proceeding as the "foreign main proceeding" pursuant to section 1517 of the Bankruptcy Code.

7.      Finally, Vitro SAB requests that, if and when the Appropriate Court recognizes the Voluntary Mexican Proceeding as the "foreign main proceeding," the Appropriate Court enter an order pursuant to sections 105(a), 1507(b) and 1521(a)(6) of the Bankruptcy Code extending the Preliminary Injunction as it relates to the Protected Guarantors through the conclusion of the Voluntary Mexican Proceeding.  Alternatively, Vitro SAB requests that the

Appropriate Court extend the automatic stay to any Actions by the Creditors against the

Protected Guarantors not otherwise then so protected for the duration of the Chapter 15 Case.

## V. ARGUMENT

**A. This Court Should Grant the TRO and Preliminary Injunction Pending Recognition of the Voluntary Mexican Proceeding**

8.      Section 1519 of the Bankruptcy Code gives the Court the power to provide

provisional relief to a chapter 15 debtor pending the Appropriate Court's determination on

recognition of such debtor's foreign proceeding in order "to protect the assets of the debtor or the

interests of creditors." 11 U.S.C. § 1519(a). Specifically, section 1519(a) authorizes the Court

to protect the value of, and stay execution against, such debtor's assets, including by application

of other provisions of the Bankruptcy Code such as the automatic stay pursuant to section 362.

See 11 U.S.C. § 1519(a); see also In re Pro-Fit Int'l Ltd., 391 B.R. 850 (Bankr C.D. Cal. 2008)

(granting temporary injunctive relief extending protections of section 361 and 362 to chapter 15

debtor).

9.      Additionally, section 105(a) of the Bankruptcy Code gives the Court the power to

issue any order "necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."

11 U.S.C. § 105(a). The authority under section 105, which includes imposition of a temporary

restraining order or an injunction, is even broader than the automatic stay provisions of section

362 and may extend such provisionary relief to non-debtor parties to assure the orderly conduct

of the debtor's reorganization. See In re Adelphia Commc'ns Corp., 298 B.R. 49, 54 (S.D.N.Y.

2003) ("It is well settled that bankruptcy courts, under [section 105], may extend the automatic

stay to 'enjoin suits by third parties against third parties if they threaten to thwart or frustrate the

debtor's reorganization efforts.'") (internal citations omitted).

10.     Pursuant to section 1519(e) of the Bankruptcy Code, all of the "standards, procedures and limitations applicable to injunctions shall apply" when determining whether interim relief under section 1519 is appropriate.  11 U.S.C. § 1519(e); see also FED. R. BANKR. P. 7065 (applying Federal Rule 65 in adversary proceedings); E. Air Lines v. Rolleston (In re Ionosphere Clubs, Inc.), 111 B.R. 423, 431 (Bankr. S.D.N.Y. 1990) ("The traditional standards for issuance of an injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure . . . are made applicable [to bankruptcy proceedings] pursuant to Bankruptcy Rule 7065") (citations omitted).

### 1.      The Protected Parties Are Entitled to the TRO

11.     The very nature of the injunction sought by the Motion requires issuance of the TRO under Federal Rule 65, pending a hearing on the Preliminary Injunction.  Such a temporary restraining order is properly granted to preserve the *status quo* pending the hearing on the preliminary injunction.  See Adelphia Commc'ns Corp. v. Am. Channel, LLC (In re Adelphia Commc'ns Corp.), No. 06-1528, 2006 WL 1529357, at *1 (Bankr. S.D.N.Y. June 5, 2006) (granting temporary restraining order pending hearing on request for preliminary injunction) (attached hereto as Exhibit D).  Bankruptcy Rule 7065 provides that a court should issue a TRO where the moving party establishes that (1) failure to issue the TRO would result in immediate and irreparable injury, loss or damage, and (2) expedited relief is necessary with limited or no notice.  FED R. BANK. P. 7065(b).

12.     Specifically, Federal Rule 65 provides that a temporary restraining order may be granted only if:

> (A) specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and

(B) the movant's attorney certifies in writing any efforts made to give the notice and the reasons why it notice should not be required.

FED. R. CIV. P. 65(b)(1); see also Official Comm. of Unsecured Creditors v. PSS S.S. Co. (In re Prudential Lines, Inc.), 107 B.R. 832, 835 n.4 (Bankr. S.D.N.Y. 1989) (granting temporary restraining order where moving party established "summary showing of its necessity in order to prevent immediate and irreparable injury"), aff'd, 119 B.R. 430 (S.D.N.Y. 1990), aff'd, 928 F.2d 565 (2d Cir. 1991).

### a.  The Actions Vitro SAB Seeks to Enjoin Would Burden Vitro SAB's Reorganization Process

13.    As set forth in the Verified Complaint and the Declarations and discussed in further detail below, if the Creditors are not immediately enjoined from commencing or continuing any Actions against any of the Protected Parties, Vitro SAB's restructuring efforts under the *Concurso* Plan would be seriously and irreparably undermined.

14.    Such Actions, if commenced or continued against Vitro SAB, would force it to expend its resources on litigation in the United States that is either duplicative of the matters that will likely be litigated either in Mexico or this Chapter 15 Case and/or would have the effect of improving certain Creditors' positions relative to other identically situated Creditors.  If commenced or continued against any Protected Guarantor, such Actions not only would undermine the relief Vitro SAB hopes to obtain in the Voluntary Mexican Proceeding -- thus undercutting the vital comity considerations discussed below -- but could impair the ability of Vitro to operate in the ordinary course of its business.  The requested relief is well within this Court's authority under section 105(a) of the Bankruptcy Code.  See 11 U.S.C. § 105(a) (Court may issue any order "necessary or appropriate to carry out the provisions of [the Bankruptcy Code].").

15.     Indeed, courts have issued temporary restraining orders enjoining actions against non-debtors under circumstances almost identical to those here.  In Truvo USA LLC v. Bank of New York Mellon Corp. (In re Truvo USA LLC), Case. No. 10-03341 (AJG) (Bankr. S.D.N.Y. July 1, 2010), ECF No. 2 (hereinafter "Truvo") Judge Gropper granted a chapter 11 debtor's request for a temporary restraining order (and preliminary injunction) prohibiting creditors from pursuing claims against certain of its non-debtor operating subsidiaries, and intermediate holding companies that owned equity in those operating subsidiaries, that had guaranteed the debt at issue in the proceeding.  (See Truvo, Temporary Restraining Order entered July 1, 2010 ("Truvo TRO") and related Motion, attached hereto as Exhibits E and F, respectively).  Similarly, in Corporacion Durango, S.A.B. de C.V. v. Law Debenture Trust Co. (In re Corporacion Durango S.A.B. de C.V.), Adv. Pro. No. 08-01608 (RDD) (Bankr. S.D.N.Y. Oct. 6, 2008), ECF No. 17 (hereinafter, "Durango"), a Mexican corporation filed a concurso proceeding in Mexico, along with a chapter 15 petition in this Court to have the concurso proceeding recognized in the United States.  Durango court granted the debtor's request for a temporary restraining order (and preliminary injunction) to preserve both its own assets and those of its non-debtor subsidiary guarantors, pending the Court's ruling on whether or not to recognize the concurso proceeding under chapter 15.  See Durango, Temporary Restraining Order entered October 10, 2008 ("Durango TRO"), attached hereto as Exhibit G.  The debtor in that case noted that, in the absence of the requested relief, creditors could commence actions in the United States against the debtor and its non-debtor subsidiaries and thereby undermine the concurso proceeding before this Court could have the opportunity to evaluate the merits of the chapter 15 petition.  See Durango, Motion of Debtor for a Temporary Restraining Order and Preliminary Injunction; Memorandum of Points and Authorities filed October 6, 2008, attached hereto as Exhibit H.

16.     Here, the Voluntary Mexican Proceeding faces an imminent threat from the Actions that have already been brought by certain Creditors: as discussed below, Aurelius and Elliot have initiated collection Actions in the New York State Court against Vitro SAB and certain Protected Guarantors, have already obtained pre-judgment attachment orders in such Actions (the "Attachment Orders"), and continue to aggressively seek to impede Vitro SAB's restructuring efforts.  (See Foreign Representative Declaration ¶ 40.)  Vitro SAB is justifiably concerned that other Creditors may similarly attempt to collect the Restructured Debt from the Protected Guarantors directly, including through attachment of assets of the Protected Guarantors located in the United States.  Indeed, counsel to the Steering Committee has acknowledged the imminent threat of such Actions at a recent status conference in the Texas Bankruptcy Court, stating the following:

> what the ruling is going to engender with the [U.S. Protected Guarantors'
> involuntary chapter 11] cases getting dismissed is everybody going and
> proceeding under state law rights and filing dozens of suits around the
> country. There's not just going to be the one action in New York. There
> will be actions everywhere where bondholders seek, and we don't
> represent all the bondholders, and we certainly don't control all the
> bondholders, where people go out and start exercising state court remedies
> because the bankruptcy forum has been denied to them.

April 12 Hearing Transcript, at 46:17-47:1.

17.     Absent entry of the TRO, Vitro SAB's ability to reorganize under the *Concurso* Plan will be threatened with immediate, irreparable harm.  (See Foreign Representative Declaration ¶ 69; Rothschild Declaration ¶ 6-9.)  Application of the TRO to all Protected Parties, including the Protected Guarantors, is critical to maintaining the status quo until the Appropriate Court determines whether recognition of the Voluntary Mexican Proceeding under chapter 15 is proper.

**b.       No Further Notice Is Necessary**

18.       As explained in the U.S. Counsel Declaration, Vitro SAB's counsel served all of the papers supporting the Motion and the Verified Complaint on (i) the United States Trustee, (ii) counsel to the Steering Committee, (iii) counsel to Fintech, (iv) counsel to Elliott, (v) counsel to Aurelius, and (vi) the trustees under the Indentures governing the Old Notes (or their counsel, if known). Promptly upon the issuance of the TRO, Vitro SAB will serve such TRO on all other known Creditors, accompanied by a notice of entry advising recipients how to obtain copies of the Motion, the Verified Complaint, and all supporting papers from the Court's filing system.

19.       No further notice is required. Advance notice to other Creditors may trigger immediate actions to commence further enforcement proceedings and other Actions against the Protected Parties before such Actions are enjoined by the TRO. Those other Creditors, on notice that Vitro SAB has sought to put a halt to any enforcement efforts, would accelerate such efforts and may proceed on an expedited and/or *ex parte* basis. Advance notice to Creditors would serve as a cattle call for additional Actions against the Protected Parties that would cause the very irreparable harm that the Motion seeks to forestall. See In re Vuitton et Fils, S.A., 606 F.2d 1, 4 (2d Cir. 1979) ("If notice is required, that notice all too often appears to serve only to render fruitless further prosecution of the action").

20.       Giving notice (other than the notice described above) at this point could render the requested relief moot before the Motion is even heard by this Court. On the other hand, entry of the TRO would preserve the *status quo* until the time the Court may hold a hearing on the Preliminary Injunction, on notice to all known Creditors. Therefore, no further notice is required at this time.

### 2. The Protected Parties Are Entitled to the Preliminary Injunction

21.     Following the expiration of the TRO, this Court should also enter the Preliminary Injunction.  Bankruptcy courts in this District typically apply the following test to determine the appropriateness of preliminary injunctive relief in the bankruptcy context:

(1)     whether there is a likelihood of a successful reorganization;

(2)     whether there will be imminent irreparable harm to the debtor's estate in the absence of the injunction;

(3)     whether the balance of harms weighs in favor of the movant; and

(4)     whether the public interest weighs in favor of the injunction.

Nev. Power Co. v. Calpine Corp. (In re Calpine Corp.), 365 B.R. 401, 409 (S.D.N.Y. 2007) (internal citations omitted).  Furthermore, "[i]n evaluating these factors, the court takes a flexible approach and no one factor is determinative.'" Haw. Structural Ironworkers Pension Trust Fund v. Calpine Corp., Inc., 2006 WL 3755175, *4 (S.D.N.Y. Dec. 20, 2006) (attached hereto as Exhibit I).  As discussed below, the Preliminary Injunction is necessary to safeguard Vitro SAB's estate until the Appropriate Court has a full and fair opportunity to determine whether recognition of the Voluntary Mexican Proceeding under chapter 15 of the Bankruptcy Code is appropriate.

### a. Vitro SAB Is Likely to Complete a Successful Reorganization

22.     Vitro SAB is likely to complete a successful reorganization pursuant to the *Concurso* Plan.  In this regard, it bears noting that a debtor need only show a "*reasonable likelihood* of a successful reorganization" rather than a certainty.  Lyondell Chem. Co. v. CenterPoint Energy Gas Servs, Inc. (In re Lyondell Chem. Co.), 402 B.R. 571, 590 (Bankr. S.D.N.Y. 2009) (emphasis added); see also; Productos Carnic, S.A. v. Cent. Am. Beef & Seafood Trading Co., 621 F.2d 683, 686 (5th Cir. 1980) ("Where the other factors are strong, a

showing of some likelihood of success on the merits will justify temporary injunctive relief."). Vitro SAB's prospects for a successful reorganization in the Voluntary Mexican Proceeding are more than just "reasonably likely," as it already has the requisite creditor support for the approval of the *Concurso* Plan by the District Court of Nuevo León. (<u>See</u> Foreign Representative Declaration ¶ 49.) Moreover, the Mexican Appellate Court has concluded as a matter of law that the Voluntary *Concurso* Petition and *Concurso* Plan satisfied the requirements of a prepackaged *concurso* proceeding under the Mexican Business Reorganization Act. (<u>See</u> Foreign Representative Declaration ¶ 52.) Although final approval of the *Concurso* Plan is subject to the discretion of the District Court of Nuevo León, Vitro SAB strongly believes that the *Concurso* Plan will be approved expeditiously. Moreover, any doubts concerning the likelihood of a successful reorganization should be resolved in favor of Vitro SAB. <u>See Marley Orchards Income Fund I, Ltd. P'ship v. Walker (In re Marley Orchards Income Fund I, Ltd. P'ship)</u>, 120 B.R. 566, 569 (Bankr. E.D. Wash. 1990) (holding that "[i]f there be uncertainty [in assessing reasonable probability of success on the merits], that uncertainty should be resolved in the debtor's favor").

### b. Vitro SAB Faces Imminent and Irreparable Harm in the Absence of Preliminary Injunction

23. Another factor the Court should consider is whether there will be imminent irreparable harm to the debtor's estate in the absence of the injunction. <u>In re Calpine Corp.</u>, 365 B.R. at 409. Here, in the absence of the requested injunctive relief, Actions brought by Creditors against the Protected Parties are likely to undermine the relief that Vitro SAB's hopes to obtain in the Voluntary Mexican Proceeding. <u>See Goldin v. Primavera Familienstiftung Tag Assocs., Ltd. (In re Granite Partners L.P.)</u>, 194 B.R. 318, 337 (Bankr. S.D.N.Y. 1996) ("[T]he court can and should enjoin suits by third parties against third parties if they threaten to thwart or frustrate

the debtor's reorganization efforts"); <u>Garrity v. Leffler (In re Neuman)</u>, 71 B.R. 567, 571-72 (S.D.N.Y. 1987) ("Section 105(a) contemplates injunctive relief in precisely those instances where parties are attempting to obstruct the reorganization") (internal quotations omitted), <u>aff'd</u> 88 B.R. 30 (S.D.N.Y. 1988).

24.     Indeed, the NYS Actions pending against Vitro SAB and 49 of the Protected Guarantors are already disrupting Vitro SAB's restructuring process. As described in detail in the Foreign Representative Declaration and the Rothschild Declaration, as a result of the NYS Actions brought by two members of the Steering Committee and the use to which the Attachment Orders obtained therein have been put by the NYS Plaintiffs, not only were key steps in Vitro SAB's reorganization efforts in Mexico disrupted,[7] but continuing operations of Vitro were directly threatened when the NYS Plaintiffs served the Attachment Orders on numerous Vitro customers in an attempt to garnish accounts payable owed to the Vitro entities (the "<u>Garnishees</u>"). (<u>See</u> Foreign Representative Declaration ¶ 41.) In response, certain of the Garnishees withheld (and, in many cases, continue to withhold) payments to the NYS Defendants, on account of goods and services provided by them, pending the New York State Court's determination of whether the Attachment Orders should be vacated or a clarification that such payments were not subject thereto. (<u>See</u> Foreign Representative Declaration ¶ 41.)[8] Oral

---

[7]     Specifically, D.F. King & Co., Inc. ("<u>D.F. King</u>"), the Depositary for the Tender Offer and Information and Exchange Agent for the Exchange Offer and Consent Solicitation, refused to take certain steps necessary to effectuate the transfer of the Old Notes tendered in the Tender Offer or disburse the Consent Payment to those holders of the Old Notes that consented to the *Concurso* Plan until, after nearly two weeks of expedited litigation before the New York State Court and the New York Appellate Division, an order was entered clarifying that the Orders of Attachment did not attach to bonds tendered or exchanged as part of the Offers. (<u>See</u> Foreign Representative Declaration ¶ 41.)

[8]     On February 8, 2011, Justice Kornreich of the New York State Court heard argument on cross-motions by the NYS Plaintiffs to confirm and the NYS Defendants to vacate the Attachment Orders, as well as an order to show cause by Invex seeking entry of an order clarifying that payments due to the Flat Glass Payment Trust from customers on account of receivables generated by Automotríz were not subject to the Attachment Orders. At the conclusion of the hearing, Justice Kornreich took the cross-motions under advisement and entered an order on Invex's order to show cause (the "<u>Partial *Vacatur* Order</u>") vacating the Attachment Orders with respect to the Flat Glass Payment Trust receivables. Justice Kornreich briefly

14

argument on the cross-motions for partial summary judgment in the New York State Court is currently scheduled for May 3, 2011. (<u>See</u> Foreign Representative Declaration ¶ 43.)  To avoid the immediate irreparable harm to Vitro SAB's efforts to restructure through the *Concurso* Plan, Creditors must be enjoined from taking any further Action, including continuing to proceed in the NYS Actions or attempting to divert any postpetition payables away from the NYS Defendants pursuant to the prepetition Attachment Orders.  The TRO and Preliminary Injunction should further clarify that all Garnishees shall, after entry of the TRO, remit all payments to the applicable Protected Parties in accordance with ordinary practices that existed between each such Garnishee and the applicable Protected Party prior to their being served with the applicable Attachment Order.

25.     For similar reasons, courts have provided injunctive relief to protect debtors from this kind of action in the "gap period" between the filing of a chapter 15 petition and the recognition of the foreign proceeding.  In <u>In re Compania Mexicana de Aviacion, S.A. de C.V.</u>, Case No. 10-14182 (Bankr. S.D.N.Y. Aug. 18, 2010), ECF No. 140 (hereinafter "<u>Mexicana</u>"), this Court entered a broad injunction extending the protections to the debtor pursuant to section 362 of the Bankruptcy Code to cover the "gap period."  (<u>See</u> <u>Mexicana</u>, Order Granting Preliminary Injunction entered Aug. 18, 2010 at 3 (ordering "the protections of section 362 of the Bankruptcy Code shall apply to Mexicana and its assets in the United States") ("<u>Mexicana Injunction Order</u>") attached hereto as <u>Exhibit J</u>; <u>see also</u> <u>In re Metrofinanciera S.A.P.I. de C.V., Sociedad Financiera de Objeto Multiple, E.N.R.</u>, Case No. 10-20666 (Bankr. S.D. Tex. filed Aug. 30, 2010), Temporary Restraining Order at 2 (same) attached hereto as <u>Exhibit K</u>).

stayed the Partial *Vacatur* Order and the NYS Plaintiffs appealed.  On February 10, 2011, the New York Appellate Division, First Department denied plaintiffs' application for a stay pending appeal and the Partial *Vacatur* Order became final.

26.     Proceedings against the Protected Guarantors may have the same practical effect as proceedings against Vitro SAB.  As described above, the NYS Actions, which were brought against both Vitro SAB and certain Protected Guarantors, have already significantly burdened Vitro SAB's restructuring efforts.  The enforcement of the Attachment Orders postpetition or the filing of copycat actions by other Creditors will serve to only further impede those efforts.  (See Rothschild Declaration ¶ 6-9.)  There can be little question that there is a substantial identity of interests between Vitro SAB and the Protected Guarantors, and that any actions against the Protected Guarantors with regard to the Restructured Debt will undermine the relief Vitro SAB is hoping to obtain in the Voluntary Mexican Proceeding.  See, e.g., Truvo TRO (granting injunctive relief in favor of non-debtor subsidiaries); Durango TRO (same).[9]

27.     These circumstances warrant an injunction.  See In re Lyondell Chem. Co., 402 B.R. at 591 ("I find that irreparable injury would plainly result if an involuntary insolvency proceeding were commenced against [non-debtor affiliates] – to the Debtor's ability to reorganize and, in addition, to the Debtors themselves."); id. at 591, n.48 ("I don't find irreparable harm as a consequence of [creditor] perfecting its attachment, so long as it takes no further steps to enforce it. . . . . If, of course, [creditor] were to then seek to *enforce* its lien, or if, even with just an attachment, it were to try to *block* or *impede* the passage of funds between [non-debtor affiliate] and [Debtors], that would, by contrast, result in irreparable harm.") (emphasis in original).  Extending injunctive relief to the Protected Guarantors is necessary to protect Vitro SAB's reorganization prospects.

---

[9]     See generally 3V Capital Master Fund Ltd. v. Official Comm. of Unsecured Creditors (In re TOUSA, Inc.), Nos. 10–60017–CIV/GOLD, 10–61478, 10–62032, 10–62035, 10–62037, 2011 WL 522008, at *30, n.43 (S.D. Fla. Feb. 11, 2011) (attached hereto as Exhibit L) ("An analysis of whether a parent and subsidiary share an identity of interest is frequently undertaken in cases involving upstream guarantees or financing, which occur when a subsidiary corporation loans its parent money or guarantees its parent's obligations. The identity of interest doctrine recognizes that the facts may suggest that a corporate group has purposely availed itself of the benefits of an enterprise and should be treated as one borrowing unit even though each member of the enterprise is a separate entity.") (collecting cases).

### c. The Balance of Harms Weighs Heavily in Favor of Issuing the Preliminary Injunction

28.     As discussed above, the Actions sought to be enjoined here would jeopardize the global restructuring that Vitro SAB is seeking and hoping to obtain in the Voluntary Mexican Proceeding.

29.     Conversely, the harm to the Creditors will be minimal.  The imposition of the TRO and Preliminary Injunction would not result in a waiver of any of the rights or remedies available to the Creditors in the Voluntary Mexican Proceeding, including the right to object to, vote for or against, and, if such plan is approved, receive distributions under, the *Concurso* Plan or be heard in the District Court of Nuevo León.  Nor should the Creditors, who each voluntarily purchased debt obligations of a *Mexican* issuer, be heard pleading harm stemming from having to protect their rights in a proceeding under *Mexican* insolvency law in front of a *Mexican* court. Moreover, the Actions that the TRO and the Preliminary Injunction would enjoin, such as the levy of Property pursuant to orders of attachment, actually harms the Creditors not party to such Actions by disrupting Vitro SAB's business, decreasing the pool of assets from which all Creditors may recover, and preferring certain Creditors over others.

30.     In <u>Mexicana</u>, where a preliminary injunction (following a TRO) was issued pursuant to Section 105(a) and 1519 in a chapter 15 case enjoining all actions against the debtor related to the debt that was to be restructured through a bankruptcy proceeding in Mexico, the court noted that injunctive relief would "permit the expeditious and economical administration of Mexicana's estate in the *Concurso* Proceeding, and such injunctive relief will either (i) not cause an undue hardship to other parties in interest or (ii) any hardship to parties is outweighed by the benefits to Mexicana of the relief requested."  <u>Mexicana Injunction Order</u> at 2.  For the same reasons, the Preliminary Injunction should issue here.

### d. The Public Interest Weighs Heavily in Favor of Issuing the Preliminary Injunction

31.     Section 1501 of the Bankruptcy Code expressly states that the purpose of chapter 15 is to foster, *inter alia*, "cooperation between U.S. courts and 'courts and other competent authorities of foreign countries,' 'greater legal certainty for trade and investment,' and 'fair and efficient administration of cross-border insolvencies.'"  See Argo Fund Ltd. v. Bd. of Dirs. of Telecom Arg., S.A. (In re Bd. of Dirs. of Telecom Arg., S.A.), 528 F.3d 162, 169 (2d Cir. 2008) (quoting 11 U.S.C. § 1501); see also Fogerty v. Petroquest Res., Inc. (In re Condor Ins. Ltd.), 601 F.3d 319, 324 (5th Cir. 2010) (quoting 11 U.S.C. § 1501).  Thus, comity is the most important consideration in favor of the Court granting the TRO and the Preliminary Injunction. See Hilton v. Guyot, 159 U.S. 113, 164 (1895) (comity is "the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation").

32.     Due to its international origins, chapter 15 is interpreted in coordination with the interpretation given to similar laws by other countries to promote a uniform and coordinated legal regime for cross-border insolvency cases.  See 11 U.S.C. § 1508 ("In interpreting this chapter, the court shall consider its international origin, and the need to promote an application of this chapter that is consistent with the application of similar statutes adopted by foreign jurisdictions."); see also H.R. Rep. No. 109-31, 1st Sess. 106 (2005) ("[Chapter 15] incorporates the Model Law on Cross-Border Insolvency to encourage cooperation between the United States and foreign countries with respect to transaction insolvency cases").[10]

33.     By protecting the Protected Parties from piecemeal litigation in the United States with respect to the same obligations that are being restructured in a global process in Mexico, the

---

[10]     Chapter 15 of the Bankruptcy Code incorporates and implements the United Nations Commission on International Trade Law Model Law on Cross-Border Insolvency (the "Model Law").  See In re Bd. of Dirs. of Telecom Arg., S.A., 528 F.3d at 169.  Mexico is among the countries that have adopted the Model Law. Thus, the Mexican Business Reorganization Act also incorporates the Model Law.

requested injunctive relief furthers the stated goals of chapter 15. Vitro SAB is a Mexican entity, subject to a pending Mexican restructuring proceeding. It is clear that the *Concurso* Plan should be permitted to move forward unobstructed by creditor actions against the Protected Parties in the United States. Claims of Creditors, such as Aurelius and Elliott, should be resolved in the Voluntary Mexican Proceeding where all of the Restructured Debt will be restructured pursuant to the *Concurso* Plan, rather than in piecemeal litigation in multiple *fora*. Under the principles of comity, the Court should respect the Voluntary Mexican Proceeding and extend its protection to the Protected Parties.[11]

**B.      If and When the Voluntary Mexican Proceeding is Recognized, the Appropriate Court Should Extend the Preliminary Injunction or the Automatic Stay to the Protected Guarantors**

   **1.      Extension of the Preliminary Injunction is Warranted Under Sections 105(a) and 1507(b) of the Bankruptcy Code and Principles of Comity**

34.      After recognition of the Voluntary Mexican Proceeding as the foreign main proceeding, the Appropriate Court should extend injunctive relief to the Protected Guarantors based on principles of comity under section 1507(b) of the Bankruptcy Code. In addition to the relief provided in sections 1519-1521 of the Bankruptcy Code, courts are authorized to provide "additional assistance" to a foreign representative under chapter 15 or under other laws of the United States. See Allan L. Gropper, Current Developments in International Insolvency Law:  A

---

[11]      Moreover, the "public interest" prong of the test is generally considered to be satisfied if granting the injunctive relief will promote a successful reorganization.  See LTV Corp. v. Back (In re Chateaugay Corp., 201 B.R. 48, 72 (Bankr. S.D.N.Y. 1996) ("Public policy, as evidenced by chapter 11 of the Bankruptcy Code, strongly favors the reorganization and rehabilitation of troubled companies and the concomitant preservation of jobs and going concern values."); Johns-Mansville Corp. v. Asbestos Litig. Grp. (In re Johns-Mansville Corp.), 26 B.R. 420, 428 (Bankr. S.D.N.Y. 1983) ("[T]his court finds the goal of removing all obstacles to plan formulation eminently praiseworthy and supports every lawful effort to foster this goal while protecting the due process rights of all constituencies."), vacated in part, 41 B.R. 926 (S.D.N.Y. 1984); see also Nixon Mach. Co. v. Roy Energy, Inc. (In re Nixon Mach. Co.), 27 B.R. 871, 873 (Bankr. E.D. Tenn. 1983) ("In a bankruptcy case, a paramount consideration is speedy and economic administration of the bankruptcy case.").

<u>United States Perspective</u>, 887 PLI/Comm 815, 830 (2006) ("The legislative history of § 1507 states specifically that 'additional relief' is 'beyond that permitted under §§ 1519-1521.'").

35.     In determining whether additional assistance is proper, courts must consider "whether such additional assistance, ***consistent with the principles of comity***, will reasonably assure":

> (1) just treatment of all holders of claims against or interests in the debtor's property;
>
> (2) protection of claim holders in the United States against prejudice and inconvenience in the processing of claims in such foreign proceeding;
>
> (3) prevention of preferential or fraudulent dispositions of property of the debtor;
>
> (4) distribution of proceeds of the debtor's property substantially in accordance with the order prescribed by this title; and
>
> (5) if appropriate, the provision of an opportunity for a fresh start for the individual that such foreign proceeding concerns.

11 U.S.C. § 1507(b) (emphasis added); <u>see also</u> <u>In re Metcalfe & Mansfield Alternative Invs.</u>, 421 B.R. 685, 696 (Bankr. S.D.N.Y. 2010) ("Section 1507 directs the court to consider comity in granting additional assistance to the foreign representative.").

36.     Section 1507(b) of the Bankruptcy Code embodies the protections contained in former section 304 of the Bankruptcy Code,[12] the predecessor statute to chapter 15.  <u>See</u> House

---

[12]     The relevant portions of former section 304 of the Bankruptcy Code are provided below:
(b) Subject to the provisions of subsection (c) of this section … the court may –
    (1) enjoin the commencement or continuation of –
        (A) any action against - (i) a debtor with respect to property involved in such foreign proceeding; or (ii) such property; or
        (B) the enforcement of any judgment against the debtor with respect to such property, or any act or the commencement or continuation of any judicial proceeding to create or enforce a lien against the property of such estate …
(c) In determining whether to grant relief under subsection (b) of this section, the court shall be guided by what will best assure an economical and expeditious administration of such estate, consistent with –
    (1) just treatment of all holders of claims against or interests in such estate;

Report No. 109-31, Pt. 1, 109th Cong., 1st Sess. 109 (2005) ("The additional assistance is made conditional upon the court's consideration of the factors set forth in the current subsection 304(c) in a context of a reasonable balancing of interests following current case law."); In re Atlas Shipping A/S, 404 B.R. 726, 741 (Bankr. S.D.N.Y. 2009) ("the legislative history confirms that Congress expected courts to interpret [section 1507] consistently with prior law under § 304"). Section 304(b)(1) permitted the bankruptcy court "to enjoin the commencement or continuation of any action against a foreign debtor with respect to property 'involved in' the foreign proceeding. Property 'involved in' a foreign proceeding extend[ed] beyond 'property of [the debtor's] estate.'" In re Avila, 296 B.R. 95, 105 (Bankr. S.D.N.Y. 2003) (citing Koreag, Controle et Revision S.A. v. Refxo F/X Assocs., Inc. (In re Koreag, Controle et Revision S.A.), 961 F.2d 341, 348-49 (2d Cir. 1992)); A.P. Esteve Sales, Inc. v. Manning (In re Manning), 236 B.R. 14, 20-21 (9th Cir. BAP 1999)); see also In re Koreag, 961 F.2d at 348 ("A bankruptcy court is given broad latitude in fashioning an appropriate remedy in a § 304 proceeding.").

37.     Under former section 304 of the Bankruptcy Code, courts interpreted property "involved in" a foreign proceeding to include subsidiaries of foreign debtors and thus granted injunctions in favor of such subsidiaries. See, e.g., Schimmelpenninck v. Byrne (In re Schimmelpenninck), 183 F.3d 347, 362 (5th Cir. 1999) (extending injunctive relief to prevent direct action against foreign debtor's wholly-owned subsidiary, where such action would diminish the value of the foreign debtor's ownership interest to the detriment of all creditors).

---

(2) protection of claim holders in the United States against prejudice and inconvenience in the processing of claims in such foreign proceeding;
(3) prevention of preferential or fraudulent dispositions of property of such estate;
(4) distribution of proceeds of such estate substantially in accordance with the order prescribed by this title;
(5) comity; and
(6) if appropriate, the provision of an opportunity for a fresh start for the individual that such foreign proceeding concerns.
11 U.S.C. § 304(b) and (c).

Indeed, the <u>Schimmelpenninck</u> court held that section 304 was the most appropriate statutory predicate for injunctive relief that was "sought in … proceedings that [were] ancillary to a foreign bankruptcy from a country whose laws are compatible with and not repugnant to ours." 183 F.3d at 366.

38.     In granting injunctive relief in favor of non-debtor subsidiaries in <u>Avila</u>, the bankruptcy court considered all factors for extending relief under former section 304(c) of the Bankruptcy Code and concluded that the Mexican Business Reorganization Act (i) treated all creditors and interest holders justly, (ii) protected United States creditors against prejudice and inconvenience in processing their claims, (iii) prevented preferential and fraudulent distributions, and (iv) provided a scheme governing the distribution of the estate to secured, administrative, other priority and unsecured creditors.  296 B.R. at 107-09 (citing and discussing various provisions of the Mexican Business Reorganization Act).  For the same reasons, Vitro SAB respectfully submits that the injunctive relief requested herein is proper under section 1507 of the Bankruptcy Code.  (See <u>Mexican Counsel Declaration</u> ¶¶ 21-33.)

>    **2.     In the Alternative, Extension of Preliminary Injunction is Warranted Under Sections 105(a) and 1521(a)(6) of the Bankruptcy Code**

39.     In the event the Appropriate Court does not extend the injunctive relief to the Protected Guarantors pursuant to section 1507(b) of the Bankruptcy Code, section 1521(a)(6) provides an alternate means for the Protected Guarantors to obtain necessary relief.  Section 1521(a)(6) permits the Appropriate Court, upon recognition of the foreign proceeding, to "grant any appropriate relief, including … extending relief granted under section 1519(a)."  Here, it is clear that ample grounds exist for extending injunctive relief to the Protected Guarantors through the confirmation of the *Concurso* Plan.  <u>See</u> <u>supra</u>, ¶¶ 21-31.

### 3. Finally, Unusual Circumstances Warrant Extension of Automatic Stay to Protected Guarantors

40.     In the alternative, the Appropriate Court should extend the automatic stay under section 362 of the Bankruptcy Code to prevent Actions against the Protected Guarantors. Although section 362(a)(1) of the Bankruptcy Code only expressly refers to staying actions against debtors, the Second Circuit has held that "an action taken against a nondebtor which would inevitably have an adverse impact upon the property of the [debtor's] estate must be barred by the automatic stay provision." Licensing by Paolo v. Sinatra (In re Gucci), 126 F.3d 380, 392 (2d Cir. 1997) (citing 48th St. Steakhouse, Inc. v. Rockefeller Grp., Inc. (In re 48th St. Steakhouse, Inc.), 835 F.2d 427, 431 (2d Cir. 1987)); see also Queenie, Ltd. v. Nygard Int'l, 321 F.3d 282, 287-88 (2d Cir. 2003) (finding that automatic stay barred litigation against a chapter 11 debtor's wholly-owned subsidiary because "the adjudication of a claim against [that] .. corporation [would] … have an immediate adverse economic impact on [the debtor]"). In addition, courts may extend the stay to enjoin proceedings against non-debtors in "unusual circumstances." Robert Plan Corp. v. Liberty Mut. Fire Ins. Co., No. 09-1930, 2010 WL 1193151, at *3 (E.D.N.Y. Mar. 23, 2010) (citing A.H. Robins Co. v. Piccinin, 788 F.2d 994, 999 (4th Cir. 1986)) (attached hereto as Exhibit M).

41.     First, and most important, the pendency of the Voluntary Mexican Proceeding constitutes unusual circumstances that warrant extending the automatic stay to the Protected Guarantors. Indeed, as discussed above, principles of comity require that this Court permit the District Court of Nuevo León to resolve all issues related to the Restructured Debt by enjoining any Actions that would undermine the restructuring in the Voluntary Mexican Proceeding.

42.     Second, any Action taken against any Protected Guarantor will inevitably have an adverse impact upon the property of Vitro SAB's estate. In re Gucci, 126 F.3d at 392. Should

Creditors be permitted to bring Actions against Protected Guarantors, all of which are direct and indirect subsidiaries of Vitro SAB, the value of these subsidiaries may be significantly diminished, thereby diminishing the value of Vitro SAB's estate.

43.    Finally, although Schimmelpenninck was decided under a now repealed section of the Bankruptcy Code, its reasoning is instructive here.  In that case, a creditor sought to obtain a state court judgment against a non-debtor subsidiary of a foreign debtor attempting to hold the subsidiary responsible for the debts owed by the parent debtor. 183 F.3d at 350.  In permitting an injunction that would protect the subsidiary, the court concluded that "obtaining and executing a judgment against [the subsidiary] would have an effect economically indistinguishable from . . . obtaining and executing on a judgment obtained post-petition directly against [the parent] – which, of course, [a creditor] cannot do." Id. at 362.  The same reasoning applies here, as an Action against any of the Protected Guarantors would have essentially the same effect as an action against Vitro SAB.

44.    For the foregoing reasons, unusual circumstances warrant an extension of the automatic stay to the Protected Guarantors.

## **NOTICE**

45.    Notice of this Motion has been provided to (i) the United States Trustee, (ii) counsel to the Steering Committee, (iii) counsel to Fintech, (iv) counsel to Elliott, (v) counsel to Aurelius, and (vi) the trustees under the Indentures governing the Old Notes (or their counsel, if known).  Vitro SAB submits that no other or further notice need be provided.

## VI.    CONCLUSION

46.    Wherefore, for the reasons set forth herein, Vitro SAB respectfully requests that

(i) the Court immediately enter the TRO; (ii) thereafter, the Court enter the Preliminary

Injunction pending the Appropriate Court's decision concerning recognition of the Voluntary

Mexican Proceeding as a foreign main proceeding; (iii) if and when the Voluntary Mexican

Proceeding is recognized as a foreign main proceeding, the Appropriate Court enter an order

extending injunctive relief or the automatic stay to the Protected Guarantors not otherwise then

protected by the automatic stay and (iv) provide any additional relief that the Court (or the

Appropriate Court, as applicable) deems just and proper.

Dated: New York, New York
          April 26, 2011

/s/ Risa M. Rosenberg
Risa M. Rosenberg
Thomas J. Matz
Jeremy C. Hollembeak
MILBANK, TWEED, HADLEY & McCLOY LLP
1 Chase Manhattan Plaza
New York, NY 10005
Telephone:  (212) 530-5000

Andrew M. Leblanc (admitted *pro hac vice*)
MILBANK, TWEED, HADLEY & McCLOY LLP
1850 K Street, NW
Suite 1100
Washington, DC 20006
Telephone:  (202) 835-7500

*Attorneys for Alejandro Francisco Sánchez-Mujica*
*as Foreign Representative of Vitro, S.A.B. de C.V.*

**Exhibit A**

**Proposed TRO**

| | |
|---|---|
| In re: | ) |
| | ) |
| | ) Chapter 15 |
| VITRO, S.A.B. de C.V., | ) |
| | ) Case No. 11-11754 (SCC) |
| Debtor in a Foreign Proceeding. | ) |
| | ) |
| | ) |
| VITRO, S.A.B. de C.V., | ) |
| | ) |
| | ) Adversary No. 11-_____ (___) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| ACP MASTER, LTD.; AD HOC GROUP OF | ) |
| VITRO NOTEHOLDERS; AURELIUS | ) |
| CAPITAL MASTER, LTD.; AURELIUS | ) |
| CONVERGENCE MASTER, LTD.; ELLIOTT | ) |
| INTERNATIONAL L.P.; THE LIVERPOOL | ) |
| LIMITED PARTNERSHIP; and DOES 1- | ) |
| 1000, | ) |
| | ) |
| Defendants. | ) |

## TEMPORARY RESTRAINING ORDER

Upon the motion dated April 26, 2011 (the "Motion")[1] of Alejandro Francisco Sánchez-

Mujica, as the Foreign Representative of the above-captioned debtor, Vitro, S.A.B. de C.V.

("Vitro SAB"), the debtor in (a) the Voluntary Mexican Proceeding commenced on December 13,

2010 under the Mexican Business Reorganization Act and currently pending before the District

Court of Nuevo León, and (b) this Chapter 15 Case, pursuant to sections 105(a), 1507(b),

1519(a) and 1521(a)(6) of the Bankruptcy Code and Federal Rule 65, made applicable to this

proceeding through Bankruptcy Rule 7065, for a temporary restraining order and preliminary

injunction, as set forth more fully in the Motion; and upon the Court's review and consideration

---

[1] All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

of the (i) Verified Complaint for Temporary Restraining Order and Injunctive Relief;

(ii) Declaration of Risa M. Rosenberg in Support of Motion for Temporary Restraining Order and Preliminary Injunction; (iii) Declaration of Homer D. Parkhill in Support of Temporary Restraining Order and Preliminary Injunction; (iv) Declaration of Alejandro Francisco Sánchez-Mujica, as Foreign Representative of Vitro, S.A.B. de C.V., in Support of Chapter 15 Petition for Recognition of Foreign Main Proceeding and Request for Related Relief; and (v) Declaration of Alonso Rivera Gaxiola, as Mexican Counsel to Vitro, S.A.B. de C.V., in Support of Chapter 15 Petition for Recognition of Foreign Main Proceeding and Request for Related Relief; and the Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and consideration of the Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(P); and venue being proper before this Court pursuant to 28 U.S.C. § 1410; and the relief granted herein being within the scope of relief Vitro SAB is permitted to request and this Court is permitted to grant in accordance with the order (the "Lift Stay Order") issued by the Texas Bankruptcy Court on April 26, 2011, notwithstanding the stay of proceedings generally in the Chapter 15 Case currently imposed by operation of Bankruptcy Rule 1014(b); and the Court being satisfied that the Motion, the Verified Complaint, the U.S. Counsel Declaration, Rothschild Declaration, the Foreign Representative Declaration, and the Mexican Counsel Declaration demonstrate good and proper cause pursuant to Local Bankruptcy Rule 9077-1(b) and Federal Rule 65(b)(1) for issuance of this order; and the Court having determined that the relief sought in the Motion is in the best interests of Vitro SAB, its creditors and all parties in interest; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and based upon the record of

the _____, 2011 hearing before the Court on the Motion (the "Hearing"), and after due deliberation and sufficient cause appearing therefor it is hereby

**FOUND**, that:

1.      The Foreign Representative commenced a case on behalf of Vitro SAB pursuant to chapter 15 of the Bankruptcy Code;

2.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157, and venue is proper pursuant to 28 U.S.C. § 1410;

3.      The relief granted herein is within the scope of relief Vitro SAB is permitted to request and this Court is permitted to grant in accordance with the Lift Stay Order;

4.      This Court, pursuant to sections 105(a) and 1519 of the Bankruptcy Code, Federal Rule 65, and Bankruptcy Rule 7065, may issue any order as may be necessary or appropriate to carry out the provisions of the Bankruptcy Code, including but not limited to issuing a temporary restraining order; and

5.      Vitro SAB will suffer irreparable harm unless the Creditors are temporarily restrained from initiating or continuing any Action against the Protected Parties and/or their Property pending a further hearing on the Motion as provided herein;

**ACCORDINGLY**, based upon the foregoing, and after due deliberation and sufficient cause appearing therefor for the reasons stated by the Court on the record of the Hearing, it is hereby:

**ORDERED** that, pursuant to sections 105(a) and 1519(a) of the Bankruptcy Code, Federal Rule 65 and Bankruptcy Rule 7065, pending a hearing and determination of Vitro SAB's request for a preliminary injunction, effective immediately and subject to the terms hereof, all holders of Restructured Debt (including the Old Notes), as well as their respective agents,

attorneys and all persons acting in concert or participation with the foregoing (collectively, the "Creditors"), are hereby enjoined from commencing or continuing any and all litigation (including the NYS Actions) or actions to collect (including pursuant to the Attachment Orders) (collectively, the "Actions") against Vitro SAB and the Old Guarantors that are not already protected by the automatic stay under section 362 of the Bankruptcy Code (the "Protected Guarantors" and, together with Vitro SAB, the "Protected Parties") or their respective Property, including:

(1)     the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against any Protected Party that was or could have been commenced before the commencement of the Chapter 15 Case, or to recover (including pursuant to the Attachment Orders) a claim against any Protected Party that arose before the commencement of the Chapter 15 Case;

(2)     the enforcement, against any Protected Party or against Property of any Protected Party, of a judgment (or a prejudgment remedy, including the Attachment Orders) obtained before the commencement of the Chapter 15 Case;

(3)     any act to obtain possession of Property of any Protected Party or of Property from any Protected Party or to exercise control over Property of any Protected Party, including pursuant to the Attachment Orders;

(4)     any act to create, perfect, or enforce any lien against Property of any Protected Party;

(5)     any act to create, perfect, or enforce against Property of any Protected Party any lien to the extent that such lien secures a claim that arose before the commencement of the Chapter 15 Case;

(6)     any act to collect, assess, or recover a claim against any Protected Party that arose before the commencement of the Chapter 15 Case, including pursuant to the Attachment Orders; and

(7)     the setoff of any debt owing to any Protected Party that arose before the commencement of the Chapter 15 Case against any claim against such Protected Party.

The foregoing TRO shall expire by its terms at midnight on _____, 2011, unless further extended by order of the Court.

      **ORDERED** that, to the extent any Old Guarantor has lost, or loses, the protection of the automatic stay during the pendency of the Chapter 15 Case, such Old Guarantor shall be deemed a Protected Guarantor and shall be granted the protection of the TRO.

      **ORDERED** that, in accordance with the foregoing, notwithstanding the Attachment Orders, all Garnishees shall, from and after the date of entry hereof, remit all payments to the applicable Protected Parties in accordance with the ordinary practices that existed between each such Garnishee and the applicable Protected Party prior to their being served with the applicable Attachment Order.

      **ORDERED** that the Creditors, or any other party affected by the entry of this Order, are directed to file any papers in opposition to the Motion and/or Vitro SAB's request for a preliminary injunction with this Court (with a copy to chambers) and to serve on (i) counsel to Vitro SAB, Milbank, Tweed, Hadley & M<sup>c</sup>Cloy LLP, One Chase Manhattan Plaza, New York, New York, 10004, Attn: Dennis F. Dunne, Esq. and Andrew M. Leblanc, Esq., (ii) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, New York, New York 10004, Attn: Richard C. Morrissey, Esq., (iii) counsel to the Steering Committee, White & Case LLP, 1155 Avenue of Americas, New York, NY 10036, Attn: J. Christopher Shore, Esq., (iv) counsel to Fintech, Cleary Gottlieb Steen & Hamilton LLP, One Liberty Plaza, New York, New York 10006, Attn: Lindsee P. Granfield, Esq., (v) counsel to Elliott, Dechert LLP, 1095 Avenue of the Americas, New York, NY 10036-6797, Attn: Glenn E. Siegel, Esq., Dennis H. Hranitzky, Esq. and Jeffrey T. Mispagel, Esq., (vi) counsel to Aurelius, Friedman Kaplan Seiler & Adelman LLP, 1633 Broadway, New York, New York 10019, Attn: Edward A.

Friedman, Esq., Jeffrey C. Fourmaux, Esq. and Benjamin S. Holzer, Esq., (vii) counsel to U.S. Bank National Association, Sullivan & Worcester LLP, One Post Office Square, Boston, MA 02109, Attn: Jeanne P. Darcey, Esq., Richard Hiersteiner, Esq. and Amy A. Zuccarello, Esq., (viii) Wilmington Trust FSB, 166 Mercer Street, Suite 2-R, New York, NY 10012-3249, Attn: Adam Berman, and (ix) counsel to Wilmington Trust, Hogan Lovells US LLP, 875 Third Avenue, New York, NY 10022, Attn: Robin Keller, Esq. and Scott Reynolds, Esq., so as to be received no later than __:__ p.m. on _____.

**ORDERED** that a hearing on the Motion and request for preliminary injunctive relief will be held on _____, 2011 at __: 00 _.m.

**ORDERED** that Vitro SAB shall serve a copy of this Order upon all known Creditors by first class mail, postage, prepaid, no later than _____, 2011.

**ORDERED** that the Protected Parties fully reserve and preserve all of their respective rights, arguments, and legal positions with respect to any or all matters that may arise in connection with the Chapter 15 Petition and the Motion.

Dated: New York, New York
April __, 2011
_:_0 _.M.

_____
THE HONORABLE SHELLY C. CHAPMAN
UNITED STATES BANKRUPTCY JUDGE

## Exhibit B

## Proposed Preliminary Injunction Order

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: ) | |
| ) | Chapter 15 |
| VITRO, S.A.B. de C.V., ) | |
| ) | Case No. 11-11754 (SCC) |
|       Debtor in a Foreign Proceeding. ) | |
| ) | |
| ) | |
| VITRO, S.A.B. de C.V., ) | |
| ) | |
|       Plaintiff, ) | Adversary No. 11-_____ (____) |
| ) | |
| v. ) | |
| ) | |
| ACP MASTER, LTD.; AD HOC GROUP OF ) | |
| VITRO NOTEHOLDERS; AURELIUS ) | |
| CAPITAL MASTER, LTD.; AURELIUS ) | |
| CONVERGENCE MASTER, LTD.; ELLIOTT ) | |
| INTERNATIONAL L.P.; THE LIVERPOOL ) | |
| LIMITED PARTNERSHIP; and DOES 1- ) | |
| 1000, ) | |
| ) | |
|       Defendants. ) | |

## ORDER GRANTING PRELIMINARY INJUNCTION

Upon the motion dated April 26, 2011 (the "Motion")[1] of Alejandro Francisco Sánchez-

Mujica, as the Foreign Representative of the above-captioned debtor, Vitro, S.A.B. de C.V.

("Vitro SAB"), the debtor in (a) the Voluntary Mexican Proceeding commenced on December 13,

2010 under the Mexican Business Reorganization Act and currently pending before the District

Court of Nuevo León, and (b) this Chapter 15 Case, pursuant to sections 105(a), 1507(b),

1519(a) and 1521(a)(6) of the Bankruptcy Code and Federal Rule 65, made applicable to this

proceeding through Bankruptcy Rule 7065, for a temporary restraining order and preliminary

injunction, as set forth more fully in the Motion; and upon the Court's review and consideration

---

[1]     All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

of the (i) Verified Complaint for Temporary Restraining Order and Injunctive Relief;

(ii) Declaration of Risa M. Rosenberg in Support of Motion for Temporary Restraining Order and Preliminary Injunction; (iii) Declaration of Homer D. Parkhill in Support of Temporary Restraining Order and Preliminary Injunction; (iv) Declaration of Alejandro Francisco Sánchez-Mujica, as Foreign Representative of Vitro, S.A.B. de C.V., in Support of Chapter 15 Petition for Recognition of Foreign Main Proceeding and Request for Related Relief; and (v) Declaration of Alonso Rivera Gaxiola, as Mexican Counsel to Vitro, S.A.B. de C.V., in Support of Chapter 15 Petition for Recognition of Foreign Main Proceeding and Request for Related Relief; and the Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and consideration of the Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(P); and venue being proper before this Court pursuant to 28 U.S.C. § 1410; and the relief granted herein being within the scope of relief Vitro SAB is permitted to request and this Court is permitted to grant in accordance with the order (the "Lift Stay Order") issued by the Texas Bankruptcy Court on April 26, 2011, notwithstanding the stay of proceedings generally in the Chapter 15 Case currently imposed by operation of Bankruptcy Rule 1014(b); and the Court being satisfied that the Motion, the Verified Complaint, the U.S. Counsel Declaration, the Rothschild Declaration, the Foreign Representative Declaration, and the Mexican Counsel Declaration demonstrate good and proper cause pursuant to Local Bankruptcy Rule 9077-1(b) and Federal Rule 65(b)(1) for issuance of this order; and the Court having issued the TRO on _____, 2011; and the Court having determined that the relief sought in the Motion is in the best interests of Vitro SAB, its creditors and all parties in interest; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and based upon the record of the _____, 2011

hearing before the Court on the Motion (the "Hearing"), and notice of the Motion and Hearing having been given to known Creditors; and after due deliberation and sufficient cause appearing therefor it is hereby

**FOUND**, that:

1.     The Foreign Representative commenced a case on behalf of Vitro SAB pursuant to chapter 15 of the Bankruptcy Code;

2.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157, and venue is proper pursuant to 28 U.S.C. § 1410;

3.     The relief granted herein is within the scope of relief Vitro SAB is permitted to request and this Court is permitted to grant in accordance with the Lift Stay Order;

4.     This Court, pursuant to sections 105(a) and 1519 of the Bankruptcy Code, Federal Rule 65, and Bankruptcy Rule 7065, may issue any order as may be necessary or appropriate to carry out the provisions of the Bankruptcy Code, including but not limited to issuing a preliminary injunction; and

5.     Vitro SAB will suffer irreparable harm unless the Creditors are preliminarily enjoined to the extent provided in this Order from initiating or continuing any Action against any of the Protected Parties and/or their Property pending recognition of the Voluntary Mexican Proceeding as a foreign main proceedings under chapter 15 of the Bankruptcy Code.

**ACCORDINGLY**, based on the foregoing, and after due deliberation and sufficient cause appearing therefor for the reasons stated by the Court on the record of the Hearing it is hereby:

**ORDERED** that, beginning on the date of this Order and continuing until the date of entry of an order of the Appropriate Court determining the Foreign Representative's request for an order recognizing the Voluntary Mexican Proceeding as a "foreign main proceeding" as defined in section 1502(4) of the Bankruptcy Code and the Foreign Representative as a "foreign representative" as defined in section 101(24) of the Bankruptcy Code (unless otherwise extended pursuant to sections 1519(b) and 1521(a)(6) of the Bankruptcy Code), all holders of Restructured Debt (including the Old Notes), as well as their respective agents, attorneys and all persons acting in concert or participation with the foregoing (collectively, the "Creditors"), are hereby enjoined from commencing or continuing any and all litigation (including the NYS Actions) or actions to collect (including pursuant to the Attachment Orders) (collectively, the "Actions") against Vitro SAB and the Old Guarantors that are not already protected by the automatic stay under section 362 of the Bankruptcy Code (the "Protected Guarantors" and, together with Vitro SAB, the "Protected Parties") or their respective Property, including:

(1)     the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against any Protected Party that was or could have been commenced before the commencement of the Chapter 15 Case, or to recover (including pursuant to the Attachment Orders) a claim against any Protected Party that arose before the commencement of the Chapter 15 Case;

(2)     the enforcement, against any Protected Party or against Property of any Protected Party, of a judgment (or a prejudgment remedy, including the Attachment Orders) obtained before the commencement of the Chapter 15 Case;

(3)     any act to obtain possession of Property of any Protected Party or of Property from any Protected Party or to exercise control over Property of any Protected Party, including pursuant to the Attachment Orders;

(4)     any act to create, perfect, or enforce any lien against Property of any Protected Party;

(5)     any act to create, perfect, or enforce against Property of any Protected Party any lien to the extent that such lien secures a claim that arose before the commencement of the Chapter 15 Case;

(6)     any act to collect, assess, or recover a claim against any Protected Party that arose before the commencement of the Chapter 15 Case, including pursuant to the Attachment Orders; and

(7)     the setoff of any debt owing to any Protected Party that arose before the commencement of the Chapter 15 Case against any claim against such Protected Party.

**ORDERED** that, to the extent any Old Guarantor has lost, or loses, the protection of the automatic stay during the pendency of the Chapter 15 Case, such Old Guarantor shall be deemed a Protected Guarantor and shall be granted the protection of the Preliminary Injunction.

**ORDERED** that, in accordance with the foregoing, notwithstanding the Attachment Orders, all Garnishees shall, from and after the date of entry hereof, remit all payments to the applicable Protected Parties in accordance with the ordinary practices that existed between each such Garnishee and the applicable Protected Party prior to their being served with the applicable Attachment Order.

**ORDERED** that**,** if and when the Appropriate Court recognizes the Voluntary Mexican Proceeding as the "foreign main proceeding," the Preliminary Injunction and/or the automatic stay is hereby extended, pursuant to sections 105(a), 1507(b) and 1521(a)(6) of the Bankruptcy Code, to the Protected Guarantors through the conclusion of the Voluntary Mexican Proceeding.

Dated: New York, New York
_____, 2011

_____
THE HONORABLE SHELLY C. CHAPMAN
UNITED STATES BANKRUPTCY JUDGE

<u>**Exhibit C**</u>

**Proposed Order to Show Cause**

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | ) |
| | ) |
| | ) Chapter 15 |
| VITRO, S.A.B. de C.V., | ) |
| | ) Case No. 11-11754 (SCC) |
| Debtor in a Foreign Proceeding. | ) |
| | ) |
| | ) |
| VITRO, S.A.B. de C.V., | ) |
| | ) |
| | ) Adversary No. 11-_____ (___) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| ACP MASTER, LTD.; AD HOC GROUP OF | ) |
| VITRO NOTEHOLDERS; AURELIUS | ) |
| CAPITAL MASTER, LTD.; AURELIUS | ) |
| CONVERGENCE MASTER, LTD.; ELLIOTT | ) |
| INTERNATIONAL L.P.; THE LIVERPOOL | ) |
| LIMITED PARTNERSHIP; and DOES 1- | ) |
| 1000, | ) |
| | ) |
| Defendants. | ) |

## <u>ORDER TO SHOW CAUSE</u>

Upon the motion dated April 26, 2011 (the "<u>Motion</u>")[1] of Alejandro Francisco

Sánchez-Mujica, as the Foreign Representative of the above-captioned debtor, Vitro, S.A.B. de

C.V. ("<u>Vitro SAB</u>"), the debtor in (a) the Voluntary Mexican Proceeding commenced on

December 13, 2010 under the Mexican Business Reorganization Act and currently pending

before the District Court of Nuevo León, and (b) this Chapter 15 Case, pursuant to

sections 105(a), 1507(b), 1519(a) and 1521(a)(6) of the Bankruptcy Code and Federal Rule 65,

made applicable to this proceeding through Bankruptcy Rule 7065, for a temporary restraining

order and preliminary injunction, as set forth more fully in the Motion; and upon the Court's

---

[1]     All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the
Motion.

review and consideration of the (i) Verified Complaint for Temporary Restraining Order and Injunctive Relief; (ii) Declaration of Risa M. Rosenberg in Support of Motion for Temporary Restraining Order and Preliminary Injunction; (iii) Declaration of Homer D. Parkhill in Support of Motion for Temporary Restraining Order and Preliminary Injunction; (iv) Declaration of Alejandro Francisco Sánchez-Mujica, as Foreign Representative of Vitro, S.A.B. de C.V., in Support of Chapter 15 Petition for Recognition of Foreign Main Proceeding and Request for Related Relief; and (v) Declaration of Alonso Rivera Gaxiola, as Mexican Counsel to Vitro, S.A.B. de C.V., in Support of Chapter 15 Petition for Recognition of Foreign Main Proceeding and Request for Related Relief; and the Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and consideration of the Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(P); and venue being proper before this Court pursuant to 28 U.S.C. § 1410; and the relief granted herein being within the scope of relief Vitro SAB is permitted to request and this Court is permitted to grant in accordance with the order (the "Lift Stay Order") issued by the Texas Bankruptcy Court on April 26, 2011, notwithstanding the stay of proceeding generally in the Chapter 15 Case currently imposed by operation of Bankruptcy Rule 1014(b); and it appearing that no notice of this Order to Show Cause need be given, except as provided for in the Motion; and the Court being satisfied that the Motion, the Verified Complaint, the U.S. Counsel Declaration, the Rothschild Declaration, the Foreign Representative Declaration, and the Mexican Counsel Declaration demonstrate good and proper cause that an Order to Show Cause is necessary to expedite consideration of the relief requested in the Motion and that such expedited consideration is beneficial to Vitro SAB's estate and creditors; and after due deliberation and sufficient cause appearing therefor, it is hereby

**ORDERED** that any party in interest may show cause on April 28, 2011 at 2:00 p.m. in Courtroom 610, One Bowling Green, New York, New York, 10004-1408, why the Court should not enter the TRO, pursuant to sections 105(a) and 1519(a) of the Bankruptcy Code, Federal Rule 65 and Bankruptcy Rule 7065, pending a hearing and determination of Vitro SAB's request for a preliminary injunction, effective immediately and subject to the terms hereof, enjoining all holders of Restructured Debt (including the Old Notes), including their respective agents, attorneys and all persons acting in concert or participation with the foregoing (collectively, the "Creditors"), from commencing or continuing any and all litigation (including the NYS Actions) or actions to collect (including pursuant to the Attachment Orders) (collectively, the "Actions") against Vitro SAB and the Old Guarantors that are not already protected by the automatic stay under section 362 of the Bankruptcy Code (the "Protected Guarantors" and, together with Vitro SAB, the "Protected Parties") or their respective Property, including:

(1)     the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against any Protected Party that was or could have been commenced before the commencement of the Chapter 15 Case, or to recover (including pursuant to the Attachment Orders) a claim against any Protected Party that arose before the commencement of the Chapter 15 Case;

(2)     the enforcement, against any Protected Party or against Property of any Protected Party, of a judgment (or a prejudgment remedy, including the Attachment Orders) obtained before the commencement of the Chapter 15 Case;

(3)     any act to obtain possession of Property of any Protected Party or of Property from any Protected Party or to exercise control over Property of any Protected Party, including pursuant to the Attachment Orders;

(4)     any act to create, perfect, or enforce any lien against Property of any Protected Party;

(5)     any act to create, perfect, or enforce against Property of any Protected Party any lien to the extent that such lien secures a claim that arose before the commencement of the Chapter 15 Case;

(6)     any act to collect, assess, or recover a claim against any Protected Party that arose before the commencement of the Chapter 15 Case, including pursuant to the Attachment Orders; and

(7)     the setoff of any debt owing to any Protected Party that arose before the commencement of the Chapter 15 Case against any claim against such Protected Party.

**ORDERED** that Creditors, or any party affected by entry of this Order, are directed to file any papers in opposition to the Motion and/or Vitro SAB's request for a preliminary injunction with this Court (with a copy to chambers) and to serve on (i) counsel to Vitro SAB, Milbank, Tweed, Hadley & M<sup>c</sup>Cloy LLP, One Chase Manhattan Plaza, New York, New York, 10004, Attn: Dennis F. Dunne, Esq. and Andrew M. Leblanc, Esq., (ii) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, New York, New York 10004, Attn: Richard C. Morrissey, Esq., (iii) counsel to the Steering Committee, White & Case LLP, 1155 Avenue of Americas, New York, NY 10036, Attn: J. Christopher Shore, Esq., (iv) counsel to Fintech, Cleary Gottlieb Steen & Hamilton LLP, One Liberty Plaza, New York, New York 10006, Attn: Lindsee P. Granfield, Esq., (v) counsel to Elliott, Dechert LLP, 1095 Avenue of the Americas, New York, NY 10036-6797, Attn: Glenn E. Siegel, Esq., Dennis H. Hranitzky, Esq. and Jeffrey T. Mispagel, Esq., (vi) counsel to Aurelius, Friedman Kaplan Seiler & Adelman LLP, 1633 Broadway, New York, New York 10019, Attn: Edward A. Friedman, Esq., Jeffrey C. Fourmaux, Esq. and Benjamin S. Holzer, Esq., (vii) counsel to U.S. Bank National Association, Sullivan & Worcester LLP, One Post Office Square, Boston, MA 02109, Attn: Jeanne P. Darcey, Esq., Richard Hiersteiner, Esq. and Amy A. Zuccarello, Esq., and (viii) Wilmington Trust FSB, 166 Mercer Street, Suite 2-R, New York, NY 10012-3249, Attn: Adam Berman, and (ix) counsel

to Wilmington Trust, Hogan Lovells US LLP, 875 Third Avenue, New York, NY 10022, Attn:

Robin Keller, Esq. and Scott Reynolds, Esq., so as to be received no later than __:__ p.m. on

_____, 2011.


Dated: New York, New York
       _____, 2011

                                    _____
                                    THE HONORABLE SHELLY C. CHAPMAN
                                    UNITED STATES BANKRUPTCY JUDGE

# **Exhibit D**

Not Reported in B.R., 2006 WL 1529357 (Bkrtcy.S.D.N.Y.)
**(Cite as: 2006 WL 1529357 (Bkrtcy.S.D.N.Y.))**



Only the Westlaw citation is currently available.

United States Bankruptcy Court,
S.D. New York.
In re ADELPHIA COMMUNICATIONS CORP., et al., Debtors.
Adelphia Communications Corp., et al., Plaintiffs,
v.
The America Channel, LLC, Alioto Law Firm and Gray, Plant, Mooty, Mooty & Bennett, P.A., Defendants.

Bankruptcy No. 02–41729 (REG).
Adversary No. 06–01528.
June 5, 2006.

Willkie Farr & Gallagher LLP, by: Brian E. O'Connor, Esq. (argued), Michael D. Maimin, Esq., New York, NY, for Plaintiff Debtors and Debtors in Possession.

Kasowitz, Benson, Torres & Friedman LLP, by: Jonathan E. Minsker, Esq. (argued), New York, NY, for Official Committee of Unsecured Creditors.

Morgenstern Jacobs & Blue, LLC, by: Gregory A. Blue, Esq., New York, NY, for Official Committee of Equity Security Holders.

No Appearance by Defendants.

BENCH DECISION ON ISSUANCE OF TEMPORARY RESTRAINING ORDER (THE AMERICA CHANNEL) [FN1]

> FN1. This written decision memorializes (and in the last paragraph clarifies) the decision dictated in open court on Friday, June 2, 2006. It is subject to cite checking and technical corrections.

ROBERT E. GERBER, Bankruptcy Judge.

**\*1** In this adversary proceeding under the umbrella of the approximately 230 jointly administered chapter 11 cases of Adelphia Communications Corporation and its subsidiaries (the "Debtors"), I have the Debtors' motion, pursuant to Fed. R. Bankr.P. 7065, and Fed.R.Civ.P. 65(b) (which Rule 7065 incorporates in substantial part), for a TRO enjoining the prosecution of an antitrust action in Minnesota in which the prayers for relief include, as a prominent feature, an injunction restraining the now-pending sale to Time Warner Cable and Comcast of the Debtors' assets in the *in rem* proceedings before me, as authorized to date, and to be further authorized, in this Court. The defendants are The America Channel ("TAC," a cable channel, assertedly not yet in operation, that is aggrieved by the failure of Time Warner, Comcast and Adelphia to agree to carry it on their cable systems), and TAC's lawyers, who are trying to enjoin the pending sale in Minnesota federal court.

The request for the TRO was made on notice, and my chambers authorized counsel for TAC to appear either in person or by telephone. They elected not to appear.

For the reasons that follow, I am granting the TRO in the form in which it was requested, though at the time of the hearing on the preliminary injunction, I will wish to hear argument from the Debtor plaintiffs and the defendants (assuming that the defendants are then willing to appear), with respect to whether I can address the very substantial needs and concerns of the Debtors and their creditors by a somewhat narrower injunction, which might permit conduct that would not, like TAC's present conduct, interfere with the property of the estate and the reorganization proceedings before me.

The following are my Findings of Fact, Conclusions of Law and bases for the exercise of my discretion in connection with this determination.

*Findings of Fact*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in B.R., 2006 WL 1529357 (Bkrtcy.S.D.N.Y.)
**(Cite as: 2006 WL 1529357 (Bkrtcy.S.D.N.Y.))**

*Notice*

The Debtors provided notice of the hearing on this application (as well as copies of the adversary complaint, order to show cause and motion for temporary restraining order and preliminary injunction, and supporting papers) to TAC and the TAC Attorneys (together, the "Defendants"), among others, by e-mail last evening. In addition, the Debtors provided telephonic notice to the Defendants. The Defendants declined to appear. I find that the notice provided is appropriate under the circumstances, and that the Defendants have not suffered any prejudice with respect to their ability to be heard on this matter. I also find as a fact, or mixed question of fact and law, that this application was taken on notice and not *ex parte. See In re Lang Communications, L.P.,* 2000 Bankr.LEXIS 2021, *5 (Bankr.S.D.N.Y.2000) (the failure of counsel to attend a hearing as to which it was on notice did not make such a hearing "*ex parte* ").

*The Sale to Time Warner and Comcast*

Most of the Debtors in these cases filed for relief under chapter 11 of the Code on June 25, 2002. In April 2004, the Debtors announced their decision to pursue a sale of substantially all of the Debtors' assets and began a court-supervised, multi-phase auction process in which the Debtors were advised by UBS Securities, Allen & Company, and Sullivan & Cromwell. The Debtors considered numerous methods of sale and bids. After careful consideration and significant negotiation, the Debtors entered into definitive sale agreements (the "Purchase Agreements") with Time Warner and Comcast (the "Purchasers"), pursuant to which the Purchasers agreed to purchase substantially all of the Debtors' assets (the "Sale") for approximately $12.6 billion in cash and a 16% interest in Time Warner Cable for total consideration valued at over $17 billion. The Purchasers' offer represented a substantial premium above the next-best offer.

**\*2** After obtaining this Court's approval of bid protections, including a $440 million break-up fee, the Debtors and Time Warner and Comcast entered into Asset Purchase Agreements on April 20, 2005, pursuant to which Time Warner and Comcast agreed to purchase substantially all the Debtors' assets (the "Purchase Agreements").

Failure to close under the Purchase Agreements by the dates set forth therein would trigger certain termination rights, including the Purchasers' right to seek a $440 million break-up fee. It was so important that the Debtors close their deal in a timely way that when intercreditor disputes in this case created risks to the confirmation of the pending reorganization plan, the Debtors had to restructure the transaction to accomplish it by a court-approved section 363 sale, to preserve the economic benefits associated with the Sale.

Accordingly, on May 26, 2006, the Debtors filed a motion seeking, among other things, approval of the Sale pursuant to section 363 of the Code. A hearing to consider bidding procedures in connection with the Sale is scheduled for this coming Thursday, June 8, 2006, and a hearing to consider final approval of the Sale is scheduled on June 27, 2006.

The Sale represents an extraordinary achievement. To date it has not been disputed that the proposed Sale will generate the maximum possible recoveries for the Debtors' creditors and other constituents. Despite a multitude of other disputes among creditors in these cases, the creditors in this case have consistently expressed their approval of the Sale and its benefits.

*The TAC Action*

On May 31, 2006, the Defendants in this adversary proceeding filed an action in the United States District Court for the District of Minnesota, 06–CV–2175, which seeks, as an important element of its requested relief, an order preliminarily and permanently enjoining the Purchasers from purchasing Adelphia's assets, based on alleged antitrust violations (the "TAC Action"). The Debtors are not named as defendants in the TAC Action. Defendants have filed the TAC Action seeking, among

other things, to enjoin the Purchasers from purchasing Adelphia's assets on the basis of alleged antitrust violations.

The TAC Action is apparently the latest step in a series of unsuccessful attempts to secure carriage of the America Channel on the cable systems run by Time Warner, Comcast and Adelphia—and to achieve that end, to restrict or block the Sale. TAC has sought carriage by Adelphia for years without success. After failing to persuade the Debtors to carry its programming, TAC aired its concerns regarding the Debtors' denial of carriage and the Sale to both the FCC and FTC.

However, the FTC has closed its investigation into the Sale. Although the FCC has not yet approved the Sale, the Debtors expect it to do so. I do not today make findings on the underlying merits of the antitrust action. But as ultimate facts, I find, as facts or mixed questions of fact and law, that by trying to block the sale of Adelphia's assets to Time Warner & Comcast, and to prevent the closing of a deal that will bring into this estate $17 billion in value, the defendants are exercising control over property of the estate, and that the TAC action raises a substantial and material threat to the Debtors' reorganization.

*Conclusions of Law*

**\*3** Section 362(a) of the Bankruptcy Code imposes what is referred to in bankruptcy parlance as the "automatic stay," one of the most critical elements of bankruptcy law for the nearly 30 years that we've lived under the modern Bankruptcy Code—and indeed, going back even further, to the days of the old Bankruptcy Act, when Bankruptcy Rule 11–44 was enacted, about 5 years before the 1979 effective date of the Code. One of section 362's several critical provisions is section 362(a)(3). It provides, in relevant part, that with exceptions not applicable here:

[A] petition filed under section 301 ... of this title ... operates as a stay, applicable to all entities, of-

...

(3) any act to ... exercise control over property of the estate....

Code section 362(a)(3) protects the *in rem* jurisdiction of the Court, and prohibits interference with the disposition of the assets that are under the Court's wing, whether or not the Debtor is named as a defendant as part of the effort. And that is so without distinction as to the form the interference takes. *See, e.g., In re MCEG Productions, Inc.,* 133 B.R. 232, 235 (Bankr.C.D.Cal.1991), a decision by Judge Riblet.

I agree with the Debtors that *MCEG* is closely on point. There a disgruntled party in interest, after unsuccessfully opposing a sale of a nondebtor subsidiary of a chapter 11 debtor, brought an action in state court seeking to enjoin completion of the transfer, or the acquisition of the corporate debtor or its subs or related companies. Judge Riblet found that effort to be squarely violative of section 362(a)(3). She recognized that the attempt to enjoin the sale counterparty's contract rights in the sale "necessarily implicated" the debtor's rights in the same agreement, and continued:

Moreover, § 362(a)(3) protects against such acts to exercise control over property of the estate without distinction as to the form such interference takes. Accordingly, the filing of the injunctive action was a violation of § 362(a)(3).

While she ruled, consistent with the law in the Second Circuit, that corporate debtors didn't have a private right of action for stay violations under section 362(h) and thus have an entitlement to damages under that section, *see* 133 B.R. at 236, she found that the disgruntled party's actions "certainly rise to the level of sanctionable conduct." *Id.*

Thus, though the effort in Minnesota here was to enjoin Adelphia from selling its assets (and, as or more importantly, receiving payment for its assets) without naming Adelphia as a defendant, the failure

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

to name Adelphia as a defendant is not dispositive. As *MCEG* makes clear, we look to the substance and not the form. As the Second Circuit held in *In re 48th Street Steakhouse, Inc.,* 835 F.2d 427, 431 (2d Cir.1987):

> If action taken against the non-bankrupt party would inevitably have an adverse impact on property of the bankrupt estate, then such action should be barred by the automatic stay.

**\*4** An interference with the estate's ability to dispose of its property, or, for that matter, with its contractual right to secure the $17 billion in cash and stock that it will obtain on the closing of the Time Warner and Comcast deal, is a classic, and egregious, violation of section 362(a)(3).

Additionally, section 105(a) of the Code provides:

> The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title.

Section 105(a) of the Bankruptcy Code provides broad equitable power for a Bankruptcy Court to maintain its own jurisdiction and to facilitate the reorganization process. Section 105(a) powers may be exercised "where there is a basis for concluding that rehabilitation, the very purpose for the bankruptcy proceedings, might be undone by the other action." *Manville Corp. v. Equity Sec. Holders Comm. (In re Johns–Manville Corp.),* 801 F.2d 60, 64 (2d Cir.1986).

Included within the Court's authority is the power to issue a temporary restraining order to prevent irreparable harm to the debtor's estate or harm to the debtor's ability to reorganize. *See In re Monroe Well Serv., Inc.,* 67 B.R. 746, 750 (Bankr.E.D.Pa.1986).

The Bankruptcy Court's injunctive powers under section 105(a) also include "the power to enjoin the Defendants from proceeding against non-debtor third parties ... where, as here, the actions against

such third parties have at least a conceivable effect upon the Debtors or implicate the interpretation or enforcement of this Court's orders." *In re Chateaugay Corp.,* 201 B.R. 48, 66 (Bankr .S.D.N.Y.1996). Here, of course, where TAC wishes to enjoin the very transaction that will provide the underpinnings of the Debtors' reorganization, and provide the lion's share of creditor recoveries, the effort to enjoin this sale will have much more than a "conceivable effect" on the Debtors and this Court's orders.

The standards for a TRO and preliminary injunction in this Circuit, which are not materially different, are well established. To prevail, the moving party must show: (a) that it will suffer "irreparable harm in the absence of an injunction" and "(b) either (i) a likelihood of success on the merits or (ii) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor." *Zervos v. Verizon N.Y., Inc.,* 252 F.3d 163, 172 (2d Cir.2001); *see also Polymer Technology Corp. v. Mimran,* 37 F.3d 74, 77–78 (2d Cir.1994); *Green v. Drexler (In re Feit & Drexler, Inc.),* 760 F.2d 406, 415 (2d Cir.1985); *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,* 596 F.2d 70, 72 (2d Cir.1979).

Here I find, as a mixed question of fact and law, that Adelphia plainly has shown irreparable injury, by reason of the threatened loss of the $17 billion it will receive on the sale of its business, and the threatened interference with Adelphia's reorganization. There is nothing in the record now, if there ever will be, to lead me to believe that TAC, a company yet to start business, could answer for such an astronomical loss in damages. The irreparable injury is especially severe since the proposed Sale involves a control premium which Adelphia was unable to obtain from anyone else, and since any delay in closing will subject the Adelphia estate to even greater prejudice, as interest on secured bank claims continues to accrue.

**\*5** The infringement on this Court's jurisdiction constitutes irreparable harm as well. *See In re*

Not Reported in B.R., 2006 WL 1529357 (Bkrtcy.S.D.N.Y.)
**(Cite as: 2006 WL 1529357 (Bkrtcy.S.D.N.Y.))**

*Johns–Manville Corp.,* 97 B.R. 174, 181 (Bankr.S.D.N.Y.1989) (Lifland, C.J.) (finding irreparable harm to future asbestos claimants by the filing of litigation in other forums in violation of claims procedures set forth in the debtors' confirmed reorganization plan, thereby defeating the court's continuing jurisdiction to implement the plan).

I also find that Adelphia has shown a likelihood of success. I have never seen such a blatant violation of section 362(a)(3). *48th Street Steakhouse,* a controlling decision of the Second Circuit, articulates principles directly applicable here, and *MCEG,* a decision from a respected colleague, is very close to being on all fours with this case. The injunction requested in Minnesota would have the effect (and Adelphia may well be able to establish the purpose) of holding the sale of Adelphia's assets hostage in an effort to coerce Time Warner and Comcast to carry TAC's programming on their cable properties. If TAC contends that Comcast, Time Warner or Adelphia acted wrongfully in declining to put TAC on their cable systems' channel lineups, it can seek to convince a court of that, and secure an order requiring TAC's programming to be carried, or to secure damages for a refusal. But as the remedy for the alleged offense, TAC seeks very different relief—an injunction prohibiting Adelphia and its creditors from realizing on the value of their assets—directly and materially interfering with the estate's realization of the value of its assets, and with its reorganization. That goes to the heart of what section 362(a)(3) prohibits.

And an injunction here is appropriate not just to meet the needs and concerns of the Debtors; it also is appropriate to meet the needs and concerns of the Court. Section 105(a) provides:

(a) The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or mak-

ing any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

Like most bankruptcy judges, I invoke section 105(a) with restraint, and never inconsistently with, or to circumvent, other provisions of the Code. But it is manifestly proper, in my view, to invoke section 105(a) "to enforce or implement" my earlier orders, to prevent abuses of process, and to avoid such a blatant interference with the Debtors' reorganization in these chapter 11 cases. Exercise of the Court's section 105(a) authority in this manner, and for this purpose, vindicates the interests of the *Court,* as much as (and perhaps more than) it vindicates the interest of an individual litigant. Particularly in such a situation, it is not surprising that the usual grounds for injunctive relief, such as irreparable injury, need not be shown in a proceeding for an injunction under section 105(a). *See LTV Steel Co. v. Board of Education (In re Chateaugay Corp.),* 93 B.R. 26, 29 (S.D.N.Y.1988) (Leval, J., then a District Judge); *Garrity v. Leffler ( In re Neuman),* 71 B.R. 567, 571 (S.D.N.Y.1987) (Sweet, J.); *C & J Clark America, Inc. v. Carol Ruth, Inc. ( In re Wingspread Corp.),* 92 B.R. 87, 92 (Bankr.S.D.N.Y.1988) (Brozman, C J.).

**\*6** I issue this injunction notwithstanding my assumption that the injunctive relief requested in Minnesota would be very difficult to obtain. Aside from any deficiencies that might exist as a matter of federal antitrust law (a matter as to which I take no position), I find it somewhat difficult to see how any injunction prohibiting the pending sale could be issued without requiring Adelphia to be named as a party to give it an opportunity to address the extraordinary injury Adelphia and its creditors would suffer if the sale were enjoined, and without also requiring a $17 billion bond for the value Adelphia would receive on the sale that is proposed to be blocked. But the prejudice to Adelphia and its creditors is so severe, and the violations of section 362(a)(3) and the interference with reorganization are all so blatant, that I must stop this in its tracks.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

If TAC wishes to have its carriage concerns addressed by means that are not violative of section 362(a)(3), or interfere with this Court's *in rem* jurisdiction and Adelphia's ability to reorganize, I will hear argument as to the practicality of narrower relief at the time we consider the preliminary injunction.

To my surprise, this Court's jurisdiction over this matter was questioned. Let me take a couple of minutes to put that matter to rest.

The subject matter jurisdiction of the district courts (and hence bankruptcy courts) with respect to bankruptcy matters arises principally from 28 U.S.C. § 1334. *See Buena Vista Television v. Adelphia Communications Corp. (In re Adelphia Communications Corp.)*, 307 B.R. 404, 412–414 (Bankr.S.D.N.Y.2004), discussing the applicable law in greater detail.

After providing, in its subsection (a), that the district courts have jurisdiction (and, indeed, exclusive jurisdiction) over *cases* under title 11 (a matter not relevant here), 28 U.S.C. § 1334 provides, with respect to *proceedings* (which include, in addition to contested matters in cases, adversary proceedings like this one):

(b) Notwithstanding any Act of Congress that confers exclusive jurisdiction on a court or courts other than the district courts, the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11.

The three types of jurisdiction that district (and hence bankruptcy) courts thus may exercise are "arising under" and "arising in" jurisdiction (which the Court regards as species of federal question jurisdiction), and "related to" jurisdiction.

As Adelphia properly observes, the test in the Second Circuit (like most Circuits) for determining the existence of "related to" jurisdiction under 28 U.S.C. § 1334 is whether the outcome of a proceed-

ing "might have any 'conceivable effect' on the bankrupt estate," or if the proceeding has "a significant connection" with the bankrupt estate. *In re Cuyahoga Equipment Corp.*, 980 F.2d 110, 114 (2d Cir.1992).

**\*7** As Chief Judge Mukasey of the district court noted when considering an earlier "related to" issue under section 1334(b):

The Third Circuit articulated what has become the prevailing definition of "related [to]" jurisdiction: "[A] civil proceeding is related to bankruptcy [if] ••• *the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy.* Thus, the proceeding need not necessarily be against the debtor or the debtor's property. An action is related to the bankruptcy if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate."

*Weisman v. Southeast Hotel Properties Ltd. Partnership*, 1992 WL 131080, at \*3 (S.D.N.Y.1992) (emphasis in original).

And though it's not necessary now to decide the matter, because the "related to" jurisdiction is so obvious, I believe that because the estate relies on rights arising under Bankruptcy Code sections 362(a)(3) and 105(a), and because the estate is trying to avoid damage to a reorganization pending in this Court, "arising under" and "arising in" jurisdiction are present here as well.

Also, the Bankruptcy Court has inherent ancillary jurisdiction over the Defendants and the claims asserted in the TAC Action, irrespective of statutory grants of authority. As Chief Judge Lifland of this Court stated:

Bankruptcy courts have inherent or ancillary jurisdiction to interpret and enforce their own orders wholly independent of the statutory grant of juris-

diction under 28 U.S.C. § 1334. *Local Loan Co. v. Hunt,* 292 U.S. 234, 239, 54 S.Ct. 695, 696, 78 L.Ed. 1230 (1934); *Paris Mfg. Corp. v. Ace Hardware Corp. (In re Paris Indus. Corp.),* 132 B.R. 504, 508 (D.Me.1991) ( "Bankruptcy Courts must have the ability to enforce prior orders and 'secure or preserve the fruits and advantages of a judgment or decree rendered therein' ... The proceeding being ancillary and dependent, the jurisdiction of the Court follows that of the original cause ...") (quoting *Local Loan Co).*

*LTV Corp. v. Back ( In re Chateaugay Corp.),* 201 B.R. 48, 62 (Bankr.S.D.N.Y.1996). In later proceedings in that same case, the district court upheld the bankruptcy court's injunctive relief, enjoining the appellants from pursuing remedies in courts other than the bankruptcy court. *See Back v. LTV Corp.,* 213 B.R. 633, 637 (S.D.N.Y.1997).

Then, a word about the somewhat strange contention that I don't have jurisdiction to issue a TRO because the adversary complaint wasn't served yet. I've never heard that contention before, in 30 years of practice, and about 6 on the bench. Rule 65(b) sets forth the notice requirements for the issuance of a TRO, and even provides that a TRO can be issued without any notice at all. As a matter of practice, I and most federal judges insist on notice, except in those rare cases where notice would vitiate the purposes of the requested injunction. But the service of the complaint, which could properly be done by U.S. Mail under Fed. R. Bankr.P. 7004(b), has nothing to do with that.

**\*8** Finally, in e-mails to Debtors' counsel (though not in court, or by pleadings subject to Rule 11), counsel for TAC seemed to raise some kind of *in personam* jurisdiction claim, suggesting that TAC and/or its counsel was immune to answering in this Court for its conduct, and expressing an intention to quash any process or order served up in this case. I find this threat puzzling. Bankruptcy Rule 7004(d), entitled "Nationwide Service of Process," provides that "[t]he summons and complaint and all other process except a subpoena may be

served anywhere in the United States." Bankruptcy Rule 7004(f), entitled, "Personal Jurisdiction," states:

> If the exercise of jurisdiction is consistent with the Constitution and laws of the United States, serving a summons ... in accordance with this rule or the subdivisions of Rule 4 F .R.Civ.P. made applicable by these rules is effective to establish personal jurisdiction over the person of any defendant with respect to a case under the Code or a civil proceeding arising under the Code, or arising in or related to a case under the Code.

In *Enron Corp. v. Arora (In re Enron, Corp. et al.),* 316 B.R. 434 (Bankr.S.D.N.Y.2004), Judge Gonzalez of this Court held that the Fifth Amendment's Due Process Clause requires courts to use a *federal* minimum contacts test, not an inquiry into the defendants' minimum contacts with the forum *state,* to determine whether personal jurisdiction exists under Bankruptcy Rule 7004(f). *See Enron,* 316 B.R. at 445 (citing, *inter alia, Medical Mutual of Ohio v. De Soto,* 245 F.3d 561, 567–68, in which the Sixth Circuit noted with regard to an ERISA nationwide service of process provision that "when a federal court exercises jurisdiction pursuant to a nationwide service of process provision, it is exercising jurisdiction for the territory of the United States and the individual liberty concern [under the Due Process Clause of the Fifth Amendment] is whether the individual over which the court is exercising jurisdiction has sufficient minimum contacts with the United States"). Obviously, that's the case here.

If TAC's counsel wishes to move before me to "quash" the order served upon it, it may be within its rights to seek such relief (subject to the "Motions for Reargument" requirements of Local Bankruptcy Rule 9023–1 and my Case Mgt. Order # 3, ¶ 29). And TAC will of course have a chance to be heard when Adelphia proceeds with its request for a preliminary injunction. But until such time, if any, that I or any higher court vacates the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in B.R., 2006 WL 1529357 (Bkrtcy.S.D.N.Y.)
**(Cite as: 2006 WL 1529357 (Bkrtcy.S.D.N.Y.))**

TRO issued today, I expect TAC and its counsel to comply with it.

Bkrtcy.S.D.N.Y.,2006.
In re Adelphia Communications Corp.
Not Reported in B.R., 2006 WL 1529357 (Bkrtcy.S.D.N.Y.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

## **Exhibit E**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-------------------------------------------------------------- x
```
In re:                                           :
                                                 :      Chapter 11
TRUVO USA LLC, et al.,                           :
                                                 :      Case No. 10-13513 (AJG)
                              Debtors.           :
                                                 :      Joint Administration Pending
```
-------------------------------------------------------------- :
```
TRUVO USA LLC, et al.,                           :
                                                 :      Adv. Proc. No. 10-03341
                              Plaintiffs,        :
                                                 :
v.                                               :
                                                 :
THE BANK OF NEW YORK MELLON                      :
CORPORATION, INDENTURE TRUSTEE WITH              :
RESPECT TO THE HY NOTES, et al.,                 :
                                                 :
                              Defendants.        :
```
-------------------------------------------------------------- x
```

## TEMPORARY RESTRAINING ORDER

Upon consideration of the Ex Parte Motion for a Temporary Restraining Order and a Preliminary Injunction Following a Hearing (I) Pursuant to 11 U.S.C. § 105, Rule 65 of the Federal Rules of Civil Procedure, and Rules 7001(7) and 7065 of the Federal Rules of Bankruptcy Procedure and/or (II) Extending the Automatic Stay Pursuant to Section 362 of the Bankruptcy Code (the "Motion")[1] filed by Truvo USA LLC ("Truvo USA") and certain of its subsidiaries and affiliates, as debtors and debtors-in-possession in the above-captioned chapter 11 cases and plaintiffs in this adversary proceeding (collectively, the "Debtors"); and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. § 1334; and consideration of the Motion and the relief requested therein being a core proceeding

---

[1] Capitalized terms used but not defined herein shall have the same meanings ascribed to those terms as used in the Motion.

pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and the relief requested being in the best interests of the Debtors and their estates and creditors; and the Court having considered and reviewed (i) the complaint for injunctive relief (the "Complaint"), (ii) the Motion, (iii) the Memorandum of Law in Support of the Motion (the "Memorandum"), (iv) the Declaration of Marc C. F. Goegebuer in support of the Motion (the "Goegebuer TRO Declaration"), (v) the Declaration of Jacques Reding in support of the Motion (the "Reding Declaration"), (vi) the Declaration of Peter Werdmuller in support of the Motion (the "Werdmuller Declaration"), (vii) the Declaration of Laura MacDermott in support of the Motion (the "MacDermott Declaration"), (viii) the Declaration of Saul E. Burian in support of the Motion (the "Burian Declaration"), (ix) the Declaration of Luke A. Barefoot in support of the Motion, together with the exhibits thereto (the "Barefoot Declaration"); and (x) the Declaration of Thomas J. Moloney pursuant to Local Bankruptcy Rule 9077-1(b) (the "Moloney Declaration", and together with the Motion, Memorandum, Goegebuer TRO Declaration, Reding Declaration, Werdmuller Declaration, MacDermott Declaration, Burian Declaration, and the Barefoot Declaration, the "Moving Papers"); and the Court being satisfied that the Memorandum and the Moloney Declaration demonstrate good and proper cause pursuant to Local Bankruptcy Rule 9077-1(b) and Civil Rule 65(b)(1) (made applicable by Bankruptcy Rule 7065) for issuance of this order on an *ex parte* basis; and service of the Moving Papers as provided herein providing due, proper, and sufficient notice; and the Court having determined that the legal and factual bases set forth in the Moving Papers establish just cause for the relief granted herein; and upon all of the proceedings had before the Court and after due deliberation and sufficient cause appearing therefor, this Court hereby makes the following findings of fact and conclusions of law:

1.      The Debtors have made a *prima facie* case that they are likely to prevail on the Motion to obtain injunctive relief against the Defendants;

2.      Failure to enter this temporary restraining order pending a hearing on the Motion would cause immediate and irreparable injury to the Debtors' estates, threatening the Debtors' ability to consummate a plan of reorganization, destroying value in the Debtors' estates, and disrupting the Debtors' administration of these chapter 11 cases;

3.      The issuance of a temporary restraining order appears necessary to maximize the value of the Debtors' estates and is in the best interests of the Debtors, their estates and their creditors (including Defendants);

4.      Defendants do not appear to be harmed by the issuance of a temporary restraining order;

5.      For the reasons set forth in the Moloney Declaration, the Debtors have demonstrated good cause for entry of this Order without notice to Defendants;

6.      The legal and factual bases set forth in the Complaint and the Moving Papers establish just cause for the relief granted herein.

**NOW, THEREFORE**, based on the foregoing and for other good and sufficient cause, it is hereby

**ORDERED** that the Motion is granted as to the request for a temporary restraining order pursuant to sections 105(a) and 362(a) of the Bankruptcy Code and Rule 7065 of the Bankruptcy Rules; and it is further

**ORDERED** that, pending a hearing and determination of the Debtors' request for a preliminary injunction, effective immediately and subject to the terms hereof, the Defendants (whether known or unknown) and all other creditors of the Debtors receiving notice of this

Order, including without limitation, their agents, attorneys and all persons acting in concert or participation with them, directly or indirectly, are hereby stayed, restrained and enjoined from (a) taking any act or action to enforce any rights in respect of the Guaranteed Debt[2] against any of the European Guarantors[3] (including without limitation, any efforts to accelerate the maturity of the Guaranteed Debt, including service by the Trustee of any notice of default pursuant to the Intercreditor Agreement), (b) taking any act or action in respect of the Guaranteed Debt to take or obtain possession of or to exercise control over property, or the proceeds of property, of the European Guarantors (including, without limitation, any efforts to attach such property, or to enforce security interests in such property), (c) taking any act or action in respect of the Guaranteed Debt (including, without limitation, commencing or continuing any act or action or other legal proceeding including any judicial, quasi-judicial, administrative or regulatory action, proceeding or process whatsoever) to create, perfect or enforce any lien against the European Guarantors or their property, or the proceeds of such property; (d) commencing or continuing any act or action or other legal proceeding (including, without limitation, any judicial, quasi-judicial, administrative or regulatory action, proceeding or process whatsoever), in respect of the Guaranteed Debt against the European Guarantors, or any of their property, or the proceeds of such property, including, without limitation, the commencement of insolvency or similar proceedings against the European Guarantors in any jurisdiction whatsoever; and (e) taking any act or action to enforce or collect upon any judicial, quasi-judicial, administrative or regulatory judgment, assessment or order against the European Guarantors in respect of the Guaranteed

---

[2] The Guaranteed Debt is comprised of obligations under (a) the Senior Facility Agreement dated May 23, 2007, and (b) the €395 million of 8 1/2% senior notes and $200 million of 8 3/8% senior notes due in 2014 issued by debtor Truvo Subsidiary Corp. pursuant to the Indenture dated December 7, 2004.

[3] Truvo Belgium Comm. V., Truvo Services & Technology B.V., Truvo Belgium Comm. V., Truvo Nederland B.V., Truvo Dutch Holdings B.V., Truvo Ireland Ltd., Truvo Corporate CVBA, Truvo Ireland Holdings B.V., and Truvo Nederland Holdings B.V. are each European Guarantors

Debt, in any jurisdiction whatsoever; *provided however*, that nothing in this Order shall be interpreted to stay, restrain or enjoin any actions taken in furtherance of or to effectuate the Debtors' Plan or the Plan Support Agreement; and it is further

      **ORDERED** that pursuant to Bankruptcy Rule 7065, the Debtors are relieved from posting any security pursuant to Rule 65(c) of the Federal Rules of Civil Procedure; and it is further

      **ORDERED** that the Court will conduct a hearing (the "<u>Hearing</u>") on the Debtors' request for a preliminary injunction on July 14, 2010 at 11:00 a.m. (prevailing Eastern time); and it is further

      **ORDERED** that entry of this Order shall be without prejudice to any creditor or party in interest seeking relief from its terms on notice to the Debtors; and it is further

      **ORDERED** that notice of this Order shall be served by overnight mail, postage prepaid, on or before July 1, 2010, upon all known Defendants at their last known address, by sending a copy of this Order with instructions that the Motion, supporting documents and other pleadings related thereto can be obtained on the Bankruptcy Court's website at *www.nysb.uscourts.gov* by registered users of the Bankruptcy Court's case filing system, and from Debtors' noticing agent in these cases, at [*www.kccllc.net*]; and it is further

      **ORDERED** that service of the Motion as provided therein, including service upon Defendants, shall be deemed good and sufficient notice of such Motion, and service of this Order in accordance herewith shall be deemed good and sufficient service and adequate notice for all purposes, and no other or further notice of the Motion or this Order need be provided; and it is further

**ORDERED** that this Order shall remain in effect through and including the date on which the Court conducts a hearing on the Motion's request for entry of a preliminary injunction, subject to (i) any further order of the Court, (ii) the Debtors' rights to request an extension or other modification of this Order, and (iii) any party's rights to request relief from or a modification of this Order on notice to the Debtors; and it is further

**ORDERED** that objections, if any, to the Debtors' request for a preliminary injunction shall be set forth in a writing describing the basis therefor which shall be filed with the Court electronically in accordance with General Order M-242 by registered users of the Court's electronic case filing system and, by all other parties in interest, on a 3.5 inch disk, preferably in Portable Document Format (PDF), WordPerfect or any other Windows-based word processing format (with a hard copy delivered directly to the chambers of the Hon. Arthur J. Gonzalez, United States Bankruptcy Judge, at the United States Bankruptcy Court, Room 523, United States Custom House, One Bowling Green, New York, New York, 10004-1408) and served in accordance with General Order M-242 and the Administrative Order, Pursuant to Rule 1015(c) of the Federal Rules of Bankruptcy Procedure Establishing Case Management and Scheduling Procedures, entered by the Court in these cases, so as to be actually received no later than 4:00 p.m. (prevailing Eastern time) on July 12, 2010 (the "Objection Deadline") on (i) Cleary Gottlieb Steen & Hamilton LLP, Attorneys for the Debtors, One Liberty Plaza, New York, New York 10006 (Attn: Thomas J. Moloney, Esq. and Sean A. O'Neal, Esq.); (ii) Jenner & Block LLP, Attorneys for the Debtors, 919 Third Avenue, 37th Floor, New York, New York 10022 (Attn: Vince E. Lazar, Esq. and Heather McArn, Esq.); (iii) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, New York, New York 10004 (Attn:

Brian S. Matsumoto, Esq.); and (iv) Linklaters LLP, 1345 Avenue of the Americas, New York, New York 10105 (Attn: Martin Flics, Esq. and Edward Rasp, Esq.), and it is further

       **ORDERED** that unless objections to the Debtors' request for a preliminary injunction are filed and served by the Objection Deadline, the Court may sign an order granting the Motion in its entirety without a further hearing or notice;

       **ORDERED** that this Court shall retain jurisdiction to, among other things, interpret, implement, and enforce the terms and provisions of this temporary restraining order.

Dated: New York, New York
     July 1, 2010 at 10:30 a.m., prevailing Eastern Time

                           _/s/ Arthur J. Gonzalez_____
                           UNITED STATES BANKRUPTCY JUDGE

**<u>Exhibit F</u>**

CLEARY GOTTLIEB STEEN & HAMILTON LLP          JENNER & BLOCK LLP
One Liberty Plaza                             919 Third Avenue, 37th Floor
New York, New York 10006                      New York, New York  10022
Telephone:  (212) 225-2000                    Telephone:  (212) 891-1600
Facsimile:  (212) 225-3999                    Facsimile:  (212) 891-1699
Thomas J. Moloney                             Vincent E. Lazar
Sean A. O'Neal                                Heather D. McArn

*Proposed Counsel for the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------ x

In re:                                    :
                                          :   Chapter 11
TRUVO USA LLC, et al.,                    :
                                          :   Case No. 10-[_____] (____)
                      Debtors.            :
                                          :   Joint Administration Pending
------------------------------------------------------------ :
TRUVO USA LLC, et al.,                    :
                                          :   Adv. Proc. No. 10-[_____]
                      Plaintiffs,         :
                                          :
v.                                        :
                                          :
THE BANK OF NEW YORK MELLON               :
CORPORATION, INDENTURE TRUSTEE WITH       :
RESPECT TO THE HY NOTES, et al.,          :
                                          :
                      Defendants.         :
------------------------------------------------------------ x

**DEBTORS' *EX PARTE* MOTION FOR A TEMPORARY RESTRAINING ORDER**
**AND PRELIMINARY INJUNCTION FOLLOWING A HEARING (I) PURSUANT**
**TO 11 U.S.C. § 105, RULE 65 OF THE FEDERAL RULES OF CIVIL PROCEDURE,**
**AND RULES 7001(7) AND 7065 OF THE FEDERAL RULES OF BANKRUPTCY**
**PROCEDURE, AND/OR (II) EXTENDING THE AUTOMATIC**
**STAY PURSUANT TO SECTION 362 OF THE BANKRUPTCY CODE**

Truvo USA LLC and certain of its affiliates, as debtors and debtors in possession

(collectively, the "Debtors"[1] and each, a "Debtor"; together with their non-debtor direct and

---

[1]     The Debtors are Truvo USA LLC ("Truvo USA"), Truvo Parent Corp. ("Truvo Parent"), Truvo
Intermediate LLC, ("Truvo Intermediate"), Truvo Subsidiary Corp. ("Truvo Subsidiary"), and Truvo Acquisition
Corp. ( "Truvo Acquisition").  The Debtors have moved for joint administration under the case of Truvo USA.

indirect subsidiaries, the "Truvo Group") hereby move this Court (the "Motion") for the entry of orders substantially in the form attached hereto as Exhibits A and B, granting a temporary restraining order and setting a hearing on a preliminary injunction (i) pursuant to Section 105(a) and Rule 7065 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and/or (ii) extending the automatic stay pursuant to Section 362(a) of the Bankruptcy Code. In support of this Motion, the Debtors respectfully represent as follows:

## Background

*The Debtors And The Proposed Reorganization Of The Truvo Group*

1. On July 1, 2010 (the "Petition Date"), each Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. The Debtors continue to operate their businesses and manage their assets as debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

2. The Truvo Group is a multinational provider of local search and advertising services in print, online, voice, and mobile formats with operations in Belgium, Ireland, and through a joint venture, Portugal. The Truvo Group also has significant, non-controlling equity interests in leading directory companies operating in South Africa and Puerto Rico. The Truvo Group has over 1,700 full time employees, and a total customer base of over two hundred thousand advertisers. Most of these advertisers are small and medium-sized enterprises, who rely on the Truvo Group's products as the most cost-effective vehicle for branding.[2]

---

[2]	Additional information about the Debtors' businesses, capital structure, and the circumstances leading to their Chapter 11 filing are set forth in the Declaration of Marc C. F. Goegebuer in Support of First Day Motions and Applications Pursuant to Local Rule 1007-2 (the "First Day Decl."), which is incorporated in its entirety by reference herein.

3.       The Truvo Group's main source of revenue is the sale of advertising space in its print and online media products through its operating subsidiaries. The Debtors, however, are holding companies, which have no revenue-generating operations, and depend instead on upstream revenues or other forms of capital support from their operating subsidiaries or intermediate holding companies. The Debtors will continue to rely on intercompany transfers from their non-debtor subsidiaries to fund the costs and expenses of this proceeding.[3]

4.       The Debtors' Chapter 11 cases provide an opportunity to make critically-needed adjustments to the Truvo Group's capital structure, which are necessary to effect the transformation of the Truvo Group. In order to maximize and preserve going concern value, the Debtors have negotiated a plan of reorganization supported by holders of at least 70 percent of their senior debt (as may be modified or amended from time to time, the "Plan"), the only "in the money" constituency in these cases. The organized and coordinated process that the Plan contemplates, which will provide not only for sharing of value with junior creditor classes that accept the Plan but also for a complete resolution of claims under the Guaranteed Debt (as defined below), depends on the relief sought in this Motion.

*The Debt Instruments and the Guaranteed Debt*

5.       The Debtors' capital structure relies on support, in the form of guarantees and/or pledges of security interests, from certain of their non-debtor operating subsidiaries and the intermediate holding companies that more closely own the equity in those operating subsidiaries (together, the "European Guarantors").[4]

---

[3]       See Debtors' Motion for an Order Pursuant to Sections 345, 363, and 503(b)(1) (A) Approving the Continued Use of the Cash Management System, Bank Accounts, and Business Forms, (B) Authorizing Banks to Honor Certain Transfers and Charge Certain Fees and other Amounts, (C) Permitting Continued Intercompany Transactions and Granting Superpriority Status to Postpetition Intercompany Claims, and (D) Preserving and Permitting the Exercise of Intercompany Setoff Rights (the "Cash Management Motion"), ¶ 23.

[4]       The European Guarantors are Truvo Services & Technology B.V., Truvo Belgium Comm. V., Truvo

6.      Specifically, prior to the petition date, Truvo USA and certain of its subsidiaries in the Truvo Group entered into the Senior Facility Agreement dated May 23, 2007 (the "Senior Facility", and the lenders thereunder, "Senior Lenders", and the loans outstanding thereunder, the "Senior Loans").   The amounts outstanding under the Senior Facility are guaranteed by certain of the Debtors and each of the European Guarantors.   Certain of the Debtors and European Guarantors have also secured the Senior Loans by pledging equity interests and other assets as collateral.

7.      Debtor Truvo Subsidiary has also issued senior notes due in 2014 under the Indenture dated December 7, 2004 (the "Indenture", and the notes issued thereunder the "HY Notes", together with the Senior Facility, the "Debt Instruments", and the Debtors' obligations thereunder, the "Guaranteed Debt").   These HY Notes are guaranteed by certain of the Debtors and European Guarantors.   The relative rights and priorities in respect of the Guaranteed Debt are governed by an Intercreditor Agreement dated May 23, 2007 (the "Intercreditor Agreement"), which is governed by English law and includes an exclusive English forum-selection clause.

8.      The Debtors' Chapter 11 petitions constitute an event of default under both the Senior Facility and the Indenture.   In addition, Debtor Truvo Subsidiary did not make its June 1, 2010 coupon payment on the HY Notes, which (including the 30-day grace period) will become payable on July 1, 2010.

9.      While the Debtors have secured the support of at least 70 percent of the Senior Loans for their proposed Plan, as described in the attached Declaration of Saul E. Burian (the "Burian Decl."), the Debtors have been unable to engage in any effective dialogue with a

---

Nederland B.V., Truvo Dutch Holdings B.V., Truvo Ireland Ltd., Truvo Corporate CVBA, Truvo Ireland Holdings B.V., and Truvo Nederland Holdings B.V.

critical mass of holders of the HY Notes. As a result, there remains a real risk that during the pendency of the Debtors' Chapter 11 cases, holders of the HY Notes or dissident individual Senior Lenders that have not agreed to support the Debtors' Plan could take action to collect or enforce the Guaranteed Debt against the European Guarantors.

*Jurisdiction And Venue*

10.     As set forth in the Memorandum, this Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B), (G) and (O). The statutory bases for the relief requested herein are Sections 105(a) and 362(a) of the Bankruptcy Code. Venue in this District is proper pursuant to 28 U.S.C. § 1409.

*Procedural Setting*

11.     In connection with this Motion, the Debtors have simultaneously filed an adversary complaint (the "Complaint") against the holders of the HY Notes and those Senior Lenders that have not signed the plan support agreement, dated as of June 29, 2010 (the "Plan Support Agreement", and such entities together, "Defendants").[5] The Complaint seeks an order, (i) pursuant to Section 105 of the Bankruptcy Code, Rule 65 of the Federal Rules of Civil Procedure (the "Civil Rules"), as made applicable by Federal Rule of Bankruptcy Procedure 7065) and Bankruptcy Rule 7001(7) enjoining for an initial period of 120 days any Defendants' pursuit of claims or remedies against the European Guarantors on account of the Guaranteed Debt (collectively, "Guaranty Claims"), and/or (ii) extending the automatic stay pursuant to

---

[5]     As noted in the Complaint, the Debtors will voluntarily dismiss any Senior Lender who is or becomes a signatory to the Plan Support Agreement that is inadvertently named in the Complaint. A copy of the Plan Support Agreement is attached as Exhibit A to the Declaration of Humayun Khalid in Support of Debtors' First Day Motions and Applications (the "Khalid Decl.").

Section 362 of the Bankruptcy Code to stay actions by the Defendants against the European Guarantors based on the Guaranteed Debt.

### **Relief Requested**

12.     Unless the Motion is granted, actions by dissident creditors threaten to render meaningless the protections of the automatic stay.  The Debtors have proposed a Plan of reorganization with the support of at least 70 percent of the Senior Loans that provides for an orderly sale of their assets and which, pursuant to the Intercreditor Agreement, will resolve claims under the Guaranteed Debt both with respect to the Debtors and the European Guarantors. This coordinated and largely agreed-upon reorganization faces the imminent threat of actions that dissident creditors may take to enforce or collect the Guaranteed Debt from the European Guarantors directly, including through the filing of involuntary insolvency proceedings.

13.     Absent entry of an injunction, such actions threaten irreparable harm to the Debtors' ability to reorganize, as well as risk destruction of going concern value in the Debtors' estates, and a compromised ability to administer these Chapter 11 cases.  Defendants as a whole would similarly benefit from entry of the injunction, by ensuring that the going concern value of the Truvo Group is preserved and maximized, eliminating the destruction of such value through individual efforts to enforce the Guaranteed Debt.   Junior creditors similarly stand to benefit from the requested relief, as the orderly reorganization that the injunction will permit contemplates a sharing of value with junior creditor classes that vote in favor of the Plan, which would be impossible in liquidation.  In any event, all Defendants will have the opportunity to fully and fairly contest any issues concerning the Debtors' proposed Plan in this proceeding.  In light of the advanced stages of the Debtors' Plan, the limited duration of the requested injunction, and the public interests in promoting a successful, organized reorganization, the Court should grant the Motion.

**Entitlement to *Ex Parte* Relief**

14.     The Debtors have demonstrated ample cause for entry of a temporary restraining order on an *ex parte* basis.  As set forth in the accompanying Declaration of Thomas J. Moloney Pursuant to Local Bankruptcy Rule 9077-1(b) (the "Moloney Decl."), if Defendants were given advance notice of this application, they would have incentives to immediately take efforts to commence involuntary bankruptcy, attachment, or other proceedings against the European Guarantors before they were otherwise enjoined from doing so.  Many of these remedies are themselves available on an *ex parte* basis without any notice to the Debtors.  See Declaration of Jacques Reding (the "Reding Decl.") ¶ 16; Declaration of Peter Werdmuller (the "Werdmuller Decl.") ¶ 13; Declaration of Laura MacDermott (the "MacDermott Decl.") ¶ 13. Advance notice could thus precipitate the irreparable harm that the Motion seeks to avoid, rendering the requested relief unavailable and frustrating this Court's jurisdiction.  Moreover, any insolvency proceeding or other enforcement action taken against the European Guarantors would cause irreparable damage to the market reputation of the Truvo Group as a whole, which could not be remedied by dismissal of such proceedings.  See Declaration of Marc C. F. Goegebuer in Support of Motion (the "Goegebuer TRO Decl.") ¶¶ 10-11, 14; Burian Decl. ¶ 9. By contrast, entry of the temporary restraining order on an *ex parte* basis will only serve to preserve the status quo until such time as the Court can hold a hearing on the preliminary injunction, on notice to Defendants.

15.     As set forth in the Debtors' proposed temporary restraining order, promptly following entry (and in addition to individual service of the Complaint itself on Known Defendants), the Debtors will serve all of the papers supporting the Debtors' Motion on: (i) the Trustee for the HY Notes, (ii) the agent under the Senior Facility, and (iii) the security agent under the Intercreditor Agreement.  The Debtors will also serve the temporary restraining order

in accordance with its terms, accompanied by a notice of entry which advises recipients how to obtain copies of the Motion, Complaint, and supporting papers from this Court's filing system and the website for the Debtors' noticing agent, the form of which is attached hereto as Exhibit C.  In addition, the Debtors will also promptly publish said notice on the Irish Stock Exchange, where the HY Notes are listed.

16.     The Debtors submit that no other or further notice of the Motion need be given, and that good cause for entry of the temporary restraining order *ex parte* has been shown pursuant to Local Bankruptcy Rule 9077-1(b) and Rule 65(b)(1)(B).

## No Prior Application

17.     No previous request for the relief sought herein has been made to this or any other court.

**WHEREFORE**, the Debtors respectfully request that this Court (i) grant this Motion and the relief requested herein; (ii) enter the proposed temporary restraining order attached as <u>Exhibit A</u> hereto, pending a hearing on the proposed preliminary injunction order attached as <u>Exhibit B</u>; and (iii) grant such other and further relief as it deems just and proper.

Dated: July 1, 2010
     New York, New York

CLEARY GOTTLIEB STEEN & HAMILTON LLP

By:    /s/ Thomas J. Moloney
       Thomas J. Moloney
       Sean A. O'Neal

One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999

*Proposed Counsel for the Debtors and Debtors in Possession as to all claims, except for claims against Defendants ACMO, Bank of America, BNY Mellon, Barclays, Citibank, Deutsche Bank, Goldman Sachs, Halcyon, King Street, Macquarie, Morgan Stanley, Royal Bank of Scotland, Natixis, Perry, and Silver Point*

JENNER & BLOCK LLP

By:     /s/ Vincent E. Lazar
       Vincent E. Lazar
       Heather D. McArn

919 Third Avenue, 37th Floor
New York, New York 10006
Telephone: (212) 891-1600
Facsimile: (212) 891-1699

*Proposed Counsel for the Debtors and Debtors in Possession as to all claims*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-------------------------------------------------------------- x
In re:                                          :
                                                :   Chapter 11
TRUVO USA LLC, et al.,                          :
                                                :   Case No. 10-[_____] (_____)
                        Debtors.                :
                                                :   Joint Administration Pending
-------------------------------------------------------------- :
TRUVO USA LLC, et al.,                          :
                                                :   Adv. Proc. No. 10-[_____]
                        Plaintiffs,             :
                                                :
v.                                              :
                                                :
THE BANK OF NEW YORK MELLON                     :
CORPORATION, INDENTURE TRUSTEE WITH             :
RESPECT TO THE HY NOTES, et al.,                :
                                                :
                        Defendants.             :
-------------------------------------------------------------- x
```

## <u>TEMPORARY RESTRAINING ORDER</u>

Upon consideration of the Ex Parte Motion for a Temporary Restraining Order and a Preliminary Injunction Following a Hearing (I) Pursuant to 11 U.S.C.§ 105, Rule 65 of the Federal Rules of Civil Procedure, and Rules 7001(7) and 7065 of the Federal Rules of Bankruptcy Procedure and/or (II) Extending the Automatic Stay Pursuant to Section 362 of the Bankruptcy Code (the "<u>Motion</u>")[1] filed by Truvo USA LLC ("<u>Truvo USA</u>") and certain of its subsidiaries and affiliates, as debtors and debtors-in-possession in the above-captioned chapter 11 cases and plaintiffs in this adversary proceeding (collectively, the "<u>Debtors</u>"); and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. § 1334; and consideration of the Motion and the relief requested therein being a core proceeding

---

[1] Capitalized terms used but not defined herein shall have the same meanings ascribed to those terms as used in the Motion.

pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and the relief requested being in the best interests of the Debtors and their estates and creditors; and the Court having considered and reviewed (i) the complaint for injunctive relief (the "Complaint"), (ii) the Motion, (iii) the Memorandum of Law in Support of the Motion (the "Memorandum"), (iv) the Declaration of Marc C. F. Goegebuer in support of the Motion (the "Goegebuer TRO Declaration"), (v) the Declaration of Jacques Reding in support of the Motion (the "Reding Declaration"), (vi) the Declaration of Peter Werdmuller in support of the Motion (the "Werdmuller Declaration"), (vii) the Declaration of Laura MacDermott in support of the Motion (the "MacDermott Declaration"), (viii) the Declaration of Saul E. Burian in support of the Motion (the "Burian Declaration"), (ix) the Declaration of Luke A. Barefoot in support of the Motion, together with the exhibits thereto (the "Barefoot Declaration"); and (x) the Declaration of Thomas J. Moloney pursuant to Local Bankruptcy Rule 9077-1(b) (the "Moloney Declaration", and together with the Motion, Memorandum, Goegebuer TRO Declaration, Reding Declaration, Werdmuller Declaration, MacDermott Declaration, Burian Declaration, and the Barefoot Declaration, the "Moving Papers"); and the Court being satisfied that the Memorandum and the Moloney Declaration demonstrate good and proper cause pursuant to Local Bankruptcy Rule 9077-1(b) and Civil Rule 65(b)(1) (made applicable by Bankruptcy Rule 7065) for issuance of this order on an *ex parte* basis; and service of the Moving Papers as provided herein providing due, proper, and sufficient notice; and the Court having determined that the legal and factual bases set forth in the Moving Papers establish just cause for the relief granted herein; and upon all of the proceedings had before the Court and after due deliberation and sufficient cause appearing therefor, this Court hereby makes the following findings of fact and conclusions of law:

1.     The Debtors have made a *prima facie* case that they are likely to prevail on the Motion to obtain injunctive relief against the Defendants;

2.     Failure to enter this temporary restraining order pending a hearing on the Motion would cause immediate and irreparable injury to the Debtors' estates, threatening the Debtors' ability to consummate a plan of reorganization, destroying value in the Debtors' estates, and disrupting the Debtors' administration of these chapter 11 cases;

3.     The issuance of a temporary restraining order appears necessary to maximize the value of the Debtors' estates and is in the best interests of the Debtors, their estates and their creditors (including Defendants);

4.     Defendants do not appear to be harmed by the issuance of a temporary restraining order;

5.     For the reasons set forth in the Moloney Declaration, the Debtors have demonstrated good cause for entry of this Order without notice to Defendants;

6.     The legal and factual bases set forth in the Complaint and the Moving Papers establish just cause for the relief granted herein.

**NOW, THEREFORE**, based on the foregoing and for other good and sufficient cause, it is hereby

**ORDERED** that the Motion is granted as to the request for a temporary restraining order pursuant to sections 105(a) and 362(a) of the Bankruptcy Code and Rule 7065 of the Bankruptcy Rules; and it is further

**ORDERED** that, pending a hearing and determination of the Debtors' request for a preliminary injunction, effective immediately and subject to the terms hereof, the Defendants (whether known or unknown) and all other creditors of the Debtors receiving notice of this

Order, including without limitation, their agents, attorneys and all persons acting in concert or participation with them, directly or indirectly, are hereby stayed, restrained and enjoined from (a) taking any act or action to enforce any rights in respect of the Guaranteed Debt[2] against any of the European Guarantors[3] (including without limitation, any efforts to accelerate the maturity of the Guaranteed Debt, including service by the Trustee of any notice of default pursuant to the Intercreditor Agreement), (b) taking any act or action in respect of the Guaranteed Debt to take or obtain possession of or to exercise control over property, or the proceeds of property, of the European Guarantors (including, without limitation, any efforts to attach such property, or to enforce security interests in such property), (c) taking any act or action in respect of the Guaranteed Debt (including, without limitation, commencing or continuing any act or action or other legal proceeding including any judicial, quasi-judicial, administrative or regulatory action, proceeding or process whatsoever) to create, perfect or enforce any lien against the European Guarantors or their property, or the proceeds of such property; (d) commencing or continuing any act or action or other legal proceeding (including, without limitation, any judicial, quasi-judicial, administrative or regulatory action, proceeding or process whatsoever), in respect of the Guaranteed Debt against the European Guarantors, or any of their property, or the proceeds of such property, including, without limitation, the commencement of insolvency or similar proceedings against the European Guarantors in any jurisdiction whatsoever; and (e) taking any act or action to enforce or collect upon any judicial, quasi-judicial, administrative or regulatory judgment, assessment or order against the European Guarantors in respect of the Guaranteed

---

[2] The Guaranteed Debt is comprised of obligations under (a) the Senior Facility Agreement dated May 23, 2007, and (b) the €395 million of 8 1/2% senior notes and $200 million of 8 3/8% senior notes due in 2014 issued by debtor Truvo Subsidiary Corp. pursuant to the Indenture dated December 7, 2004.

[3] Truvo Belgium Comm. V., Truvo Services & Technology B.V., Truvo Belgium Comm. V., Truvo Nederland B.V., Truvo Dutch Holdings B.V., Truvo Ireland Ltd., Truvo Corporate CVBA, Truvo Ireland Holdings B.V., and Truvo Nederland Holdings B.V. are each European Guarantors

Debt, in any jurisdiction whatsoever; *provided however*, that nothing in this Order shall be interpreted to stay, restrain or enjoin any actions taken in furtherance of or to effectuate the Debtors' Plan or the Plan Support Agreement; and it is further

**ORDERED** that pursuant to Bankruptcy Rule 7065, the Debtors are relieved from posting any security pursuant to Rule 65(c) of the Federal Rules of Civil Procedure; and it is further

**ORDERED** that the Court will conduct a hearing (the "<u>Hearing</u>") on the Debtors' request for a preliminary injunction on July [_], 2010 at _____] a.m. (prevailing Eastern time); and it is further

**ORDERED** that entry of this Order shall be without prejudice to any creditor or party in interest seeking relief from its terms on notice to the Debtors; and it is further

**ORDERED** that notice of this Order shall be served by overnight mail, postage prepaid, on or before July [__], 2010, upon all known Defendants at their last known address, by sending a copy of this Order with instructions that the Motion, supporting documents and other pleadings related thereto can be obtained on the Bankruptcy Court's website at *www.nysb.uscourts.gov* by registered users of the Bankruptcy Court's case filing system, and from Debtors' noticing agent in these cases, at [*www.kccllc.net*]; and it is further

**ORDERED** that service of the Motion as provided therein, including service upon Defendants, shall be deemed good and sufficient notice of such Motion, and service of this Order in accordance herewith shall be deemed good and sufficient service and adequate notice for all purposes, and no other or further notice of the Motion or this Order need be provided; and it is further

**ORDERED** that this Order shall remain in effect through and including the date on which the Court conducts a hearing on the Motion's request for entry of a preliminary injunction, subject to (i) any further order of the Court, (ii) the Debtors' rights to request an extension or other modification of this Order, and (iii) any party's rights to request relief from or a modification of this Order on notice to the Debtors; and it is further

**ORDERED** that objections, if any, to the Debtors' request for a preliminary injunction shall be set forth in a writing describing the basis therefor which shall be filed with the Court electronically in accordance with General Order M-242 by registered users of the Court's electronic case filing system and, by all other parties in interest, on a 3.5 inch disk, preferably in Portable Document Format (PDF), WordPerfect or any other Windows-based word processing format (with a hard copy delivered directly to the chambers of the Hon. [_____], United States Bankruptcy Judge, at the United States Bankruptcy Court, Room [____], United States Custom House, One Bowling Green Plaza, New York, New York, 10004-1408) and served in accordance with General Order M-242 and the Administrative Order, Pursuant to Rule 1015(c) of the Federal Rules of Bankruptcy Procedure Establishing Case Management and Scheduling Procedures, entered by the Court in these cases, so as to be actually received no later than 4:00 p.m. (prevailing Eastern time) on July [_], 2010 (the "Objection Deadline") on (i) Cleary Gottlieb Steen & Hamilton LLP, Attorneys for the Debtors, One Liberty Plaza, New York, New York 10006 (Attn: Thomas J. Moloney, Esq. and Sean A. O'Neal, Esq.); (ii) Jenner & Block LLP, Attorneys for the Debtors, 919 Third Avenue, 37th Floor, New York, New York 10022 (Attn: Vince E. Lazar, Esq. and Heather McArn, Esq.); (iii) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, New York, New York 10004

(Attn: Brian S. Matsumoto, Esq.); and (iv) Linklaters LLP, 1345 Avenue of the Americas, New York, New York 10105 (Attn: Martin Flics, Esq. and Edward Rasp, Esq.), and it is further

**ORDERED** that unless objections to the Debtors' request for a preliminary injunction are filed and served by the Objection Deadline, the Court may sign an order granting the Motion in its entirety without a further hearing or notice;

**ORDERED** that this Court shall retain jurisdiction to, among other things, interpret, implement, and enforce the terms and provisions of this temporary restraining order.

Dated: New York, New York
      July __, 2010 at __:__ _.m., prevailing Eastern Time

_____
UNITED STATES BANKRUPTCY JUDGE

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
------------------------------------------------------------ x
In re:                                         :
                                               :    Chapter 11
TRUVO USA LLC, et al.,                         :
                                               :    Case No. 10-[_____] (____)
                           Debtors.            :
                                               :    Joint Administration Pending
------------------------------------------------------------ :
TRUVO USA LLC, et al.,                         :
                                               :    Adv. Proc. No. 10-[_____]
                           Plaintiffs,         :
                                               :
v.                                             :
                                               :
THE BANK OF NEW YORK MELLON                    :
CORPORATION, INDENTURE TRUSTEE WITH            :
RESPECT TO THE HY NOTES, et al.,               :
                                               :
                           Defendants.         :
------------------------------------------------------------ x
```

## PRELIMINARY INJUNCTION FOLLOWING A HEARING PURSUANT TO 11 U.S.C. § 105, RULE 65 OF THE FEDERAL RULES OF CIVIL PROCEDURE, AND RULES 7001(7) AND 7065 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE

Upon the motion dated July 1, 2010 (the "Motion"),[1] filed by Truvo USA LLC

("Truvo USA") and certain of its subsidiaries and affiliates, as debtors and debtors-in-possession

in the above-captioned Chapter 11 cases and plaintiffs in this adversary proceeding (collectively,

the "Debtors"), for entry of a temporary restraining order and a preliminary injunction following

a hearing (i) pursuant to 11 U.S.C.§ 105, Rule 65 of the Federal Rules of Civil Procedure, and

Rules 7001(7) and 7065 of the Federal Rules of Bankruptcy Procedure and/or (ii) extending the

automatic stay pursuant to Section 362 of the Bankruptcy Code; and the Court having

---

[1] Capitalized terms used but not defined herein shall have the same meanings ascribed to those terms as used in the Motion.

jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. § 1334; and consideration of the Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and the relief requested being in the best interests of the Debtors and their estates and creditors; and the Court having entered the Temporary Restraining Order sought by the Motion on July [__], 2010 (D.I. --); and the Court having considered and reviewed (i) the complaint for injunctive relief and the exhibits thereto (the "Complaint"), (ii) the Motion, (iii) the Memorandum of Law in Support of the Motion (the "Memorandum"), (iv) the Declaration of Marc C. F. Goegebuer in support of the Motion (the "Goegebuer TRO Declaration"), (v) the Declaration of Jacques Reding in support of the Motion (the "Reding Declaration"), (vi) the Declaration of Peter Werdmuller in support of the Motion (the "Werdmuller Declaration"), (vii) the Declaration of Laura MacDermott in support of the Motion (the "MacDermott Declaration"), (viii) the Declaration of Saul E. Burian in support of the Motion (the "Burian Declaration"), (ix), the Declaration of Luke A. Barefoot in support of the Motion (the "Barefoot Declaration"), and (x) the Declaration of Thomas J. Moloney pursuant to Local Bankruptcy Rule 9077-1(b) (the "Moloney Declaration", and together with the Motion, Memorandum, Goegebuer TRO Declaration, Reding Declaration, Werdmuller Declaration, MacDermott Declaration, Burian Declaration, and Barefoot Declaration, the "Moving Papers"), (xi) the affidavit of service reflecting the service provided of the Moving Papers and notice of entry of the Court's TRO, [(xii) the objections filed with respect to the Motion (the "Objections"),] and (xiii) the testimony, evidence, and arguments presented on the record of the hearing held before the Court on July [_], 2010 (the "Hearing"); and service of the Moving Papers as provided herein providing due, proper, and sufficient notice; and the Court having determined that the legal and factual bases set

forth in the Moving Papers establish just cause for the relief granted herein; and upon all of the proceedings had before the Court and after due deliberation and sufficient cause appearing therefor, this Court hereby makes the following findings of fact and conclusions of law:

1. Failure to enter this preliminary injunction would cause immediate and irreparable injury to the Debtors' estates, threatening the Debtors' ability to consummate a plan of reorganization, destroying value in the Debtors' estates, and disrupting the Debtors' administration of these Chapter 11 cases.

2. The issuance of a preliminary injunction appears necessary to preserve and maximize the value of the Debtors' estates and is in the best interests of the Debtors, their estates and their creditors.

3. Actions to enforce the Guaranteed Debt against the European Guarantors threaten to destroy the Debtors' ability to reorganize pursuant to the Plan. Such actions could include forcing the European Guarantors into involuntary insolvency proceedings, attaching the property of the European Guarantors, and/or taking actions to enforce any security interests against the European Guarantors.

4. Any such involuntary insolvency proceeding would generally divest management of control of the operations of the European Guarantors in favor of an appointed trustee charged with liquidating the assets of the companies. Scattering control of the European Guarantors among various bankruptcy trustees would irreparably destroy creditor value and the ability of the Debtors to reorganize.

5. Any attachments of the European Guarantors' property (whether *ex parte* or otherwise) would threaten their ability to continue operations, obstruct the shift towards an online- and mobile-focused business model, and, preclude the European Guarantors from making

intercompany loans or other transfers to the Debtors to fund the administration of their ongoing Chapter 11 expenses.

6.     Because the property pledged by the European Guarantors in support of the Truvo Group's obligations under the Senior Facility includes the key operational assets of Truvo Belgium and Truvo Ireland, enforcement of security interests against such property would force these entities to cease operations.

7.     Absent a preliminary injunction, the threat of involuntary insolvency proceedings or other enforcement actions in the jurisdictions where the European Guarantors operate would also cause severe commercial and reputational harm by dissuading the Truvo Group's short-term customers from renewing their contracts and continuing to do business with any member of the Truvo Group.  Such uncertainty would also threaten the European Guarantors' ability to recruit and retain critical employees.

8.     The injunction is in the best interests of all parties in interest in these Chapter 11 cases.  As a whole, the Defendants will benefit from entry of the injunction, which will ensure that the going-concern value of the Truvo Group is preserved and maximized, eliminating the destruction of such value through piecemeal individual efforts to enforce the Guaranteed Debt against the European Guarantors.  The coordinated process embodied in the Debtors' Plan also permits the sharing of value with junior creditors whose classes vote in favor of the Plan, which would be impossible in a liquidation scenario.  The temporary delay imposed by this injunction will not prejudice the Defendants to any degree comparable to the prejudice that all creditors as a group and other parties in interest in these Chapter 11 cases would suffer if the enforcement actions were not enjoined.  The balance of the equities therefore weighs in the favor of the Debtors.

9.      For these reasons, the granting of the requested injunctive relief is necessary to avoid immediate and irreparable injury to the Debtors' estates.

10.     Due and adequate notice to the extent practicable has been given to the Defendants.

11.     The legal and factual bases set forth in the Complaint, the Moving Papers, and at the Hearing establish just cause for the relief granted herein.

**NOW, THEREFORE**, based on the foregoing and for other good and sufficient cause, it is hereby

**ORDERED** that the Motion is granted in its entirety; and it is further

**ORDERED** that any objections to the relief sought in the Motions are overruled on their merits; and it is further

**ORDERED** that, pursuant to sections 105(a) and 362(a) of the Bankruptcy Code, effective immediately and subject to the terms hereof, and for an initial period of 120 days (subject to the rights of the Debtors and their creditors to request an extension or reduction), the Defendants (whether known or unknown) and all other creditors of the Debtors receiving notice of this Order, including without limitation, their agents, attorneys and all persons acting in concert or participation with them, directly or indirectly, are hereby stayed, restrained and enjoined from (a) taking any act or action to enforce any rights in respect of the Guaranteed Debt[2] against any of the European Guarantors[3] (including without limitation, any efforts to accelerate the maturity of the Guaranteed Debt, including service by the Trustee of any notice of

---

[2]     The Guaranteed Debt is comprised of obligations under (a) the Senior Facility Agreement dated May 23, 2007, and (b) the €395 million of 8 1/2% senior notes and $200 million of 8 3/8% senior notes due in 2014 issued by debtor Truvo Subsidiary Corp. pursuant to the Indenture dated December 7, 2004.

[3]     Truvo Belgium Comm. V., Truvo Services & Technology B.V., Truvo Belgium Comm. V., Truvo Nederland B.V., Truvo Dutch Holdings B.V., Truvo Ireland Ltd., Truvo Corporate CVBA, Truvo Ireland Holdings B.V., and Truvo Nederland Holdings B.V. are each European Guarantors

default pursuant to the Intercreditor Agreement), (b) taking any act or action in respect of the Guaranteed Debt to take or obtain possession of or to exercise control over property, or the proceeds of property, of the European Guarantors (including, without limitation, any efforts to attach such property, or to enforce security interests in such property), (c) taking any act or action in respect of the Guaranteed Debt (including, without limitation, commencing or continuing any act or action or other legal proceeding including any judicial, quasi-judicial, administrative or regulatory action, proceeding or process whatsoever) to create, perfect or enforce any lien against the European Guarantors or their property, or the proceeds of such property; (d) commencing or continuing any act or action or other legal proceeding (including, without limitation, any judicial, quasi-judicial, administrative or regulatory action, proceeding or process whatsoever), in respect of the Guaranteed Debt against the European Guarantors, or any of their property, or the proceeds of such property, including, without limitation, the commencement of insolvency or similar proceedings against the European Guarantors in any jurisdiction whatsoever; and (e) taking any act or action to enforce or collect upon any judicial, quasi-judicial, administrative or regulatory judgment, assessment or order against the European Guarantors in respect of the Guaranteed Debt, in any jurisdiction whatsoever *provided however*, that nothing in this Order shall be interpreted to stay, restrain or enjoin any actions taken in furtherance of or to effectuate the Debtors' Plan or the Plan Support Agreement; and it is further

**ORDERED** that pursuant to Bankruptcy Rule 7065, the Debtors are relieved from posting any security pursuant to rule 65(c) of the Federal Rules of Civil Procedure; and it is further

**ORDERED** that nothing contained in this Order shall prohibit any party in interest from seeking relief from the automatic stay of section 362(a) of the Bankruptcy Code or the terms of

this Order by filing an appropriate motion with the Court, on notice to counsel for the Debtors; and it is further

**ORDERED** that a copy of this Order shall be served by overnight mail, postage prepaid, within three (3) business days of entry of this Order, upon all known Defendants and the General Service List (as defined in the Administrative Order, Pursuant to Rule 1015(c) of the Federal Rules of Bankruptcy Procedure Establishing Case Management and Scheduling Procedures (D.I. [--]); and it is further

**ORDERED** that service of the Motion and Complaint as provided therein, including service upon Defendants, shall be deemed good and sufficient notice of such Motion and Complaint, and service of this Order in accordance herewith shall be deemed good and sufficient service and adequate notice for all purposes, and no other or further notice of the Motion or this Order need be provided; and it is further

**ORDERED** that this Court shall retain jurisdiction to, among other things, interpret, implement, and enforce the terms and provisions of this Order.

Dated:   New York, New York
         July ___, 2010                        _____
                                               United States Bankruptcy Judge

CLEARY GOTTLIEB STEEN & HAMILTON LLP   JENNER & BLOCK LLP
One Liberty Plaza                                               919 Third Avenue, 37th Floor
New York, New York 10006                            New York, New York  10022
Telephone:  (212) 225-2000                           Telephone:  (212) 891-1600
Facsimile:  (212) 225-3999                            Facsimile:  (212) 891-1699
Thomas J. Moloney                                        Vincent E. Lazar
Sean A. O'Neal                                              Heather D. McArn

*Proposed Counsel for the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------ x
In re:                                                          :
                                                                :   Chapter 11
TRUVO USA LLC, et al.,                          :
                                                                :   Case No. 10-[_____] (____)
                                Debtors.         :
                                                                :   Joint Administration Pending
------------------------------------------------------------ :
TRUVO USA LLC, et al.,                          :
                                                                :   Adv. Proc. No. 10-[_____]
                                Plaintiffs,      :
                                                                :
v.                                                              :
                                                                :
THE BANK OF NEW YORK MELLON         :
CORPORATION, INDENTURE TRUSTEE WITH :
RESPECT TO THE HY NOTES, et al.,        :
                                                                :
                                Defendants.    :
------------------------------------------------------------ x

**NOTICE OF ENTRY OF TEMPORARY RESTRAINING ORDER ON DEBTORS' *EX PARTE* MOTION FOR A TEMPORARY RESTRAINING ORDER AND A PRELIMINARY INJUNCTION FOLLOWING A HEARING (I) PURSUANT TO 11 U.S.C. § 105, RULE 65 OF THE FEDERAL RULES OF CIVIL PROCEDURE, AND RULES 7001(7) AND 7065 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND/OR (II) EXTENDING THE AUTOMATIC STAY PURSUANT TO <ins>SECTION 362 OF THE BANKRUPTCY CODE</ins>**

PLEASE TAKE NOTICE that on July 1, 2010, Truvo USA LLC ("Truvo USA")

and certain of its subsidiaries and affiliates, as debtors and debtors-in-possession in the above-

captioned Chapter 11 cases and plaintiffs in this adversary proceeding (collectively, the "Debtors") filed the *Ex Parte* Motion for a Temporary Restraining Order and a Preliminary Injunction Following a Hearing (I) Pursuant to 11 U.S.C.§ 105, Rule 65 of the Federal Rules of Civil Procedure, and Rules 7001(7) and 7065 of the Federal Rules of Bankruptcy Procedure and/or (II) Extending the Automatic Stay Pursuant to Section 362 of the Bankruptcy Code (the "Motion") (D.I. --);

PLEASE TAKE FURTHER NOTICE that the Motion, together with supporting documents and other pleadings related thereto can be obtained on the website for the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), at www.nysb.uscourts.gov by registered users of the Bankruptcy Court's case filing system, or from the Debtors' noticing agent in these cases, at www.kccllc.net;

PLEASE TAKE FURTHER NOTICE that on July [_], 2010, the Court entered the attached Temporary Restraining Order (D.I. [--]) (the "TRO");

PLEASE TAKE FURTHER NOTICE that pursuant to the TRO, the Bankruptcy Court has scheduled a hearing on the Motion's request for entry of a preliminary injunction, to be held on July [_], 2010 at [_____] a.m. (prevailing Eastern time);

PLEASE TAKE FURTHER NOTICE that the TRO has established July [_], 2010 at _____ p.m. (prevailing Eastern time) (the "Objection Deadline") as the deadline by which objections, if any, to the Debtors' request for a preliminary injunction must be filed and served in accordance with the procedures set forth in the TRO;

PLEASE TAKE FURTHER NOTICE that unless objections to the Debtors' request for a preliminary injunction are filed and served by the Objection Deadline in accordance

with the TRO, the Court may sign an order granting the Motion in its entirety without further

hearing or notice.

Dated: July 1, 2010                   CLEARY GOTTLIEB STEEN & HAMILTON LLP
      New York, New York

By: _____
      Thomas J. Moloney
      Sean A. O'Neal

One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999

*Proposed Counsel for the Debtors and Debtors in
Possession as to all claims, except for claims against
Defendants ACMO, Bank of America, BNY Mellon,
Barclays, Citibank, Deutsche Bank, Goldman Sachs,
Halcyon, King Street, Macquarie, Morgan Stanley, Royal
Bank of Scotland, Natixis, Perry, and Silver Point*

JENNER & BLOCK LLP

By: _____
      Vincent E. Lazar
      Heather D. McArn

919 Third Avenue, 37th Floor
New York, New York 10006
Telephone:  (212) 891-1600
Facsimile:  (212) 891-1699

*Proposed Counsel for the Debtors
and Debtors in Possession as to all claims*

CLEARY GOTTLIEB STEEN & HAMILTON LLP     JENNER & BLOCK LLP
One Liberty Plaza                        919 Third Avenue, 37th Floor
New York, New York 10006                 New York, New York  10022
Telephone:  (212) 225-2000               Telephone:  (212) 891-1600
Facsimile:  (212) 225-3999               Facsimile:  (212) 891-1699
Thomas J. Moloney                        Vincent E. Lazar
Sean A. O'Neal                           Heather D. McArn

*Proposed Counsel for the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
------------------------------------------------------------ x
In re:                                    :
                                          :   Chapter 11
TRUVO USA LLC, et al.,                    :
                                          :   Case No. 10-[_____] (____)
                        Debtors.          :
                                          :   Joint Administration Pending
------------------------------------------------------------ :
TRUVO USA LLC, et al.,                    :
                                          :   Adv. Proc. No. 10-[_____]
                        Plaintiffs,       :
                                          :
v.                                        :
                                          :
THE BANK OF NEW YORK MELLON               :
CORPORATION, INDENTURE TRUSTEE WITH       :
RESPECT TO THE HY NOTES, et al.,          :
                                          :
                        Defendants.       :
------------------------------------------------------------ x
```

**MEMORANDUM OF LAW IN SUPPORT OF DEBTORS' *EX PARTE* MOTION**
**FOR A TEMPORARY RESTRAINING ORDER AND A PRELIMINARY**
**INJUNCTION FOLLOWING A HEARING (I) PURSUANT TO 11 U.S.C. § 105,**
**RULE 65 OF THE FEDERAL RULES OF CIVIL PROCEDURE, AND**
**RULES 7001(7) AND 7065 OF THE FEDERAL RULES OF BANKRUPTCY**
**PROCEDURE AND/OR (II) EXTENDING THE AUTOMATIC**
**STAY PURSUANT TO SECTION 362 OF THE BANKRUPTCY CODE**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................ ii

PRELIMINARY STATEMENT ..................................................................... 2

STATEMENT OF FACTS ............................................................................. 4

    A.   The Truvo Group ........................................................................ 4

    B.   Proposed Reorganization of the Truvo Group................................. 9

    C.   Irreparable Harm Surrounding the Risk of Enforcement Actions
        Against the European Guarantors.................................................... 10

ARGUMENT .................................................................................................. 13

I.     ENFORCEMENT OF THE GUARANTY CLAIMS AGAINST THE EUROPEAN
      GUARANTORS SHOULD BE STAYED PURSUANT TO SECTION 105(A) OF
      THE BANKRUPTCY CODE................................................................. 13

    A.   There is a Reasonable Likelihood of a Successful Reorganization................. 16

    B.   There is Danger of Irreparable Harm to the Debtors in the
        Absence of an Injunction.................................................................. 17

    C.   The Balance of Hardships Weighs Strongly in the Debtors' Favor ................ 18

    D.   Granting the Injunction Serves the Public Interest.......................... 20

    E.   The Debtors Have Satisfied the Requirements for the Entry of a Temporary
        Restraining Order ............................................................................ 23

II.    IN THE ALTERNATIVE, THE COURT SHOULD EXTEND THE AUTOMATIC
      STAY TO BAR PROSECUTION OF THE GUARANTY CLAIMS AGAINST THE
      EUROPEAN GUARANTORS................................................................ 24

III.   THE COURT HAS JURISDICTION TO GRANT THE RELIEF REQUESTED   27

    Claims Arise Under the Bankruptcy Code and In These Chapter 11 Cases........... 28

    The Court Also Has "Related To" Jurisdiction........................................ 30

    The Court Has Personal Jurisdiction Over Defendants ......................... 32

CONCLUSION................................................................................................ 35

# TABLE OF AUTHORITIES

**Page(s)**

**Rules and Statutes**

11 U.S.C. § 105(a) ............................................................................ 14

28 U.S.C. § 1334(b) .......................................................................... 28

Fed. R. Civ. P. 65(b) ........................................................................ 23

**Cases**

Adelphia Commc'ns Corp. v. Am. Channel, LLC
(In re Adelphia Commc'ns Corp.),
No. 06-1528 (REG), 2006 Bankr. LEXIS 975 (Bankr. S.D.N.Y. June 5, 2006) ............... 23, 29, 32

Alert Holdings, Inc. v. Interstate Protective Servs., Inc. (In re Alert Holdings Inc.),
148 B.R. 194 (Bankr. S.D.N.Y. 1992) ..................................................... 18

Am. Film Techs., Inc. v. Taritero (In re Am. Film Techs., Inc.)
175 B.R. 847 (Bankr. D. Del. 1994) ....................................................... 20

Burger King Corp. v. Rudzewicz,
471 U.S. 462 (1985) ......................................................................... 32

Chase Manhattan Bank N.A. v. Third Eighty-Ninth Assocs.
(In re Third Eighty-Ninth Assocs.),
138 B.R. 144 (S.D.N.Y. 1992) .............................................................. 18

Deutsche Bank AG, London Branch & Bear, Stearns & Co., Inc. v. Metromedia Fiber
Network, Inc. (In re Metromedia Fiber Network, Inc.),
416 F.3d 136 (2d. Cir. 2005) .............................................................. 15

E. Air Lines, Inc. v. Rolleston (In re Ionosphere Clubs Inc.),
124 B.R. 635 (S.D.N.Y. 1991) .............................................................. 15

Erti v. Paine Webber Jackson & Curtis, Inc. (In re Baldwin-United Corp. Litig.),
765 F.2d 343 (2d. Cir. 1985) .............................................................. 14

Geron v. Schulman (In re Manshul Constr. Corp.),
225 B.R. 41 (Bankr. S.D.N.Y. 1998) ....................................................... 29

Goldin v. Primavera Familienstiftung Tag Assocs., Ltd.
(In re Granite Partners LP),
194 B.R. 318 (Bankr. S.D.N.Y. 1996) ................................................................ 15

Gray v. Hirsch (In re Gray),
230 B.R. 239 (S.D.N.Y. 1999) ............................................................................ 25

Haw. Structural Ironworkers Pension Trust Fund v. Calpine Corp., Inc.,
No. 06 Civ 5358 (PKC), 2006 U.S. Dist. LEXIS 92499 (S.D.N.Y. Dec. 20, 2006) ......... 16

Helicopteros Nacionales de Colombia, S.A. v. Hall,
466 U.S. 408 (1984) ........................................................................................... 32

Hunnicutt Co. v. TJX Cos.,
190 B.R. 157 (S.D.N.Y. 1995) ............................................................................ 30

In re Adelphia Commc'ns Corp.,
298 B.R. 49 (S.D.N.Y. 2003) .............................................................................. 15

In re Adelphia Commc'ns. Corp.,
368 B.R. 140 (Bankr. S.D.N.Y. 2007) ................................................................ 21

In re Enron Corp.,
316 B.R. 434 (Bankr. S.D.N.Y. 2004) ................................................................ 32

In re J.T. Moran Fin. Corp.,
119 B.R. 447 (Bankr. S.D.N.Y. 1990) ................................................................ 28

In re Leco Enters., Inc.,
144 B.R. 244 (S.D.N.Y. 1992) ............................................................................ 29

In re Monroe Well Serv., Inc.,
67 B.R. 746 (Bankr. E.D. Pa. 1986) .................................................................... 22

In re River Center Holdings LLC,
288 B.R. 59 (Bankr. S.D.N.Y. 2003) .................................................................. 31

In re United Health Care Org.,
210 B.R. 228 (S.D.N.Y. 1997) ............................................................................ 18

In re Vuitton et Fils, S.A.,
606 F.2d 1 (2d Cir. 1979) ............................................................................. 23-24

Joremi Enters. v. Hershkowitz (In re New 118th LLC),
396 B.R. 885 (Bankr. S.D.N.Y. 2008) ........................................................... 29, 30

Johns-Manville Corp. v. Asbestos Litig. Group (In re Johns-Manville Corp.),
40 B.R. 219 (S.D.N.Y. 1984) .............................................................................. 15

Keene Corp. v. Acstar Ins. Co. (In re Keene Corp.),
    168 B.R. 285 (Bankr. S.D.N.Y. 1994).......................................................... 18. 22

LaMonica v. N. of England Protecting & Indemnity Ass'n (In re Probulk Inc.),
    407 B.R. 56 (Bankr. S.D.N.Y. 2009)........................................................... 34

LFD Operating, Inc. v. G.E. Capital Corp. (In re Ames Dep't Stores, Inc.),
    No. 06 Civ 5394 (BSJ), 2008 U.S. Dist. LEXIS 109362 (S.D.N.Y. June 4, 2008)........... 27

Lifetime Brands Inc. v. ARC Int'l, SA,
    No. 09 Civ 9792 (LAK), 2010 U.S. Dist. LEXIS 8320 (S.D.N.Y. Jan. 29, 2010)............ 30

Licensing by Paolo v. Sinatra (In re Gucci),
    126 F.3d 380 (2d Cir. 1997)...................................................................... 25

Little Tor Auto Ctr. v. Exxon Co. USA,
    822 F. Supp. 141 (S.D.N.Y. 1993)............................................................... 24

LTV Corp. v. Back (In re Chateaugay Corp.),
    201 B.R. 48 (Bankr. S.D.N.Y. 1996)............................................................ 20

LTV Steel Co., Inc. v. Bd. of Educ. (In re Chateaugay Corp., Reomar, Inc.),
    93 B.R. 26 (S.D.N.Y. 1988)...................................................................... 16

Lyondell Chem. Co. v. CenterPoint Energy Gas Servs. Inc. (In re Lyondell Chem. Co.),
    402 B.R. 571 (Bankr. S.D.N.Y. 2009).......................................................... passim

Manville Corp. v. Equity Sec. Holders Comm. (In re Johns-Manville Corp.),
    801 F.2d 60 (2d Cir. 1986)....................................................................... 29

Masterwear Corp. v. Rubin Baum Levin Contant & Friedman (In re Masterwear Corp.),
    241 B.R. 511 (Bankr. S.D.N.Y. 1999)........................................................... 31

N. Star Contracting Corp. v. McSpedon (In re N. Star Contracting Corp.),
    125 B.R. 368 (S.D.N.Y. 1991).................................................................... 25

Nev. Power Co. v. Calpine Corp. (In re Calpine Corp.),
    365 B.R. 401 (S.D.N.Y. 2007)...............................................................14, 15, 16, 17

Osanitsch v. Marconi PLC (In re Marconi PLC),
    363 B.R. 361 (S.D.N.Y. 2007).................................................................... 29

Pro-Specialites, Inc. v. Thomas Funding Corp.,
    812 F.2d 797 (2d. Cir. 1987)..................................................................27, 30, 31

Publicker Indus. v. United States (In re Cuyahoga Equip. Corp.),
    980 F.2d 110 (2d Cir. 1992)...................................................................... 30

Queenie, Ltd. v. Nygard Int'l,
321 F.3d 282 (2d Cir. 2003)................................................................ 25

Robert Plan Corp. v. Liberty Mut. Ins. Co.,
No. 09 Civ. 1930 (JS), 2010 U.S. Dist. LEXIS 27200 (E.D.N.Y. Mar. 23, 2010)............. 25

SEC v. Byers,
No. 09-0234-cv (RSP), 2010 U.S. App. LEXIS 12160 (2d. Cir. June 15, 2010)............... 3, 19

Steven P. Nelson, D.C., P.A. v. G.E. Capital Corp. (In re Steven P. Nelson, D.C., P.A.),
140 B.R. 814 (Bankr. M.D. Fla. 1992) ......................................................... 17

Sudbury, Inc. v. Escott (In re Sudbury, Inc.),
140 B.R. 461 (Bankr. N.D. Ohio) ............................................................. 20

Underwood v. Hilliard (In re Rimsat, Ltd.),
98 F.3d 956 (7th Cir. 1996) ................................................................. 34

Walsh v. Abrams (In re HBG Servicenter, Inc.),
45 B.R. 668 (Bankr. E.D.N.Y. 1985)........................................................... 29

Wolf Fin. Group, Inc. v. Hughes Constr. Co. (In re Wolf Fin. Group, Inc.),
No. 94-8884A (JLG), 1994 Bankr. LEXIS 2350 (Bankr. S.D.N.Y. Dec. 15, 1994) .......... 24

Wood v. Wood (In re Wood),
825 F.2d 90 (5th Cir. 1987) ................................................................. 28

The Debtors[1] respectfully submit this memorandum of law in support of their Motion[2] for an order prohibiting the holders of the HY Notes and those Senior Lenders that have not signed the plan support agreement and any other creditors of the Debtors receiving notice (together, the "Defendants") from pursuing, for an initial period of 120 days (subject to the rights of the Debtors and their creditors to request an extension or reduction), claims against certain of the Debtors' European operating subsidiaries and the intermediate holding companies that own the equity in those operating subsidiaries to collect or enforce the Guaranteed Debt (collectively, the "European Guarantors").[3]

## PRELIMINARY STATEMENT

The Debtors, with the support of at least 70 percent of holders of the Senior Loans, who constitute the only "in the money" creditor constituency in these cases, are poised to confirm promptly a pre-packaged Chapter 11 Plan, the terms of which have been agreed to pursuant to the Plan Support Agreement filed contemporaneously with the commencement of these cases. The Plan that is detailed therein will not only preserve the Truvo Group's multinational yellow pages and other print, online and mobile advertising businesses, including the jobs of the approximately 1,700 full-time employees, but if the Debtors' junior creditors support the Plan, they can share meaningfully in some of the Debtors' preserved going concern reorganization value, even though they are contractually subordinated to the Senior Lenders and

---

[1] The Debtors are Truvo USA LLC ("Truvo USA"), Truvo Parent Corp. ("Truvo Parent"), Truvo Intermediate LLC, ("Truvo Intermediate"), Truvo Subsidiary Corp. ("Truvo Subsidiary"), and Truvo Acquisition Corp. ("Truvo Acquisition"). The Debtors have moved for joint administration under the case of Truvo USA.

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the accompanying Motion.

[3] The European Guarantors are Truvo Services & Technology B.V., Truvo Belgium Comm. V., Truvo Nederland B.V., Truvo Dutch Holdings B.V., Truvo Ireland Ltd., Truvo Corporate CVBA, Truvo Ireland Holdings B.V., and Truvo Nederland Holdings B.V.

would receive no recovery in a liquidation scenario.  To accomplish these laudable goals and to avoid immediate and irreparable harm to the Debtors' ability to reorganize, the Debtors require the injunctive relief requested by the Motion to protect their non-debtor operating subsidiaries from rogue creditor action during a brief 120-day period, during which time the Debtors expect to confirm their Plan.

Although the relief sought here, the protection of non-debtor entities, is unusual, it is supported by this Court's recent and directly on-point decision in <u>Lyondell Chem. Co. v. CenterPoint Energy Gas Servs. Inc. (In re Lyondell Chem. Co.)</u>, 402 B.R. 571 (Bankr. S.D.N.Y. 2009).  The injunction is also thoroughly justified by the unique facts the Debtors' cases present,[4] by well-established precedent under Sections 105 and 362 of the Bankruptcy Code, and by the inherent equitable powers of this Court as recently affirmed in <u>SEC v. Byers</u>, No. 09-0234-cv, 2010 U.S. App. LEXIS 12160 (2d. Cir. June 15, 2010).  Importantly, the relief sought herein is not only essential to the Debtors and their reorganization efforts, but it is ultimately beneficial to the parties who will be subject to the proposed injunction.  If action by dissident creditors prevents the Debtors from effectuating their plan of reorganization, and instead subjects the Debtors and their subsidiaries to a series of uncoordinated liquidation proceedings across the globe, the Senior Lenders as a group will lose substantial value and junior creditors would forfeit any opportunity for recovery on their debt whatsoever.  For these reasons, and for those set forth

---

[4]     <u>See</u> (i) Declaration of Marc C. F. Goegebuer in support of the Motion (the "<u>Goegebuer TRO Declaration</u>"), (ii) Declaration of Jacques Reding in support of the Motion (the "<u>Reding Declaration</u>"), (iii) the Declaration of Peter Werdmuller in support of the Motion (the "<u>Werdmuller Declaration</u>"), (iv) the Declaration of Laura MacDermott in support of the Motion (the "<u>MacDermott Declaration</u>"), (v) the Declaration of Saul E. Burian in support of the Motion (the "<u>Burian Declaration</u>"), (vi) the Declaration of Luke A. Barefoot in support of the Motion, together with the exhibits thereto (the "<u>Barefoot Declaration</u>"), and (vii) the Declaration of Thomas J. Moloney pursuant to Local Bankruptcy Rule 9077-1(b) (the "<u>Moloney Declaration</u>", and collectively, the "<u>Declarations</u>").

below and in the Declarations submitted herewith, the Debtors respectfully request the Court grant the equitable relief requested herein.

<strong><u>STATEMENT OF FACTS</u></strong>

**A.**      **<u>The Truvo Group</u>**

The Debtors are the United States holding companies at the top of the corporate pyramid of a complex international group of related companies under common management and control known as the Truvo Group.  The Truvo Group is a multinational provider of local search and advertising services in print, online, voice, and mobile formats.  First Day Decl. ¶ 7.  The Truvo Group has over 1,700 full-time employees, through which it operates in Belgium, Ireland, and (through a joint venture) Portugal.  <u>Id.</u>  The Truvo Group also has significant equity interests in leading directories companies with operations in South Africa and Puerto Rico.  <u>Id.</u>  The Truvo Group is the market leader in the directories business in each market where it operates.  <u>Id.</u>

The Truvo Group has a customer base of over two hundred thousand advertisers.  Goegebuer TRO Decl. ¶ 6.  These customers are mostly small and medium sized enterprises ("<u>SME</u>"), which depend on the Truvo Group's products as the most cost-effective vehicle for branding and advertising in the markets where Truvo operates.  First Day Decl. ¶ 8.  These products connect buyers quickly with sellers to assist consumers in making informed purchase decisions.  Goegebuer TRO Decl. ¶ 6.

Historically, the Truvo Group's main source of revenue has been the sale by its operating subsidiaries of advertising space in print directories.  First Day Decl. ¶ 9.  In recent years, however, the global yellow pages industry has experienced a structural shift from print directories to Internet and mobile media products.  <u>Id.</u> ¶ 14.  Since September of 2008, the global economic downturn has accelerated this shift by encouraging businesses to advertise online

instead of buying space in print directories.  Id. ¶ 13.  Despite cost-cutting and internal reorganization efforts, these industry and market conditions render the Truvo Group's projected cash flow insufficient to support its existing capital structure.  Id. ¶ 17.  The Truvo Group is approximately 11 times levered and is required to make cash interest payments totaling approximately €77 million per year.  Id.  Revenues, however, continue to decline.  Id.  Indeed, in light of the Truvo Group's financial situation, in March 2010 the independent auditor's report to the Truvo Group's shareholders stated that the going concern of the Truvo Group depended on the outcome of the debt restructuring and that the auditor was unable to give a fair and true view of the Truvo Group's financial position for the year ended December 31, 2009.  Id.

These dynamics require both a transformation of the Truvo Group's business model and a recapitalization.  To this end, the Debtors have sought Chapter 11 protection as part of a pre-negotiated global restructuring effort that will recapitalize the Truvo Group and align its capital structure with an online- and mobile-oriented business model.  Id.  The Debtors have secured the support of at least 70 percent of the Senior Loans for their proposed Plan of reorganization.  That Plan provides for a complete resolution of claims under the Guaranteed Debt, including claims against the European Guarantors.  Moreover, although the total obligations under the Senior Facility exceed the Truvo Group's current value, the organized and coordinated process that the Plan contemplates permits a consensual distribution to junior creditors, should they vote in favor of the Plan.  With the benefit of the relief contemplated by the Debtors' Plan, the Truvo Group is well positioned to be a viable long-term competitor.[5]

---

[5]    Additional information about the Debtors' businesses, capital structure, and the circumstances leading to their Chapter 11 filing are set forth in the First Day Declaration, which is incorporated in its entirety by reference herein.

The Debtors, which as noted, are the Truvo Group's U.S. holding companies, are obligated on three types of debt: the Senior Facility, the HY Notes, and a PIK loan agreement dated May 23, 2007 (the facility thereunder, the "PIK Facility"). First Day Decl. ¶ 10. Debtors Truvo Acquisition and Truvo USA have guaranteed obligations under the Senior Facility, and each of the Debtors has guaranteed obligations under the HY Notes. Id. Each of the Debtors has also granted certain pledges and liens as security for obligations under both the Senior Facility and the HY Notes. Id. In turn, the European Guarantors serve as guarantors for the obligations under the HY Notes issued by debtor Truvo Subsidiary, and/or under the Senior Facility. Id.; see also Reding Decl. ¶ 4; Werdmuller Decl. ¶ 4; MacDermott Decl. ¶ 4.[6] Certain of the European Guarantors have also pledged some or all of their assets as security to support obligations under the Senior Facility. First Day Decl. ¶ 10; Reding Decl. ¶ 4; Werdmuller Decl. ¶ 4; MacDermott Decl. ¶ 4. The relative remedies and priorities among the Senior Facility, the HY Notes and the PIK Facility are governed by the Intercreditor Agreement. First Day Decl. ¶ 11. In a nutshell, to the extent that there is less value in the Truvo Group, as a whole, than the amount of the outstanding debt under the Senior Facility, which is quite clearly the case here, the Senior Lenders have priority claims on all of the Debtors' assets and the right to control any enforcement proceedings.[7]

As each of the Debtors is a holding company, none of the Debtors has its own revenue-generating operations. First Day Decl. ¶ 7; Goegebuer TRO Decl. ¶¶ 5, 17. Instead, the

---

[6] The following non-debtor subsidiaries have guaranteed obligations under the HY Notes: Truvo Belgium Comm. V., Truvo Services & Technology B.V., and Truvo Corporate CVBA. Each of these entities has also guaranteed obligations under the Senior Loans. In addition, obligations under the Senior Loans have also been guaranteed by non-debtors Truvo Nederland B.V., Truvo Dutch Holdings B.V., Truvo Ireland Ltd., Truvo Ireland Holdings B.V., and Truvo Nederland Holdings B.V.

[7] A copy of the Intercreditor Agreement is attached as Exhibit C to the Barefoot Declaration.

Debtors depend entirely on upstream revenues or other forms of capital support from their foreign non-debtor operating subsidiaries, including the European Guarantors. First Day Decl. ¶ 8; Goegebuer TRO Decl. ¶ 5. The European Guarantors include two of the Truvo Group's three primary operating revenue-generating entities: (i) Truvo Belgium, the largest operating company in the Truvo Group, which had €189.5 million in net operating revenues for 2009 (62.7% of the Truvo Group's total); and (ii) Truvo Ireland Ltd., an operating company with €53.7 million in net operating revenues for 2009 (17.8% of the Truvo Group's total). Goegebuer TRO Decl. ¶ 6. The Debtors thus depend entirely on the operations of the European Guarantors and other non-debtor subsidiaries to satisfy their obligations under the Guaranteed Debt. Id. ¶¶ 5, 17. Indeed, future costs and expenses of their Chapter 11 proceedings will be funded through intercompany loans to the Debtors from the European Guarantors and other non-debtor subsidiaries. See Cash Management Motion ¶ 23. Without this capital support from their non-debtor subsidiaries, the Debtors will have insufficient means to fund the administration of this proceeding. See Cash Collateral Motion ¶ 28.

The Debtors' Chapter 11 petitions constitute an event of default under the Senior Facility.[8] In addition, as part of the Truvo Group's global restructuring process, the Truvo Group is completing certain mergers and liquidations of certain of the Debtors' European subsidiaries, which Senior Lenders that have not executed the Plan Support Agreement could argue gives rise to an additional event of default.

The Debtors' commencement of Chapter 11 cases also represents an event of default under the Indenture. See Barefoot Decl. Ex. B, § 6.01(a)(6). This event of default

---

[8] See Barefoot Decl. Ex. A, § 26.6.

automatically accelerates the HY Notes and renders all principal and interest immediately due. Id. § 6.02(c). In addition, coupon payments on the HY Notes are due annually on December 1 and June 1, with a grace period of 30 days. See First Day Decl. ¶ 10. Debtor Truvo Subsidiary did not make its June 1, 2010 coupon payment on the HY Notes, which (including the 30-day grace period) will become payable on July 1, 2010. Id. The Debtors' failure to make that coupon payment will constitute an independent event of default under the Indenture. See Barefoot Decl. Ex. B, § 6.01(a)(1).

Defendant Bank of New York Mellon serves as successor trustee under the Indenture for these HY Noteholders (the "Trustee"). The Complaint for injunctive relief identifies certain Defendants who, on information and belief, currently hold HY Notes (collectively, the "Known HY Noteholders"). However, the HY Notes are also widely and anonymously held across the Continent, including to a large extent by holders who have no long-term interest in the Debtors or their restructuring because these holders have credit default swap protection. Burian Decl. ¶ 8. In light of these dynamics, the Debtors have been unable to identify material holders of HY Notes or to engage effectively in any dialogue with a critical mass of them. Id. Accordingly, the Complaint also names unknown financial institutions, hedge funds, banks, other entities and/or individuals that now hold or may in the future acquire ownership of the HY Notes (the "Unknown HY Noteholders 1-500", and collectively with the Known HY Noteholders, the "HY Noteholders"). See Complaint ¶ 81.

Given the Debtors' inability to effectively engage with these HY Noteholders, the Debtors have no assurances as to their intended actions or support for the Debtors' restructuring. Burian Decl. ¶ 8. In particular, individual HY Noteholders may lack sufficient information concerning the restructuring or may simply perceive hold-up value in taking action against the

European Guarantors.  Id.  Although the Intercreditor Agreement permits the Trustee to serve a notice of default on the Senior Agent, setting in motion what purports to be a standstill period under the Intercreditor Agreement, on the expiration of that period the Trustee may direct enforcement action against the Note Guarantors.  See Barefoot Decl. Ex. C, §§ 20.7, 20.6.  More troubling is the fact that holders of HY Notes may assert that the Intercreditor Agreement's standstill will no longer be in effect once the Debtors' cases are filed.  Because the Intercreditor Agreement is governed by English law, with exclusive jurisdiction in the courts of England,  id., §§ 39, 40.1, there is no way for the Debtors to obtain any prompt or certain protection under that agreement from immediate enforcement actions by rogue creditors that could entirely thwart their reorganization efforts.

**B.**          **Proposed Reorganization of the Truvo Group**

As set forth in the Debtors' Plan Support Agreement, which describes the key terms of the Debtors' proposed Plan, the requisite majority of Senior Lenders have agreed to instruct the security agent to request Truvo Acquisition to sell its interests in Truvo USA to a newly-formed entity, in exchange for a cash payment equal to the fair market value.  See Khalid Decl. Ex A.  Pursuant to the Plan and in accordance with the Intercreditor Agreement, this mechanism will release all claims under the Senior Facility and the Indenture both against certain of the Debtors and the European Guarantors.  See generally, Khalid Decl. Ex. A, Ex. E §§ 5-5.2.  Because Truvo USA itself has no operations, the value of the interests in Truvo USA depends entirely on the value of its interests in its direct and indirect subsidiaries, including the European Guarantors.  Recoveries for the Debtors' creditors are thus inextricably tied to, and depend on, preserving the value of the European Guarantors' businesses.

**C.** **Irreparable Harm Surrounding the Risk of Enforcement Actions Against the European Guarantors**

There is no question that the orderly sale of the interests in Truvo USA envisioned by the Plan will create the most value for all of the Debtors' creditors. Burian Decl. ¶ 6. Should they vote in favor of the Plan, this sale will also permit the consensual distribution of value to junior creditors who are otherwise not entitled to any distribution. <u>Id.</u> ¶ 7. With the exception of such agreed-upon compromises, the Plan will fully respect the priorities set forth in the Intercreditor Agreement. However, absent the Debtors' obtaining the relief sought herein, because of the Debtors' complex global business structure, there remains a real risk that dissident creditors could take action to enforce or collect on the Guaranteed Debt against the European Guarantors. <u>Id.</u> ¶ 8.

For example, absent an injunction from this Court, dissident HY Noteholders or Senior Lenders could take unilateral actions to force the European Guarantors into involuntary insolvency proceedings. <u>See</u> Reding Decl. ¶ 6; Werdmuller Decl. ¶ 5; MacDermott Decl. ¶ 6. Such insolvency proceedings would generally divest management of control over the operations of the European Guarantors in favor of an appointed trustee charged with liquidating the assets of the companies for the benefit of creditors. Reding Decl. ¶ 9; Werdmuller Decl. ¶ 9; MacDermott Decl. ¶ 9. Scattering control of the European Guarantors among various bankruptcy trustees would frustrate the sale of the interests in Truvo USA imbedded in the Debtors' Plan and irreparably destroy creditor value and the ability of the Debtors to reorganize. Burian Decl. ¶¶ 6-7, 9-10. In particular, this would eliminate the synergies and economies of scale across the Truvo Group and frustrate management's efforts to integrate the operations of the Debtors' subsidiaries. Goegebuer TRO Decl. ¶ 13. For example, to facilitate the shift towards online and mobile products, the Truvo Group is in the process of moving from three

different application platforms now in use in Belgium, Ireland and Portugal (each country having multiple IT support teams), to a unified IT platform and centralized support team located in Belgium.  Id. ¶ 8.  This cost-saving integrative process will be implemented during the pendency of the Debtors' Chapter 11 cases, but would be derailed if any of the European Guarantors were placed in the control of a liquidator.  Id. ¶ 13.  In addition, because standard contractual bankruptcy termination clauses are enforceable under Belgian and Irish law, the counterparties of many critical contracts of Truvo Belgium and Truvo Ireland Ltd. – the Truvo Group's largest operating entities – would terminate such contracts in the event of an insolvency proceeding against a European Guarantor.  See Reding Decl. ¶ 10; MacDermott Decl. ¶ 10; Goegebuer TRO Decl. ¶ 16.  These critical contracts are necessary for Truvo Belgium and Truvo Ireland Ltd. to continue operations because they include office space leases, utility services agreements, contracts for the printing of directories, and internet hosting agreements.  Goegebuer TRO Decl. ¶ 16.

Beyond the prospect of involuntary bankruptcy proceedings, dissident creditors could further disrupt the Debtors' reorganization efforts by seeking *ex parte* attachments of the European Guarantors' property in Belgium, the Netherlands, Ireland or elsewhere.  Reding Decl. ¶ 14; Werdmuller Decl. ¶ 13; MacDermott Decl. ¶ 13; Burian Decl. ¶ 6.  If granted, such attachments would restrict the European Guarantors' ability to use the relevant property in their day-to-day operations, including funds in bank accounts, directory software, and key IP rights. Reding Decl. ¶ 15; Werdmuller Decl. ¶ 13; MacDermott Decl. ¶ 14; Goegebuer TRO Decl. ¶ 9. Any attachment of such property would threaten the European Guarantors' ability to make supplier and employee payments necessary for operations, obstruct the shift towards an online- and mobile-focused business model, and preclude the European Guarantors from making the

intercompany loans or credits to the Debtors to fund their ongoing Chapter 11 expenses.  See Cash Management Motion ¶ 23.

In addition, subject to the provisions of the Intercreditor Agreement, dissident Senior Lenders may attempt to enforce security interests against property that the European Guarantors pledged to support obligations under the Senior Facility.  Reding Decl. ¶ 6; Werdmuller Decl. ¶ 5; MacDermott Decl. ¶ 6.   The pledged property includes the key operational assets of Truvo Belgium and Truvo Ireland Ltd.  Goegebuer TRO Decl. ¶ 15. Following enforcement of the security interests in such property, neither entity would be able to continue to operate its business.  Id.  While European laws generally provide for an alternative restructuring procedure initiated upon the company's request, such procedure would not operate to stay efforts to enforce many of the security interests that the European Guarantors have granted in their property to secure obligations under the Guaranteed Debt.  Reding Decl. ¶ 11; Werdmuller Decl. ¶¶ 7-8; MacDermott Decl. ¶ 12.

Each of these potential remedies that dissident creditors could pursue absent the relief sought herein would irreparably harm the European Guarantors' ability to continue to do business, and in turn, the Debtors' reorganization efforts.  Even the threat that some party may take action triggering these horrible business consequences is likely to harm the Truvo Group's business.  The majority of the purchasers of the Truvo Group's products are SMEs, which generally purchase advertising space in print publications and online directories pursuant to one-year contracts with an option not to renew at the end of each contract term.  Goegebuer TRO

Decl. ¶ 6.[9]  Because a majority of the Truvo Group's business stems from these short-term contracts, even the serious threat of an insolvency proceeding or other enforcement action in the jurisdictions where the European Guarantors operate would cause severe commercial harm by dissuading these short-term customers from renewing their contracts or continuing to do business with any member of the Truvo Group.  Id. ¶¶ 12, 14.  In addition, enforcement actions would compromise the European Guarantors' ability to recruit and retain critical employees, particularly their sales force, which is dependent on personal relationships developed with the Truvo Group's SME customers.  Id. ¶ 12.

Finally, even those remedies that fall short of commencing insolvency proceedings threaten to force management of the European Guarantors to themselves seek bankruptcy protection, with similar resulting commercial harm.  Reding Decl. ¶ 19; Werdmuller Decl. ¶ 15.

## ARGUMENT

I. **ENFORCEMENT OF THE GUARANTY CLAIMS AGAINST THE EUROPEAN GUARANTORS SHOULD BE STAYED PURSUANT TO SECTION 105(A) OF THE BANKRUPTCY CODE**

The preliminary injunctive relief requested here is necessary to prevent the Debtors from suffering imminent and irreparable injury.  Specifically, absent issuance of an injunction, the Debtors risk losing the opportunity to effect a global recapitalization and restructuring of the Truvo Group, under a Plan which has been agreed to by no less than 70 percent of holders of the Senior Loans – the creditors with the paramount economic interest in this case.  The Court should therefore stay prosecution of the Guaranty Claims against the

---

[9]    Sales in on-line directories are projected to account for approximately 50% of the Truvo Group's revenues for 2010.  Goegebuer TRO Decl. ¶ 11.  As the Truvo Group continues to transform its business model to focus on these mobile and on-line segments, the percentage of revenues resulting from such contracts will only increase.  Id.

European Guarantors for an initial period of 120 days pursuant to Section 105(a) of the Bankruptcy Code, because (i) the Debtors have a reasonable likelihood of a successful reorganization, (ii) the Debtors' estates are threatened with imminent and irreparable harm absent entry of an injunction, (iii) on balance, the harms that would be suffered by the Debtors in the absence of an injunction far outweighs the harm, if any, that would be suffered by the Defendants if the relief is granted, and (iv) the public interest favors an injunction.[10]   In Lyondell, the debtors sought nearly identical relief to enjoin creditors from commencing foreign involuntary insolvency proceedings or pursuing other remedies against their European non-debtor affiliate guarantor.  402 B.R. at 571.  Judge Gerber granted such relief, finding that such enforcement actions would frustrate the debtors' ability to reorganize and compromise the value of the Lyondell estates.  Id.  Granting that injunctive relief ultimately enabled the Lyondell debtors to successfully reorganize.[11]

Section 105(a) empowers bankruptcy courts to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).  This authority under Section 105 is broader than the automatic stay provisions of Section 362 and may be used to assure the orderly conduct of the reorganization proceeding.  Erti v. Paine Webber Jackson & Curtis, Inc. (In re Baldwin-United Corp. Litig.), 765 F.2d 343, 348 (2d. Cir. 1985).  Specifically, bankruptcy courts may employ the equitable

---

[10]     See Nev. Power Co. v. Calpine Corp. (In re Calpine Corp.), 365 B.R. 401, 409 (S.D.N.Y. 2007) (enumerating the factors bankruptcy courts in this Circuit look to in determining to grant a preliminary injunction under Section 105(a)).

[11]     See Findings Of Fact, Conclusions Of Law, And Order Pursuant To Section 1129 Of The Bankruptcy Code And Rule 3020 Of The Federal Rules Of Bankruptcy Procedure Confirming Third Amended Joint Chapter 11 Plan Of Reorganization For The LyondellBasell Debtors, In re Lyondell Chem Co., No. 09-10023 (REG) (Bankr. S.D.N.Y. Apr. 23, 2010) (No. 4418) (the "Lyondell Confirmation Order"); Notice of Confirmation of Plan and Effective Date, In re Lyondell Chem Co., No. 09-10023 (REG) (Bankr. S.D.N.Y. Apr. 23, 2010) (No. 4468).

power granted by Section 105(a) to enjoin actions against non-debtors when doing so would protect the debtor's estate. See Johns-Manville Corp. v. Asbestos Litig. Group (In re Johns-Manville Corp.), 40 B.R. 219, 226 (S.D.N.Y. 1984) ("Pursuant to the exercise of [Section 105] authority, the Court may issue or extend stays to enjoin a variety of proceedings which will have an adverse impact on the Debtor's ability to formulate a Chapter 11 plan."); see also E. Air Lines, Inc. v. Rolleston (In re Ionosphere Clubs Inc.), 124 B.R. 635, 642 (S.D.N.Y. 1991) (Section 105(a) "extends to creditor's actions against third parties, when such an injunction is necessary to protect the debtors and the parties in interest to the reorganization in their attempt to reorganize successfully"); Goldin v. Primavera Familienstiftung Tag Assocs., Ltd. (In re Granite Partners LP), 194 B.R. 318, 337 (Bankr. S.D.N.Y. 1996) ("[T]he court can and should enjoin suits by third parties against third parties if they threaten to thwart or frustrate the debtor's reorganization efforts").[12]

In determining when a Section 105(a) injunction should issue, courts in this circuit apply "the traditional preliminary injunction standard as modified to fit the bankruptcy context." Calpine, 365 B.R. at 409 (citation omitted); see also In re Adelphia Commc'ns Corp., 298 B.R. 49, 54 (S.D.N.Y. 2003) ("[T]he Second Circuit, courts in this District, and courts in other circuits have . . . embraced the use of § 105 without proof of all four factors normally required for injunctions, such as inadequate remedy of law or irreparable harm"). Thus, courts consider the following factors: "(1) whether there is a likelihood of successful reorganization;

---

[12]    While the Second Circuit has clarified in Deutsche Bank AG, London Branch & Bear, Stearns & Co., Inc. v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.), 416 F.3d 136, 142 (2d. Cir. 2005) that powers under Section 105 must derive from other provisions of the Bankruptcy Code, subsequent decisions have clarified that "[n]othing in the court's opinion [in Metromedia] affects the longstanding practice of courts utilizing section 105 to stay (as opposed to release) non-debtor litigation." Calpine, 365 B.R. at 409 n.20; Lyondell, 402 B.R. at 587 n.33.

(2) whether there is an imminent irreparable harm to the estate in the absence of an injunction; (3) whether the balance of harms tips in favor of the moving party; and (4) whether the public interest weighs in favor of an injunction." Calpine, 365 B.R. at 409. Courts take a flexible approach to evaluating these factors, no one of which is determinative. Haw. Structural Ironworkers Pension Trust Fund v. Calpine Corp., Inc., No. 06 Civ. 5358 (PKC), 2006 U.S. Dist. LEXIS 92499, at *14 (S.D.N.Y. Dec. 20, 2006). In particular, a court need not find irreparable harm to issue an injunction under Section 105(a). See, e.g., LTV Steel Co., Inc. v. Bd. of Educ. (In re Chateaugay Corp., Reomar, Inc.), 93 B.R. 26, 29 (S.D.N.Y. 1988); Lyondell, 402 B.R. at 591 ("I and other courts have repeatedly noted that when a court is considering an application under section 105(a) to protect the Debtor's reorganization, irreparable injury need not be shown."). In any event, each of these factors is easily established here.

A.    **There is a Reasonable Likelihood of a Successful Reorganization**

The Debtors plainly have a reasonable likelihood of a successful reorganization – they have already negotiated in detail the key terms of the Plan. Indeed, the Debtors have filed a copy of the Plan Support Agreement, which reflects the support for the Debtors' proposed Plan of at least 70 percent of the Senior Loans, the only constituency entitled to any recovery. See Khalid Decl. Ex. A. The advanced stage of the Debtors' efforts towards reorganization provides the Court with ample grounds to find that the Debtors have a "reasonable" likelihood of a successful reorganization, particularly where courts have generally found this factor satisfied on a far slimmer record. The Lyondell court, for example, mindful of the challenges that a stringent evidentiary standard would pose for a debtor in the earliest weeks of its case, found this factor satisfied where the debtors were simply "proceeding 'on track' and ha[d] met the challenges they have faced so far." Lyondell, 402 B.R. at 590. The Lyondell debtors, however, had filed no plan, nor formulated any terms for a reorganization. The Debtors here, through their pre-petition

efforts, have already formulated their proposed Plan for a restructuring of the Debtors' liabilities, which they hope to see confirmed in a matter of months. Indeed, aside from the threats that efforts to enforce the Guaranteed Debt could pose, the Court has no basis to conclude that reorganization embodied in the Debtors' Plan will be anything but successful. See Steven P. Nelson, D.C., P.A. v. G.E. Capital Corp. (In re Steven P. Nelson, D.C., P.A.), 140 B.R. 814, 816-17 (Bankr. M.D. Fla. 1992) ("This Chapter 11 case is still in an embryonic stage and it is clearly unreasonable to require the Debtor at this early stage of the case to make detailed projections of the terms or anticipated feasibility of its plan of reorganization. . . . In this connection, it should be noted that there is nothing in the record to indicate that the Debtor will not be able to successfully reorganize.").

**B.** **There is Danger of Irreparable Harm to the Debtors in the Absence of an Injunction**

Actions to enforce the Guaranteed Debt against the European Guarantors threaten the Debtors' ability to reorganize; this alone satisfies the irreparable harm factor. See, e.g., Calpine, 365 B.R. at 409 (finding irreparable harm requirement satisfied where the action to be enjoined threatens the reorganization process). As described in the Plan Support Agreement, the Debtors are proposing a reorganization plan under which, in accordance with the Intercreditor Agreement, the security agent will request that Truvo Acquisition sell its interests in Truvo USA at fair market value to a new entity that will ultimately be owned by the Senior Lenders and potentially other junior creditors. Khalid Decl. Ex. A, § 6. Truvo USA is a holding company whose main asset is its direct and indirect ownership interests in the European Guarantors and other non-debtor subsidiaries and affiliates. The Debtors' restructuring – and any resulting recoveries for Defendants – thus turns on preserving the value of the European Guarantors and other non-debtor affiliates in the Truvo Group. Moreover, the sale of the interests in Truvo USA

is a cornerstone of the Debtors' proposed Plan because it will release all claims against Truvo USA and the European Guarantors under the Senior Facility and the Indenture. Enabling this organized process preserves going concern value, and provides greater recoveries for creditors as a whole than would a piecemeal race against assets of the European Guarantors by individual creditors. Burian Decl. ¶¶ 6-7. Actions to enforce the Guaranteed Debt threaten to destroy the value of the European Guarantors, and thus directly compromise the Debtors' ability to reorganize. Standing alone, the severe threats that immediate enforcement of the Guaranty Claims pose to the Debtors' reorganization and ultimate survival clearly constitute irreparable harm. See Keene Corp. v. Acstar Ins. Co. (In re Keene Corp.), 168 B.R. 285, 292 (Bankr. S.D.N.Y. 1994) (reaffirming valid issuance of TRO to enjoin conduct that threatens the reorganization process to ensure the orderly conduct of the reorganization proceeding); In re United Health Care Org., 210 B.R. 228, 234 (S.D.N.Y. 1997) (granting Section 105(a) injunction against pursuit of non-debtors where it would prevent debtors from consummating successful reorganization); Chase Manhattan Bank, N.A. v. Third Eighty-Ninth Assocs. (In re Third Eighty-Ninth Assocs.), 138 B.R. 144, 147 (S.D.N.Y. 1992) (affirming injunction against pursuit of non-debtor guarantors where it would impair the funding of the reorganization that the guarantors were otherwise able to contribute to the debtor).[13]

### C. The Balance of Hardships Weighs Strongly in the Debtors' Favor

The disastrous consequences for the Debtors' reorganization that would result

---

[13] In addition, pursuit of the Guaranty Claims at this time threatens to irreparably damage the reputation of the Truvo Group with its customers, employees and other stakeholders, with resulting losses in sales and revenue. See Goegebuer TRO Decl. ¶¶ 11-12, 14. This too constitutes irreparable harm. See Alert Holdings, Inc. v. Interstate Protective Servs., Inc. (In re Alert Holdings Inc.), 148 B.R. 194, 200 (Bankr. S.D.N.Y. 1992) (granting injunction based on finding that "[h]arm to the debtor's operations, reputation and goodwill is considered 'irreparable'") (citation omitted).

from immediate enforcement of the Guaranteed Debt far outweigh any prejudice to Defendants from a mere delay in their ability to pursue remedies against the European Guarantors. If left unstayed, the Defendants' efforts to enforce and collect on the Guaranty Claims will lead to a series of proceedings across Europe that threaten to disrupt the Truvo Group's integrated operations, thwart the European Guarantors' ability to operate their business, displace management control, and cause untold destruction of value. Importantly, the Debtors' creditor body as a whole will clearly benefit from a stay against Guaranty Claims pending the Court's consideration of the Debtors' proposed Plan. See, e.g., Burian Decl. ¶¶ 6-7. While individual Defendants may perceive hold up value in taking unilateral action against the European Guarantors, doing so would destroy going concern value that will otherwise be available for the benefit of creditors as a whole. See Burian Decl. ¶ 9; see also SEC v. Byers, No. 09-0234-cv, 2010 U.S. App. LEXIS 12160, at *12 (2d. Cir. June 15, 2010) (affirming order enjoining creditors from pursuing involuntary bankruptcy filings against funds in SEC receivership, to "prevent small groups of creditors from placing some entities into bankruptcy, thereby removing assets from the receivership estate to the potential detriment of all."). In addition, the coordinated process embodied in the Plan permits a consensual distribution of value to junior creditor classes voting in favor of the Plan, which creditors would otherwise be entitled to no recoveries. See Burian Decl. ¶ 9. Immediate actions to enforce the Guaranty Claims will instead trigger a liquidation that would make such distributions impossible. Id. ¶ 6. Enjoining individual actions is also consistent with creditors' legitimate expectations, since it is in accord with the priority scheme and subordination provisions that are embodied in the Intercreditor Agreement. At most, the Defendants will suffer only a temporary delay in their ability to enforce the Guaranty Claims. Indeed, the Guaranty Claims will be addressed in the context of the

Debtors' Plan, which dissenting Defendants have every opportunity to oppose in the context of this proceeding. This Court will also retain jurisdiction to entertain motions to modify or obtain relief from the injunction once granted, should circumstances change or unforeseen prejudice arise. Granting the injunction will thus permit the Debtors to proceed with an orderly reorganization, with no real prejudice to the Defendants.

D.    <u>**Granting the Injunction Serves the Public Interest**</u>

In light of the advanced stages of the Debtors' restructuring efforts, and the limited duration of the injunction that the Debtors seek, the public interest heavily favors an injunction for an initial period of 120 days, during which time the Debtors anticipate that their Plan will be confirmed and become effective. The actions the Debtors seek to enjoin threaten not just the Debtors' restructuring efforts, but also the prospects of the employees, suppliers, and customers of the entire Truvo Group. In issuing Section 105 injunctions, courts have found that the "public interest" factor is satisfied if granting the injunction would promote a successful reorganization. <u>See</u> <u>LTV Corp. v. Back (In re Chateaugay Corp.)</u>, 201 B.R. 48, 72 (Bankr. S.D.N.Y. 1996) ("Public policy, as evidenced by chapter 11 of the Bankruptcy Code, strongly favors the reorganization and rehabilitation of troubled companies and the concomitant preservation of jobs and going concern values."); <u>Sudbury, Inc. v. Escott (In re Sudbury, Inc.)</u>, 140 B.R. 461, 465 (Bankr. N.D. Ohio) ("[c]ourts have generally recognized a public interest in reorganization") (citing <u>United States v. Whiting Pools, Inc.</u>, 462 U.S. 198, 204 (1983)); <u>Am. Film Techs., Inc. v. Taritero (In re Am. Film Techs., Inc.)</u>, 175 B.R. 847, 851 (Bankr. D. Del. 1994) (stating that in the bankruptcy context, "public interest" means promoting a successful reorganization, such that assisting the Debtor with its reorganization efforts is "one of the paramount interests of the court"). Here, injunctive relief will serve the public interest by permitting the Debtors to continue their efforts to reorganize, thus saving thousands of jobs of

the individuals employed by the Truvo Group, and ensuring the continued survival of trade counterparties that depend on the Truvo Group's business. Moreover, the public interest is furthered by maximizing recoveries through the organized restructuring process embodied in the Debtors' proposed Plan, as opposed to the series of uncoordinated and value-destructive proceedings that the Defendants might otherwise pursue. See In re Adelphia Commc'ns Corp., 368 B.R. 140, 284 (Bankr. S.D.N.Y. 2007) ("[T]he public interest cannot tolerate any scenario under which private agendas can thwart the maximization of value for all.")

The significant progress that the Debtors have already made towards reorganization and the resulting limited time period for which the injunction will remain in place also eliminate any of the public interest concerns articulated by the Lyondell court regarding the duration of the injunction originally requested there. Specifically, the Lyondell debtors requested entry of an injunction upon commencing a free-fall proceeding, without having even a proposal of terms on which a plan of reorganization could be formulated, much less creditor support for such terms. In that context, Judge Gerber held that the public interest required that the injunction be granted for a very limited time period – namely, 60 days. Lyondell, 402 B.R. at 594. In limiting the duration of the injunction, the Lyondell Court was animated by an interest in avoiding the "uncontrolled" filing of disparate proceedings in Europe, which proceedings it would not be able to coordinate. Id. at 581. The Lyondell injunction was thus designed only so as to allow sufficient time for the filing of a voluntary reorganization or other proceeding for the debtors' European affiliates. Id. at 594.

By contrast, here the Debtors have already reached agreement with the fulcrum security creditors and will be filing their Plan and proposed disclosure statement before July 10, 2010. Following a swift solicitation and confirmation process, the Debtors aim to take their Plan

effective during the third quarter of 2010.  As such, the concerns about the potentially protracted reorganization process in Lyondell are absent here.  Moreover, the Lyondell court limited the duration of the injunction to the time required to establish an organized process for resolution of the guaranty claims.  Id. at 594 ("60 days [is] a duration that I regard as sufficient to permit the filing of the LBIAF insolvency proceeding that probably needs to be brought somewhere").  Unlike the Lyondell debtors, however, who had established no mechanism or forum for resolving their guaranty claims, the Debtors' proposed Plan already provides for resolution of the Guaranty Claims in this very proceeding.  In this way, whereas the Lyondell facts required a 60 day injunction, after which the Court envisioned that separate proceedings would provide an organized forum for the Guaranty Claims, the Debtors have already provided such a forum in this Court through their proposed Plan.[14]  Extending the injunction here for an initial period of 120 days,[15] during which the Debtors anticipate the Plan will be confirmed and become effective, best comports with the underlying purpose of the injunction, to "assure the orderly conduct of the reorganization proceedings."  See Keene Corp., 168 B.R. at 292 (citation omitted); In re Monroe Well Serv., Inc., 67 B.R. 746, 756 (Bankr. E.D. Pa. 1986) (entering 105(a) injunction to avert "a competitive race in a variety of forums" on non-debtors' assets, in favor of "the exercise of jurisdiction in one forum, . . . to work cooperatively and to negotiate a plan acceptable to the diverse interests").  At present, only the prospect of dissident action abroad against the European Guarantors threatens such an orderly restructuring under this Court's jurisdiction.

---

[14] Ultimately, while the bankruptcy court contemplated a voluntary European bankruptcy filing for the guarantors, the Lyondell debtors themselves confirmed a plan of reorganization that embodied a similar sale mechanism to resolve guaranty claims against their European affiliates.  See Lyondell Confirmation Order ¶ 7.

[15] As explained in the proposed preliminary injunction order attached to the Motion, this initial 120 day period would be without prejudice to both (i) the rights of the Debtors to request an extension of modification of the injunction, and (ii) the rights of Defendants and other creditors to request a reduction in or relief from the injunction.

**E.     The Debtors Have Satisfied the Requirements for the Entry of a Temporary Restraining Order**

The very nature of the injunction sought by the Motion requires issuance of a temporary restraining order under Rule 65, pending a hearing on the Debtors' motion for a preliminary injunction.  Such a temporary restraining order is properly granted to preserve the status quo and prevent irreparable injury to a debtor's estate and its ability to reorganize pending a preliminary injunction hearing.  See Adelphia Commc'ns Corp. v. Am. Channel, LLC (In re Adelphia Commc'ns Corp., No. 06-1528 (REG), 2006 Bankr. LEXIS 975 at *11 (Bankr. S.D.N.Y. June 5, 2006).  Specifically, Rule 65(b) provides:

> A temporary restraining order may be granted without . . . notice to the adverse party . . . if (1) it clearly appears from specific facts shown by affidavit or by the verified complaint that immediate and irreparable injury, loss, or damage will result to the applicant before the adverse party . . . can be heard in opposition, and (2) the applicant's attorney certifies to the court in writing the efforts, if any, which have been made to give the notice and the reasons supporting the claim that notice should not be required.

Fed. R. Civ. P. 65(b).

Absent entry of such a restraining order, the relief the Debtors' injunction seeks could in effect be unavailable.  Specifically, the Debtors seek entry of an injunction to prevent the immediate and irreparable harm to their restructuring efforts that would otherwise result from commencement of a series of proceedings across the Continent to enforce the Guaranteed Debt against the European Guarantors.  If creditors are made aware of the Debtors' efforts to obtain an injunction, it could well precipitate efforts to commence involuntary insolvency proceedings against the European Guarantors, or attach or foreclose upon the European Guarantors' property.  Specifically, if dissident creditors were made aware of the pendency of the Debtors' Motion, they would have an incentive to take action against the European Guarantors in advance of being enjoined from doing so.  See Moloney Decl. ¶ 5; In re Vuitton et Fils, S.A, 606 F.2d 1, 4 (2d Cir.

1979) ("If notice [of a temporary restraining order] is required, that notice all too often appears to serve only to render fruitless further prosecution of the action."); <u>Little Tor Auto Ctr v. Exxon Co. USA</u>, 822 F. Supp. 141, 143 (S.D.N.Y. 1993) (endorsing "ex parte procedure in connection with such [temporary restraining order] applications . . . where advance contact with the adversary would itself be likely to trigger irreparable injury.").  Even if the Court were later to enjoin such efforts, once such actions are commenced, a subsequent injunction could not remedy the commercial and reputational damage and destruction of value that a barrage of collection efforts would have on the European Guarantors.  <u>See</u> Goegebuer TRO Decl. ¶¶ 10-12; Burian Decl. ¶¶ 6-7, 9.  This is particularly the case where it could take some months for the European Guarantors to successfully assert any defenses they may have to any commencement of involuntary insolvency proceedings in a European forum.  <u>See</u> Reding Decl. ¶ 11.

For these reasons, it is appropriate to grant a temporary restraining order pending a hearing on the Motion, staying, restraining and enjoining the commencement or continuation of any and all actions or other proceedings against the European Guarantors by the Defendants and other creditors on account of the Guaranteed Debt.[16]

## II. IN THE ALTERNATIVE, THE COURT SHOULD EXTEND THE AUTOMATIC STAY TO BAR PROSECUTION OF THE GUARANTY CLAIMS AGAINST THE EUROPEAN GUARANTORS

In the alternative, the Court should extend the automatic stay to prevent dissident creditors from enforcing the Guaranty Claims against the European Guarantors.  Without an

---

[16] Bankruptcy Rule 7065 makes clear that a temporary restraining order may be issued without requiring the debtor to post security in accordance with Civil Rule 65(c).  <u>See</u> Wolf Fin. Group, Inc. v. Hughes Constr. Co. (In re Wolf Fin. Group, Inc.), No. 94-8884A (JLG), 1994 Bankr. LEXIS 2350, at *11 (Bankr. S.D.N.Y. Dec. 15, 1994). As in <u>Lyondell</u>, the limited duration of the injunction sought and the fulsome protections offered to any dissident creditors to oppose the Plan in this proceeding do not require any variance from the general rule that no security is required.  <u>See</u> <u>Lyondell</u>, 402 B.R. at 595.

extension of the stay, the Debtors and their estates would suffer immediate adverse economic consequences that would devastate their reorganization. Although Section 362(a)(1) of the Bankruptcy Code only expressly refers to staying actions against debtors, the Second Circuit has held that "an action taken against a nondebtor which would inevitably have an adverse impact upon the property of the [debtor's] estate must be barred by the automatic stay provision." Licensing by Paolo v. Sinatra (In re Gucci), 126 F.3d 380, 392 (2d Cir. 1997) (citing 48th St. Steakhouse, Inc. v. Rockefeller Group, Inc. (In re 48th St. Steakhouse, Inc.), 835 F.2d 427, 431 (2d Cir. 1987)); see also Queenie, Ltd. v. Nygard Int'l, 321 F.3d 282, 287 (2d Cir. 2003) (the automatic stay may be extended to bar proceedings against non-debtors where "a claim against the non-debtor will have an *immediate adverse economic consequence* for the debtor's estate.") (emphasis added). In addition, courts can extend the stay to enjoin proceedings against non-debtors in "unusual circumstances." Robert Plan Corp. v. Liberty Mut. Ins. Co., No. 09 Civ. 1930 (JS), 2010 U.S. Dist. LEXIS 27200, at **7-8, 10 (E.D.N.Y. Mar. 23, 2010) (citing A.H. Robins Co. v. Piccinin, 788 F.2d 994, 999 (4th Cir. 1986)). Such unusual circumstances exist not only where the debtor's reorganization efforts would be harmed,[17] but also where "the debtor and the non-bankrupt party can be considered one entity or as having a unitary interest" such that a judgment against the non-debtor "will affect directly the debtor." N. Star Contracting Corp. v. McSpedon (In re N. Star Contracting Corp.), 125 B.R. 368, 370-71 (S.D.N.Y. 1991) (citations omitted). Both standards are satisfied in this case.

First, if the dissident creditors are permitted to prosecute the Guaranty Claims, the Debtors' estates and their reorganization efforts will suffer immediate adverse economic

---

[17] See Gray v. Hirsch (In re Gray), 230 B.R. 239, 243 (S.D.N.Y. 1999) (unusual circumstances are present where "the stayed actions would have posed a serious threat to the debtors' reorganization efforts").

consequences from the liquidation or attachment of the European Guarantors' assets. Reding Decl. ¶¶ 6, 9, 15; Werdmuller Decl. ¶¶ 5, 9, 13; MacDermott Decl. ¶¶ 6, 8-9, 14. Because the Debtors are all holding companies without their own revenue-generating operations, they rely on revenue from their subsidiary operating companies under various intercompany loans, dividends, and other distributions. First Day Decl. ¶¶ 8, 42. Given the inextricable financial interdependence among the Debtors and the European Guarantors, the commencement of involuntary proceedings to collect on the Guaranty Claims would deplete the value of the Debtors' interests in their subsidiaries, which would otherwise be used to satisfy their creditors' claims in connection with their Plan. Specifically, the Debtors' proposed Plan contemplates that the requisite majority of Senior Lenders will make an instruction to the security agent to instruct Truvo Acquisition to sell at fair market value its interests in Truvo USA, which in turn is the direct or indirect owner of the European Guarantors. Without extension of the stay, however, the assets of the European Guarantors – and in turn the value of the interests in Truvo USA – will be dismembered and their operations destroyed as dissident creditors race to obtain satisfaction of the Guaranty Claims in piecemeal proceedings in Belgium, the Netherlands, Ireland, or elsewhere.

Second, the globally integrated structure of the Truvo Group presents an unusual circumstance that requires extension of the automatic stay, as enforcement of the Guaranty Claims against the European Guarantors will otherwise have the same practical effect as proceedings against the Debtors. As the European Guarantors and the Debtors share high-level management (see Goegebuer TRO Decl. ¶ 8), the Debtors' leadership will be forced to divert attention and company resources away from the Debtors' Chapter 11 reorganization if dissident creditors are permitted to commence myriad proceedings against the European Guarantors across

the Continent to enforce the Guaranteed Debt. This is particularly the case where the Guaranty

Claims would not only require proof of the Debtors' liability, but enforcement of the Guaranty

Claims would also give rise to claims by the European Guarantors against the Debtors. See Pro-

Specialites, Inc. v. Thomas Funding Corp., 812 F.2d 797, 800 (2d Cir. 1987) ("[W]hen a party

agrees to become a guarantor at the behest of the principal obligor, a promise to indemnify –

even though not expressly provided for in the contract – is implied by law."). Moreover, as the

Debtors lack revenues or access to capital beyond their holdings in the European Guarantors and

other subsidiaries, a judgment against the European Guarantors will have the same effect as a

judgment against the Debtors. See, e.g., LFD Operating, Inc. v. G.E. Capital Corp. (In re Ames

Dep't Stores, Inc.), No. 06 Civ. 5394 (BSJ), 2008 U.S. Dist. LEXIS 109362, at *26 (S.D.N.Y.

June 4, 2008) (automatic stay may be extended to non-debtor when "a judgment against the non-

debtor will in effect be a judgment against the debtor", including where the non-debtor "is

entitled to absolute indemnity by the debtor on account of any judgment that might result")

(internal quotations and citations omitted). In this sense, the financial and managerial

interdependence among the Truvo Group's worldwide entities gives rise to a "unitary interest"

between the Debtors and the European Guarantors such that proceedings against the European

Guarantors are the functional equivalent of proceedings against the Debtors themselves. As a

result, the Debtors would be forced to effectively waive the benefits of Section 362(a) of the

Bankruptcy Code if the Court refuses to extend the stay to prohibit prosecution of the Guaranty

Claims.

## III.    THE COURT HAS JURISDICTION TO GRANT THE RELIEF REQUESTED

The Court has subject matter jurisdiction to enjoin claims to collect or enforce the

Guaranteed Debt against the European Guarantors, as such claims both (i) arise under the

Bankruptcy Code and in these Chapter 11 cases, and (ii) "relate to" the Debtors' Chapter 11

cases, each within the meaning of 28 U.S.C. § 1334(b).  Section 1334(b), together with the

district court's standing order of referral, provides the Court with "original but not exclusive

jurisdiction of all civil proceedings arising under title 11, or arising in or related to a case under

title 11."  28 U.S.C. § 1334(b).  As the requested relief is based on substantive rights existing

only in Chapter 11, and in light of the consequences that enforcement of the Guaranty Claims

would have on the Debtors' estates, each operative provision of Section 1334(b) provides the

Court with an independent jurisdictional basis to enter the requested injunction.

The Court also has personal jurisdiction over those dissident creditors who could

otherwise seek to enforce the Guaranty Claims against the European Guarantors.  Such creditors

have entered into agreements with or purchased securities issued by the Debtors – U.S. entities

incorporated in Delaware.  Moreover, given that Defendants' actions against the European

Guarantors would otherwise threaten to derail the U.S. Debtors' reorganization proceeding, the

Court has authority to enter an injunction to preserve its *in rem* jurisdiction over the Debtors'

property and prevent injury in their Chapter 11 cases.

*Claims Arise Under the Bankruptcy Code and In These Chapter 11 Cases*

Because the injunction sought by this Motion is a core proceeding, based on

substantive rights under the Bankruptcy Code that would not exist outside of Chapter 11, this

proceeding both "arises under" Title 11, and "arises in" the Debtors' bankruptcy cases.  While

"arising under" proceedings are those that invoke title 11 substantive rights, In re J.T. Moran Fin.

Corp., 119 B.R. 447, 450 (Bankr. S.D.N.Y. 1990) (citations omitted), "arising in" proceedings

are "those that are not based on any right expressly created by title 11, but nevertheless, would

have no existence outside of the bankruptcy."  Wood v. Wood (In re Wood), 825 F.2d 90, 97

(5th Cir. 1987).  Both types of proceedings, however, "'have as [their] foundation the creation,

recognition, or adjudication of rights which would not exist independent of a bankruptcy environment.'" Osanitsch v. Marconi PLC (In re Marconi PLC), 363 B.R. 361, 366 (S.D.N.Y. 2007) (citation omitted). Courts have also found that both "arising under" and "arising in" proceedings are essentially identical to core proceedings. In re Leco Enters., Inc., 144 B.R. 244, 248 (S.D.N.Y. 1992); Geron v. Schulman (In re Manshul Constr. Corp.), 225 B.R. 41, 44 (Bankr. S.D.N.Y. 1998).

The Debtors seek entry of an injunction pursuant to the Court's powers under Section 105(a) of the Bankruptcy Code, or in the alternative, pursuant to Section 362(a). A motion for such an injunction is a core proceeding, which invokes substantive rights created only by the Bankruptcy Code. Manville Corp. v. Equity Sec. Holders Comm. (In re Johns-Manville Corp.), 801 F.2d 60, 64 (2d Cir. 1986) (bankruptcy court core jurisdiction extends to motions for injunctions "to restrain interference resulting from proceedings in conflict with reorganization"); Joremi Enters. v. Hershkowitz (In re New 118th LLC), 396 B.R. 885, 890 (Bankr. S.D.N.Y. 2008) (a Section 105(a) injunction is "a substantive right under title 11" that can "only arise in the context of a bankruptcy case."); Walsh v. Abrams (In re HBG Servicenter, Inc.), 45 B.R. 668, 671 (Bankr. E.D.N.Y. 1985) (a Section 105 injunction is a core proceedings because it "can be deemed the equivalent of a motion to modify the automatic stay" within the meaning of 28 U.S.C. § 157(b)(2)(G)). This proceeding thus "arises under" Title 11. Moreover, the Debtors seek such an injunction in order to avert the potentially disastrous effect that enforcement of the Guaranty Claims would have on the Debtors' ability to reorganize in these existing Chapter 11 cases. As the Lyondell court held, this alone places the injunction within the scope of the Bankruptcy Court's "arising in" jurisdiction. Lyondell, 402 B.R. at 486; see also Adelphia, 2006 Bankr. LEXIS 975, at **19-20 ("[B]ecause the estate relies on rights arising under Bankruptcy

Code sections 362(a)(3) and 105(a), and because the estate is trying to avoid damage to a reorganization pending in this Court, 'arising under' and 'arising in' jurisdiction are present here").

<i>The Court Also Has "Related To" Jurisdiction</i>

In addition to "arising in" and "arising under" jurisdiction, the Court has jurisdiction to enter the Debtors' injunction because it is "related to" the Debtors' existing bankruptcy cases. Under the "quite broad" standards employed by courts in the Second Circuit[18], litigation is "related to" a Chapter 11 bankruptcy where its outcome "might have any 'conceivable effect' on the bankrupt estate." <u>Publicker Indus. v. United States (In re Cuyahoga Equip. Corp.)</u>, 980 F.2d 110, 114 (2d Cir. 1992) (citing <u>Pacor Inc. v. Higgins</u>, 743 F.2d 984, 994 (3d Cir. 1984)). Such "conceivable effects" include those that may, <i>inter alia</i>, "bring into question the very distribution of the estate's property and its allocation," <u>id.</u>, "alter the debtor's rights, liabilities, options or freedom of action (either positively or negatively)," or otherwise "impact[] upon the handling and administration of the bankrupt estate." <u>Hunnicutt Co. v. TJX Cos.</u>, 190 B.R. 157, 160 (S.D.N.Y. 1995).

It is well-settled that "related to" jurisdiction encompasses claims to enforce guarantees of a Chapter 11 debtor's obligations. <u>See</u> <u>In re New 118th LLC</u>, 396 B.R. at 890-91 (collecting cases). Among other things, guarantors who satisfy a debtor's obligations will then have claims for reimbursement as against the debtor's estate. <u>See</u> <u>Pro-Specialties</u>, 812 F.2d at 800. Indeed, the <u>Lyondell</u> court found that actions to enforce the Chapter 11 debtors' obligations against their non-debtor parent guarantor "plainly pass[ed] muster" under the standards for

---

[18]    <u>See</u> <u>Lifetime Brands Inc. v. ARC Int'l, SA</u>, 09 Civ. 9792 (LAK), 2010 U.S. Dist. LEXIS 8320, at *4 (S.D.N.Y. Jan. 29, 2010).

"related to" jurisdiction. <u>Lyondell</u>, 402 B.R. at 586-87. In particular, where the commencement of involuntary insolvency or attachment proceedings against the debtors' European guarantors threatened irreparable harm to the debtors and their ability to reorganize, there was a clear "conceivable effect" on the bankrupt estate sufficient to provide "related to" jurisdiction. <u>Id.</u>, (internal quotations and citation omitted).

The Court similarly has "related to" jurisdiction here. First, Defendants could establish liability on the Guaranty Claims only by first proving the underlying liability of the Debtors. In addition, if dissident creditors were able to collect on the Guaranteed Debt from the European Guarantors, those guarantors would in turn have claims for reimbursement from the Debtors. See <u>Pro-Specialties</u>, 812 F.2d at 800.[19] Beyond the effects of such claims on the Debtors' estates – which themselves establish jurisdiction – the Debtors seek an injunction against dissident creditors to prevent the disastrous effects that could stem from commencement of involuntary insolvency, attachment or enforcement proceedings against the European Guarantors at this time. Specifically, absent an injunction against pursuit of the Guaranty Claims, the Truvo Group's centralized leadership risks losing control over its revenue-generating operating companies, which are necessary for the Truvo Group's successful reorganization. Reding Decl. ¶¶ 6, 9; Werdmuller Decl. ¶ 9; MacDermott Decl. ¶¶ 6, 9; Goegebuer TRO Decl. ¶ 5. An injunction from this Court will also avert myriad attachments of, or enforcement of security interests in, the European Guarantors' property that would otherwise threaten their continued ability to operate, and in turn destroy value in the Debtors' estates, who are the direct

---

[19]     See also <u>In re River Center Holdings LLC</u>, 288 B.R. 59, 65 (Bankr. S.D.N.Y. 2003) (claims between non-debtors are related to a bankruptcy case if they give rise to claims against the debtors estates); <u>Masterwear Corp. v. Rubin Baum Levin Contant & Friedman (In re Masterwear Corp.)</u>, 241 B.R. 511, 516 (Bankr. S.D.N.Y. 1999) (same).

or indirect owners of the European Guarantors. Goegebuer TRO Decl. ¶¶ 9, 13, 15; Reding Decl. ¶¶ 13-17; Werdmuller Decl. ¶¶ 15, 17, 19; MacDermott Decl. ¶¶ 14-16. These dire consequences go well beyond "conceivable effects" on the Debtors' estates, and at minimum bring the Guaranty Claims within this Court's "related to" jurisdiction.

*The Court Has Personal Jurisdiction Over Defendants*

The Court has personal jurisdiction over Defendants – purchasers of the U.S. Debtors' securities or of loan positions under an agreement with the U.S. Debtors – to temporarily enjoin collection or enforcement efforts that could otherwise destroy the Debtors' prospects for reorganization. To determine personal jurisdiction, courts apply a "federal minimum contacts test" focused on minimum contacts with the United States as a whole, not with any particular forum state. Adelphia, 2006 Bankr. LEXIS 975, at *23 (citations omitted); In re Enron Corp., 316 B.R. 434, 444-46 (Bankr. S.D.N.Y. 2004). Under Bankruptcy Rule 7004(f), the Court is also granted the full scope of the constitutionally permissible exercise of personal jurisdiction, without regard to any state's long-arm statutes. In re Enron Corp., 316 B.R. at 444-46 (quoting Fed. R. Bankr. P. 7004(f)). That scope extends to permit specific jurisdiction over Defendants who have "'purposefully directed' [their] activities at residents of the forum" where the litigation arises from or relates to those activities. Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472 (1985).[20] The Defendants have more than sufficient contacts with the United States to establish this Court's specific jurisdiction over them.

---

[20] Although the Court need not reach the issue, the standards of due process embedded in Bankruptcy Rule 7004(f) also permit general jurisdiction over defendants that have "continuous and systematic general business contacts" with the United States, whether or not the plaintiff's claims arise out of those contacts. Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 416 (1984). While the presence of specific jurisdiction is determinative, this Court may also have general jurisdiction over many of the defendants sufficient to enter the requested injunction.

First, the Defendants either entered into loan agreements with, or purchased the securities of, the U.S. debtors, which Debt Instruments give rise to this proceeding. Specifically, the HY Noteholders purchased bonds issued in the United States issued by Debtor Truvo Subsidiary, a Delaware corporation. Each of the guarantors of Truvo Subsidiary's obligations under the HY Notes is also a Delaware Corporation. The Indenture governing the HY Notes contains a New York choice of law clause and provides for submission to the jurisdiction of the federal and state courts in the Borough of Manhattan. See Barefoot Decl. Ex. B, at § 13.08. The successor Indenture Trustee is The Bank of New York Mellon Corporation, also a Delaware corporation with its headquarters in New York. Complaint, ¶ 136; cf. Lyondell, 402 B.R. at 587 (exercise of jurisdiction was proper over Defendants who purchased notes issued in the United States pursuant to an Indenture that "provided for submission to jurisdiction in the United States"). Similarly, the Senior Lenders entered into the Senior Facility with Truvo USA as a borrower. Another U.S. Debtor – Truvo Acquisition – serves as a guarantor of the Senior Facility, along with Truvo USA. Certain of the asset pledge agreements the Debtors entered into in connection with the Senior Facility are also governed by New York law and provide for submission to the jurisdiction of the federal and state courts in the Borough of Manhattan.[21] Because the threats of foreign insolvency and attachment proceedings stem from rights and obligations created by these Debt Instruments, it is clear that the Debtors' motion for injunctive relief "arises out of or is related to" the Defendants' contacts with the United States, establishing this Court's specific jurisdiction over them.

Second, this Court also has exclusive *in rem* jurisdiction over "all the property,

---

[21]    See Barefoot Decl. Ex. D, § 11.4, Ex. E, § 11.4, Ex. F, § 11.4., Ex. G, § 19.5, Ex. H, § 19.5.

wherever located, of the debtor as of the commencement of [a Title 11] case, and of the property of the estate." LaMonica v. N. of England Protecting & Indemnity Ass'n (In re Probulk Inc.), 407 B.R. 56, 61 (Bankr. S.D.N.Y. 2009) (quoting 28 U.S.C. § 1334(e)(1)).   The Court is therefore empowered to provide whatever relief is necessary to preserve this *in rem* jurisdiction and protect the Debtors' reorganization, such as enjoining "actions taken by foreign entities with respect to such property."  Id. (citing In re Simon, 153 F.3d 991, 996 (9th Cir. 1998)); see also Underwood v. Hilliard (In re Rimsat, Ltd.), 98 F.3d 956, 961 (7th Cir. 1996) (upholding injunction against shareholder from taking action in foreign proceedings necessary to protect bankruptcy court's *in rem* jurisdiction over estate property).  The bankruptcy court thus has jurisdiction to enter the requested injunction – even as to enforcement actions that may take place abroad – in order to prevent catastrophic harm to the Debtors' bankruptcy proceedings here in the United States.  In re Lyondell, 402 B.R. at 587 ("To the extent anyone, even abroad, takes steps abroad to cause injury here to the reorganization before me, it is analytically no different than shooting a bullet across a state line.").

<u>**CONCLUSION**</u>

For the foregoing reasons, the Debtors respectfully request that the Court enter orders (i) temporarily restraining the Defendants, all other persons or entities acting in concert with any of them, and all creditors of the Debtors receiving notice, from taking any action or commencing any proceeding with respect to any Guaranty Claim against any of the European Guarantors pending a hearing and ruling on the Motion; (ii) (a) enjoining and restraining the Defendants, all other persons or entities acting in concert with any of them, and all creditors of the Debtors receiving notice, from taking any action or commencing any proceeding to assert claims in respect of, or to enforce, any contractual or legal rights under or in connection with any Guaranty Claims against the European Guarantors for an initial period of 120 days, or in the alternative, (b) extending the automatic stay to protect the European Guarantors from the assertion or pursuit in any manner of any of the Guaranty Claims; and (iii) granting such other relief that it deems just and proper.

Dated: July 1, 2010
      New York, New York

CLEARY GOTTLIEB STEEN & HAMILTON LLP

By:    /s/ Thomas J. Moloney
        Thomas J. Moloney
        Sean A. O'Neal

One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999

*Proposed Counsel for the Debtors and Debtors in Possession as to all claims, except for claims against Defendants ACMO, Bank of America, BNY Mellon, Barclays, Citibank, Deutsche Bank, Goldman Sachs, Halcyon, King Street, Macquarie, Morgan Stanley, Royal Bank of Scotland, Natixis, Perry, and Silver Point*

JENNER & BLOCK LLP

By: ____/s/ Vincent E. Lazar
      Vincent E. Lazar
      Heather D. McArn

919 Third Avenue, 37th Floor
New York, New York 10006
Telephone:  (212) 891-1600
Facsimile:  (212) 891-1699

*Proposed Counsel for the Debtors*
*and Debtors in Possession as to all claims*

**Exhibit G**

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re | ) | Chapter 15 |
| | ) | |
| Corporación Durango, S.A.B. de C.V., | ) | Case No. 08-13911 (RDD) |
| | ) | |
| Debtor in a Foreign Proceeding. | ) | |
| | ) | |
| | ) | |
| Corporación Durango, S.A.B. de C.V., | ) | Adversary No. 08-01608 (RDD) |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Law Debenture Trust Company of New York; | ) | |
| and DOES 1-1000 | ) | |
| | ) | |
| Defendants. | ) | |

## TEMPORARY RESTRAINING ORDER

Upon the Motion dated October 6, 2008 (the "Motion"),[1] filed by Petitioner, Gabriel

Villegas Salazar (the "Petitioner"), as foreign representative of Corporación Durango, S.A.B. de

C.V. ("Corporación Durango" or the "Debtor"), for a temporary restraining order pursuant to

sections 105(a), 1507 and 1519-1521 of title 11 of the United States Code (the "Bankruptcy

Code"), Rule 7065 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and

Rule 65 of the Federal Rules of Civil Procedure (the "Federal Rules"), enjoining parties from

initiating or continuing any action or proceeding in the United States and its territories against

Corporación Durango and the following direct and indirect Mexican subsidiaries of Corporación

Durango: Porteadores de Durango, S.A. de C.V., Administración Corporativa de Durango, S.A.

de C.V., Ponderosa Industrial de México, S.A. de C.V., Empaques de Cartón Titán, S.A. de C.V.,

---

[1]     Any capitalized term not otherwise defined in this order will have the meaning ascribed
to such term in the Motion.

Reciclajes Centauro, S.A. de C.V., Lineas Aéreas Ejecutivas de Durango, S.A. de C.V., Inmobiliaria Industrial Tizayuca, S.A. de C.V., Compañia Norteamericana de Inversiones en Celulosa y Papel, S.A. de C.V., Servicios Industriales Tizayuca, S.A. de C.V., Atenmex, S.A. de C.V., Atensa, S.A. de C.V., ECTSA, S.A. de C.V., EYEMSA, S.A. de C.V., Cartonpack, S.A. de C.V., Administración Industrial Centauro, S.A. de C.V., and Administración Industrial Durango, S.A. de C.V. (the "Mexican Subsidiary Guarantors" and each of their respective officers and directors, the "Officers and Directors," and collectively with Corporación Durango and the Officers and Directors, the "Protected Parties") and/or their respective assets; and the Court having reviewed and considered (i) the Verified Petition for Recognition of Foreign Main Proceeding and Request for Related Relief dated October 6, 2008 (the "Petition"), (ii) the Verified Complaint, (iii) the Motion, (iv) the Cunningham Declaration, (v) the Declaration of Gabriel Villegas Salazar Pursuant to 28 U.S.C. § 1746, and (vi) the Declaration of Fernando del Castillo Pursuant to 28 U.S.C. § 1746; and it appearing that, based on the circumstances, notice of both the Petition and the Motion has been given to Corporación Durango's known creditors and the Court having reviewed and considered the Objection of the Ad Hoc Noteholder Group to the relief requested in the Motion (the "Objection") and the Reply of the Debtor to the Objection (the "Reply"); and based upon the record of the October 10, 2008 hearing before the court on the motion (the "Hearing"), after due deliberation, and sufficient cause appearing therefor, it is

**FOUND**, that:

1.      The Petitioner commenced a case ancillary to a foreign proceeding on behalf of Corporación Durango with this Court pursuant to chapter 15 of the Bankruptcy Code;

2.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157, and venue is proper pursuant to 28 U.S.C. § 1410;

2

3. This Court, pursuant to and consistent with sections 105(a), 1507 and 1519-1521 of the Bankruptcy Code, Bankruptcy Rule 7065, and Federal Rule 65, may issue this order as may be necessary or appropriate to carry out such provisions of the Bankruptcy Code and the provisions of the Bankruptcy Code referenced to therein, including but not limited to issuing this temporary restraining order; and

4. On October 9, 2008, the Ad Hoc Noteholder Group filed the Objection to the Motion, and the Debtor filed its Reply thereto.

5. As set forth on the record of the Hearing, the parties resolved the Objection in accordance with and subject to the terms of this Order.

6. Corporación Durango will suffer irreparable harm unless Corporación Durango's creditors are temporarily restrained to the extent provided in this Order from initiating or continuing any action or proceeding in the United States in respect of the Protected Parties and/or their property pending a further hearing on the Motion as provided herein, which actions such creditors are capable of taking prior to the provision of additional notice; and based upon the foregoing, and after due deliberation and sufficient cause appearing therefor for the reasons stated by the Court on the record of the Hearing

it is therefore

**ORDERED, ADJUDGED AND DECREED:**

A. That all persons (including individuals, partnerships and corporations, and all those acting for or on their behalf), and all governmental units (including the United States of America and any State, Commonwealth, District Territory, municipality, department, agency or instrumentality of the United States, a State, Commonwealth, District Territory, municipality, a foreign state, or other foreign or domestic governments, and all those acting for or on their

behalf) are hereby temporarily restrained and enjoined from taking the following actions in the

United States and its territories against any of the Protected Parties and or their property in the

United States and its territories:

(i)     Commencing or continuing any suit, action, enforcement process, extrajudicial proceeding or other proceeding (including a proceeding in any court, statutory or otherwise, other than in connection with any proceeding brought before this Court or any other Bankruptcy Court having proper jurisdiction and venue (collectively, the "Bankruptcy Court")) (collectively, a "Proceeding"), or claim or demand for reclamation, against or in respect of the Protected Parties and/or their property wheresoever located within the United States or its territories, and whether held by either of the Protected Parties in whole or in part, directly or indirectly, as principal or as nominee, beneficially or otherwise, other than in connection with any proceeding brought before the Bankruptcy Court, and without limiting the generality of the foregoing, including any and all real property, personal property and intellectual property of the Protected Parties, and any and all securities, instruments, debentures, notes or bonds issued to, or held by or on behalf of either of the Protected Parties other than in connection with any proceeding brought before the Bankruptcy Court (the "Property") in each case, insofar as such claim or demand is related to Corporación Durango or with respect to property involved in Corporación Durango's pending proceeding under Mexico's *Ley de Concursos Mercantiles* (the "Foreign Proceeding"), and any and all Proceedings currently proceeding against or in respect to either the Protected Parties or the Property are hereby stayed and suspended;

(ii)    Enforcing or exercising within the United States or its territories (other than in connection with any proceeding brought before the Bankruptcy Court) the right of any person, firm, corporation, governmental authority or other entity arising by law against the Protected Parties or the Property (including, without limitation, any right of dilution, registration, attornment, encumbrance, buy-out, divestiture, repudiation, rescission, forced sale, reclamation, acceleration, set-off, repossession, distress, conversion, possession, termination, suspension, modification or cancellation or right to revoke any qualification or registration) by virtue of any agreement or by any other means, including as a result of any default or non-performance by the Protected Parties, the making or filing of these proceedings in each case, insofar as such action is related to Corporación Durango or with respect to property involved in the Foreign Proceeding;

(iii)   Taking any action to discontinue, fail to renew, alter, interfere with or terminate any right, contract, arrangement, agreement, license or permit in favor of either of the Protected Parties or the Property, as a result of any

default or non–performance by Corporación Durango or the Mexican Subsidiary Guarantors, the making or filing of these proceedings or any allegation contained in these proceedings;

(iv) Any action by a person, firm, corporation, governmental authority, or any other entity having written or oral agreements with either of the Protected Parties for the supply of goods and/or services, by or to the Protected Parties or any of the Property to discontinue, alter, interfere with or terminate the supply of such goods or services under such agreements so long as the normal prices or charges for such goods and services received after the date of this order are paid in accordance with present payment practices under such agreements, or as may be hereafter negotiated from time to time;

(v) Any action by any banks and financial institutions at which Corporación Durango or the Mexican Subsidiary Guarantors maintain a bank account are hereby restrained from stopping, withholding, redirecting or otherwise interfering with any amount in such account(s) against any indebtedness owing to that bank or financial institution by Corporación Durango or the Mexican Subsidiary Guarantors;

(vi) Taking any action against any of the directors or officers of the Protected Parties with respect to any claim against the directors or officers that relates to any obligation of the Protected Parties whereby the directors or officers are alleged under any law to be liable in their capacity as directors or officers for the payment or performance of such obligation in each case, insofar as such claim or demand is related to Corporación Durango or with respect to property involved in the Foreign Proceeding; and

(vii) Taking any action that would be in violation of any other Order of this Court.

The foregoing temporary restraining order set forth in paragraph A shall expire by its terms at midnight on October 20, 2008, unless further extended by order of the Court.

B.      Other than as expressly set forth in this paragraph, nothing in this Order prohibits either the Indenture Trustee (as defined below) or the Ad Hoc Noteholder Group from bringing suit to enforce their respective rights against the Mexican Subsidiary Guarantors under Section 11.09 of the Indenture (the "Subsidiary Guarantor Carve-Out"); provided, however, that no such suit may be initiated unless the initiating party has given prior written notice to counsel to the Debtor, John K. Cunningham, Esq. of White & Case LLP, 200 South Biscayne Boulevard,

Suite 4900, Miami, FL 33131, Facsimile: (305) 358-5744, jcunningham@whitecase.com, of

intent to institute such suit at least ten (10) business days prior to the filing of any complaint,

motion or other case initiating document (the "Notice Period").  If such prior written notice is

given as provided herein, the Debtor may seek an order from this Court on an expedited basis

seeking to enjoin any such action.

          C.       Pursuant to 11 U.S.C. §§ 1519(a)(3) and 1521(a)(7), section 363 of the

Bankruptcy Code shall apply to a transfer, use, sale or lease of an interest of the Debtor in

property that is within the territorial jurisdiction of the United States to the same extent that

section 363 would apply to property of an estate of a U.S. chapter 11 debtor.  The Debtor shall

direct the Mexican Subsidiary Guarantors to refrain from transferring, selling, distributing,

exchanging, or otherwise disposing of any of their respective assets located within the territorial

jurisdiction of the United States absent further order of the Court, provided the injunction in

favor of the Mexican Subsidiary Guarantors contained in this Order remains in effect and has not

been terminated and no suit has been brought against the Mexican Subsidiary Guarantors after

expiration of the Notice Period pursuant to the Subsidiary Guarantor Carve-Out.

          D.       The Protected Parties' creditors or any other party affected by entry of this

Order, are directed to file any papers in opposition to the Motion and Petitioner's request for a

preliminary and permanent injunction with this Court (with a copy to chambers) and to serve on

counsel for the Petitioner, White & Case LLP, 200 S. Biscayne Blvd., Suite 4900, Miami,

Florida 33131, Attention: John K. Cunningham, Esq., so as to be received on or before 4:00 p.m.

(EST) on October 17, 2008.

          E.       A hearing on the Petitioner's Motion and request for preliminary

injunctive relief will be held on October 20, 2008 at 10: 00 a.m.

F.    The Petitioner shall serve a copy of this Order upon all known creditors of Corporación Durango by first class mail, postage, prepaid, no later than October 10, 2008.

G.    Prior to the time of the hearing set in parapraph C hereof, the Protected Parties shall meet and negotiate in good faith with the Ad Hoc Noteholder Group in an effort to agree on the scope and mechanics of the relief that is to be sought in the Petition and the Motion as well as other procedural matters.

H.    Each Protected Party, the Ad Hoc Noteholder Group (including each member thereof) and the Law Debenture Trust Company of New York, as indenture trustee for the Senior Notes (the "Indenture Trustee"), fully reserves and preserves all of their respective rights, arguments, and legal positions with respect to any or all matters that may arise in connection with the Petition and the related Motion.

Dated: New York, New York
       October 10, 2008

       12:20 P.M.

                                        /s/ Robert D. Drain_____
                                        UNITED STATES BANKRUPTCY JUDGE

7

**<u>Exhibit H</u>**

WHITE & CASE LLP
Wachovia Financial Center
200 South Biscayne Blvd., Suite 4900
Miami, Florida 33131
Telephone: (305) 371-2700
Facsimile: (305) 358-5744
John K. Cunningham (JC 4661)

1155 Avenue of the Americas
New York, New York 10036-2787
Telephone: (212) 819-8200
Facsimile: (212) 354-8113
J. Christopher Shore (JS-6031)

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re | ) | Chapter 15 |
| | ) | |
| Corporación Durango, S.A.B. de C.V., | ) | Case No. 08-_____ (    ) |
| | ) | |
| Debtor in a Foreign Proceeding. | ) | |
| | ) | |
| | ) | |
| Corporación Durango, S.A.B. de C.V., | ) | Adversary No. 08-_____ (    ) |
| | ) | |
| Plaintiff, | ) | **MOTION OF THE DEBTOR** |
| | ) | **FOR A TEMPORARY** |
| v. | ) | **RESTRAINING ORDER AND** |
| | ) | **PRELIMINARY INJUNCTION;** |
| Law Debenture Trust Company of New York; | ) | **MEMORANDUM OF POINTS AND** |
| and DOES 1-1000 | ) | **AUTHORITIES** |
| | ) | |
| Defendants. | ) | |

Pursuant to Rule 65 of the Federal Rules of Civil Procedure (the "Federal Rules"), made

applicable to this proceeding through Rule 7065 of the Federal Rules of Bankruptcy Procedure

(the "Bankruptcy Rules"), and sections 105, 1507 and 1519-1521 of title 11 of the United States

Code (the "Bankruptcy Code"), the above-captioned debtor, Corporación Durango, S.A.B. de

C.V. ("Corporación Durango" or the "Debtor"), respectfully moves this Court (the "Motion")[1] for a temporary restraining order and preliminary injunction preventing the defendants, including both named and Doe defendants, from exercising any collection rights or remedies or taking any other action in the U.S. against the Protected Parties (as defined in footnote 3). This Motion is supported by the memorandum of points and authorities contained herein, the concurrently filed Verified Complaint for Temporary Restraining Order and Injunctive Relief (the "Verified Complaint"), and the Declaration of John K. Cunningham in Support of Motion for a Temporary Restraining Order and Injunctive Relief (the "Cunningham Declaration"). In support of the requested relief, the Debtor represents to the Court as follows:

## PRELIMINARY STATEMENT

1.      Gabriel Villegas Salazar (the "Petitioner"), is the authorized foreign representative of Corporación Durango. As explained in more detail below, Corporación Durango has filed for bankruptcy protection in Mexico (the "Concurso Proceeding"), and has filed a chapter 15 petition to have the Concurso Proceeding recognized in the United States in order to preserve its United States assets. Through this Motion, the Debtor seeks a temporary restraining order and preliminary injunction to preserve its assets and those of its Mexican operating subsidiaries pending this Court's ruling on whether or not to recognize the Concurso Proceeding under chapter 15.

2.      The TRO and preliminary injunction requested prior to this Court's recognition of the Concurso Proceeding are critical to maintaining the status quo pending this Court's determination of whether relief under chapter 15 is proper. For the reasons set forth herein, the Motion should be granted.

---

[1]      A proposed order granting the relief requested in the Motion is attached hereto as Exhibit "A."

## BACKGROUND FACTS

3.      Corporación Durango serves as the holding company[2] for a number of Mexican and U.S. companies (collectively, the "Company"), which together comprise one of the leading producers of corrugated containers, containerboard and industrial paper in North America. The Company is one of Mexico's largest paper companies and sells its products to a broad range of Mexican and U.S. manufacturers of consumable and durable goods.

4.      Beginning in 2002 and continuing through 2004, Corporación Durango experienced a severe liquidity crisis that caused it to default on various payments of principal and interest on its unsecured indebtedness. As a result of this crisis, and in an effort to implement a long-term solution to its capital structure and debt service requirements, Corporación Durango filed a voluntary petition to commence an insolvency proceeding under the Mexican Business Reorganization Act on May 18, 2004 (the "2004 Concurso Proceeding").

5.      Shortly thereafter, on May 20, 2004, the company's foreign representative, Gabriel Villegas Salazar, commenced a case ancillary to a foreign proceeding under section 304 of the Bankruptcy Code with the United States Bankruptcy Court for the Southern District of New York, Case No. 04-13487 (RDD) (the "304 Proceeding" and, together with the 2004 Concurso Proceeding, the "2004 Proceedings") in order to obtain ancillary relief in the United States in furtherance of Corporación Durango's ongoing reorganization efforts in Mexico.

6.      As a result of the 2004 Proceedings, Corporación Durango was able to propose a plan of reorganization that was approved by a majority of its claimholders, confirmed by the Mexican court, and ultimately consummated on February 7, 2005. Pursuant to the aforementioned plan, Corporación Durango restructured approximately US$833.2 million (Ps.

---

[2] An organizational chart of the Corporación Durango family of companies is attached as Exhibit "B," and is incorporated herein by this reference.

9.396 billion) in existing obligations in exchange for (i) approximately 17% of the company's issued and outstanding capital stock (the "Series B Shares"), (ii) the execution of a restructured credit agreement by and between the company and its bank creditors (the "Restructured Credit Agreement"), pursuant to which the company issued notes in an aggregate principal amount of US$116.1 million, and (iii) the issuance of notes (the "Series B Notes") in an aggregate principal amount of US$433.8 million.

7.      More than two years after the 2004 Proceedings, Corporación Durango initiated an effort to purchase and/or redeem all of the then-outstanding Series B Notes and to prepay all amounts due under the Restructured Credit Agreement.  As of June 30, 2007, the aggregate principal amount of outstanding Series B Notes was US$418.6 million (Ps. 4.5 billion) and the aggregate principal amount outstanding under the Restructured Credit Agreement was US$86.2 million (Ps. 930.6 million).

8.      In order to effectuate the aforementioned transactions, on June 21, 2007, Corporación Durango commenced a cash tender offer for any and all of the outstanding Series B Notes.  Subsequently, on or about October 5, 2007, the company issued $520 million in principal amount of 10.50% Senior Notes due 2017 (the "Senior Notes")—which remain outstanding—to (i) purchase all of the Series B Notes tendered in connection with the cash tender offer, (ii) redeem all of the Series B Notes not purchased in the tender offer, and (iii) prepay all amounts due under the Restructured Credit Agreement.

9.      Corporación Durango's obligations under the Senior Notes are guaranteed by 16 of Corporación Durango's Mexican subsidiaries (collectively, the "Mexican Subsidiary Guarantors"),[3] as well as by two of the company's U.S. subsidiaries, i.e., Paper International,

---

[3]      The Mexican Subsidiary Guarantors are Porteadores de Durango, S.A. de C.V., Administración Corporativa de Durango, S.A. de C.V., Ponderosa Industrial de México, S.A. de C.V., Empaques de Cartón Titán,

Inc. ("International"), formerly known as Durango International, Inc., and Fiber Management of Texas, Inc. ("FMT").[4]

10.     Over the course of the last year, and since the issuance of the Senior Notes in 2007, Corporación Durango, like many other entities in a variety of industries throughout the world, has faced significant challenges stemming in large part from an unprecedented, unexpected and sustained rise in global energy prices.  Specifically, the rising price of energy has resulted in a rapid escalation in the company's input costs.

11.     Corporación Durango's aggregated cost of energy, raw materials and freight, for example, increased by US$72.3 million in the first half of 2008 as compared to the first half of 2007.  The financial consequences of these increased costs have been significant, causing the company's EBITDA to decrease by approximately 68% from the second quarter of 2007 through the second quarter of 2008.  Notably, 32% of this decrease occurred in the second quarter of 2008.

12.     Unfortunately, the rising cost of energy, coupled with (i) the well-documented downturn in the U.S. economy—punctuated by recent governmental efforts to restore confidence to the world's ailing credit markets through a massive infusion of capital—which has had worldwide implications, (ii) increased foreign competition in the paper industry, and (iii) the appreciation of the Mexican Peso, have made it difficult for Corporación Durango to transfer its rising cost of goods to its customers.

---

S.A. de C.V., Reciclajes Centauro, S.A. de C.V., Lineas Aéreas Ejecutivas de Durango, S.A. de C.V., Inmobiliaria Industrial Tizayuca, S.A. de C.V., Compañia Norteamericana de Inversiones en Celulosa y Papel, S.A. de C.V., Servicios Industriales Tizayuca, S.A. de C.V., Atenmex, S.A. de C.V., Atensa, S.A. de C.V., ECTSA, S.A. de C.V., EYEMSA, S.A. C.V., Cartonpack, S.A. de C.V., Administración Industrial Centauro, S.A. de C.V., and Administración Industrial Durango, S.A. de C.V.  The Debtor and the Mexican Subsidiary Guarantors, collectively with the officers and directors of both the Debtor and the Mexican Subsidiary Guarantors are referred to herein as the "Protected Parties."

[4]     Both International and FMT are filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code concurrently herewith.

13.     As a result of the foregoing, Corporación Durango is facing a liquidity crisis that has led to its failure today to make its scheduled interest payment of approximately $26.5 million on the Senior Notes.  Based on these facts, Corporación Durango believed it was in the best interests of the company and its creditors to seek relief under the Mexican Business Reorganization Act and Chapter 15 of the Bankruptcy Code in order to preserve its value as a going concern and maximize the value of its assets for the benefit of all creditors.

## REQUESTED RELIEF

14.     Pursuant to the instant motion, the Debtor respectfully requests that the Court enter an order (the "Order") that all persons (including individuals, partnerships and corporations, and all those acting for or on their behalf), and all governmental units (including the United States of America and any State, Commonwealth, District Territory, municipality, department, agency or instrumentality of the United States, a State, Commonwealth, District, Territory, municipality, a foreign state, or other foreign or domestic governments, and all those acting for or on their behalf) are hereby temporarily restrained and enjoined from taking the following actions in the United States and its territories against any of the Protected Parties and or their property:

(i)     Commencing or continuing any suit, action, enforcement process, extrajudicial proceeding or other proceeding (including a proceeding in any court, statutory or otherwise) (collectively, a "Proceeding"), or claim or demand for reclamation, against or in respect of the Protected Parties and/or their property wheresoever located, and whether held by either of the Protected Parties in whole or in part, directly or indirectly, as principal or as nominee, beneficially or otherwise, and without limiting the generality of the foregoing, including any and all real property, personal property and intellectual property of the Protected Parties, and any and all securities, instruments, debentures, notes or bonds issued to, or held by or on behalf of either of the Protected Parties (the "Property") in each case, insofar as such claim or demand is related to Corporación Durango or with respect to property involved in Corporación Durango's pending in the Concurso Proceeding, and any and all Proceedings currently proceeding against or in

respect to the either of the Protected Parties or the Property are hereby stayed and suspended;

(ii)   Enforcing or exercising the right of any person, firm, corporation, governmental authority or other entity arising by law against the Protected Parties or the Property (including, without limitation, any right of dilution, registration, attornment, encumbrance, buy-out, divestiture, repudiation, rescission, forced sale, reclamation, acceleration, set-off, repossession, distress, conversion, possession, termination, suspension, modification or cancellation or right to revoke any qualification or registration) by virtue of any agreement or by any other means, including as a result of any default or non-performance by the Protected Parties, the making or filing of these proceedings in each case, insofar as such action in related to Corporación Durango or with respect to property involved in the Concurso Proceeding;

(iii)  Taking any action to discontinue, fail to renew, alter, interfere with or terminate any right, contract, arrangement, agreement, license or permit in favor of either of the Protected Parties or the Property, as a result of any default or non–performance by Corporación Durango or the Mexican Subsidiary Guarantors, the making or filing of these proceedings or any allegation contained in these proceedings;

(iv)   Any action by a person, firm, corporation, governmental authority, or any other entity having written or oral agreements with either of the Protected Parties for the supply of goods and/or services, by or to the Protected Parties or any of the Property to discontinue, alter, interfere with or terminate the supply of such goods or services under such agreements so long as the normal prices or charges for such goods and services received after the date of this order are paid in accordance with present payment practices under such agreements, or as may be hereafter negotiated from time to time;

(v)    Any action by any banks and financial institutions at which Corporación Durango or the Mexican Subsidiary Guarantors maintain a bank account are hereby restrained from stopping, withholding, redirecting or otherwise interfering with any amount in such account(s) against any indebtedness owing to that bank or financial institution by Corporación Durango or the Mexican Subsidiary Guarantors;

(vi)   Taking any action against any of the directors or officers of the Protected Parties with respect to any claim against the directors or officers that relates to any obligation of the Protected Parties whereby the directors or officers are alleged under any law to be liable in their capacity as directors or officers for the payment or performance of such obligation in each case, insofar as such claim or demand is related to Corporación Durango or with respect to property involved in the Concurso Proceeding; and

(vii)  Taking any action that would be in violation of any other order of this Court.

15.    The Debtor further requests that the Order be initially entered as a temporary restraining order and that a status conference be set prior to the expiration of the initial 10 day term of the TRO.  Thereafter, the Debtor requests that the Court either extend the Order for an additional 10 days or enter the Order as a preliminary injunction pending the hearing concerning the recognition of the Concurso Proceeding.

16.    Finally, the Debtor requests that, if and when the Concurso Proceeding is recognized, the Court extend the automatic stay to all Protected Parties not otherwise protected by the automatic stay.

## ARGUMENT

**A.    This Court Should Grant Relief Pending a Determination Regarding the Recognition of the Concurso Proceeding**

17.    The Court has the authority, pursuant to 11 U.S.C. § 105, to issue any order, process, or judgment that is necessary or appropriate to (a) carry out the provisions of the Bankruptcy Code and (b) enforce the Court's own orders.  In addition, section 1519 of the Bankruptcy Code permits the Court to enter injunctive relief to protect the Debtor's assets pending the recognition of a foreign proceeding by the Court.  11 U.S.C. § 1519(a)(1).  Here, the Debtor requests that the Order be entered immediately to protect all of the Protected Parties and their assets pending this Court's ruling on whether to recognize the Concurso Proceeding under chapter 15.

18.    The Court should enter the Order pursuant to section 1519(a) because the requested relief is urgently needed to protect the assets of the Debtor and maintain the status quo until this Court has a full and fair opportunity to determine whether chapter 15 is appropriate under the circumstances.  See 11 U.S.C. §1519.  In the absence of the requested injunctive relief, the holders of Senior Notes could attempt to commence actions in the U.S. against the Debtor

and the Mexican Subsidiary Guarantors and undermine the restructuring process in Mexico before this Court even has an opportunity to determine the propriety of chapter 15 in this case. In addition, the Debtor's chapter 15 filing could result in a "race to the courthouse" with respect to such actions against the Debtor and the other Protected Parties. This is exactly the situation that section 1519 was intended to address.

19. The Court should also enter the order because the Debtor has met the standard for the issuance of both a temporary retraining order and a preliminary injunction. A temporary restraining order should be granted when the moving party establishes that "(1) the failure to issue it would result in immediate and irreparable injury, loss, or damage and (2) the applicant sufficiently demonstrates the reason notice should not be required." In re Vuitton Et Fils S.A., 606 F.2d 1, 4 (2d Cir. 1979) (internal citations omitted); see also In re Prudential Lines, Inc., 107 B.R. 832, 835 n.4 (Bankr. S.D.N.Y. 1989) (granting temporary restraining order where the moving party established a "summary showing of its necessity in order to prevent immediate and irreparable injury"), aff'd, 119 B.R. 430 (S.D.N.Y. 1990), aff'd, 928 F.2d 565 (2d Cir. 1991).

20. In determining whether a preliminary injunction should issue in a bankruptcy case, courts should evaluate the following factors: (1) whether there is a likelihood of successful reorganization; (2) whether there is an imminent irreparable harm to the estate in the absence of an injunction; (3) whether the balance of harms tips in favor of the moving party; and (4) whether the public interest weighs in favor of an injunction. Id. (citing United Health, 210 B.R. at 233). In evaluating these factors, courts take a "flexible approach and no one factor is determinative." Id. (citation omitted).

21. Notably, there is a limited exception to the imminent irreparable harm requirement that permits the court to issue a "preliminary injunction in the bankruptcy context

where the action to be enjoined is one that threatens the reorganization process." Id.; see also Alert Holdings, Inc. v. Interstate Protective Servs., Inc., 148 B.R. 194, 200 (Bankr. S.D.N.Y. 1992).  As such, "[w]here there is a showing that the action sought to be enjoined would burden, delay or otherwise impede the reorganization proceedings or if the stay is necessary to preserve or protect the debtor's estate or reorganization prospects, the Bankruptcy Court may issue injunctive relief."  Rosetta Res. Operating LP v. Pogo Producing Co. (In re Calpine Corp.), No. 05-60200, 2007 WL 1302604, at *3 (Bankr. S.D.N.Y. Apr. 30, 2007) (citing Alert Holdings, 148 B.R. at 199).

**1**.    **The Debtor Will Prevail on the Merits**

22.    An injunction in the form of both a temporary restraining order and a preliminary injunction is appropriate in this case, and the Court should enter the Order.  First, Corporación Durango is likely to succeed on the merits—i.e., to structure and consummate a successful plan of reorganization under the Mexican Business Reorganization Act.  Corporación Durango fully anticipates that it will be able to structure and consummate a successful plan of reorganization under the Mexican Business Reorganization Act.  In any event, at this early stage of Corporación Durango's case, it is entitled to a presumption that it can successfully reorganize, especially where no facts demonstrating the contrary exist.  See In re Lahman Mfg., 33 B.R. 681, 684-85 (Bankr. D.S.D. 1983) (noting that a bankruptcy court should resolve issues in favor of reorganization).

**2.**    **The Debtor Will Suffer Irreparable Harm if an Injunction Is Not Issued**

23.    Second, in the absence of the requested injunctive relief, the Debtor will suffer immediate and irreparable harm.   As noted above, in the absence of the requested injunctive relief, the holders of Senior Notes could attempt to commence actions in the U.S. and undermine

the restructuring process in Mexico before this Court determined the Debtor's application for recognition of the Concurso Proceeding under chapter 15. In addition, the Debtor's chapter 15 filing could result in a "race to the courthouse" to the detriment of the Debtor's creditors and the reorganization process in Mexico.

24.     Further, with respect to the injunction requested concerning the Mexican Subsidiary Guarantors, the Mexican Subsidiary Guarantors are directly or indirectly owned by Corporación Durango and represent the only sources of income for Corporación Durango's reorganization as well as its most important assets. Indeed, Corporación Durango is a holding company with no operations of its own. As a result, its reorganization will be greatly prejudiced in the event that the assets of the Mexican Subsidiary Guarantors are not protected by the Order. There can be little question that there is an identity of interests between the Debtor and the Mexican Subsidiary Guarantors and that any action against them on the Senior Notes is effectively an action against the Debtor and its assets involved in the Concurso Proceeding.

25.     Finally, any effort by the Debtor's officers and directors to respond to collection and other actions against the Mexican Subsidiary Guarantors would present a significant burden and distraction from the company's restructuring proceedings in Mexico. See Verified Complaint ¶ 27. In short, extending the stay to the Protected Parties, as requested, is necessary to preserve and protect the Debtor's estate and its reorganization prospects.

### 3.     The Balance of Harms Weighs Heavily In Favor of The Debtor

26.     Third, the balance of harms weighs heavily in favor of entering the Order as a temporary restraining order and, later, as a preliminary injunction. Doing so will preserve the assets of the Debtor and the Mexican Subsidiary Guarantors pending a determination by this Court of whether the Concurso Proceeding should be recognized under chapter 15 of the Bankruptcy Code. Thereafter, it will afford the parties an opportunity to focus on the

reorganization process in the Concurso Proceeding in Mexico.  In contrast, the issuance of the requested injunctive relief would cause little, if any, harm to the defendants, including the holders of Senior Notes.  Corporación Durango will continue to operate as a going concern and, as such, its assets—including all revenues derived from the operations of the Mexican Subsidiary Guarantors—will be available for the purpose of making distributions to creditors in the Concurso Proceeding.  See id. ¶ 28.  Additionally, creditors are not being asked to waive any rights and remedies they may have available to them, including the right to participate fully in the Concurso Proceeding.  Finally, the injunctive relief requested hereby will prevent a "race to the courthouse," which is beneficial to the Debtor and all of its creditors.

**4.      The Public Interest Favors Granting the Requested Injunctive Relief**

27.      Fourth, the public interest weighs heavily in favor of granting the requested injunctive relief. The goals of the Bankruptcy Code, generally, and chapter 15, more specifically, also weigh in favor of granting the requested preliminary injunctive relief.  The requested relief would further the Bankruptcy Code's general goal of avoiding piecemeal distribution and depletion of a debtor's estate, as well as the stated purpose of chapter 15, which is to, among other things, (i) foster fair and efficient administration of cross-border insolvencies that protects the interests of all creditors, and other interested parties, including the debtor; (ii) protect and maximize the value of the debtor's assets; and (iii) facilitate the rescue of financially troubled businesses, thereby protecting investment and preserving employment.  See 11 U.S.C. § 1501(a).

**B.      The Court Should Extend the Stay to the Protected Parties**

28.      Section 1521(a)(7) provides that foreign debtors may also obtain any and all relief that is generally available to trustees in bankruptcy.  Id. at § 1521(a)(7) ("Upon recognition of a foreign proceeding, . . . the court may, at the request of the foreign representative, grant any appropriate relief, including . . . (7) granting any additional relief that may be available to a

trustee, except for relief available under sections 522, 544, 545, 547, 548, 550, and 724(a)."); see also 8 Collier on Bankruptcy at ¶ 1521.02 (15th ed. Rev. 2008) ("[S]ection 1521(a)(7) authorizes any additional relief that may be available to a trustee except for the exercise of avoidance powers.").  Here, Corporación Durango requests that the Court extend the stay to the Protected Parties, including, without limitation, the Mexican Subsidiary Guarantors.

29.     It is well settled that trustees may seek to extend injunctive relief to non-debtors under appropriate circumstances pursuant to section 362 and section 105 of the Bankruptcy Code.  The Second Circuit has held that the automatic stay may be extended directly to a debtor's wholly-owned subsidiary "when a claim against the non-debtor will have an immediate adverse economic consequence for the debtor's estate."  Queenie, Ltd. v. Nygard Int'l, 321 F.3d 282, 287-288 (2d Cir. 2003).  The court in Queenie further noted that the automatic stay barred litigation against a chapter 11 debtor's wholly-owned subsidiary because the "adjudication of a claim against [that] . . . corporation [would] . . . have an immediate adverse economic impact on [the debtor]".  Id.

30.     Other courts interpreting section 105(a) in tandem with section 362 agree, especially if the action to be enjoined threatens "to thwart or frustrate the debtor's reorganization efforts."  See Calpine Corp. v. Nevada Power Co. (In re Calpine Corp.), 354 B.R. 45, 48 (Bankr. S.D.N.Y. 2006) (quoting In re Adelphia Commc'ns Corp., 298 B.R. 49, 54 (S.D.N.Y. 2003) and collecting cases), aff'd, 365 B.R. 401 (S.D.N.Y. 2007).

31.     Stated simply, because non-debtors generally do not fall within the protection of the automatic stay, courts have recognized that "at times section 105 must be invoked on their behalf to prevent creditors from frustrating an otherwise-viable reorganization effort by pursuing actions against them."  Calpine, 2007 WL 1302604, at *2 (collecting cases).  Otherwise,

"[c]ongressional intent to provide relief to debtors would be frustrated by permitting indirectly what is expressly prohibited in the Code." Id. (quoting In re United Health Care Org., 210 B.R. 228, 233 (S.D.N.Y. 1997)); see, e.g., Calpine, 354 B.R. at 48-50 (extending stay to preliminarily enjoin litigation against chapter 11 debtor's surety, where (i) claims were based on identical facts and inextricably tied to claim against the debtor, (ii) resolution of legal issues exposed the debtor to significant risk of collateral estoppel, stare decisis or other prejudicial effect, (iii) surety would have an indemnity claim against the debtor for any judgment entered against it, and (iv) allowing litigation to proceed would distract key personnel from the debtor's reorganization efforts), aff'd, 365 B.R. 401 (S.D.N.Y. 2007); see also generally A.H. Robins Co., Inc. v. Piccinin, 788 F.2d 994, 999 (4th Cir.), cert. denied, 479 U.S. 876 (1986) (holding that the protections of section 362(a) may be extended to non-debtors "when there is such identity between the debtor and the third-party defendant that the debtor may be said to be the real party defendant and that a judgment against the third-party defendant will in effect be a judgment or finding against the debtor"); W.R. Grace & Co. v. Chakarian (In re W.R. Grace & Co.), No. 01-01139, Adv. A-01-771, 2004 WL 954772, at *2 (Bankr. D. Del. Apr. 29, 2004) ("[T]he automatic stay has generally been extended to the 'unusual situation' where an action against one party is essentially an action against the bankruptcy debtor, as in the case where a third-party is entitled to indemnification by the debtor for any judgment taken against it."); Lomas Fin. Corp. v. N. Trust Co. (In re Lomas Financial Corp.), 117 B.R. 64, 68 (S.D.N.Y. 1990) (same).

32.     Additionally, courts have found grounds for extending injunctive relief to the officers and/or directors of bankrupt corporations where failure to do so would jeopardize the success of the bankruptcy process. See, e.g., A.H. Robins, 788 F.2d at 1008 (if lawsuits were allowed to proceed, efforts to comply with discovery requests would sidetrack management from

the reorganization process); <u>Hawaii Structural Ironworkers Pension Trust Fund v. Calpine Corp., Inc.</u>, No. 06 Civ. 5358, 2006 WL 3755175, at *4-*6 (S.D.N.Y. Dec. 20, 2006) (injunction preventing litigation against debtor's directors was proper where attention to lawsuit "threatened to irreparably impair the company's reorganization process"); <u>In re Ionosphere Clubs, Inc.</u>, 124 B.R. 635, 642 (S.D.N.Y. 1991) (stay may properly be extended to parties in interest to the reorganization where failure to do so would frustrate reorganization attempts); <u>Lomas</u>, 117 B.R. at 67 (stay of litigation proper where reorganization efforts would be stymied by distraction of key personnel who were targets of litigation); <u>In re Davis</u>, 191 B.R. 577, 585 (Bankr. S.D.N.Y. 1996) (enjoining litigation against Canadian bankruptcy trustee in connection with proceedings under former section 304 of the Bankruptcy Code, where continued litigation would impair trustee's "ability to perform his duties in the Canadian proceedings . . . .").

33.     Here, it is clear that ample grounds exist for extending injunctive relief to the Protected Parties during the course of the Concurso Proceeding.  As noted above, the Mexican Subsidiary Guarantors, all of which are directly or indirectly owned by Corporación Durango represent the only sources of income for Corporación Durango's reorganization and the most important and valuable assets of the Debtor.  As a result, any interruption in the business of the Mexican Subsidiary Guarantors will critically and irreparably harm the Debtor's most important assets as well as the Debtor's reorganization efforts and will frustrate the reorganization process in Mexico.  Moreover, if an injunction is not granted, the Debtor's officers and directors will be distracted from their primary task of reorganizing the Debtor to the detriment of the Debtor and its creditors.  Extending the automatic stay to the Protected Parties will preserve the Debtor's most important assets, assure that the officers and directors of the Debtor are free to focus on their most critical task—reorganizing the Debtor, and will foster the reorganization process by

assuring that the assets and liabilities of the Debtor are resolved comprehensively in the Debtor's Concurso Proceeding.

34.     In addition to the foregoing, extending the automatic stay to the Mexican Subsidiary Guarantors is consistent with decisions rendered under former section 304 of the Bankruptcy Code, in which courts granted nationwide injunctions in favor of the wholly-owned subsidiaries of foreign debtors in order to protect assets that were inextricably tied to—and involved in— reorganization efforts in a foreign proceeding.  See, e.g., In re Schimmelpenninck, 183 F.3d 347, 362 (5th Cir. 1999) (extending injunctive relief to prevent direct action against foreign debtor's wholly-owned subsidiary, where such action would diminish the value of the foreign debtor's ownership interest to the detriment of all creditors); see also In re Avila, 296 B.R. 95, 105-06 (Bankr. S.D.N.Y. 2003) (enjoining action against non-debtor trust, which held proceeds from foreign debtors' securitized bond offering that were, in large part, to be paid to creditors under foreign plan of reorganization).  Indeed, identical injunctive relief was granted to certain of Corporación Durango's wholly-owned subsidiaries, as well as its officers and directors, in furtherance of the company's reorganization efforts before this Court in 2004 in the 304 Proceeding.  See, e.g., In re Corporación Durango, S.A. de C.V., No. 04-13487 (Bankr. S.D.N.Y. June 4, 2004).[5]

---

[5]     In granting injunctive relief to a non-debtor, the court in Avila—which involved an ancillary proceeding under former section 304 of the Bankruptcy Code that was commenced to prevent the disruption of ongoing restructuring efforts in Mexico—considered all factors for extending relief under former section 304(c) of the Bankruptcy Code and specifically concluded that Mexico's Concurso Law (i) treated all creditors and interest holders justly, (ii) protected United States creditors against prejudice and inconvenience in processing their claims, (iii) prevented preferential and fraudulent distributions, and (iv) provided a scheme governing the distribution of the estate to secured, administrative, other priority and unsecured creditors.  Avila, 296 B.R. at 107-09 (citing and discussing various provisions of the Concurso Law); see also Corporación Durango, No. 04-13487 (Bankr. S.D.N.Y. June 4, 2004) (citing Avila).  Although section 304 has been repealed, section 1521 of the Bankruptcy Code (as explained in greater detail below) provides grounds for extending the injunctive relief that was previously granted by the courts in Schimmelpenninck, Avila, and Corporación Durango.  Indeed, the continued viability of such relief is evidenced by section 1507 of the Bankruptcy Code, which vests courts with expansive authority to "provide additional assistance" to foreign representatives under title 11 or under other laws of the United States based on the same factors previously considered for the grant of such relief under section 304 of the Bankruptcy Code.  See 11

35.     In short, the Motion should be granted.

**C.     Notice Has Been Provided to Known Persons That Would Be Restricted by the Requested Relief**

36.     Notice of the Motion and the Cunningham Declaration has been provided to the (i) the Office of the United States Trustee for the Southern District of New York, (ii) Law Debenture Trust Company of New York, as indenture trustee for the Senior Notes (the "Indenture Trustee"), (iii) all parties listed on Interim Bankruptcy Rule 2002(q)(1) of which the Debtor is currently aware, and (iv) all other known holders of the Senior Notes and other parties in interest in the U.S.  As a result of the foregoing, the Debtor believes that it has exercised reasonable diligence in providing notice to its creditors and that no further notice should be required.

**NO PRIOR REQUEST**

37.     No previous request for the relief requested herein has been made to this or any other court.

Dated:   New York, New York
         October 6, 2008

                                WHITE & CASE LLP

                                By: _____
                                    John K. Cunningham (JC 4661)
                                    Wachovia Financial Center
                                    200 South Biscayne Blvd., Suite 4900
                                    Miami, Florida 33131
                                    Telephone:  (305) 371-2700
                                    Facsimile:   (305) 358-5744

---

U.S.C. § 1507; see also 8 Collier on Bankruptcy ¶ 1507.01 (discussing interplay between section 1507 and 1521 and noting that, "[e]ven if [1507] . . . does not expand the available relief [under 1521]," it "may provide an opening to look to jurisprudence under former section 304 not as binding precedent but for guidance or inspiration in fashioning relief under other sections of chapter 15").  In light of this Court's prior rulings in Avila and Corporación Durango, and in consideration of the Declaration of Fernando del Castillo filed contemporaneously herewith, Petitioner respectfully submits that the grant of the injunctive relief requested herein is additionally proper under section 1507 of the Bankruptcy Code.

– and –

J. Christopher Shore (JS-6031)
1155 Avenue of the Americas
New York, New York 10036-2787
Telephone: (212) 819-8200
Facsimile:  (212) 354-8113

Attorneys for Gabriel Villegas Salazar as
Foreign Representative of Corporación
Durango

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re | )     Chapter 15 |
| | ) |
| Corporación Durango, S.A.B. de C.V., | )     Case No. 08-_____ (   ) |
| | ) |
| Debtor in a Foreign Proceeding. | ) |
| | ) |

## **TEMPORARY RESTRAINING ORDER**

Upon the Motion dated October 6, 2008 (the "Motion"),[1] filed by Petitioner, Gabriel

Villegas Salazar (the "Petitioner"), as foreign representative of Corporación Durango, S.A.B. de

C.V. ("Corporación Durango"), for a temporary restraining order pursuant to sections 105(a),

1507 and 1519-1521 of title 11 of the United States Code (the "Bankruptcy Code"), Rule 7065 of

the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 65 of the Federal

Rules of Civil Procedure (the "Federal Rules"), enjoining parties from initiating or continuing

any action or proceeding in the United States and its territories against Corporación Durango and

the following direct and indirect Mexican subsidiaries of Corporación Durango: Porteadores de

Durango, S.A. de C.V., Administración Corporativa de Durango, S.A. de C.V., Ponderosa

Industrial de México, S.A. de C.V., Empaques de Cartón Titán, S.A. de C.V., Reciclajes

Centauro, S.A. de C.V., Lineas Aéreas Ejecutivas de Durango, S.A. de C.V., Inmobiliaria

Industrial Tizayuca, S.A. de C.V., Compañia Norteamericana de Inversiones en Celulosa y

Papel, S.A. de C.V., Servicios Industriales Tizayuca, S.A. de C.V., Atenmex, S.A. de C.V.,

Atensa, S.A. de C.V., ECTSA, S.A. de C.V., EYEMSA, S.A. C.V., Cartonpack, S.A. de C.V.,

Administración Industrial Centauro, S.A. de C.V., and Administración Industrial Durango, S.A.

---

[1]     Any capitalized term not otherwise defined in this order will have the meaning ascribed to such term in the Motion.

de C.V. (the "Mexican Subsidiary Guarantors" and each of their respective officers and directors, the "Officers and Directors," and collectively with Corporación Durango and the Officers and Directors, the "Protected Parties") and/or their respective assets; and the Court having reviewed and considered the (i) Verified Petition for Recognition of Foreign Main Proceeding and Request for Related Relief dated October 6, 2008 (the "Petition"), (ii) the Verified Complaint, (ii) the Motion, (iii) the Cunningham Declaration, (iv) the Declaration of Gabriel Villegas Salazar Pursuant to 28 U.S.C. § 1746, and (v) the Declaration of Fernando del Castillo Pursuant to 28 U.S.C. § 1746; and it appearing that, based on the circumstances, notice of both the Petition and the Motion has been given to Corporación Durango's known creditors as set forth on the record of the hearing on the Motion held by the Court on October __, 2008 (the "Hearing"); and there being no objection to the requested relief, as set forth herein; and after due deliberation and sufficient cause appearing therefor, it is

**FOUND**, that:

1. The Petitioner commenced a case ancillary to a foreign proceeding on behalf of Corporación Durango with this Court pursuant to chapter 15 of the Bankruptcy Code;

2. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157, and venue is proper pursuant to 28 U.S.C. § 1410;

3. This Court, pursuant to sections 105(a), 1507 and 1519-1521 of the Bankruptcy Code, Bankruptcy Rule 7065, and Federal Rule 65, may issue any order as may be necessary or appropriate to carry out the provisions of the Bankruptcy Code, including but not limited to issuing a temporary restraining order; and

4. Corporación Durango will suffer irreparable harm unless Corporación Durango's creditors are temporarily restrained to the extent provided in this Order from initiating

MIAMI 797263 v2 (2K)

or continuing any action or proceeding in the United States in respect of the Protected Parties and/or their property pending a further hearing on the Motion as provided herein, which actions such creditors are capable of taking prior to the provision of additional notice; and based upon the foregoing, and after due deliberation and sufficient cause appearing therefor for the reasons stated by the Court on the record of the Hearing

it is therefore

**ORDERED, ADJUDGED AND DECREED:**

A.    That all persons (including individuals, partnerships and corporations, and all those acting for or on their behalf), and all governmental units (including the United States of America and any State, Commonwealth, District Territory, municipality, department, agency or instrumentality of the United States, a State, Commonwealth, District Territory, municipality, a foreign state, or other foreign or domestic governments, and all those acting for or on their behalf) are hereby temporarily restrained and enjoined from taking the following actions in the United States and its territories against any of the Protected Parties and or their property:

(i)    Commencing or continuing any suit, action, enforcement process, extrajudicial proceeding or other proceeding (including a proceeding in any court, statutory or otherwise) (collectively, a "Proceeding"), or claim or demand for reclamation, against or in respect of the Protected Parties and/or their property wheresoever located, and whether held by either of the Protected Parties in whole or in part, directly or indirectly, as principal or as nominee, beneficially or otherwise, and without limiting the generality of the foregoing, including any and all real property, personal property and intellectual property of the Protected Parties, and any and all securities, instruments, debentures, notes or bonds issued to, or held by or on behalf of either of the Protected Parties (the "Property") in each case, insofar as such claim or demand is related to Corporación Durango or with respect to property involved in Corporación Durango's pending proceeding under Mexico's *Ley de Concursos Mercantiles* (the "Foreign Proceeding")(see In re Avila, 296 B.R. 95, 105 (Bankr. S.D.N.Y. 2003)), and any and all Proceedings currently proceeding against or in respect to either the Protected Parties or the Property are hereby stayed and suspended;

(ii)     Enforcing or exercising the right of any person, firm, corporation, governmental authority or other entity arising by law against the Protected Parties or the Property (including, without limitation, any right of dilution, registration, attornment, encumbrance, buy-out, divestiture, repudiation, rescission, forced sale, reclamation, acceleration, set-off, repossession, distress, conversion, possession, termination, suspension, modification or cancellation or right to revoke any qualification or registration) by virtue of any agreement or by any other means, including as a result of any default or non-performance by the Protected Parties, the making or filing of these proceedings in each case, insofar as such action is related to Corporación Durango or with respect to property involved in the Foreign Proceeding;

(iii)    Taking any action to discontinue, fail to renew, alter, interfere with or terminate any right, contract, arrangement, agreement, license or permit in favor of either of the Protected Parties or the Property, as a result of any default or non–performance by Corporación Durango or the Mexican Subsidiary Guarantors, the making or filing of these proceedings or any allegation contained in these proceedings;

(iv)     Any action by a person, firm, corporation, governmental authority, or any other entity having written or oral agreements with either of the Protected Parties for the supply of goods and/or services, by or to the Protected Parties or any of the Property to discontinue, alter, interfere with or terminate the supply of such goods or services under such agreements so long as the normal prices or charges for such goods and services received after the date of this order are paid in accordance with present payment practices under such agreements, or as may be hereafter negotiated from time to time;

(v)      Any action by any banks and financial institutions at which Corporación Durango or the Mexican Subsidiary Guarantors maintain a bank account are hereby restrained from stopping, withholding, redirecting or otherwise interfering with any amount in such account(s) against any indebtedness owing to that bank or financial institution by Corporación Durango or the Mexican Subsidiary Guarantors;

(vi)     Taking any action against any of the directors or officers of the Protected Parties with respect to any claim against the directors or officers that relates to any obligation of the Protected Parties whereby the directors or officers are alleged under any law to be liable in their capacity as directors or officers for the payment or performance of such obligation in each case, insofar as such claim or demand is related to Corporación Durango or with respect to property involved in the Foreign Proceeding; and

(vii)    Taking any action that would be in violation of any other Order of this Court.

4

The foregoing temporary restraining order set forth in paragraph A shall expire by its terms at midnight on October __, 2008, unless further extended by order of the Court.

B.    The Protected Parties' creditors or any other party affected by entry of this Order, are directed to file any papers in opposition to the Motion and Petitioner's request for a preliminary and permanent injunction with this Court (with a copy to chambers) and to serve on counsel for the Petitioner, White & Case LLP, 200 S. Biscayne Blvd., Suite 4900, Miami, Florida 33131, Attention: John K. Cunningham, Esq., so as to be received on or before 4:00 p.m. (EST) on October __, 2008.

C.    A hearing on the Petitioner's Motion and request for preliminary injunctive relief will be held on October __, 2008 at __: 00 _.m.

D.    The Petitioner shall serve a copy of this Order upon all known creditors of Corporación Durango by first class mail, postage, prepaid, no later than October __, 2008.

E.    Prior to the time of the hearing set in parapraph C hereof, the Protected Parties shall meet and negotiate in good faith with their creditor constituencies in an effort to agree on the scope and mechanics of the relief that is to be sought in the Petition and the Motion as well as other procedural matters.

MIAMI 797263 v2 (2K)

F.     Each Protected Party and the Law Debenture Trust Company of New York, as indenture trustee for the Senior Notes, fully reserves and preserves all of their respective rights, arguments, and legal positions with respect to any or all matters that may arise in connection with the Petition and the related Motion.

Dated: New York, New York
        October __, 2008

        _:_0 _.M.

        _____
        UNITED STATES BANKRUPTCY JUDGE

MIAMI 797263 v2 (2K)



# CORPORACIÓN DURANGO, S.A.B. DE C.V.
## and subsidiaries



**Corporación Durango, S.A.B. de C.V.**
(Mexican Corporation)

- **99.96%** Porteadores de Durango S.A. de C.V. (Mexican Corporation)
  - **99.99%** Recidajes Centauro S.A. de C.V. (Mexican Corporation)
  - **99.99%** Conicepa * (Mexican Corporation)

- **99.99%** Administración Corporativa de Durango, S.A. de C.V. (Mexican Corporation)
  - **71.65% (1)** Líneas Aéreas Ejecutivas de Durango, S.A. de C.V. (Mexican Corporation)

- **99.62%** Empaques de Cartón Titán, S.A. de C.V. (Mexican Corporation)
  - **99.99%** Empresas Titán, S.A. de C.V. (Mexican Corporation)

- **99.99%** Inmobiliaria Industrial Tizayuca, S.A. de C.V. (Mexican Corporation)
  - **99.99%** Servicios Industriales Tizayuca, S.A. de C.V. (Mexican Corporation)
  - **99.99%** Atensa S.A. de C.V. (Mexican Corporation)
  - **99.99%** Eyemsa Industrial S.A. de C.V. (Mexican Corporation)
  - **99.99%** Administración Industrial Centauro, S.A. de C.V. (Mexican Corporation)
    - **99.99%** Atenmex S.A. de C.V. (Mexican Corporation)
    - **99.99%** Ectsa Industrial S.A. de C.V. (Mexican Corporation)
    - **99.99%** Cartonpack Industrial S.A. de C.V. (Mexican Corporation)
    - **99.99%** Administradora Industrial Durango, S.A. de C.V. (Mexican Corporation)

- **99.99%** Ponderosa Industrial de México, S.A. de C.V. (Mexican Corporation)

- **99.99%** Grupo Pipsamex S.A. de C.V. (Mexican Corporation)
  - **99.99%** Mexpape S.A. de C.V. (Mexican Corporation)
  - **99.99%** Fapatux S.A. de C.V. (Mexican Corporation)
  - **99.99%** Servicios Pipsamex S.A. de C.V. (Mexican Corporation)
  - **99.99%** Formatodo Industrial S.A. de C.V. (Mexican Corporation)
  - **100%** SummaFibers Inc. (Texas Corporation)

- **100%** Paper International, Inc (New Mexico Corporation)
  - **100%** Durango McKinley Paper Company (New Mexico Corporation)
  - **100%** Fiber Management of Texas, Inc. (Texas Corporation)

\* Conicepa = Compañía Norteamericana de Inversiones en Celulosa y Papel, S.A. de C.V.

(1)         16.19% is controlled through Corporación Durango, S.A.B. de C.V.

October, 2008

|  |  |  |
|---|---|---|
| In re | ) | Chapter 15 |
|  | ) |  |
| Corporación Durango, S.A.B. de C.V., | ) | Case No. 08-113911(RDD) |
|  | ) |  |
| Debtor in a Foreign Proceeding. | ) |  |
|  | ) |  |

## ORDER TO SHOW CAUSE

Upon the motion of the above-captioned debtor, Corporación Durango, S.A.B. de C.V. ("Corporación Durango" or the "Debtor"), pursuant to Rule 65 of the Federal Rules of Civil Procedure (the "Federal Rules"), made applicable to this proceeding through Rule 7065 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and sections 105, 1507 and 1519-1521 of title 11 of the United States Code (the "Bankruptcy Code"), for a Temporary Restraining Order and Preliminary Injunction; Memorandum of Points and Authorities dated October 6, 2008 (the "TRO Motion"); Verified Complaint for Temporary Restraining Order and Injunctive Relief dated October 6, 2008 (the "Complaint"); and the Declaration of John K. Cunningham in Support of Motion for a Temporary Restraining Order and Injunctive Relief dated October 6, 2008 (the "Cunningham Declaration");

IT IS HEREBY ORDERED, that that Law Debenture Trust Company of New York, DOES 1-1000, and any other parties in interest show cause on _____, 2008 at __ a.m./p.m. in Courtroom 610, One Bowling Green, New York, New York, why the Court should not enter a temporary restraining order (the "TRO") enjoining all persons (including individuals, partnerships and corporations, and all those acting for or on their behalf), and all governmental units (including the United States of America and any State, Commonwealth, District Territory, municipality, department, agency or instrumentality of the United States, a State,

Commonwealth, District, Territory, municipality, a foreign state, or other foreign or domestic governments, and all those acting for or on their behalf) from taking the following actions in the United States and its territories against any of the Protected Parties[1] and or their property:

(i)     Commencing or continuing any suit, action, enforcement process, extrajudicial proceeding or other proceeding (including a proceeding in any court, statutory or otherwise) (collectively, a "Proceeding"), or claim or demand for reclamation, against or in respect of the Protected Parties and/or their property wheresoever located, and whether held by either of the Protected Parties in whole or in part, directly or indirectly, as principal or as nominee, beneficially or otherwise, and without limiting the generality of the foregoing, including any and all real property, personal property and intellectual property of the Protected Parties, and any and all securities, instruments, debentures, notes or bonds issued to, or held by or on behalf of either of the Protected Parties (the "Property") in each case, insofar as such claim or demand is related to Corporación Durango or with respect to property involved in Corporación Durango's pending bankruptcy protection in Mexico (the "Concurso Proceeding"), and any and all Proceedings currently proceeding against or in respect to the either of the Protected Parties or the Property are hereby stayed and suspended;

(ii)    Enforcing or exercising the right of any person, firm, corporation, governmental authority or other entity arising by law against the Protected Parties or the Property (including, without limitation, any right of dilution, registration, attornment, encumbrance, buy-out, divestiture, repudiation, rescission, forced sale, reclamation, acceleration, set-off, repossession, distress, conversion, possession, termination, suspension, modification or cancellation or right to revoke any qualification or registration) by virtue of any agreement or by any other means, including as a result of any default or non-performance by the Protected Parties, the making or filing of these proceedings in each case, insofar as such action in related to Corporación Durango or with respect to property involved in the Concurso Proceeding;

(iii)   Taking any action to discontinue, fail to renew, alter, interfere with or terminate any right, contract, arrangement, agreement, license or permit in favor of either of the Protected Parties or the Property, as a result of any default or non–

---

[1]     The Mexican Subsidiary Guarantors are Porteadores de Durango, S.A. de C.V., Administración Corporativa de Durango, S.A. de C.V., Ponderosa Industrial de México, S.A. de C.V., Empaques de Cartón Titán, S.A. de C.V., Reciclajes Centauro, S.A. de C.V., Lineas Aéreas Ejecutivas de Durango, S.A. de C.V., Inmobiliaria Industrial Tizayuca, S.A. de C.V., Compañia Norteamericana de Inversiones en Celulosa y Papel, S.A. de C.V., Servicios Industriales Tizayuca, S.A. de C.V., Atenmex, S.A. de C.V., Atensa, S.A. de C.V., ECTSA, S.A. de C.V., EYEMSA, S.A. C.V., Cartonpack, S.A. de C.V., Administración Industrial Centauro, S.A. de C.V., and Administración Industrial Durango, S.A. de C.V.  The Debtor and the Mexican Subsidiary Guarantors, collectively with the officers and directors of both the Debtor and the Mexican Subsidiary Guarantors are referred to herein as the "Protected Parties."

performance by Corporación Durango or the Mexican Subsidiary Guarantors, the making or filing of these proceedings or any allegation contained in these proceedings;

(iv)    Any action by a person, firm, corporation, governmental authority, or any other entity having written or oral agreements with either of the Protected Parties for the supply of goods and/or services, by or to the Protected Parties or any of the Property to discontinue, alter, interfere with or terminate the supply of such goods or services under such agreements so long as the normal prices or charges for such goods and services received after the date of this order are paid in accordance with present payment practices under such agreements, or as may be hereafter negotiated from time to time;

(v)    Any action by any banks and financial institutions at which Corporación Durango or the Mexican Subsidiary Guarantors maintain a bank account are hereby restrained from stopping, withholding, redirecting or otherwise interfering with any amount in such account(s) against any indebtedness owing to that bank or financial institution by Corporación Durango or the Mexican Subsidiary Guarantors;

(vi)    Taking any action against any of the directors or officers of the Protected Parties with respect to any claim against the directors or officers that relates to any obligation of the Protected Parties whereby the directors or officers are alleged under any law to be liable in their capacity as directors or officers for the payment or performance of such obligation in each case, insofar as such claim or demand is related to Corporación Durango or with respect to property involved in the Concurso Proceeding; and

(vii)    Taking any action that would be in violation of any other order of this Court;

and it is further

ORDERED, that all opposing papers be served on counsel to the Debtor, White & Case LLP, Wachovia Financial Center 200 South Biscayne Blvd., Suite 4900 Miami, Florida 33131 so as to be received on or before _____, 2008; and it is further

ORDERED, that service of the Verified Complaint, the TRO Motion, and the Cunningham Declaration (a) on October 6, 2008, by hand delivery on the Office of the United States Trustee and Law Debenture Trust Company of New York (b) on October 6, 2008 by first class mail on (i) the entities identified on Exhibit A to the Cunningham Declaration based on the Debtor's most current information, and by (x) electronic mail for those parties on Exhibit A to

the Cunningham Declaration for which the Debtor has an electronic mail address or (y) facsimile for those parties on Exhibit A to the Cunningham Declaration for which the Debtor has a facsimile number but no electronic mail address, and (ii) all other known parties in interest in the U.S. shall be good and sufficient service and adequate notice of this TRO.

Dated: New York, New York

_____, 2008

_____
HONORABLE JUDGE ROBERT D. DRAIN
UNITED STATES BANKRUPTCY JUDGE

## **Exhibit I**

Not Reported in F.Supp.2d, 2006 WL 3755175 (S.D.N.Y.)
**(Cite as: 2006 WL 3755175 (S.D.N.Y.))**



**C**
Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
HAWAII STRUCTURAL IRONWORKERS PEN-
SION TRUST FUND, Appellant,
v.
CALPINE CORPORATION, INC., Appellee.

No. 06 Civ. 5358(PKC).
Dec. 20, 2006.

*MEMORANDUM AND ORDER*
CASTEL, J.

**\*1** This is an appeal from a June 8, 2006 Order of the United States Bankruptcy Court for this District (Burton R. Lifland, U.S.B.J.) granting an injunction pursuant to sections 105(a), 362(a)(1) and (a)(3) of the Bankruptcy Code, 11 U.S.C. §§ 105 and 362, against the prosecution in state court of a securities class action against individual defendants who were directors of the debtor. For the reasons set forth below, the Order is affirmed.

I. *BACKGROUND*
   The Hawaii Structural Ironworkers Pension Trust Fund (the "Ironworkers Fund") is the class representative in a certified securities class action pending in state court in California. *Hawaii Structural Ironworkers Pension Trust Fund v. Calpine, et al.,* Case No. 1-04 CV 021465 Superior Court, County of Santa Clara, California (the "State Court Action"). The First Amended Complaint in the State Court Action asserts claims under the Securities Act of 1933 against, among others, Calpine Corporation ("Calpine") and five individuals who signed Calpine's April 2002 Registration Statement as company directors. (A1 167-68) The Registration Statement is alleged to have contained false statements regarding reported income that was subsequently restated, the earnings outlook and the intentions of officers and directors to hold their stock during a specified period. (A1 170-71) The restate-

ment of income was announced in March 2003 and related to the reclassification of two purported sale-leaseback transactions as financing transactions. (A1 172-73) The Ironworkers allege that Calpine is "strictly liable" to plaintiffs for the misstatements and omissions contained in the Registration Statement. (A1 177) The underwriters of the securities were also named as defendants. Liability is asserted against all defendants under sections 11 and 12(a)(2), 15 U.S.C. §§ 77k and 77(1)(a)(2). Liability against the individual defendants was also asserted under section 17, as controlling persons of Calpine. 15 U.S.C. § 770. Relief in the nature of recession or damages is sought. (A1 180)

   On December 20, 2005, subsequent to the filing of the State Court Action, Calpine filed a voluntary petition under Chapter 11 of the Bankruptcy Code. Calpine, the debtor, filed an adversary proceeding seeking to extend the automatic stay under sections 362(a)(1) and (a)(3) of the Bankruptcy Code or, in the alternative, to enjoin further adjudication of the State Court Action, as well as certain other suits, under sections 105(a) and 362 of the Code. The complaint seeking to extend the automatic stay or injunctive relief was reasonably well-detailed and placed all parties on notice as to the basis for the relief. (A1 012-24) It was accompanied by a motion (A1 025), a declaration annexing the First Amended Complaint (A1 064) and a 23-page memorandum of law which further explained the basis for the relief sought. (A1 036) The Ironworkers responded with a memorandum of law meeting the issues head-on. (A1 222) The debtor filed a reply memorandum (A1 262), together with the declaration of Jay L. Pomerantz, a partner in the law firm representing the defendants in the State Court Action. (A1 330)

   **\*2** A hearing date of June 6, 2006 was set. In Court and available to testify at the hearing were Mr. Pomerantz and Mr. Scott Davido, the debtor's Chief Executive Officer and Chief Financial Officer. (A2 036) Counsel for the Ironworkers initially objected

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 3755175 (S.D.N.Y.)
**(Cite as: 2006 WL 3755175 (S.D.N.Y.))**

because "I was not advised certainly that there would be any witnesses presented today." (A2 019) The Court overruled the objection and allowed debtor's counsel to proceed. Counsel for the debtor made offers of proof as to the direct testimony of Pomerantz and Davido and offered them for cross-examination. The Ironworkers' counsel declined the opportunity to cross examine Pomerantz (A2 036) but elected to cross-examine Davido. (A2 038-49) Davido described how the time and attention of the Chief Accounting Officer and his staff is essential to the reorganization, including the timely reporting of results. (A2 042) The Chief Accounting Officer and his staff would be "deeply involved" in responding to discovery requests and would need to be available to respond to lawyer inquiries and for depositions. Davido also testified that two executives whose time would be needed for the State Court Action were heading up the internal review of contracts and leases for assumption or rejection. (A2 044)

Judge Lifland concluded that the continuation of the State Court Action would "place the Debtor[ ] at risk of collateral estoppel and evidentiary prejudice, threaten the assets of the Debtor['s] bankruptcy estates and distract the officers, directors and employees of the Debtor[ ] at a time when their assistance is most critical to a successful reorganization." (A2 072) Specifically, he concluded that, because the allegations against the individuals were premised upon violations of sections 11 or 12 of the 1933 Act, 15 U.S.C. §§ 77k and 77(1), there is a "real risk of Plaintiffs claiming issue preclusion or inheriting a prejudicial evidentiary record after [the debtor's] emergence from Chapter 11." (A2 073) "The practical reality," he noted, "is that the risk of evidentiary prejudice will force Debtor['s] counsel to be involved in all aspects of the [State] Court Action...." (*Id.*) Judge Lifland also concluded that "the continuation of the [State Court] Action against the Individual Defendants has the potential to severely drain the Debtors' D & O insurance policies and diminish the assets of the Debtors' estates." (A2 074) Finally, he concluded that, "if al-

lowed to proceed, the [State Court] Action will place serious litigation demands to [sic] the Debtor ['s] senior management and personnel and will distract them from the reorganization." He noted that the Debtor would be "the principal responder to discovery" in the State Court Action. (A2 074)

The foregoing led the Bankruptcy Court to conclude that allowing the State Court Action to proceed against the individuals would "place a substantial burden on the Debtor[ ] because the risks of collateral estoppel, evidentiary prejudice, depletion of estate resources and litigation distractions will all hurt the reorganization effort." (*Id.*) On a balancing of the equities, he concluded that the debtor will "suffer real harm" and that a successful reorganization of the debtor's power generation business was in the public interest. He concluded that the debtor had made a "substantial case" for an injunction. Judge Lifland's ruling was reflected in a June 8, 2006 Order from which Ironworkers Fund timely appealed.

## II. *STANDARD OF REIVEW*

**\*3** The Bankruptcy Court's findings of fact are reviewed for clear error. Fed. R. Bankr.8013. Under the clearly erroneous standard, the court will reverse if " 'left with the definite and firm conviction that a mistake has been committed.' " *Manville Forest Prods. Corp-Gulf States Exploration Co. v. Manville Forest,* 896 F.2d 1384, 1388 (2d Cir.1990)(quoting *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948)). The Bankruptcy Court's legal conclusions are subject to *de novo* review. *In re Ogden N.Y. Servs., Inc.,* 312 B.R. 729, 730 (S.D.N.Y.2004). The decision to grant or deny an injunction is reviewable on appeal for an abuse of discretion. *See Wisdom Import Sales Co., L.L.C. v. Labatt Brewing Co., Ltd.,* 339 F.3d 101, 108 (2d Cir.2003) (citation omitted).

## III. *DISCUSSION*

Ironworkers Fund argues that the Bankruptcy Court erred in basing an injunction on this record where it had no advance notice that Davido would

Not Reported in F.Supp.2d, 2006 WL 3755175 (S.D.N.Y.)
**(Cite as: 2006 WL 3755175 (S.D.N.Y.))**

testify. Ironworker's Fund also urges this court to conclude that extension of the automatic stay under section 362(a)(1) is unwarranted on these facts and that the D & O policies are not property of the estate for purposes of section 362(a)(3). Further, it asserts that issuance of an injunction is improper under section 105(a) because the record did not justify the extraordinary remedy and that the Bankruptcy Court's injunction should therefore be vacated.

I conclude that denying the requested adjournment and permitting the Davido proffer was not an abuse of the Bankruptcy Court's discretion. I further conclude that the court did not abuse its discretion in enjoining the State Court Action under section 105(a). The Bankruptcy Court's finding that the continuation of the State Court Action will, at this juncture, place a substantial burden on the debtors, irreparably harming efforts by the debtor to reorganize, is not clearly erroneous. There was ample support for the court's conclusion that the harm to the debtors by a failure to reorganize, and the harm to the public such a failure would derivatively cause, outweighs any harm in enjoining the securities litigation. Because I conclude that the issuance of an injunction under section 105 was proper, I need not reach the issue of whether the stay should be extended under section 362.[FN1]

> FN1. I note that 11 U.S.C. § 362 was amended on December 12, 2006 by PL 109-390. This recent amendment has no bearing on this litigation.

### 1. The Admission of Pomerantz and Davido's Testimony Was Not An Abuse of Discretion

Ironworkers Fund objects to the proffer of Davido at the hearing without advance notice. It argues that the Bankruptcy Court should have granted its request for an adjournment. Although it is true that Ironworkers Fund did not know that Davido would appear at the June 6 hearing, Ironworkers Fund was fully apprised of the substance of Calpine's position regarding the need for an injunction in advance of the hearing and the Davido proffer merely echoed and supported that position. (A1 52-54; A1 279-82)

I conclude that it was not an abuse of discretion for the Bankruptcy Court to proceed with the hearing and to deny the requested adjournment.

*4 As to Pomerantz, Ironworkers Fund does not contend that there was any infirmity in the proffer of his statements at the hearing. Ironworkers Fund had the declaration of Pomerantz in hand prior to the hearing. Indeed, counsel conceded at the hearing that "... I don't think we would have anything to add beyond w[hat's] in the declaration, I don't think it's particularly helpful, but that's for the court to decide ultimately." (A2 020)

### 2. The Bankruptcy Court's Grant of An Injunction Was a Proper Exercise of Discretion

Section 105(a) of the Bankruptcy Code provides bankruptcy courts with broad discretion to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." Section 105 of the Code is "broader than the automatic stay provisions of section 362 and [the court] may use its equitable powers to assure the orderly conduct of the reorganization proceedings." In re Baldwin-United Corp. Litig., 765 F.2d 343, 348 (2d Cir.1985) (citations omitted). Section 105 may support the issuance of an injunction to parties who do not fall within the scope of section 362(a). See In re Chateaugay, 93 B.R. 26, 30 (S.D.N.Y.1988)(extending a stay pursuant to the injunctive power of § 105 despite the inapplicability of § 362). If an action against a non-debtor would frustrate the goal of debtor reorganization, section 105(a) provides the statutory authority for an injunction staying the action against the non-debtor. See Adelphia Commc'ns. Corp., 298 B.R. 49, 54 (S.D.N.Y.2003)("It is well settled that bankruptcy courts, under [ § 105], may extend the automatic stay to 'enjoin suits by third parties against third parties if they threaten to thwart or frustrate the debtor's reorganization efforts." ') (citations omitted). There has been no delineation by the Court of Appeals for the Second Circuit as to "under what circumstances, if any, a bankruptcy court may properly exercise § 105 jurisdiction to issue a stay with

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

respect to non-bankrupt co-defendants." *Teachers Ins. & Annuity Ass'n. of America v. Butler,* 803 F.2d 61, 65-66 (2d Cir.1986). I therefore look to other cases in this District, as well as other Circuits, to determine under what circumstances exercise of a court's powers under section 105(a) is appropriate.

A request by a debtor for an injunction under section 105(a) pending confirmation of the debtor's plans for reorganization is regarded as a request for a preliminary injunction. *See, e.g., GAF Corp. v. Johns-Manville Corp.,* 26 B.R. 405, 415 (Bankr.S.D.N.Y.1983), *aff'd,* 40 B.R. 219 (S.D.N.Y.1984); *In re United Health Care Org.,* 210 B.R. 228, 233-35 (S.D.N.Y.1997), *appeal dismissed as moot,* 147 F.3d 179 (2d Cir.1998). The determination of whether an injunction should issue calls into play the traditional preliminary injunction standard as modified to fit the bankruptcy context. *See* 105.02 Collier on Bankruptcy (15th Edition Rev.2006); *In re United Health Care,* 210 B.R. at 233. Although the first requirement is classically that there be a danger of imminent, irreparable harm to the estate, there is a limited exception permitting "issuance of a preliminary injunction in the bankruptcy context where the action to be enjoined is one that threatens the reorganization process." *Alert Holdings, Inc. v. Interstate Protective Servs., Inc.,* 148 B.R. 194, 200 (Bankr.S.D.N.Y.1992). Even under this narrow exception, the threat to the reorganization process must be imminent, substantial and irreparable. As for the second requirement, there must be a reasonable likelihood of a successful reorganization. Third, the court must balance the comparative harm to the debtor, and to debtor's reorganization, against that to the would-be-enjoined party should an injunction be issued. Fourth, the court must consider the public interest which "requires a balancing of the public interest in successful bankruptcy reorganizations with other competing societal interests." 105.02 Collier; *accord Tucker Anthony Realty Corp. v. Schlesinger,* 888 F.2d 969, 972 (2d Cir.1989). In evaluating these factors, the court takes a flexible approach

and no one factor is determinative. *See In re Eagle-Picher Indus., Inc.,* 963 F.2d 855, 859 (6th Cir.1992).

**\*5** Calpine urges that it was proper for the Bankruptcy Court to consider the potential collateral estoppel, *res judicata* or *stare decisis* effect on the debtor of allowing litigation against a non-bankrupt third party to continue. *See, e.g., In re Ionosphere Clubs, Inc.,* 111 B.R. 42, 34-35 (Bankr.S.D.N.Y.1990), *aff'd in part,* 124 B.R. 635 (S.D.N.Y.1991). Ironworkers Fund relies upon *Queenie, Ltd. v. Nygard Int'l,* 321 F.3d 282, 287-88 (2d Cir.2003) in which the Second Circuit extended the automatic stay provision of 362(a) to the debtor's wholly-owned corporation but declined to extend it to a co-defendant. As the court noted, " '[A] suit against a codefendant is not automatically stayed by the debtor's bankruptcy filing' 'and to stay a suit against a co-defendant due purely to the potential risk to a debtor of offensive collateral estoppel would create a "vast and unwarranted interference with creditors' enforcement of their rights against non-debtor co-defendants." *Id.* at 287, 288 (citation omitted). Because the decision of the Bankruptcy Court is well supported by other threats to reorganization posed by the continuation of the State Court Litigation, I need not decide whether Calpine faces a risk of collateral estoppel sufficient on its own to warrant issuance of an injunction under section 105(a).

Here, the Bankruptcy Court properly exercised its discretion in balancing the appropriate factors in deciding to grant the injunction. At the time that the injunction was issued, the logistical stress on Calpine from attempting to simultaneously undertake a massive reorganization while monitoring and producing documents in the State Court Action threatened to irreparably impair the company's reorganization process. Davido specifically identified individuals that would be heavily involved in both the reorganization process and in responding to requests pertaining to the State Court Action. Additionally, the corporate debtor and its management

would necessarily be the prime focus of discovery in the State Court Action and, in this regard, it matters little that some of the individual defendants are no longer affiliated with the debtor. Further, given that evidence of the truth or falsity of the statements in the Registration Statements would likely lie in the hands of the corporate debtor, the key depositions would likely be of members of management who would know the basis for the financial treatment that lead to the restatement. While I decline to conclude that collateral estoppel, *res judicata* or *stare decisis* provide an adequate, independent basis for enjoining the State Court Action, I recognize that a prudent debtor would devote managerial and financial resources to assisting in the defense against the State Court Action because of the potential impact upon a claim or suit against the debtor. I conclude, based on the evidence in the record before me, that the Bankruptcy court properly exercised its discretion in finding that the critical process of Calpine's reorganization would imminently, substantially and irreparably be harmed by permitting the State Court Action to continue at the time that the injunction issued.

**\*6** As to the second factor concerning the likelihood of successful reorganization, I cannot conclude on the current record that the Bankruptcy Court committed clear error by finding, based on the testimony at the hearing and the record before him, that if the State Court Action is enjoined, the debtor is likely to be successful in its reorganization efforts. (A2 074)

Similarly, the Bankruptcy Court's conclusion as to the third and fourth factors, the balancing of the equities between the parties as well as the harm to the public, is supported by the evidence as set forth in the record before me. The balancing of the equities favors the debtors, in part because, as Appellant concedes, it is unclear at this juncture how disbursements from the entity insurance policy, which covers both the debtor and the individual defendants, will be made. While there is a Priority of Payment Clause in Endorsement Five of the policy, A1

485, it is unclear how payment for costs, for example defense costs, would be made should simultaneous litigation ensue. Therefore, despite the Priority of Payments Clause, it is possible that the individual defendants and debtor may be competing for resources under the policy, thereby impacting the bankruptcy estate.

As the bankruptcy court properly concluded, there is the risk that if the injunction does not issue, the debtor will "suffer real harm". (A2 075) There is no concomitant harm that will befall the class plaintiffs' in a delay of the State Court Action. I therefore conclude that the balancing of harms at this point favors the debtor. Additionally, as to the final factor considered, there is a public benefit which will be derived from Calpine's successful reorganization of its power generation business.

It is important to note that the Bankruptcy Court's ruling does not reach the underwriter defendants and the claims against them may proceed unhindered. It is also significant that the nature of the equitable relief granted by the Bankruptcy Court is inherently open to revisitation as the circumstances change. The injunction was premised upon an assessment of the equities as they existed on the date the relief was granted. I am informed by the parties that the period of exclusivity for proposing a plan of reorganization ends in June 2007 and Ironworkers Fund's counsel acknowledged at argument that the debtor's plan, as well as any intervening changes in circumstances, may further demonstrate why an injunction is no longer necessary. In the event that Ironworkers Fund seeks, and is denied, modification of the injunction on or after the current date in June 2007 that Calpine's plan of reorganization is due, any appeal should be refiled under the present docket number and assigned to the undersigned.

IV. *CONCLUSION*
The Order of June 8, 2006 is affirmed.

SO ORDERED.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 3755175 (S.D.N.Y.)
**(Cite as: 2006 WL 3755175 (S.D.N.Y.))**

S.D.N.Y.,2006.
Hawaii Structural Ironworkers Pension Trust Fund
v. Calpine Corp., Inc.
Not Reported in F.Supp.2d, 2006 WL 3755175
(S.D.N.Y.)

END OF DOCUMENT

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 15 |
| | ) |
| COMPANIA MEXICANA DE AVIACION, S.A. de | ) Case No. 10-14182(MG) |
| C.V., | ) |
| | ) |
| Debtor in a Foreign Proceeding. | ) |
| | ) |

## ORDER GRANTING PRELIMINARY INJUNCTION

Upon the Application for certain provisional and injunctive relief (the "Application")

filed by Maru E. Johansen as foreign representative of the above-captioned debtor (the "Foreign

Representative" and "Mexicana," respectively) in Mexicana's reorganization proceedings under

Mexican law currently pending before the District Court for Civil Matters for The Federal

District, Mexico (the "Mexico Court" and "Concurso Proceeding"); and upon this Court's review

and consideration of the Application, the Foreign Representative's Declaration and the

Declaration of Jaime René Guerra González; and upon consideration of prior proceedings before

the Court in this Chapter 15 proceeding; and this Court having jurisdiction to consider the

Application and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334, and 11

U.S.C. §§ 109 and 1501; and consideration of the Application and the relief requested therein

being a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(P); and venue being proper before

this Court pursuant to 28 U.S.C. § 1410(3); and appropriate, sufficient and timely notice of the

filing of the Application and the hearing thereon having been given in accordance with this

Court's Order to Show Cause with Temporary Restraining Order and the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules"); and upon the record established at such

hearing; and it appearing that the relief requested in the Application is necessary and beneficial

to Mexicana; and no objections or other responses to the Application having been filed that have

not been overruled, withdrawn or otherwise resolved; and this Court having extended the

effectiveness and enforceability of the Temporary Restraining Order pending entry of this Order; and after due deliberation and sufficient cause appearing therefor;

IT IS HEREBY FOUND AND DETERMINED THAT:[1]

1.　　There is a substantial likelihood that the Foreign Representative will be able to demonstrate that the Concurso Proceeding constitutes a "foreign main proceeding" as defined in section 1502(4) of the Bankruptcy Code.

2.　　The commencement or continuation of any action or proceeding in the United States against Mexicana should be enjoined pursuant to sections 105(a) and 1519 of the Bankruptcy Code to permit the expeditious and economical administration of Mexicana's estate in the Concurso Proceeding, and such injunctive relief will either (i) not cause an undue hardship to other parties in interest or (ii) any hardship to parties is outweighed by the benefits to Mexicana of the relief requested.

3.　　Unless a preliminary injunction issues, there is a material risk that Mexicana's United States-based assets could be subject to efforts by creditors or other parties-in-interest in the United States to control or possess such assets, or that contract counterparties could use the Concurso Proceeding as a pretext to terminate contracts, require security, tighten credit terms or take other action against Mexicana or its U.S.-based assets.

4.　　Such acts could (i) interfere with and cause harm to Mexicana's efforts to administer its estate pursuant to the Concurso Proceeding and the Mexican Court's administration of the Concurso Proceeding; and (ii) undermine the Foreign Representative's efforts to achieve an equitable result for the benefit of all of Mexicana's creditors.  Accordingly,

---

[1] The findings and conclusions set forth herein and in the record of the hearing on the Petition constitute this Court's findings of facts and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure, as made applicable herein by Bankruptcy Rules 7052 and 9014.  To the extent any of the findings of fact herein constitute conclusions of law, they are adopted as such.  To the extent any of the conclusions of law herein constitute findings of fact, they are adopted as such.

there is a material risk that Mexicana may suffer immediate and irreparable injury absent injunctive relief, and it is therefore necessary that the Court enter this Order.

5. The interest of the public will be served by this Court's entry of this Order.

BASED ON THE FOREGOING FINDINGS OF FACT AND CONCLUSIONS OF LAW, AND AFTER DUE DELIBERATION AND SUFFICIENT CAUSE APPEARING THEREFOR, IT IS HEREBY ORDERED THAT:

6. Beginning on the date of this Order and continuing until the date of entry of an order of this Court determining the Foreign Representative's request for an order recognizing the Concurso Proceeding as a "foreign main proceeding" as defined in section 1502(4) of the Bankruptcy Code and the foreign representative as defined in section 101(24) of the Bankruptcy Code (unless otherwise extended pursuant to section 1519(b) of the Bankruptcy Code):

     i      the protections of section 362 of the Bankruptcy Code shall apply to Mexicana and its assets in the United States;

     ii      the Foreign Representative is established as the representative of Mexicana with full authority to administer Mexicana's assets and affairs in the United States;

     iii      the Foreign Representative is entrusted with the administration or realization of Mexicana's assets in the United States, including, without limitation, all of Mexicana's assets that may have been transferred to parties in the United States;

     iv      all persons and entities are enjoined from seizing, attaching and/or enforcing or executing liens or judgments against Mexicana's property in the United States or from transferring, encumbering or otherwise disposing of or interfering with Mexicana's assets or agreements, rights, services and operations in the United States without (a) an order from the Mexico Court, or this Court, permitting such action or (b) the express written consent of the Foreign Representative; and

     v      all persons and entities are enjoined in the United States from commencing or continuing, including the issuance or employment of process of, any judicial, administrative or any other action or proceeding involving or against Mexicana or its assets or proceeds thereof, or to recover a claim or enforce any judicial, quasi-judicial, regulatory, administrative or other judgment, assessment, order, lien or arbitration award against Mexicana or its assets in the United States or the proceeds thereof without (a) an order from the Mexico Court, or this Court,

permitting such action or (b) the express written consent of the Foreign Representative.

7.      Nothing contained in this Order enjoins any party from commencing or continuing any judicial, administrative or other action or proceeding outside of the United States involving Mexicana or its assets.  To the extent a party obtains judicial relief from a court (a "Foreign Court") other than the Mexico Court or this Court, and wishes to obtain an order or relief from this Court arising out of the relief granted by the Foreign Court, such relief may only be granted by this Court upon prior notice to the Foreign Representative.

8.      To the extent a party obtains relief from the Mexico Court with respect to injunctive relief provided in the Concurso Proceeding, such party may seek relief from the injunctive relief provided by this Court on an emergency basis.

9.      The Foreign Representative and Mexicana are entitled to and are hereby granted the full protections and rights available pursuant to section 1519(a)(1)-(3) of the Bankruptcy Code.

10.     Notwithstanding the above (or the terms of any contract between the parties), each of the following providers: Flying Food Catering, Inc.; Integrated Airline Services, Inc.; Allied Aviation Fueling Company of San Antonio, Inc.; Allied Aviation Fueling Company, Inc.; Menzies Aviation (USA), Inc.; Servisair & Shell Fuel Services, LLC; Servisair USA, Inc.; and Servisair, LLC; Aircraft Service International, Inc.; and  Aviation Port Services, L.L.C. (collectively, the "Providers", and each individually, a "Provider") may discontinue providing goods and/or services to Mexicana unless Mexicana complies with the following terms with respect to such Provider:

> (a)     With respect to insurance coverage, Mexicana maintains its insurance coverage and other practices regarding insurance that Mexicana followed prepetition;
>
> (b)     Mexicana makes payment for all postpetition goods and services rendered by such Provider so that payment is actually received by that Provider no later

than: (i) Wednesday August 25, 2010 for any invoice (for postpetition goods and services rendered) that has been delivered to Mexicana on or before August 18, 2010; or (ii) seven (7) days after receipt or deemed receipt of an invoice (for postpetition goods and services rendered) that has been delivered to Mexicana after August 18, 2010;

(c)     Invoices shall, in addition to delivery to local representatives of Mexicana (in accordance with normal practice), be sent to each of the individuals identified below by: electronic mail; facsimile transmission; or hand delivery or overnight delivery service addressed to both:

William Heuer                          Maritza Jendro
Duane Morris LLP                    Mexicana Airlines, Accts Payable manager
1540 Broadway                        9841 Airport Blvd. Ste 400.
New York, NY 10036-4086       Los Angeles CA 90045
wheuer@duanemorris.com       maritza.jendro@mexicana.com.mx
Fax: (212) 208-4521                 Fax: (310)646-0465

An invoice, if properly addressed, shall be deemed received by Mexicana: (i) on the date sent, if sent before 6:00 p.m. (pacific) by electronic mail or facsimile transmission, or if sent by hand delivery and actually received by Mexicana before 6:00 p.m. (Pacific); or (ii) on the following business day if sent by overnight delivery service or if delivered in accordance with the preceding romanette but having been sent or received (as applicable) after 6:00 p.m. (Pacific).

(d)     Payments are to be made by Mexicana by wire transfer, or by check for good funds drawn on a bank which is a member of United States Federal Reserve System.  If Mexicana elects to make payment by check to be sent by overnight delivery, it will be overnight delivery for "first morning" or "earliest next day" delivery, or something similar.

(e)     If Mexicana fails to make any payment within the time specified, a Provider can give Notice of Default to Mexicana. A Notice of Default shall be in writing and shall identify or enclose a copy of any invoice for postpetition goods and/or services for which a timely payment has not been timely received.  A Notice of Default must include wire transfer information for the Provider in order to be effective.

(f)     Notices of Default shall be sent by two of the following methods of delivery: electronic mail; facsimile transmission; or hand delivery or overnight delivery service, addressed to each of the following:

William Heuer                          Maritza Jendro
Duane Morris LLP                    Mexicana Airlines, Accts Payable manager
1540 Broadway                        9841 Airport Blvd. Ste 400.
New York, NY 10036-4086       Los Angeles CA 90045
wheuer@duanemorris.com       maritza.jendro@mexicana.com.mx
Fax: (212) 208-4521                 Fax: (310)646-0465

A Notice of Default, if properly addressed, shall be deemed received by Mexicana: (i) on the date sent, if sent before 6:00 p.m. (Pacific) by electronic mail or facsimile transmission, or if sent by hand delivery and actually received by

Mexicana before 6:00 p.m. (Pacific); (ii) on the following business day if sent by overnight delivery service or if delivered in accordance with the preceding romanette but having been sent or received (as applicable) after 6:00 p.m. (Pacific).

(g)     If a payment is still not received by Provider by the second business day after a Notice of Default has been received or deemed received by Mexicana (by way of example if Notice of Default is sent by electronic mail and fax on a Tuesday (such that it is sent before 6:00 p.m. (Pacific)) the time to cure the default expires on Thursday), Provider may discontinue providing goods and/or services to Mexicana without any further notice.  If a check is received by the Provider on the second day after a Notice of Default has been received or deemed received by Mexicana, that shall constitute payment sufficient to cure the payment default.  Nothing herein precludes Mexicana or any Provider from seeking other relief from the Court prior to the expiration of the time to cure a default.

(h)     Notwithstanding anything herein to the contrary or the terms of any contract between the parties, if any payment by Mexicana to a Provider is not honored by Mexicana's bank, such Provider may immediately discontinue providing goods and/or services to Mexicana without any further notice or opportunity to cure.

(i)     If the Debtor complies with these requirements, it has provided "sufficient protection" to the parties noted above in accordance with 11 U.S.C. § 1522(a).

11.     Nothing herein prohibits Mexicana from remitting fees and taxes, as may be required by government or agency regulations, statutes or rules, that are not property of the estate.  Mexicana recognizes its obligation to comply with such requirements.  Mexicana has confirmed to the Court that Mexicana recognizes and will timely fulfill all of its obligations to comply with all statutes, regulations and rules of the United States and its agencies applicable to Mexicana including, without limitation, its obligations to remit fees and taxes (that are not property of the estate), and specifically including its obligation to segregate and timely remit passenger facility charges to airports within the territorial jurisdiction of the United States.

12.     The Foreign Representative having confirmed that the Debtor intends to perform the Debtor's obligations under the Debtor's interline agreements, clearinghouse agreements and billing and settlement agreements administered by the International Air Transport Association ("IATA"), the IATA Clearing House, the Airlines Clearing House, Inc. ("ACH") and Universal Air Travel Plan, Inc. (collectively, the "Industry Agreements"), the Debtor and the Foreign

Representative, as the case may be, are authorized to perform in accordance with the Industry Agreements, including without limitation (i) to honor and pay outstanding prepetition and postpetition claims arising in the ordinary course of business under the Industry Agreements, and (ii) to process customary payments and transfers and to honor customary transfer requests made by the Debtor and other participants pursuant to the Industry Agreements. Notwithstanding anything to the contrary contained in this Order or the Court's August 2, 2010 Order to Show Cause with Temporary Restraining Order, as amended, the provisions of sections 362 and 1520 of the United States Bankruptcy Code are hereby modified, *nunc pro tunc* to August 2, 2010, solely to the extent necessary to permit performance of, and under, the Industry Agreements by the Debtor and other parties to such agreements and by financial institutions involved in implementing such agreements.

13. This injunction shall not apply to or enjoin Banco Mercantil del Norte, S.A. ("Banorte") from exercising rights and remedies against Mexicana's U.S.-based assets arising under agreements between the parties including, without limitation, (i) that certain Credit Agreement dated April 17, 2008 among Banorte, Mexicana, as an obligor, and certain non-debtor affiliates of Mexicana parties thereto (as amended from time to time, and, together with all documents, papers and instruments related thereto, the "Credit Agreement"), (ii) that certain Deposit Account Security Agreement dated June 16, 2008 among Inter National Bank ("INB"), as collateral agent, Mexicana and Aerovias Caribe, S.A. de C.V., as grantors (as amended from time to time, and, together with all documents, papers and instruments related thereto, the "Security Agreement") and (iii) that certain Collateral Agency Agreement dated June 16, 2008 between Banorte and INB (as amended from time to time, and, together with all documents, papers and instruments related thereto, the "Agency Agreement" and, together with the Credit Agreement and the Security Agreement, the "Banorte Agreements"). Consistent with this

paragraph, INB shall remain subject to this Order, except to the extent acting on instructions given to it by Banorte consistent with the Banorte Agreements. Nothing in this Order is intended to relieve any party's obligation to perform (i) that certain Agreement between U.S. Bank National Association and Mexicana dated June 12, 2002 (as amended from time to time, the "USB Agreement") and (ii) that certain Terms and Conditions for Worldwide Acceptance of the American Express Card By Airlines among Mexicana and Aerovias Caribe, S.A. de C.V., Grupo Mexicana de Aviacion, S.A. de C.V. and American Express Travel Related Services Company Inc. dated May 10, 2006 (as amended from time to time, the "Amex Agreement" and, together with the USB Agreement, the "Credit Card Funding Agreements") in accordance with their terms.

14.     Nothing in this Order, the Court's August 2, 2010 Order to Show Cause with Temporary Restraining Order, as amended, or in Bankruptcy Code section 362, including, without limitation, any injunctions set forth herein or therein shall enjoin, prevent or limit in any manner whatsoever the parties identified on Schedule A hereto or any other parties related thereto (as relates to the assets identified on Schedule A hereto) from exercising any of their rights or remedies with respect to the assets identified on Schedule A hereto.

15.     The objections of (i) Wells Fargo Bank Northwest, N.A., not in its individual capacity but solely as owner trustee, and Marco Aircraft Leasing Limited and AeroTurbine, Inc. [Docket No. 15] (solely as relates to (a) certain spare parts and (b) two engines owned by Aeroturbine, Inc. in the Debtor's possession), and (ii) C.I.T Leasing Corporation, CIT Aerospace International, Wells Fargo Bank Northwest, N.A., not in its individual capacity but solely as owner trustee, and Marco Aircraft Leasing Ltd., Wilmington Trust SP Services (Dublin) Limited, not in its individual capacity by solely as Trustee [Docket No. 76], are adjourned as per agreement among the parties and shall be heard, if necessary, on a date to be determined by the

Court. Any objection of Rolls-Royce Plc to the relief sought in the Application may be scheduled and determined by the Court at a later date. Pending any such hearing(s), the provisions of this Order apply to the parties identified in this paragraph.

16. The Application and request for injunctive relief is denied with respect to EAST Trust-Sub 12, without prejudice.

17. Pursuant to Rule 65(b) the Federal Rules of Civil Procedure, made applicable to this Chapter 15 proceeding pursuant to Bankruptcy Rule 7065, no additional notice to any person is required prior to entry and issuance of this Order.

18. Pursuant to Bankruptcy Rule 7065, the security provisions of Rule 65(c) of the Federal Rules of Civil Procedure are waived.

19. This Order shall be served by first class mail on: (a) the Office of the United States Trustee: (b) the Federal Aviation Administration; (c) the Federal Transit Administration; (d) United States Department of Justice; (e) the depository institutions for Mexicana's U.S.-based depository receipts; (f) the administrative agents and lenders for Mexicana's prepetition credit facilities; (g) Mexicana's aircraft and spare engine lessors; (h) all U.S. airport authorities at which Mexicana has operations; (i) Mexicana's U.S.-based real property lessors; (j) all third parties providing services to Mexicana in the United States; and (k) all parties that file notices of appearance in this Chapter 15 proceeding pursuant to Bankruptcy Rule 2002.

20. Service in accordance with this Order shall be deemed good and sufficient service and adequate notice for all purposes. The Foreign Representative, Mexicana and its respective agents are authorized to serve or provide any notices required under the Bankruptcy Rules or local rules of this Court.

21. The banks and financial institutions with which Mexicana maintains U.S.-based bank accounts or on which checks are drawn or electronic payment requests made in payment of

prepetition or postpetition obligations are authorized and directed to continue to service and administer Mexicana's bank accounts without interruption and in the ordinary course and to receive, process, honor and pay any and all such checks, drafts, wires and automatic clearing house transfers issued, whether before or after the Petition Date and drawn on Mexicana's bank accounts by the respective holders and makers thereof and at the direction of the Foreign Representative or Mexicana, as the case may be.

22.     The Foreign Representative is authorized to take all actions necessary to effectuate the relief granted pursuant to this Order.

23.     The terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

24.     This Court shall retain jurisdiction with respect to the enforcement, amendment or modification of this Order, any requests for additional relief or any adversary proceeding brought in and through the Chapter 15 proceeding, and any request by an entity for relief from the provisions of this Order, for cause shown, that is properly commenced and within the jurisdiction of this Court.

Dated: New York, New York                         /s/Martin Glenn
       **August 18, 2010**

_____
Hon. Martin Glenn
United States Bankruptcy Judge

# SCHEDULE A

| Aircraft Make/Model | Manufacturer's Serial Number | Engine Make/Model and ESN | Lessor |
|---|---|---|---|
| Airbus A319-100 | MSN 1612 | Two CF International CFM 56-5B6/3 Engines<br><br>ESN 575279 and 575280 | Marco Aircraft Leasing, Ltd.* |
| Airbus A319-100 | MSN 4127 | Two CF International CFM 56-5B6/3 Engines<br><br>ESN 699684 and 699685 | Wells Fargo Bank Northwest, National Association, not in its individual capacity but solely as Owner Trustee/ Lessor* |
| Airbus A319-100 | MSN 4204 | Two CF International CFM 56-5B6/3 Engines<br><br>ESN 699784 and 699787 | Wells Fargo Bank Northwest, National Association, not in its individual capacity but solely as Owner Trustee/ Lessor* |
| Airbus A319-100 | MSN 4254 | Two CF International CFM 56-5B6/3 Engines<br><br>ESN 699822 and 699824 | Wells Fargo Bank Northwest, National Association, not in its individual capacity but solely as Owner Trustee/ Lessor* |
| Airbus A320-200 | MSN 0361 | IAE V2500-A1 Engines<br><br>ESN V0253 and V0255 | Wells Fargo Bank Northwest, National Association, not in its individual capacity but solely as Owner Trustee/ Lessor* |
| Airbus A320-200 | MSN 0369 | Two International Aero Engines AG, Model V2500-A1 Engines<br><br>ESN V0225 and V0226 | Wells Fargo Bank Northwest, National Association, not in its individual capacity, but solely as owner trustee** |
| Airbus A320-200 | MSN 0373 | Two International Aero Engines AG, Model V2500-A1 Engines<br><br>ESN V0266 and V0267 | AFT Trust-Sub I** |
| Airbus A318-100 | MSN 2328 | Two CFM International, Model CFM56-5B8/P Engines<br><br>ESN 577134 and 577136 | Celestial Aviation Trading 43 Limited** |

**Error! No property name supplied.**

| Aircraft Make/Model | Manufacturer's Serial Number | Engine Make/Model and ESN | Lessor |
|---|---|---|---|
| Airbus A318-100 | MSN 2333 | Two CFM International, Model CFM56-5B8/P Engines<br><br>ESN 577139 and 577140 | Celestial Aviation Trading 43 Limited** |
| Airbus A318-100 | MSN 2358 | Two CFM International, Model CFM56-5B8/P Engines<br><br>ESN 577154 and 577155 | Celestial Aviation Trading 43 Limited** |
| Airbus A318-100 | MSN 2367 | Two CFM International, Model CFM56-5B8/P Engines<br><br>ESN 577167 and 577168 | Celestial Aviation Trading 43 Limited** |
| Airbus A318-100 | MSN 2377 | Two CFM International, Model CFM56-5B8/P Engines<br><br>ESN 577174 and 577175 | Celestial Aviation Trading 43 Limited** |
| Airbus A318-100 | MSN 2394 | Two CFM International, Model CFM56-5B8/P Engines<br><br>ESN 577194 and 577195 | Celestial Aviation Trading 43 Limited** |
| Airbus A318-100 | MSN 2523 | Two CFM International, Model CFM56-5B8/P Engines<br><br>ESN 577314 and 577315 | Celestial Aviation Trading 68 Limited ** |
| Airbus A318-100 | MSN 2544 | Two CFM International, Model CFM56-5B8/P Engines<br><br>ESN 577336 and 577338 | Celestial Aviation Trading 68 Limited ** |
| Airbus A318-100 | MSN 2552 | Two CFM International, Model CFM56-5B8/P Engines<br><br>ESN 577354 and 577355 | Celestial Aviation Trading 69 Limited ** |
| Airbus A318-100 | MSN 2575 | Two CFM International, Model CFM56-5B8/P Engines<br><br>ESN 577381 and 577382 | Celestial Aviation Trading 69 Limited ** |
| Airbus A320-200 | MSN 3123 | Two CF International, Model CFM 56-5B3/P | International Lease Finance Corporation*** |

| Aircraft Make/Model | Manufacturer's Serial Number | Engine Make/Model and ESN | Lessor |
|---|---|---|---|
| | | Engines<br><br>ESN 697250 and 697251 | |
| Airbus A319-100 | MSN 1866 | Two CFM International, Model CFM 56-5B6/P Engines<br><br>ESN 575504 and 575505 | International Lease Finance Corporation*** |
| Airbus A319-100 | MSN 1872 | Two CFM International, Model CFM56-5B6/P Engines<br><br>ESN 575508 and 575509 | International Lease Finance Corporation*** |
| Airbus A319-100 | MSN 1882 | Two CFM International, Model CFM56-5B6/P Engines<br><br>ESN 575516 and 575517 | International Lease Finance Corporation*** |
| Airbus A319-100 | MSN 1925 | Two CFM International, Model CFM56-5B6/P Engines<br><br>ESN 575544 and 575545 | International Lease Finance Corporation*** |
| Airbus A319-100 | MSN 2126 | Two CFM International, Model CFM56-5B6/P Engines<br><br>ESN 575741 and 575742 | Calloipe Limited (Lessor) Sierra Leasing Limited (Owner)*** |
| Airbus A319-100 | MSN 3790 | Two CF International, Model CFM 56-5B6/3 Engines<br><br>ESN 699219 and 699220 | Whitney Ireland Leasing Limited (Lessor) Wells Fargo Bank Northwest N.A. (Owner)*** |
| Airbus A319-100 | MSN 4275 | Two CF International, Model CFM 56-5B6/3 Engines<br><br>ESN 699855 and 699857 | Whitney Ireland Leasing Limited (Lessor) Wells Fargo Bank Northwest N.A. (Owner)*** |

\*       Subject to Wells Fargo Bank Northwest, National Association Motion.
\*\*     Subject to GE Capital Aviation Services Motion.
\*\*\*   Subject to International Lease Finance Corporation Motion.

**<u>Exhibit K</u>**



# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| In re | ) | Chapter 15 |
| | ) | |
| Metrofinanciera, S.A.P.I. de C.V., Sociedad | ) | Case No. 10-20666 (     ) |
| Financiera de Objeto Múltiple, E.N.R., | ) | |
| | ) | |
| Debtor in a Foreign Proceeding. | ) | |
| | ) | |

## PRELIMINARY INJUNCTION ORDER

On August 30, 2010, upon consideration of the Emergency Motion of the Foreign Representative for a Preliminary Injunction and Temporary Restraining Order Prohibiting Collection Actions against the Debtor in the United States (the "Emergency Motion"),[1] filed by or on behalf of the Petitioner, José Angel Amaro, in his capacity as the duly-appointed foreign representative of Metrofinanciera, S.A.P.I. de C.V., Sociedad Financiera de Objeto Múltiple, E.N.R. ("Metrofinanciera" or the "Debtor") in a voluntary restructuring proceeding (the "Mexican Proceeding") currently pending before the Fourth Court of Civil and Labor Matters in the State of Nuevo León, *Juzgado Cuarto de Distrito en Materia Civil y de Trabajo en el Estado de Nuevo León*, a Mexican federal court (the "Mexican Court") sitting in the city of Monterrey, state of Nuevo León in the United Mexican States; and upon notice to Bank of New York-Mellon ("BNYM")[2] as the indenture trustee for the holders of the Perpetual Notes the Court; and after consideration of the evidence, and BNYM expressing no opposition to the entry of the Temporary Restraining Order ("TRO"); and after having entered the TRO; and having further set a hearing on the extension of the TRO to a preliminary injunction for September 13, 2010; and

---

[1]    Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Emergency Motion.

[2]    All references to BNYM herein, unless otherwise noted, solely refer to BNYM in its capacity as indenture trustee for the holders of the Perpetual Notes and do not refer to BNYM in its individual capacity or as trustee for any other Mexican trust.

having now heard that the Debtor and BNYM have reached an agreement to extend the TRO to a preliminary injunction, subject in all things to further orders of this Court, accordingly it is

ORDERED that the injunctive relief set out in the Temporary Restraining Order dated August 30, 2010, shall be extended as a preliminary injunction on the same terms and provisions as set out in the TRO; and it is further

ORDERED that this preliminary injunction and the terms thereof shall remain in effect through September 24, 2010, unless extended by further order of the Court; and it is further

ORDERED, that entry of this preliminary injunction is without prejudice to the right of any party-in-interest, including BNYM, to seek, upon appropriate notice and hearing, to terminate or limit this preliminary injunction.

Dated:   September 10th, 2010.

Honorable Richard Schmidt,
United States Bankruptcy Judge

**ORDER AGREED TO AND SUBMITTED BY:**

**WHITE & CASE LLP**
By: /s/ Alan S. Gover
Alan Shore Gover
1155 Avenue of the Americas
New York, New York 10036-2787
Telephone: (212) 819-8200
Facsimile:  (212) 354-8113
Craig H. Averch
Roberto J. Kampfner
633 West Fifth Street, Suite 1900
Los Angeles, California 90071-2007
Telephone: (213) 620-7700
Facsimile: (213) 452-2329
-and-
JORDAN, HYDEN, WOMBLE, CULBRETH & HOLZER, P.C.
Shelby A. Jordan
500 North Shoreline Boulevard, Suite 900

Corpus Christi, Texas 78471
Telephone: (361) 884-5678
Facsimile: (361) 888-5555
*Attorneys for José Angel Amaro as Foreign Representative of Metrofinanciera*

NO OPPOSITON TO ENTRY OF ORDER BY:

CHADBOURNE & PARKE LLP
By:  /s/ N. Theodore Zink, Jr.
N. Theodore Zink, Jr.
Francisco Vazquez
30 Rockefeller Plaza
New York, New York 10112
Telephone: (212) 408-5356
Facsimile: (646) 710-5356


*Attorneys for BANK OF NEW YORK, MELLON*

**<u>Exhibit L</u>**



--- B.R. ----, 2011 WL 522008 (S.D.Fla.)
**(Cite as: 2011 WL 522008 (S.D.Fla.))**

United States District Court,
S.D. Florida.
In re TOUSA, INC., et al., Debtors.
3V Capital Master Fund Ltd., et al., Appellants,
v.
Official Committee of Unsecured Creditors of
Tousa, Inc., et al., Appellees.

Nos. 10–60017–CIV/GOLD, 10–61478, 10–62032,
10–62035, 10–62037.
Feb. 11, 2011.

**Background:** Official committee of unsecured creditors brought adversary proceeding against, among others, lenders that had provided financing to certain debtors prepetition in connection with joint venture, asserting, inter alia, claims to avoid and recover alleged fraudulent transfers. The Bankruptcy Court, John K. Olson, J., 408 B.R. 434, granted summary judgment for committee on affirmative defenses of substantive consolidation, single business enterprise, and alter ego and, following bench trial, 422 B.R. 783, ruled in committee's favor, ordering disgorgement, as fraudulent transfers, of monies that joint venture lenders had received in payment of antecedent debt, and payment of prejudgment interest. Joint venture lenders appealed, and other lenders were granted leave to intervene.

**Holdings:** The District Court, Alan S. Gold, J., held that:

(1) debtor-subsidiaries lacked property interest required for avoidance of fraudulent transfer in proceeds of new loans used by debtor-parent company to pay joint venture lenders in settlement of antecedent debt;

(2) debtor-subsidiaries received value in exchange for granting liens on their assets to new lenders that provided financing for settlement payment made to joint venture lenders;

(3) debtor-subsidiaries received reasonably equival-

ent value in exchange for liens given to new lenders;

(4) joint venture lenders were not "entities for whose benefit" transfers of liens by debtor-subsidiaries to new lenders were made; and

(5) joint venture lenders could not be found to have acted in bad faith or with knowledge of avoidability of lien transfers, as would preclude them from qualifying for exceptions to avoidance recovery.

Order quashed.

West Headnotes

**[1] Bankruptcy 51 🔑 3782**

51 Bankruptcy
   51XIX Review
      51XIX(B) Review of Bankruptcy Court
         51k3782 k. Conclusions of law; de novo review. Most Cited Cases

In bankruptcy appeals, a district court conducts a de novo review of the bankruptcy court's legal determinations, including conclusions regarding the legal significance accorded to the facts.

**[2] Bankruptcy 51 🔑 3786**

51 Bankruptcy
   51XIX Review
      51XIX(B) Review of Bankruptcy Court
         51k3785 Findings of Fact
            51k3786 k. Clear error. Most Cited Cases

"Clearly erroneous" standard of review requires reversal when the record lacks substantial evidence to support the factual findings, such that an appellate court's review of the evidence results in a firm conviction that a mistake has been made.

**[3] Bankruptcy 51 🔑 3787**

51 Bankruptcy
   51XIX Review
      51XIX(B) Review of Bankruptcy Court

51k3785 Findings of Fact
51k3787 k. Particular cases and issues.
Most Cited Cases

Whether allegedly fraudulent transfer was made for reasonably equivalent value is generally a question of fact to be reviewed under the clearly erroneous standard. 11 U.S.C.A. § 548.

**[4] Bankruptcy 51 ☞3787**

51 Bankruptcy
51XIX Review
51XIX(B) Review of Bankruptcy Court
51k3785 Findings of Fact
51k3787 k. Particular cases and issues.
Most Cited Cases

The clearly erroneous standard of review for factual findings is relaxed in circumstances in which a lower court adopted one party's proposed order verbatim.

**[5] Bankruptcy 51 ☞3790**

51 Bankruptcy
51XIX Review
51XIX(B) Review of Bankruptcy Court
51k3789 Determination and Disposition; Additional Findings
51k3790 k. Remand. Most Cited Cases

When the factual record on appeal allows but one resolution of the factual issue, remand is unnecessary.

**[6] Bankruptcy 51 ☞2648**

51 Bankruptcy
51V The Estate
51V(F) Fraudulent Transfers
51k2648 k. Property or rights transferred.
Most Cited Cases

Debtor-subsidiaries lacked property interest required for avoidance of fraudulent transfer in proceeds of new loans that were extended to debtor-parent company prepetition, as primary borrower, for payment in settlement of antecedent debt to lenders that had provided financing to certain debt-

ors in connection with joint venture, even though debtor-subsidiaries were co-borrowers on loans, where debtor-subsidiaries did not receive loan proceeds and had no power to distribute them or designate who would receive them, which instead lay exclusively with debtor-parent under terms of loan agreements. 11 U.S.C.A. § 548(a)(1).

**[7] Bankruptcy 51 ☞2648**

51 Bankruptcy
51V The Estate
51V(F) Fraudulent Transfers
51k2648 k. Property or rights transferred.
Most Cited Cases

Control test used to determine whether property that is subject of fraudulent transfer claim was property of debtor encompasses two elements: (1) the power to designate which party will receive the funds, and (2) the power to actually disburse the funds at issue to that party. 11 U.S.C.A. § 548(a)(1).

**[8] Bankruptcy 51 ☞2648**

51 Bankruptcy
51V The Estate
51V(F) Fraudulent Transfers
51k2648 k. Property or rights transferred.
Most Cited Cases

Under control test used to determine whether property that is subject of fraudulent transfer claim was property of debtor, requisite control refers to control over identifying the payee and control over whether the payee will actually be paid. 11 U.S.C.A. § 548(a)(1).

**[9] Bankruptcy 51 ☞2648**

51 Bankruptcy
51V The Estate
51V(F) Fraudulent Transfers
51k2648 k. Property or rights transferred.
Most Cited Cases

Under totality of the circumstances, control required to establish that property which is subject of

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

alleged fraudulent transfer was in fact property of debtor does not exist where loan from third party is conditioned on payment to particular creditor. 11 U.S.C.A. § 548(a)(1).

**[10] Bankruptcy 51 ⟳2726.1(3)**

51 Bankruptcy
  51V The Estate
    51V(H) Avoidance Rights
      51V(H)2 Proceedings
        51k2725 Evidence
          51k2726.1 Burden of Proof
            51k2726.1(3) k. Fraudulent transfers. Most Cited Cases

Party alleging a fraudulent transfer bears the burden of proving that the debtor did not receive reasonably equivalent value in exchange for the property transferred and obligations incurred. 11 U.S.C.A. § 548(a)(1).

**[11] Bankruptcy 51 ⟳2650(2)**

51 Bankruptcy
  51V The Estate
    51V(F) Fraudulent Transfers
      51k2650 Consideration
        51k2650(2) k. "Reasonably equivalent value" in general. Most Cited Cases

Use to which loan proceeds were put by debtor-or-parent company was irrelevant to whether debtor-subsidiaries, as co-borrowers, received reasonably equivalent value for their property interest in proceeds within meaning of Bankruptcy Code's fraudulent transfer statute. 11 U.S.C.A. § 548(a)(1).

**[12] Bankruptcy 51 ⟳2650(2)**

51 Bankruptcy
  51V The Estate
    51V(F) Fraudulent Transfers
      51k2650 Consideration
        51k2650(2) k. "Reasonably equivalent value" in general. Most Cited Cases

To the extent that property interest in loan proceeds of debtor-subsidiaries, as co-borrowers, was

of minimal value, court had to determine only whether debtor-subsidiaries received minimal value in return in deciding whether debtor-subsidiaries received reasonably equivalent value in exchange for transfer of their interest under Bankruptcy Code's fraudulent transfer statute. 11 U.S.C.A. § 548(a)(1).

**[13] Bankruptcy 51 ⟳2650(2)**

51 Bankruptcy
  51V The Estate
    51V(F) Fraudulent Transfers
      51k2650 Consideration
        51k2650(2) k. "Reasonably equivalent value" in general. Most Cited Cases

Under Bankruptcy Code's fraudulent transfer statute, "reasonably equivalent value" must be measured in terms of the value of the debtors' interest in the property conveyed. 11 U.S.C.A. § 548(a)(1).

**[14] Bankruptcy 51 ⟳2701**

51 Bankruptcy
  51V The Estate
    51V(H) Avoidance Rights
      51V(H)1 In General
        51k2701 k. Avoidance rights and limits thereon, in general. Most Cited Cases

If a transfer is not avoided, trustee may not recover under bankruptcy statute governing recovery of avoided fraudulent transfers. 11 U.S.C.A. §§ 548, 550.

**[15] Bankruptcy 51 ⟳2726.1(3)**

51 Bankruptcy
  51V The Estate
    51V(H) Avoidance Rights
      51V(H)2 Proceedings
        51k2725 Evidence
          51k2726.1 Burden of Proof
            51k2726.1(3) k. Fraudulent transfers. Most Cited Cases

Burden of proving lack of "reasonably equivalent value" rests on trustee challenging allegedly

fraudulent transfer. 11 U.S.C.A. § 548(a)(1)(B)(i).

**[16] Bankruptcy 51 ⚖══2650(5)**

51 Bankruptcy
   51V The Estate
      51V(F) Fraudulent Transfers
      51k2650 Consideration
         51k2650(5) k. Future or indirect benefit; benefit to third party. Most Cited Cases

In determining whether debtor-subsidiaries received reasonably equivalent value for allegedly fraudulent transfers, bankruptcy court had to consider whether identity of interest doctrine applied to warrant treating debtor-parent company and debtor-subsidiaries as one borrowing unit even though they were separate entities. 11 U.S.C.A. § 548(a)(1)(B)(i).

**[17] Bankruptcy 51 ⚖══2650(5)**

51 Bankruptcy
   51V The Estate
      51V(F) Fraudulent Transfers
      51k2650 Consideration
         51k2650(5) k. Future or indirect benefit; benefit to third party. Most Cited Cases

"Identity of interest rule" recognizes that if a debtor and third party are so related or situated that they share an identity of interests, what benefits one will benefit the other to some degree for purposes of fraudulent transfer claim. 11 U.S.C.A. § 548.

**[18] Bankruptcy 51 ⚖══2650(5)**

51 Bankruptcy
   51V The Estate
      51V(F) Fraudulent Transfers
      51k2650 Consideration
         51k2650(5) k. Future or indirect benefit; benefit to third party. Most Cited Cases

Identity of interest doctrine recognizes that the facts may suggest that a corporate group has purposely availed itself of the benefits of an enterprise and should be treated as one borrowing unit, for purposes of fraudulent transfer claim, even though

each member of the enterprise is a separate entity. 11 U.S.C.A. § 548.

**[19] Bankruptcy 51 ⚖══3782**

51 Bankruptcy
   51XIX Review
      51XIX(B) Review of Bankruptcy Court
         51k3782 k. Conclusions of law; de novo review. Most Cited Cases

Issue of whether avoidance of default and of bankruptcy could serve as "value" in determining whether debtors received reasonably equivalent value in exchange for allegedly fraudulent transfers raised pure questions of law regarding interpretation of fraudulent transfer statute that were subject to de novo review. 11 U.S.C.A. § 548.

**[20] Bankruptcy 51 ⚖══2650(2)**

51 Bankruptcy
   51V The Estate
      51V(F) Fraudulent Transfers
      51k2650 Consideration
         51k2650(2) k. "Reasonably equivalent value" in general. Most Cited Cases

To determine whether debtor received "reasonably equivalent value" within meaning of fraudulent transfer statute, court must look at what "value" debtor received in return for challenged transfer, and must then determine whether the value received is reasonably equivalent, which will depend on the facts of each case. 11 U.S.C.A. § 548(a)(1), (d)(2)(A).

**[21] Bankruptcy 51 ⚖══3782**

51 Bankruptcy
   51XIX Review
      51XIX(B) Review of Bankruptcy Court
         51k3782 k. Conclusions of law; de novo review. Most Cited Cases

Bankruptcy court's interpretation and definition of a term in the Bankruptcy Code is subject to de novo review.

**[22] Bankruptcy 51 ⚖══2650(5)**

51 Bankruptcy
  51V The Estate
    51V(F) Fraudulent Transfers
      51k2650 Consideration
        51k2650(5) k. Future or indirect benefit; benefit to third party. Most Cited Cases

Debtor-subsidiaries received, in form of opportunity to avoid default under credit facility and bond indentures and bankruptcy, indirect economic benefits constituting "value" under Bankruptcy Code's fraudulent transfer statute in exchange for granting liens on their assets to new lenders that provided financing for debtor-parent company's payment in settlement of antecedent debt to lenders which had previously provided financing for joint venture. 11 U.S.C.A. § 548(a)(1), (d)(2)(A).

**[23] Statutes 361 ☞217.4**

361 Statutes
  361VI Construction and Operation
    361VI(A) General Rules of Construction
      361k213 Extrinsic Aids to Construction
        361k217.4 k. Legislative history in general. Most Cited Cases

In interpreting statute, court cannot look to legislative history unless the statutory language is ambiguous or inconclusive.

**[24] Bankruptcy 51 ☞2650(5)**

51 Bankruptcy
  51V The Estate
    51V(F) Fraudulent Transfers
      51k2650 Consideration
        51k2650(5) k. Future or indirect benefit; benefit to third party. Most Cited Cases

Indirect, intangible economic benefits, including the opportunity to avoid default, to facilitate debtor enterprise's rehabilitation, and to avoid bankruptcy, even if it proves to be short-lived, may be considered in determining whether debtor received reasonably equivalent value in exchange for allegedly fraudulent transfer. 11 U.S.C.A. § 548(a)(1), (d)(2)(A).

**[25] Bankruptcy 51 ☞2650(2)**

51 Bankruptcy
  51V The Estate
    51V(F) Fraudulent Transfers
      51k2650 Consideration
        51k2650(2) k. "Reasonably equivalent value" in general. Most Cited Cases

**Bankruptcy 51 ☞2650(5)**

51 Bankruptcy
  51V The Estate
    51V(F) Fraudulent Transfers
      51k2650 Consideration
        51k2650(5) k. Future or indirect benefit; benefit to third party. Most Cited Cases

Expectation that settlement would avoid default and produce strong synergy for debtor enterprise would suffice to confer "value" under fraudulent transfer statute's reasonably equivalent value test so long as expectation was legitimate and reasonable; touchstone is whether transaction confers reasonable commercial value on debtor. 11 U.S.C.A. § 548(a)(1), (d)(2)(A).

**[26] Bankruptcy 51 ☞2650(2)**

51 Bankruptcy
  51V The Estate
    51V(F) Fraudulent Transfers
      51k2650 Consideration
        51k2650(2) k. "Reasonably equivalent value" in general. Most Cited Cases

Bankruptcy court had to consider the totality of the circumstances in determining whether debtors received reasonably equivalent value in exchange for transfers challenged as fraudulent. 11 U.S.C.A. § 548(a)(1)(B)(i).

**[27] Bankruptcy 51 ☞2650(2)**

51 Bankruptcy
  51V The Estate
    51V(F) Fraudulent Transfers
      51k2650 Consideration
        51k2650(2) k. "Reasonably equivalent

value" in general. Most Cited Cases

In determining whether debtor received reasonably equivalent value within meaning of fraudulent transfer statute, court must examine all aspects of the transaction to measure carefully the value of the benefits received. 11 U.S.C.A. § 548(a)(1)(B)(i).

**[28] Bankruptcy 51 ⚖➔2650(5)**

51 Bankruptcy
    51V The Estate
        51V(F) Fraudulent Transfers
            51k2650 Consideration
                51k2650(5) k. Future or indirect benefit; benefit to third party. Most Cited Cases

Debtor-subsidiaries had vital stake in prepetition settlement of antecedent debt owed to joint venture lenders, which was guaranteed by debtor-parent company, as a result of debtor-subsidiaries' guarantees of revolving credit facility and bond debt which would have been triggered by anticipated adverse judgment in joint venture lenders' litigation against debtor-parent or by any bankruptcy filing by debtor-parent, and therefore debtor-subsidiaries received reasonably equivalent value within meaning of Bankruptcy Code's fraudulent transfer statute in exchange for liens which they gave to new lenders that provided financing for payment of settlement to joint venture lenders through economic benefits stemming from elimination of threat to their viability as going concerns and their continued access to financing through debtor-parent. 11 U.S.C.A. § 548(a)(1), (d)(2)(A).

**[29] Bankruptcy 51 ⚖➔2725.1**

51 Bankruptcy
    51V The Estate
        51V(H) Avoidance Rights
            51V(H)2 Proceedings
                51k2725 Evidence
                    51k2725.1 k. In general. Most Cited Cases

Executive vice president and chief of staff for debtor-parent company, who was officer for many of debtor-subsidiaries, was qualified to testify re-

garding negative effects of litigation on debtor-subsidiaries and benefits received by debtor-subsidiaries from settlement of that litigation, and therefore his testimony was admissible as non-hearsay in unsecured creditors committee's fraudulent transfer action as statements by agent or officer of debtor-subsidiaries, which were the real parties in action. Fed.Rules Evid.Rule 801(d)(2)(D), 28 U.S.C.A.

**[30] Bankruptcy 51 ⚖➔2650(2)**

51 Bankruptcy
    51V The Estate
        51V(F) Fraudulent Transfers
            51k2650 Consideration
                51k2650(2) k. "Reasonably equivalent value" in general. Most Cited Cases

Whether debtor received reasonably equivalent value within meaning of fraudulent transfer statute must be evaluated as of the date of challenged transaction. 11 U.S.C.A. § 548(a)(1).

**[31] Bankruptcy 51 ⚖➔2650(5)**

51 Bankruptcy
    51V The Estate
        51V(F) Fraudulent Transfers
            51k2650 Consideration
                51k2650(5) k. Future or indirect benefit; benefit to third party. Most Cited Cases

**Bankruptcy 51 ⚖➔2727(3)**

51 Bankruptcy
    51V The Estate
        51V(H) Avoidance Rights
            51V(H)2 Proceedings
                51k2725 Evidence
                  51k2727 Weight and Sufficiency
                    51k2727(3) k. Fraudulent transfers. Most Cited Cases

Bankruptcy court committed clear error in finding that debtor-subsidiaries could have survived as standalone entities and obtained alternative financing for their operations absent payment made by

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

debtor-parent company, through new financing, in settlement of antecedent debt of joint venture lenders, which prevented adverse judgment and/or debtor-parent bankruptcy triggering debtor-subsidiaries' guarantee obligations on bond debt and revolving credit facility, and thus in finding that, for purposes of its reasonably-equivalent-value analysis under fraudulent transfer statute, debtor-subsidiaries gained little or no benefit from granting liens on their assets to new lenders to facilitate settlement payment. 11 U.S.C.A. § 548(a)(1).

**[32] Bankruptcy 51 ☞2701**

51 Bankruptcy
    51V The Estate
        51V(H) Avoidance Rights
            51V(H)1 In General
                51k2701 k. Avoidance rights and limits thereon, in general. Most Cited Cases

There are three types of entities from whom or from which a trustee may recover an avoidable transfer: (1) an initial transferee, (2) an entity for whose benefit the initial transfer was made, and (3) a subsequent transferee. 11 U.S.C.A. § 550(a).

**[33] Bankruptcy 51 ☞2701**

51 Bankruptcy
    51V The Estate
        51V(H) Avoidance Rights
            51V(H)1 In General
                51k2701 k. Avoidance rights and limits thereon, in general. Most Cited Cases

Liability to bankruptcy estate of initial transferee of avoidable transfer or of entity for whose benefit the initial transfer was made is absolute, whereas liability of subsequent transferee to estate is not strict but subject to statutory good-faith-purchaser-for-value defense. 11 U.S.C.A. § 550(a)(1, 2), (b).

**[34] Bankruptcy 51 ☞2701**

51 Bankruptcy
    51V The Estate

51V(H) Avoidance Rights
    51V(H)1 In General
        51k2701 k. Avoidance rights and limits thereon, in general. Most Cited Cases

Joint venture lenders, to which liens that were granted by debtor-subsidiaries in connection with financing obtained to pay settlement to joint venture lenders were never transferred, and which never exercised control over liens, were not "initial transferees" or "subsequent transferees" of liens under statute governing recovery of avoided transfers. 11 U.S.C.A. § 550(a).

**[35] Bankruptcy 51 ☞2701**

51 Bankruptcy
    51V The Estate
        51V(H) Avoidance Rights
            51V(H)1 In General
                51k2701 k. Avoidance rights and limits thereon, in general. Most Cited Cases

Joint venture lenders were subsequent transferees of loan proceeds backed by liens granted by debtor-subsidiaries to new lenders, and thus could not be "entities for whose benefit" lien transfers were made within meaning of provision of bankruptcy statute permitting recovery of avoidable transfers from "entity for whose benefit the initial transfer was made," where liens resulted in transfer of loan proceeds from new lenders to debtor-parent company, which then transferred loan proceeds to joint venture lenders in settlement and payment of valid, antecedent debt. 11 U.S.C.A. § 550(a)(1).

**[36] Bankruptcy 51 ☞2701**

51 Bankruptcy
    51V The Estate
        51V(H) Avoidance Rights
            51V(H)1 In General
                51k2701 k. Avoidance rights and limits thereon, in general. Most Cited Cases

Because statute governing recovery of avoided transfers explicitly links the initial transferee with the entity "for whose benefit" the initial transfer was made, only a person or entity who receives a

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

benefit from the initial transfer can be an entity "for whose benefit the initial transfer was made," and therefore a subsequent transferee cannot be the "entity for whose benefit" the initial transfer was made. 11 U.S.C.A. § 550(a).

**[37] Bankruptcy 51 🗝2701**

51 Bankruptcy
  51V The Estate
    51V(H) Avoidance Rights
      51V(H)1 In General
        51k2701 k. Avoidance rights and limits thereon, in general. Most Cited Cases

"For whose benefit" language in provision of bankruptcy statute permitting recovery of avoidable transfers from "entity for whose benefit the initial transfer was made" does not apply where the benefit is not the immediate and necessary consequence of the initial transfer, but flows from the manner in which the initial transfer is used by its recipient; the benefit must derive directly from the initial transfer, not from the use to which the initial transfer is put by the transferee, to trigger the "for whose benefit" language. 11 U.S.C.A. § 550(a)(1).

**[38] Bankruptcy 51 🗝2701**

51 Bankruptcy
  51V The Estate
    51V(H) Avoidance Rights
      51V(H)1 In General
        51k2701 k. Avoidance rights and limits thereon, in general. Most Cited Cases

Assuming that joint venture lenders could be considered to be immediate transferees of loan proceeds under statute governing recovery of avoided transfers, they took proceeds, which were received in payment of valid antecedent debt, "for value," precluding recovery of proceeds under statute. 11 U.S.C.A. § 550(b)(1).

**[39] Bankruptcy 51 🗝2701**

51 Bankruptcy
  51V The Estate

51V(H) Avoidance Rights
  51V(H)1 In General
    51k2701 k. Avoidance rights and limits thereon, in general. Most Cited Cases

Joint venture lenders that received, as payment in settlement of valid antecedent debt from debtor-parent company, proceeds of new loans in connection with which debtor-subsidiaries gave liens to new lenders did not have reason or duty to conduct extraordinary due diligence with respect to funds with which they were paid, and thus could not be found to have acted in bad faith and with knowledge of alleged voidability of lien transfers, as would preclude them from coming within statutory exceptions barring recovery of avoidable transfers from subsequent transferees, on grounds that they knew or should have known, based on publicly available information, that debtor-parent and debtor-subsidiaries were insolvent on date of payment or were precariously close to becoming insolvent. 11 U.S.C.A. § 550(b)(1, 2).

Nancy A. Copperthwaite, Akerman Senterfitt, Miami, FL, Aaron D. Van Oort, Minneapolis, MN, Alan J. Stone, Milbank, Tweed, Hadley & McCloy, New York, NY, Andrew T. Beirne, Milbank, Tweed, Hadley & McCloy, New York, NY, pro hac, vice, Andrew M. Leblanc, Milbank Tweed Hadley & McCloy LLP, Washington, DC, Atara Miller, Milbank, Tweed, Hadley & McCloy, New York, NY, Melina K. Williams, Faegre & Benson, LLP, Minneapolis, MN, Michael Ira Goldberg, Akerman Senterfitt & Eidson, Fort Lauderdale, FL, Stephen M. Mertz, Faegre & Benson, LLP, Minneapolis, MN, for Senior Transeastern Lenders (Group 1).

Ceci Culpepper Berman, Fowler White Boggs P.A., Tampa, FL, for Centurion CDO 10, Ltd., Centurion CDO 8, Ltd., Centurion CDO 9, Ltd., Centurion CDO 11, Ltd., Centurion CDO VI, Ltd., Centurion CDO VII, Ltd., Centurion CDO XI, Ltd., Sequils-Centurion V, Ltd., Eaton Vance Credit Opportunities Fund, Eaton Vance Floating-Rate Income Trust, Eaton Vance Grayson & Co., Eaton Vance Limited

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Duration Income Fund, Eaton Vance Senior Debt Portfolio, Eaton Vance Senior Floating-Rate Trust, Eaton Vance Senior Income Trust, Eaton Vance Vt Floating-Rate Income Fund, Riversource Floating Rate Fund.

Nancy A. Copperthwaite, Akerman Senterfitt, Miami, FL, Gabrielle Ruha, Milbank Tweed Hadley & McCloy LLP, New York, NY, Michael Ira Goldberg, Akerman Senterfitt & Eidson, Fort Lauderdale, FL, Patrick Marecki, Milbank Tweed Hadley & McCloy LLP, New York, NY, for 3V Capital Master Fund Ltd., Atascosa Investments, LLC, Aurum CLO 2002-1 Ltd., Bank of America, N.A., Bear Stearns Investment Products Inc., Burnet Partners, LLC, Deutsche Bank Trust Company Americas, Flagship CLO III, Flagship CLO IV, Flagship CLO V, Gleneagles CLO Ltd., Goldman Sachs Credit Partners, L.P., Grand Central Asset Trust, SOH Series, Grand Central Asset Trust, CED Series, Grand Central Asset Trust, HLD Series, Hartford Mutual Funds, Inc. on Behalf of the Hartford Floating Rate Fund by Hartford Investments Management Company, Their Sub-Advisor, Highland CDO Opportunity Fund, Ltd., Highland Credit Opportunities CDO Ltd., Highland FloatingRate Advantage Fund, Highland Floating Rate LLC, Highland Legacy Limited, Highland Offshore Partners, L.P., JP Morgan Chase Bank, N.A., Jasper CLO, Ltd., LL Blue Marlin Funding LLC, Liberty CLO, Ltd., Merrill Lynch Credit Products LLC, Monarch Master Funding Ltd. formerly known as Quadrangle Master Funding Ltd., Ocean Bank, Rockwall CDO, Ltd., Silver Oak Capital LLC, Stedman CBNA Loan Funding LLC, Foothills Group, Inc., Van Kampen Dynamic CreditOpportunities Fund, Van Kampen SeniorIncome Trust, Van Kampen SeniorLoan Fund, Wells Fargo Bank N.A.

Nancy A. Copperthwaite, Akerman Senterfitt, Miami, FL, Michael Ira Goldberg, Akerman Senterfitt & Eidson, Fort Lauderdale, FL, for Loan Funding VII, LLC.

Aaron D. Van Oort, Minneapolis, MN, Ceci Culpepper Berman, Fowler White Boggs P.A., Tampa, FL, Melina K. Williams, Faegre & Benson, LLP, Minneapolis, MN, Stephen M. Mertz, Faegre & Benson, LLP, Minneapolis, MN, for Senior Transeastern Lenders (Group 2) Appellants Represented by Ceci Culpepper Berman.

Donald J. Russell, Robbins, Russell, Englert, Orseck, Untereiner & Sauber, LLP, Washington, DC, Eric J. Feigin, Robbins Russell Englert Orseck & Untereiner, Washington, DC, Lawrence S. Robbins, Robbins Russell Englert Orseck & Untereiner, Washington, DC, Michael L. Waldman, Robbins Russell Englert Orseck & Untereiner, Washington, DC, Patricia Ann Redmond, Stearns Weaver Miller Weissler Alhadeff & Sitterson, Miami, FL, for Official Committee of Unsecured Creditors c/o Patricia Redmond.

Beth A. Williams, Kirkland & Ellis, Washington, DC, Daniel T. Donovan, Kirkland & Ellis, Washington, DC, Paul A. Avron, Berger Singerman, Miami, FL, for Tousa, Inc. et al c/o Paul Avron.

### OPINION AND ORDER ON APPEALS BY TRANSEASTERN LENDERS

ALAN S. GOLD, District Judge.
### I. INTRODUCTION

*1 The Appellants in this bankruptcy appeal are a collection of financial entities (the "Traneastern Lenders") [FN1] that loaned appropriately $450 million in 2005 to a homebuilding joint venture involving TOUSA, Inc. ("TOUSA").[FN2] The Bankruptcy Court below ordered the Transeastern Lenders to disgorge, as "fraudulent transfers" under Section 548 of the Bankruptcy Code (11 U.S.C. Sections 101, *et seq.*), monies that they received on July 31, 2007, in repayment of their antecedent debt, and to pay prejudgment interest for a total disgorgement of more than $480 million dollars. The Transeastern Lenders appeal [FN3] from this ruling as established by the Amended Findings of Fact and Conclusions of Law [ECF No. 722 in Bankruptcy Case No. 08–10928] ("the Opinion" or "Op.") and the Amended Final

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Judgment (the "Judgment") entered on October 30, 2009 by U.S. Bankruptcy Judge John K. Olson. This Court has jurisdiction pursuant to 28 U.S.C. § 158 and Federal Rule of Bankruptcy Procedure 8001(a).

## II. BACKGROUND

### A. The Tousa Entities

The Debtors in the bankruptcy proceedings below were TOUSA and various affiliates and subsidiaries of TOUSA (collectively, "the Debtors"), which design, build, and market detached single-family residences, town homes, and condominiums under various brand names. [Stip., p. 2].FN4 Several aspects of this appeal focus on a subgroup of the Debtors called the "Conveying Subsidiaries."FN5 The TOUSA Group's assets include land and homes in various stages of completion and related assets. Between 1995 and 2005, the Debtors' business activities grew rapidly as they acquired other homebuilding companies. [Committee's Br., p. 13]. As of 2006, they operated the thirteenth largest homebuilding enterprise in the country with operations in Florida, Texas, the mid-Atlantic states, and the western United States. [First Lien Proposed Findings, pp. 1, 4]. The two main home-building subsidiaries, which held the majority of the home-building assets, were TOUSA Homes, Inc. ("THI") and its wholly owned subsidiary, Newmark Homes LP ("Newmark"). [Stip., p. 22 n. 11].

### i. Funding for the TOUSA Entities

To finance operations for itself and its subsidiaries, TOUSA relied on two principle sources of funding: bonds and a revolving credit facility.

### 1. Bonds

The TOUSA entities took on unsecured bond indebtedness through six major issuances between June 2002 and April 2006. On June 25, 2002, $200 million of notes were issued, which were due in 2010; on the same date, an additional $150 million of notes were issued, which were due in 2012; on February 3, 2003, $100 million in notes were issued, which were due in 2010; on March 17, 2004, $125 million of notes were issued, which were due

in 2011; on December 21, 2004, $200 million of notes were issued, which were due in 2015; and on April 12, 2006, $250 million of notes were issued, which were due in 2011. [Stip., pp. 3–8; Trial Exhs. 3064–69].FN6

#### a. Information Contained in Bond Prospectus Documents

**\*2** For each bond indenture, a Prospectus was issued, which contained information about TOUSA's structure and the nature of its operations.FN7 Bondholders who reviewed the information in the Prospectuses learned that TOUSA operated as a diverse but highly integrated enterprise in which the company's subsidiaries played a critical role in the vitality of the organization as a whole.

The Prospectuses provided collective information about the enterprise as a whole to explain its operations. They referenced "consolidated" or "combined" financial statements; they referred to the "consolidated net worth" of the enterprise; and they noted that TOUSA marketed homes under "various brand names." [*E.g.,* Trial Exh. 3296, pp. 1, 7, 10]. The Prospectuses also provided information about how bond notes would be paid, including details on interest rates. TOUSA was primarily responsible for payment of the notes, but the consolidated financial statements made it clear that the funds used to pay the notes would derive from the *net operations of TOUSA and its subsidiaries.* [Trial Exh. 3064, p. 41]. On each level, the TOUSA enterprise's decision to raise money through bonds and then guarantee those bonds was a collective, group effort. [Appeal Hr'g Tr. 11:24–12:2 (counsel for the Committee noting that "the bond debt was used for the purchase of real estate and companies that were being rolled up, and those decisions, it is true, were made at headquarters"); *id.* at 13:17–22 (counsel for the Committee agreeing that "there was no money that went initially on the bonds that later became notes directly to the subsidiaries [because the bond debt was a joint effort among the TOUSA and its subsidiaries]") ].

When identifying certain "Risks related to the

Notes," TOUSA stated in the Prospectuses that "[w]e may not have sufficient funds to satisfy our repurchase obligations that arise upon a change in control or a decline in our *consolidated net worth.*" [Trial Exh. 3296, p. 12 (emphasis added) ]. The Prospectuses also noted that cash flows for the TOUSA enterprise were heavily dependent on the role of the subsidiaries:

> Substantially all of our operations are conducted through our subsidiaries. Therefore, *our ability to service our debt, including the notes, is dependent upon the cash flows of those subsidiaries* and, to the extent they are not subsidiary guarantors, their ability to distribute those cash flows as dividends, loans or other payments to the entities which are obligors under the notes and the guarantees.

[*Id.* at 13 (emphasis added) ].

Because the subsidiaries played such a vital role to the bondholders, the Prospectuses also specifically referenced and disclosed other debts of the borrowers, including the subsidiaries. For example, the Prospectuses provided information to bondholders about the guarantees provided by TOUSA's subsidiaries under the Revolving Credit facility as discussed in further detail below.[FN8]

**b. Guarantors of the Bond Indentures**

**\*3** TOUSA was the obligor under each of the six bond indentures, and most of the Conveying Subsidiaries [FN9] were jointly and severally liable as guarantors. [Stip., p. 3]. The Prospectuses described these guarantees, noting that "[a]lthough the notes are our obligations, they are unconditionally guaranteed on a senior unsecured basis by all of our material domestic subsidiaries, other than our mortgage and title subsidiaries." [Trial Exh. 3296, p. 13; *see also* Appeal Hr'g Tr. 10:24–25 (counsel for the Committee noting that "the conveying subs were guarantors on [the bonds]") ]. Likewise, the bond indentures themselves specified the nature of the subsidiary guarantees:

Section 10.01. SUBSIDIARY GUARANTY

(a) Subject to this Article 10, each of the Subsidiary Guarantors hereby, jointly and severally, unconditionally Guarantees to each Holder of a Note ... that (a) the principal of, premium, if any, and interest, including Special Interest, if any, on the Notes shall be promptly paid in full when due, whether at maturity, by acceleration, redemption or otherwise, ... and (b) in case of any extension of time of payment or renewal of any Notes or any of such other Obligations, that same shall be promptly paid in full when due or performed in accordance with the terms of the extension or renewal, whether at Stated Maturity, by acceleration or otherwise. Failing payment when due on any amount so Guaranteed or any performance so Guaranteed for whatever reason, the Subsidiary Guarantors shall be jointly and severally obligated to pay the same immediately. Each Subsidiary Guarantor agrees that this is a guarantee of payment and not a guarantee of collection.

(b) Each Subsidiary Guarantor hereby agrees that its Obligations with regard to this Subsidiary Guaranty shall be absolute and unconditional.

[Trial Exhs. 3064–69 § 10.01].

As counsel for the Committee confirmed during oral argument, these subsidiary guarantees played a critical role in the bond offerings because the subsidiaries provided a rich cash flow to the TOUSA enterprise. [Appeal Hr'g Tr. 14:22–15:1 ("Yes. [The Prospectuses] presented consolidated financial statement, and it made very clear that the credit worthiness of the bonds turned in large part, in principal part, on the case flow of the subsidiaries which is why the bondholders took guarantees from the individual subsidiaries.") ]. As such, the bondholders dealt with TOUSA and its subsidiaries "as a consolidated enterprise that was interdependent, both in terms of structure and the flow of money." [*Id.* at 16:20–25].

**c. Default**

Pursuant to Articles 6.01–02 of each indenture, a judgment for more than $10 million against TOUSA or its subsidiaries or a bankruptcy filing by TOUSA or its subsidiaries would constitute an event of "default," which would permit the note holders to declare all outstanding amounts under the bond debt to be immediately due.

Section 6.01 EVENTS OF DEFAULT

**\*4** (a) Each of the following is an "Event of Default":

....

(vi) any judgment or judgments for the payment of money in an aggregate amount in excess of $10.0 million that shall be rendered against the Company or any Restricted Subsidiary and that shall not be waived, satisfied or discharged for any period of 30 consecutive days during which a stay of enforcement shall not be in effect;

....

(vii) the Company or any Significant Subsidiary pursuant to or within the meaning of any Bankruptcy Law:

(1) commences a voluntary case,

(2) consents to the entry of an order for relief against it in an involuntary case,

(3) consents to the appointment of a custodian of it or for all or substantially all of its property,

(4) makes a general assignment for the benefit of its creditors, or

(5) generally is not paying its debts as they become due;

(viii) a court of competent jurisdiction enters an order or decree under any Bankruptcy law that:

(1) is for relief against the Company or any Significant Subsidiary in an involuntary case,

(2) appoints a custodian of the Company or any Significant Subsidiary or for all or substantially all of the property of the Company or any Significant Subsidiary, or

(3) orders the liquidation of the Company or any Significant Subsidiary,

and the order or decree remains unstayed and in effect for 60 days; or

(ix) any Subsidiary Guaranty relating to the Notes ceases to be in full force and effect (other than in accordance with the terms of such Subsidiary Guaranty), or any Subsidiary Guarantor denies or disaffirms its obligations under its Subsidiary Guaranty relating to the Notes.

(b) a Default under clause (a)(iv) is not an Event of Default in respect of the Notes until the Trustee or the Holders of not less than 25% in aggregate principal amount of Notes then outstanding notify the Company of the Default, and the Company does not cure such Default within the time specified after receipt of such notice. Such notice must specify the Default, demand that it be remedied and state that such notice is a "Notice of Default."

Section 6.02 ACCELERATION

(a) If an Event of Default (other than an Event of Default specified in Section 6.01(a)(vii) or (a)(viii)), shall have occurred and be continuing, the Trustee or Holders of not less than 25% in aggregate principal amount of the Notes then outstanding may declare to be immediately due and payable the principal amount of all the Notes then outstanding, plus accrued but unpaid interest, including Special Interest, if any, to the date of acceleration. In the case of an Event of Default specified in Section 6.01(a)(vii) or (a)(viii), such amount with respect to the all the

Notes will become due and payable immediately without any declaration or other act on the part of the Trustee or the Holders.

[Trial Exhs. 3064–69 §§ 6.01–02].

As of July 31, 2007, the total amount of principal outstanding on the TOUSA bond debt was approximately $1.06 billion. [Stip., p. 3].

### 2. Revolving Credit Facility

**\*5** On March 9, 2006, TOUSA established a revolving credit facility ("the Revolver") with Citicorp North America, Inc. serving as Administrative Agent. [*Id.* at 8]. TOUSA used this facility to fund working capital and land acquisitions and to support letter of credit requirements under land option agreements. [*Id.*]. The credit line capped at $800 million. [Trial Exh. 2017]. The amount of credit under the Revolver was determined once per month based on the combined value of the TOUSA enterprise's collateralized assets that made up the "Borrowing Base" as defined in the Revolver. [Trial Exh. 2017, pp. 3–4, 15, 54 (defining "Borrowing Base" and explaining how "Maximum Credit" is determined by level of "Borrowing Base") ]. Citicorp representative Marni McManus explained the concept of the "Borrowing Base" in the following manner:

The borrowing base is a construct which is in most of the homebuilder deals, whether secured or unsecured, and essentially it governs the percentage of dollars that can be borrowed against a certain category of assets that the home builder may have on its balance sheet. So, for example a completed home, you may be able to borrow 90 cents, versus an uncompleted home it would be 50 cents and a piece of raw land, 10 cents.... [T]he company would be limited in the amount they could borrow to either the amount that the borrowing base—their assets allowed them to or the total size of the facility.

[Bankr.Hr'g Tr. 3605:4–24].

The Revolver was the primary source of liquidity for TOUSA, and it allowed TOUSA to post letters of credit and surety bonds. [*Id.* at 258:16–259:21, 3900:1–3901:11].

#### a. Amendments to the Revolver

Several of the Conveying Subsidiaries were guarantors under the Revolver as of March 9, 2006. [FN10] The Revolver was amended twice before the July 31, 2007 transactions at issue in this appeal (the "July 31 Transaction"). [FN11] Both of these amendments had an impact on TOUSA's subsidiaries. On October 23, 2006, TOUSA and Citicorp amended the Revolver, requiring TOUSA's subsidiaries, including the Conveying Subsidiaries, to pledge assets as security under the Revolver. [Stip., p 9; Trial Exhs. 209, 3062]. [FN12] On January 30, 2007, TOUSA's subsidiaries, again including Conveying Subsidiaries, were added as "Subsidiary Borrowers" on the Revolver. [Stip., p. 10; Trial Exh. 210]. [FN13] As the largest consumers of Revolver funds and the two subsidiaries holding most of the enterprise's assets, THI and Newmark—both of which are Conveying Subsidiaries—were most affected by these amendments. [Bankr.Hr'g Tr. 1626:1–7].

The terms of the January 30, 2007 Revolver governed until the July 31 Transaction at issue in this case. Under the January 30, 2007 Revolver, TOUSA and its subsidiaries had full access to the Revolver. [FN14] TOUSA, as "Administrative Borrower," exercised more control than the "Subsidiary Borrowers." For example, under Section 2.2, labeled "Borrowing Procedures," TOUSA was authorized to give notice requesting funds for each instance of borrowing on behalf of all of the Borrowers. [Trial Exh. 210, pp. 33, 59]. The agreement provided a specific form for "Notice of Borrowing" to be submitted by TOUSA for each "Proposed Borrowing." [*Id.* at Exhibit D]. Also, each of the Borrowers under the Revolver appointed TOUSA as their "agent" for "all purposes" under the agreement, and "[a]ny acknowledgment, consent, direction, certificate or other action which might other-

wise be valid or effective only if given or taken by all of the Borrowers or acting singly, *shall be valid and effective if given or taken only by the Administrative Borrower [TOUSA], whether or not any of the other Borrowers joins therein.*" [*Id.* at 111 (emphasis added) ].

### b. Default Provisions

**\*6** The Revolver had specific default provisions similar to those contained in the bond indentures. Pursuant to Section 8 of the January 30, 2007 Revolver, any bankruptcy proceeding or judgment for over $10 million involving TOUSA or any subsidiary constituted a default, which would have made all outstanding amounts of principal and interest immediately due and payable to the Revolver lenders from TOUSA or any of the Subsidiary Borrowers.

EVENTS OF DEFAULT

Section 8.1 *Events of Default*

Each of the following events shall be an Event of Default:

....

(f)(ii) any proceeding shall be instituted by or against the Administrative Borrower or any of its Restricted Subsidiaries seeking to adjudicate it a bankrupt or insolvent, or seeking liquidation, winding up, reorganization, arrangement, adjustment, protection, relief or composition of it or its debts under any Requirement of Law relating to bankruptcy, insolvency or reorganization or relief of debtors....

(g) any final judgment or order (or other similar process) involving, in any single case or in the aggregate, an amount in excess of $10,000,000 in the case of a money judgment, to the extent not covered by insurance, or that could reasonably be expected to have a Material Adverse Effect, in the case of a non-monetary judgment, shall be rendered against one or more of the Administrative Borrower and its Restricted Subsidiaries by a

court having jurisdiction, and such judgment or order shall continue unsatisfied and in effect for a period of thirty days without being vacated, discharged, satisfied, or stayed or bonded pending appeal....

....

Section 8.2 *Remedies*

During the continuance of any Event of Default, the Administrative Agent (a) may, and at the request of the Requisite Lenders shall, by notice to the Administrative Borrower declare that all or any portion of the Revolving Credit Commitments be terminated, whereupon the obligation of each Lender to make any Loan and each Issuer to Issue any Letter of Credit shall immediately be decreased or terminate, as the case may be, and/ or (b) may, and at the request of the Requisite Lenders shall, by notice to the Administrative Borrower, declare the Loans, all interest thereon and all other amounts and Obligations payable under this Agreement to be forthwith due and payable, whereupon the Loans, all such interest and all such amounts and Obligations shall immediately become and be forthwith due and payable, without presentment, demand, protest or further notice of any kind, all of which are hereby expressly waived by the Borrowers; *provided, however,* that upon the occurrence of the Events of Default specified in Section 8.1(f)(ii) [the bankruptcy provisions], the Revolving Credit Commitments of each Lender to make Loans and the commitments of each Lender and Issuer to Issue or participate in Letters of Credit shall each automatically be terminated and the Loans, all such interest and all such amounts and Obligations shall automatically become and be due and payable, without presentment, demand, protest or any notice of any kind, all of which are hereby expressly waived by the Borrowers.

**\*7** [*Id.* §§ 8.1(g), 8.2 (emphasis in original) ].

As of July 31, 2007, TOUSA and the subsidi-

ary borrowers owed $373 million on the Revolver loan. [Trial Exh. 3429; Appeal Hr'g Tr. 60:22, 66:4–8]. As noted above, TOUSA and the subsidiary borrowers simultaneously owed approximately $1.06 billion under the bond issuances as of this date. As also noted above, the bondholders were aware of obligations of TOUSA and the Conveying Subsidiaries under the Revolver.

### B. The Transeastern Joint Venture

In June 2005, TOUSA became involved in a joint venture, which plays a central role in the origins of the current dispute. Tousa Homes LP ("Homes LP"), a wholly owned subsidiary of TOUSA, and Falcone/Ritchie LLC ("Falcone") formed a joint venture called TE/TOUSA LLC ("Transeastern JV" or "the Joint Venture"). [Stip., p. 11]. They formed the Joint Venture for the purpose of acquiring certain home-building assets owned by Transeastern Properties, Inc. ("TEP"), which was a leading developer in Florida. [*Id.*]. TOUSA viewed this acquisition of TEP as attractive because it offered TOUSA the chance to become a dominant player in Florida's real estate market, and it provided TOUSA a partner that could obtain independent financing and share business risks. [Trial Exh. 104, p. 042818; Bankr.Hr'g Tr. 263:13–21].

Within the Joint Venture, Homes LP served as Managing Member and held a 50 percent voting interest shared with Falcone. [Stip., p. 11]. There were also a series of "tiered" special purpose subsidiaries: EH/Transeastern ("EHT") served as the primary operating subsidiary; TE/TOUSA Senior LLC ("TOUSA Senior") served as managing member and sole owner of EHT; TE/TOUSA Mezzanine LLC ("TOUSA Mezz") owned all of the membership interests in TOUSA Senior; and TE/TOUSA Mezzanine Two LLC ("TOUSA Mezz II") owned all of the membership interests in TOUSA Mezz. [*Id.*].

### i. Funding for the Transeastern Joint Venture

The Transeastern JV was funded independently of the TOUSA enterprise, using $675 million of

third-party debt capacity, a subordinated loan from Homes LP, and equity. [*Id.*]. The $675 million third-party debt lies at the heart of these appeals. The entities responsible under the pledges, liens, and guarantees for this debt were TOUSA, Homes LP, TOUSA Senior, EHT, TOUSA Mezz, and TOUSA Mezz II—none of which are Conveying Subsidiaries. The debt consisted of three parts, stemming from three agreements, which were all executed on August 1, 2005 (the "Transeastern Credit Agreements").

#### 1. Senior Debt

TOUSA Senior and EHT entered into a "Senior Credit Agreement" with Deutsche Bank Trust Company Americas ("DBTCA") as Administrative Agent.[FN15] [Trial Exhs. 2007, 2010, 3071, 3076]. The Senior Credit Agreement provided a $335 million senior secured term loan and a $115 million senior secured revolving credit agreement from the "Senior Transeastern Lenders"[FN16] with TOUSA Senior and EHT obligated as borrowers. The Senior Debt was secured by first priority liens on substantially all of the assets of EHT and a pledge of the membership interests in EHT held by TOUSA Senior. [Stip., p. 12].

#### 2. Senior Mezzanine Debt

**\*8** TOUSA Mezz entered into a Senior Mezzanine Credit Agreement with DBTCA as Administrative Agent. [Trial Exhs. 2008, 2009, 3072, 3079]. That agreement provided a $137.5 million term loan from the "Senior Mezzanine Lenders" [FN17] with TOUSA Mezz obligated as borrower. [Stip., p. 12].

#### 3. Junior Mezzanine Debt

TOUSA Mezz II entered into a "Junior Mezzanine Credit Agreement" with DBTCA as Administrative Agent. [Trial Exhs. 2011, 3082]. That agreement provided an $87.5 million loan from the "Junior Mezzanine Lender." [FN18]

#### 4. Carve Out and Completion Guarantees

As a condition precedent to the Transeastern Credit Agreements, TOUSA and Homes LP also

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

granted two types of guarantees, completion and carve-out guarantees, on the Senior Debt, the Senior Mezzanine Debt, and the Junior Mezzanine Debt, for a total of six guarantees (the "Completion and Carve–Out Guarantees"). [Stip., p. 13]. The "Completion" part of the guaranty obligated TOUSA and Homes LP to complete work on Transeastern JV properties in progress when the Joint Venture was created in the event the Joint Venture itself failed to do so. [*Id.*]. The "Carve–Out" part of the guarantee required TOUSA and Homes LP to indemnify the lenders for losses resulting from fraud, misappropriation and similar acts by the Joint Venture, and it required full repayment of the Transeastern Loans if the Joint Venture voluntarily filed for bankruptcy protection. [*Id.*]. In the event of bankruptcy, the guarantors would also have a 100 percent obligation to pay the debt in full. [Trial Exh. 3075, pp. 1–2; Bankr.Hr'g Tr. 1594–99].

The guarantee provisions in the Completion and Carve Out agreements provided the following:

> Guarantors do hereby, jointly and severally, unconditionally, absolutely and irrevocably guarantee [the debt] to the Administrative Agent.... This is an irrevocable, absolute, continuing guaranty of payment and performance and not a guaranty of collection. Guarantors waive any right to require that any resort be had by the Administrative Agent or any lender to any of the security held for payment of the Guaranteed Obligations or to any balance of any deposit account or credit on the books of the Administrative Agent or any lender in favor of Borrowers or any other person. This Guaranty may not be revoked by Guarantors and shall continue to be effective with respect to the Guaranteed Obligations arising or created after any attempted revocation by Guarantors. It is the intent of Guarantors that the obligations and liabilities of Guarantors hereunder are absolute and unconditional under any and all circumstances and that until the Guaranteed Obligations are fully and finally satisfied, such obligations

and liabilities shall not be discharged or released in whole or in part, by any act or occurrence which might, but for the provisions of this Guaranty, be deemed a legal or equitable discharge or release of Guarantors.

[Trial Exhs. 3074, 3075, 3077, 3078, 3080, 3081].

## C. The Transeastern Litigation

**\*9** The downturn in the housing market and the weak overall economy soon threatened the viability of the Joint Venture. Several events marked the decline of business for the Transeastern JV. On September 29, 2006, DBTCA, as Administrative Agent for all of the Transeastern Lenders, entered into a "Consent and Agreement" with TOUSA Senior, EHT, TOUSA Mezz, and TOUSA Mezz II, recognizing that a potential default or an event of default had occurred under the Transeastern Credit Agreements. [Trial Exh. 4044, pp. 1–2]. On October 2, 2006, TOUSA disclosed potential losses associated with the Transeastern JV in its Form 8–K SEC filing. [Trial Exh. 5005]. On October 4, 2006, certain Falcone entities gave notice of default to the Transeastern JV on existing land option agreements. [Stip., p. 14].

On October 31 and November 1, 2006, Deutsche Bank sent demand letters to TOUSA and Homes LP, demanding payment of all debt under the Transeastern Credit Agreements pursuant to the Completion and Carve–Out Guarantees. [Trial Exhs. 398, 399]. On November 14, 2006, TOUSA filed Form 10–Q, disclosing that the Transeastern JV would not have the ability to continue as a going concern. [Trial Exh. 2034, pp. 13, 37].

As noted above, Citicorp, the Administrative Agent under the Revolver, required TOUSA and its subsidiaries to increase their obligations under the Revolver in light of TOUSA's ongoing difficulties with the Transeastern JV. Specifically, the Revolver lenders recognized that TOUSA was "no longer able to satisfy all of the conditions precedent under the March 2006 Credit Agreement" because

of "Transeastern Events." [Trial Exh. 209, p. 1]. In response, the Conveying Subsidiaries agreed on October 23, 2006, to pledge assets as security under the Revolver so that the Revolver lenders would continue to grant the TOUSA enterprise access to its most important source of liquidity. [Stip., p 9; Trial Exhs. 209, 3062; Trial Exh. 5006 at Ex. 10.1]. When difficulties with the Transeastern JV continued, the Conveying Subsidiaries agreed on January 30, 2007 to provide additional guarantees, now listing themselves as "Subsidiary Borrowers" under the Revolver. [Stip., p. 10; Trial Exh. 210].

Litigation also ensued between TOUSA and the Transeastern Lenders. TOUSA and Homes LP filed an action against DBTCA in Florida on November 28, 2006, seeking a declaratory judgment that they were not obligated under the Completion and Carve–Out Guarantees. [Trial Exh. 3105, pp. 11–12]. On December 4, 2006, DBTCA, on behalf of the Senior Transeastern Lenders and the Senior and Junior Mezzanine Lenders, filed action against TOUSA and Homes LP in New York state court. [Trial Exh. 3089]. DBTCA sought repayment of the Transeastern loans and damages for the various breaches by TOUSA and Homes LP of the Completion and Carve–Out Guarantees. [Stip., p. 15; Trial Exh. 3089].[FN19] When TOUSA and Homes LP moved to dismiss the New York action, the court denied their motion. [Trial Exhs. 3094–98]. The Parties agreed to consolidate the Florida and New York actions. [Trial Exh. 3112, p. 3].

**\*10** In its Complaint, DBTCA alleged that "[t]o date, more than $600 million has been advanced to the joint venture borrowers under various related credit facilities" and DBTCA requested "an award of damages for the various breaches by TOUSA and TOUSA Homes ... in an amount to be determined at trial up to the full amounts outstanding under the Credit Agreements, plus interest thereon." [Trial Exh. 3089, pp. 2, 59]. One month after filing its complaint, Deutsche Bank sent a letter to TOUSA to "clarify" the "potential scope of TOUSA's liability." [Trial Exh. 443, p. 1]. Specific-

ally, Deutsche Bank argued that "it is DBTCA's view that [the Completion Guarantees] apply the horizontal *and* vertical construction of all phases of all developments for which there was *any* work ... commenced as of the closing of the transaction.... By our rough calculation, the indemnifiable costs under the reading exceed the full amounts outstanding under the Credit Agreements several times over." [*Id.* (emphasis added) ]. TOUSA management personnel believed that "the ultimate ... claim from Deutsche Bank was in excess of the amount of the debt ... it was $2 billion and above." [Bankr.Hr'g Tr. 1616:16–1617:7, 2829:16–17].

To resolve the Transeastern litigation, TOUSA faced three possibilities: (1) litigate the claims, (2) file for bankruptcy, or (3) settle the claims. TOUSA management believed that "the senior lenders [to the Senior Credit Agreement] were entitled to get 100 percent cash. Everyone took the position if we didn't pay them 100 percent, we had no deal.... Certainly, we had a series of advisors, and the decision was that there was no sense spending time trying to negotiate with them." [*Id.* at 1611:4–16; *see also id.* at 506:15–16 (former TOUSA Executive Vice President and CEO Steve Wagman stating that he "believed that there was significant risk associated with continuing to litigate"); *id.* at 3616:20–23 (Citicorp's Manager on TOUSA Relations, Marni McManus, stating that "the company had a clear view that it had come to with the advice of their counsel as well as their financial advisors that settlement was better for the company overall"); Appeal Hr'g Tr. 20:25–21:14 ("[T]here was no dispute in this litigation that the amounts paid by TOUSA to the Transeastern lenders were, in fact owed.... Nobody has contended that the guarantees weren't valid obligations of TOUSA that arose to at least the level that was paid, so there isn't an argument of a gift.... And just to be clear, the fear of the parent was that the judgment against it would be far in excess of what it paid ultimately to resolve the Transeastern litigation.") ]. Counsel for the Committee even conceded at oral argument that settlement was in the best interests of TOUSA as the par-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

ent company. [Appeal Hr'g Tr. 20:12–16 ("I agree with the Court that there's no question at some point that the parent decided to honor the guarantee and settle the case because it, in contrast to the conveying subsidiaries, was on the hook for the guarantee.") ].

**\*11** TOUSA's consultants and advisors also believed that settlement was in the best interests of the TOUSA enterprise. According to Kirkland & Ellis and Lehman Brothers, there was "a substantial risk of a judgment against TOUSA," and time was "of the essence and the Company [did] not have the luxury of continuing to negotiate with the EHT lenders over a longer period of time." [Trial Exh. 187, p. 35]. When TOUSA sought advice from its consultants regarding bankruptcy, Lehman Brothers provided a detailed "waterfall analysis," concluding that if bankruptcy occurred, TOUSA "may not be able to continue operating as a going concern and reorganize" and such a bankruptcy would be "likely to have a negative impact on TOUSA's liquidity, value of its assets and its ability to obtain performance bonds." [*Id.* at 36–39]. TOUSA management shared these same concerns on behalf of the subsidiaries. [Bankr.Hr'g Tr. 1848:8–9 ("[W]e didn't see how the company could exist with the parent in bankruptcy.") ]. In light of these concerns, TOUSA chose to settle the Transeastern litigation.

### D. The Transeastern Settlement

To repay the Transeastern Lenders, TOUSA had to obtain new financing (the "New Loans"). TOUSA selected Citicorp North America, Inc. ("CNAI") as the Administrative Agent for the new lenders (the "New Lenders"), and on June 27, 2007, CNAI sent TOUSA a final commitment letter reflecting the structure of their intended transactions. [Trial Exh. 3301].

#### i. The Settlement Agreements

TOUSA entered into a number of settlement agreements during this time. On May 30, 2007, TOUSA, Homes LP, and the Transeastern JV Subsidiaries reached a settlement agreement with Falcone and related entities under which TOUSA be-

came the sole owner of the Joint Venture and paid approximately $49 million to receive properties related to the Joint Venture. [Stip., p. 18; Trial Exh. 2116].[FN20]

The Transeastern assets that were sold resulted in proceeds that went into a centralized cash management system "available for all of the various subsidiaries to use." [Bankr.Hr'g Tr. 551:15–21]. In addition to real estate, TOUSA acquired Transeastern's unrestricted cash, restricted cash, fixed assets, and other assets. [Valdes Dep., pp. 60:18–63:13]. A portion of this was cash held in escrow deposits that would become actual, unrestricted cash upon the closing of the homes. [Devendorf Dep., pp. 46–47]. The Parties dispute the actual value of these Transeastern assets as of July 2007,[FN21] but it is undisputed that proceeds from the sales of all these Transeastern assets and deposits that Transeastern held prior to TOUSA's acquisition were swept into TOUSA's central cash management system, which was available to the Conveying Subsidiaries. [McAden Dep., pp. 154–55; Bankr.Hr'g Tr. 1675:17–21].

The acquisition of the Transeastern assets also affected the "Borrowing Base" of the collective borrowers' assets under the Revolver. TOUSA's former Executive Vice President and CFO believed that "as a result of the July 31 transactions, the available credit, the borrowing base available credit under the revolver increased ... by $150 million ... [and] that additional liquidity of value [was] ... available to the various subsidiary borrowers on the revolver." [Bankr.Hr'g Tr. 545:9–546:15; Trial Exh. 362, p. 7]. This was especially valuable to the Conveying Subsidiaries in July 2007 because it would have been "pretty close to impossible" for the Conveying Subsidiaries to secure their own financing at that time. [Bankr.Hr'g Tr. 546:19–547:1].

**\*12** On June 29, 2007, TOUSA, Homes LP, and the Transeastern JV Subsidiaries executed settlement agreements with the Mezzanine Lenders. [Trial Exhs. 2134, 3111].[FN22] On July 31, 2007, TOUSA, Homes LP, and the Transeastern JV Sub-

sidiaries reached a settlement agreement with lenders under the Senior Credit Agreement (the "CIT Settlement Agreement"). [Stip., p. 16; Trial Exh. 2182]. Under the terms of the CIT Settlement Agreement, EHT and TOUSA Senior agreed to pay $421,522,193.46 to the lenders, plus additional interest payments of approximately $140,000.00 per day. [Stip., p. 16; Trial Exh. 2182].

To fund the settlement agreements with the Transeastern Lenders, TOUSA entered into two separate credit agreements with the New Lenders—First and Second Term Loan facilities with CNAI as Administrative Agent for the First and Second Lien Term Lenders. [Trial Exhs. 360, 361].[FN23] The First Lien Term Loan provided $200 million, and the Second Lien Term Loan provided $300 million to the borrowers. [Trial Exhs. 360, 361].[FN24] Both of the New Loans directed that loan proceeds be used to satisfy the Transeastern Settlement, which the New Loans referred to as the "Acquisition." [Trial Exh. 360 §§ 1.1, 4.12; Trial Exh. 361 §§ 1.1, 4.12].[FN25] Specifically, Section 4.12 provided that loan funds be used to "discharge all amounts of outstanding indebtedness of the Transeastern JV Entities" and that TOUSA was to serve as the sole "Administrative Borrower." [Trial Exh. 360 § 4.12; Trial Exh. 361 § 4.12].

Unlike the Transeastern Credit Agreements, both of these New Loan agreements named all of the Conveying Subsidiaries as "Subsidiary Borrowers." [Trial Exhs. 360, pp. 132–36; Trial Exh. 361, pp. 131–35]. In accordance with their obligations as "Subsidiary Borrowers," the Conveying Subsidiaries were required to pledge their assets as security under the New Loans. Because the Conveying Subsidiaries had already pledged their assets as security to the Revolver lenders under the Revolver amendments described above, the New Lenders had to obtain the consent of the Revolver lenders before they could enter into the First and Second Lien Term Loan facilities. Thus, on May 1, 2007, TOUSA made a presentation to a Steering Committee of Re-

volving Credit Lenders, and 79.125% of the Revolver lenders approved the terms of the new financing. [Trial Exh. 352; Bankr.Hr'g Tr. 3667:1–12]. As Marni McManus of Citicorp explained on behalf of the New Lenders, the "revolvers had taken collateral in the fall [on October 23, 2006], so we needed their approval in order to share that collateral with any other lenders." [Bankr.Hr'g Tr. 3615:17–25].

In accordance with the May 1, 2007 creditor presentation, the Revolver Lenders, the First Lien Lenders, and the Second Lien Lenders entered into an "Intercreditor Agreement" on July 31, 2007 to clarify the priorities of their liens. [Trial Exh. 2166]. Citicorp acted as Administrative Agent in the agreement on behalf of all of the lenders involved. [Id. at 1]. The agreement provided for equal priority of liens among the Revolver lenders and the First Lien Term Loan Lenders. [Id. at 4–8].

**\*13** The Revolver lenders also independently required the borrowers under the Revolver to amend that agreement again on July 31, 2007. Under the new amendments, the maximum credit available under the Revolver was reduced from $800 million to $700 million. [Trial Exh. 362, p. 1].[FN26] The Conveying Subsidiaries remained listed as "Subsidiary Borrowers" that were jointly and severally liable with TOUSA under the terms of the Revolver, and their assets remained pledged as collateral. [Id. at 1, 139–41; Trial Exh. 2172, pp. 5–7].

The parties to the Revolver amended their agreement two more times after July 31, 2007. On October 25, 2007, they amended the Revolver to provide for a waiver of solvency certification requirements for the third quarter and to permit borrowings of up to $65 million through the end of 2007. [Trial Exh. 216, pp. 2–3, 9]. In December 2007, TOUSA negotiated another amendment to the Revolver, providing for an extension of the prior certification waiver through February 1, 2008. [Trial Exh. 389 ¶ 46].

The internal corporate decisions approving the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

New Loans as part of the Transeastern Settlement play an important role in this dispute and should be examined carefully. On June 20, 2007, TOUSA's board, which consisted of five inside directors and six outside directors, unanimously approved settlement of the Transeastern Litigation. [Trial Exh. 255; Bankr.Hr'g Tr. 189:21–190:11, 248:25–250:18]. The resolutions passed by TOUSA's Board explicitly state that the New Loans were not only in the best interest of TOUSA but were also "necessary and convenient to the conduct, promotion and attainment of the business of the Administrative Borrower [TOUSA] *and its subsidiaries.*" [Trial Exh. 374, pp. 5, 8 (emphasis added) ]. Of critical importance, officers and directors of all of the Conveying Subsidiaries also executed formal resolutions or consents approving their obligations under the New Loans. [Trial Exhs. 375–76, 501–31, 2163; *see also* First Lien Br., p. 62]. These formal documents all contain substantially the same language, specifically recognizing the New Loans as being in the "best interest" and for the "benefit" of the individual subsidiaries. For example, the resolution passed by THI, one of the two largest Conveying Subsidiaries holding most of TOUSA's assets, provides the following:

> WHEREAS, it is a condition to the extension of loans under the [First and Second] Lien Credit Agreement[s] that certain subsidiaries, including the Corporation, guaranty the obligations of the Administrative Borrower and each other Borrower under the [First and Second] Lien Credit Agreement[s];

> WHEREAS, *the Board [of THI] deems to be in the best interest of the Corporation to become Borrower under the [First and Second] Lien Credit Agreement[s]* and to guaranty the obligations of the Administrative Borrower and each other Borrower under the [First and Second] Lien Credit Agreement[s]....

> ...

> **\*14** WHEREAS, *the Corporation will obtain be-*

> *nefits from the incurrence of the Loans and the other obligations under the [First and Second] Lien Credit Agreement[s]* and the other Loan Documents which are necessary and convenient to the conduct, promotion and attainment of the business of the Corporation.

> NOW, THEREFORE BE IT:

> RESOLVED, that *the Board finds that the Loan Documents (i) are in the best interest of the Corporation,* (ii) are necessary and convenient to the conduct, promotion and attainment of the business of the Administrative Borrower and its subsidiaries, including, without limitations, the Corporation, and (iii) may reasonably be expected to benefit, directly or indirectly, the Corporation....

[Trial Exh. 504, pp. 4–5, 7–8 (emphasis added) ].

The settlement also resulted in significant tax benefits for the TOUSA subsidiaries. In exchange for the conveyances associated with the First Lien Term loan, TOUSA and the Conveying Subsidiaries obtained the right to future tax benefits totaling approximately $74.8 million. [Trial Exh. 5404 ¶ 40; Trial Exh. 3000, p. 147]. As with all TOUSA receipts, those funds were expected to be placed into the TOUSA centralized cash management system, on which all TOUSA subsidiaries could draw. [Bankr.Hr'g Tr. 1675:17–21].

*ii. The Flow of Funds on July 31, 2007*

The exchange of property interests and funds that make up the "July 31 Transaction" can be broken down into three parts. First, as a result of the New Loan agreements, TOUSA and the Conveying Subsidiaries pledged their assets as security to the New Lenders, which, in turn, placed liens on those assets. Second, in exchange for these liens, the New Lenders disbursed $500 million in funds to TOUSA, the parent. Of the $500 million that TOUSA received from the New Lenders, the net proceeds were $476,418,784.40 after accounting for fees and expenses, including legal and syndicate costs. [Trial Exh. 442]. In accordance with the New

Loans, the Conveying Subsidiaries provided written authorization to TOUSA, appointing TOUSA as their agent for the purpose of using these funds to settle the Transeastern debts. [Trial Exh. 360 § 10.21].

The exact disbursement of these funds was as follows: On July 31, 2007, CNAI, as Administrative Agent for the New Lenders, wired $476,418,784.40 to Universal Land Title, Inc. ("ULT"), a wholly-owned subsidiary of TOUSA. [Stip. ¶ 43]. CNAI's instructions for the wire transfer provided that the funds were to be received by David Bronson of ULT and credit for the wire was to go to Technical Olympic USA, Inc., which was TOUSA's former corporate name. [Trial Exh. 442]. TOUSA management explained that ULT was a "non-conveying, non-filing" subsidiary that acted as part of TOUSA's financial services group in the capacity of a title company or escrow agent. [Bankr.Hr'g Tr. 1709:25–1710:9]. Management further confirmed that TOUSA's subsidiaries, including the Conveying Subsidiaries, exercised no control over the $476,418,784.40 transferred from the New Lenders to ULT. [*Id.* at 1711:22–1712:7]. CNAI personnel also explained that "[n]one of the subsidiaries had a right to the funds." [*Id.* at 3696:23–24; *see also* Appeal Hr'g Tr. 93:2–10 (counsel for the committee stating that the $476,418,784.40 "actually went to a particular subsidiary of TOUSA that is not one of the conveying subsidiaries and was then earmarked directly, pursuant to the very loan documents, *to go directly to the Senior Transeastern Lenders.... [The Conveying Subsidiaries] didn't formally hold the money")* (emphasis added) ].

**\*15** Third, following this transfer of $476,418,784.40, ULT wired $426,383,828.08 to Citibank, as Administrative Agent for the Transeastern Lenders. Citibank disbursed these proceeds to the other Transeastern Lenders by separate wire transfers taking place on July 31, 2007 and August 1, 2007. [Stip., p. 20; Trial Exhs. 136, 5107, 5109].[FN27]

### E. The Bankruptcy Pre–Trial Proceedings

Despite the July 31 Transaction, it became clear between August 2007 and the beginning of 2008 that TOUSA and its subsidiaries would not be able to continue as going concerns. TOUSA's eventual collapse was caused in large part by the catastrophic economic events that independently doomed the housing market shortly after the July 31 Transaction. According to company management, nobody within TOUSA predicted that the housing market would get anywhere near as bad as it did after July 31, 2007. [Bankr.Hr'g Tr. 287:12–288:4, 543:4–10]. Media reports in the record referred to August 2007 as a "once in a century credit tsunami," a "Black Swan" event, and an "economic Pearl Harbor." [Trial Exhs. 4168–70]. Real estate valuation experts, such as Christopher James who testified at the trial below, confirmed that homebuilders like TOUSA were devastated by the tightening of credit markets in August 2007. [Bankr.Hr'g Tr. 2142:8–2146:10; Trial Exh. 3002 ¶¶ 7–54 ("Like many homebuilders, TOUSA was hit hard by the August 2007 credit-market freeze and the consequent collapse of the mortgage market, which dried up the pool of home buyers."); Intervenor's Br., p. 5].

The Committee's own expert, Charles Hewlett, even conceded that the economy must have played a role in TOUSA's downturn after the July 31 Transaction: "There is absolutely no question, and no one would dispute, that after July 31, 2007, the market got even worse." [Bankr.Hr'g Tr. 757:21–23]. Similarly, the Bankruptcy Court acknowledged in its Order that it was "undisputed" that the national housing market "went to hell in a handcart beginning in August 2007." [Op., p. 50].

Given these catastrophic conditions, TOUSA and most of its subsidiaries filed petitions for relief under Title 11 of the U.S.Code on January 29, 2008. [Stip., p. 22].[FN28] On February 13, 2008, the Office of the U.S. Trustee for the Southern District of Florida appointed the Official Committee of Unsecured Creditors of TOUSA, Inc. (the

"Committee"). [FN29] [Id.]. On July 14, 2008, the Committee brought [FN30] this adversary proceeding on behalf of the Conveying Subsidiaries. [Id.]. [FN31]

The Committee claims that when TOUSA and the Conveying Subsidiaries filed for bankruptcy, the Transeastern Lenders and the First and Second Lien Term Lenders "elbow[ed] their way to the front of the creditors' line" and "the unsecured creditors [i.e., the bondholders] were pushed to the back of that line" as a result of the July 31 Transaction. [Committee's Br., pp. 3, 32]. In total, the Committee asserted twenty claims collectively against the Transeastern Lenders and the New Lenders. [Bankr.ECF No. 243]. The Committee alleged that the July 31 Transaction constituted a fraudulent transfer under 11 U.S.C. § 548. [FN32] The Committee argued that the July 31 Transaction rendered the Conveying Subsidiaries insolvent and that the Conveying Subsidiaries did not receive "reasonably equivalent value" for the New Loans because TOUSA used the loan proceeds to finance the settlement of the Transeastern Litigation, in which the Conveying Subsidiaries held no stake because they were not defendants. The Committee brought claims on behalf of the Conveying Subsidiaries against the Transeastern Lenders, seeking recovery of the settlement funds they received in the July 31 Transaction. [FN33]

*16 The Debtors were not originally parties to the Committee's action, but they became involved when the New Lenders brought identical third-party claims against certain of the Debtors in the Fall of 2008. [Bankr.ECF Nos. 28, 276]. CNAI and Wells Fargo, as Administrative Agents for the New Lenders, brought contingent claims, denying the Committee's allegations, but alleging that if the Committee were to establish the allegations in the Complaint, then the Debtors had "materially breached" the New Loans in which they represented that they were solvent. [Bankr.ECF No. 28 ¶ 12; Bankr.ECF No. 276 ¶ 218].

The Bankruptcy Court entered several significant pretrial orders. Two of them are relevant to the appeal proceedings before me concerning the Transeastern Lenders: First, on July 2, 2009, the Bankruptcy Court granted the Debtors' Motion to Strike the Senior Transeastern Lenders' Counterclaim and Third–Party Claim. [Bankr.ECF No. 508]. Second, on July 8, 2009, the Bankruptcy Court granted the Committee's Motion for Summary Judgment on the Defendants' Affirmative Defenses of Substantive Consolidation, Single Business Enterprise and Alter Ego. [Bankr.ECF No. 513]. [FN34]

**F. The Bankruptcy Trial**

The Bankruptcy Court held a bench trial from July 13 to July 28, 2009, in which more than twenty witnesses testified, including several witnesses who provided extensive information on the July 31 Transaction and TOUSA's decision-making process leading up to that date. [FN35]

TOUSA management testified about the danger faced by the Conveying Subsidiaries if the July 31 Transaction had not gone through. In particular, if the Transeastern Lenders received a judgment against TOUSA in excess of $10 million dollars or if TOUSA filed for bankruptcy, TOUSA would be in default of the bond indentures, and "the bond debt was placed at TOUSA, Inc., but with guarantees from each of the TOUSA subsidiaries. They were absolutely and unconditional guarantees." [Bankr.Hr'g Tr. 1623:10–1624:13]. Likewise, in the case of a $10 million judgment or a bankruptcy filing, that "would have triggered the Citibank obligation, the $800 million revolver. And, again, those subsidiaries were absolutely, unconditionally guarantors and were co-borrowers, and their assets were pledged." [Id. at 1678:4–25, 1688:1–1689:25].

TOUSA management and their advisors testified that they believed that the Transeastern litigation presented an existential threat to the TOUSA enterprise because of the default provisions in the Revolver and the bond indentures. There was a "significant risk associated with continuing to litigate," and "settlement was better for the company overall." [Id. at 505:8–507:23, 3616:19–25].

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

TOUSA's outside counsel advised that the proposed settlement "was likely a better outcome than full litigation." [Trial Exh. 187, p. 20]. As to the possibility of bankruptcy, TOUSA's Executive Vice President and Chief of Staff testified that it would not have been possible to keep TOUSA's subsidiaries out of bankruptcy if TOUSA filed for bankruptcy. [Bankr.Hr'g Tr. 1623:10–1624:13, 1678:3–1679:21, 1847:25–1848:16 ("[W]e didn't see how the rest of the company could exist with the parent in bankruptcy.") ]. One of the primary concerns facing the Conveying Subsidiaries in the event of default was their failure to have maintained individualized audited statements because they "absolutely could not" obtain their own financing given the interrelated nature of the TOUSA enterprise. [*Id.* at 1877:5–1879:16].

**\*17** Because of these considerations, the TOUSA Board, including five outside directors, unanimously approved the Transeastern Settlement. [*Id.* at 189:21–190:2, 248:18–250:18].[FN36] Paul Berkowitz, who signed corporate resolutions consenting to the Transeastern Settlement on behalf of the Conveying Subsidiaries, testified that he "thought the transaction was in the best interest of the company as a whole and each of the its subsidiaries," and that he believed that the subsidiaries "benefitted" from the transaction. [*Id.* at 1592:12–24, 1692:4–5, 1718:10–1719:22 ("I believed it was benefitting the organization as a whole.") ]. The former TOUSA Executive Vice President and CFO confirmed that when he signed the resolutions approving the July 31 Transaction, he felt that "what would benefit TOUSA, Inc., would also benefit the subsidiaries, given out structure and how we operated the business." [*Id.* at 528:19–21].

The Bankruptcy Court also spent significant time during the bench trial to consider arguments concerning the solvency of TOUSA and its subsidiaries as it related to the Committee's claims against the First and Second Lien Term Lenders. Accordingly, the Parties relied heavily on expert witness

testimony concerning the valuation of TOUSA and its subsidiaries with the Committee's witnesses coming to very different conclusions than the Defendants' witnesses. The Defendants filed pre-trial *Daubert* motions to exclude the expert testimony as to two of the Committee's key expert witnesses on these issues—Charles A. Hewlett and William Q. Derrough—which the Bankruptcy Court denied. [Bankr.ECF Nos. 387, 392, 397–98, 474; *see also* Op., pp. 67, 132–34, 182].[FN37]

### G. The Bankruptcy Court Order & Post–Order Proceedings

Following the bench trial, the Bankruptcy Court ordered the Parties to submit post-trial submissions in the form of Proposed Findings of Fact and Conclusions of Law. On October 30, 2009, the Bankruptcy Court issued its Order,[FN38] holding in the Committee's favor on all of its claims. Specifically, it held that (1) the obligations incurred by the Conveying Subsidiaries to the First and Second Lien Lenders, and the Liens transferred to secure those obligations, could be avoided pursuant to 11 U.S.C. §§ 544 and 548; (2) the Senior Transeastern lenders were entities "for whose benefit" the improper transfer was made; and (3) the transfer of more than $421 million to the Senior Transeastern Lenders could also be avoided pursuant to Sections 544 and 548. [Op., p. 171].

As the Order relates to the Transeastern Lenders, the Bankruptcy Court found that the Conveying Subsidiaries did not receive reasonably equivalent value in exchange for the obligations they obtained by pledging their assets to the New Lenders. [*Id.* at 104]. To the extent the Conveying Subsidiaries received "any value at all, it was minimal and did not come anywhere near the $403 million of obligations they incurred." [*Id.* at 105]. The Conveying Subsidiaries received no "direct benefits" because "the money was transferred by the lenders to Universal Land Title, Inc." [*Id.*]. It also found that the Conveying Subsidiaries received "minimal indirect benefits" because the "July 31 Transaction did not in fact prevent the bankruptcy

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

of the parent company" and because "the Conveying Subsidiaries would not have been seriously harmed by such an earlier bankruptcy." [*Id.* at 108–09]. As for the danger presented by defaulted bonds, the Bankruptcy Court noted:

**\*18** [One of the Committee experts, William Q. Derrough] testified, based on his experience with similar situations, that the Conveying Subsidiaries could have come to an accord with the bondholders, possibly by obtaining their own financing to refinance the bonds, which would have allowed them to continue as going concerns despite the default. [Another Committee expert, Charles A. Hewlett], confirmed, based on his particular experience with the real-estate industry, that the Conveying Subsidiaries—which held some 95% of TOUSA's assets—could have obtained their own financing even if the parent were in bankruptcy.

[*Id.* at 109].

In response to arguments regarding the dangers faced by the Conveying Subsidiaries about defaulting under the Revolver, the Bankruptcy Court found "no reason to believe that the Conveying Subsidiaries could not have dealt with a possible Revolver default by transitioning to an alternative source of financing." [*Id.* at 111]. It further found that the New Lenders and the Transeastern Lenders did not act in good faith and were grossly negligent when they engaged in the July 31 Transaction on the basis that there was "overwhelming evidence that TOUSA was financially distressed." [*Id.* at 116–17].

The Bankruptcy Court held that under the language of 11 U.S.C. § 548(a)(1)(B)(I),

an "indirect benefit" is cognizable only if three requirements are satisfied. First, the benefit must be received, even if indirectly, by "the debtor," *i.e.,* by an individual Conveying Subsidiary.... Second, any purported "indirect benefits" defense must also be limited to cognizable "value." ...

Since this case does not concern the satisfaction of the debt of any Conveying Subsidiary, "property" received by a Conveying Subsidiary is the only value that is relevant here. Third, properly must have been received by a Conveying Subsidiary "in exchange for" the transfer of obligation.

[*Id.* at 146–47].

It went on to define "property" according to WEBSTER'S DICTIONARY as "some kind of enforceable entitlement to some tangible or intangible article." [*Id.* at 148 n. 55].

The Bankruptcy Court further held that the Transeastern Lenders were entities "for whose benefit the transfer was made" under 11 U.S.C. § 550(a)(1). It held that payment to them in order to extinguish the Transeastern debt was a fraudulent transfer, and it rejected their defenses of recoupment and good faith. [*Id.* at 151–63].

The Bankruptcy Court also adopted the same remedy scheme proposed by the Committee. It ordered the disgorgement of $403 million in principal amount of the total funds paid to the Transeastern Lenders and further held that the Transeastern Lenders would have to pay prejudgment interest on the full amount of that disgorgement. [*Id.* at 177]. The Bankruptcy Court justified this remedy on the basis that "a complete recovery from only one set of Defendants ... would mean that the other set of Defendants would retain the benefits obtained in the avoided transfer. In effect, one set of Defendants would obtain a windfall, at the expense of the other set of Defendants." [*Id.* at 176].

**\*19** Following the Order, the Defendants moved the Bankruptcy Court to stay proceedings pending appeals. [Bankr.ECF Nos. 666, 669, 671]. On October 30, 2010, the Bankruptcy Court granted the stays conditioned on the Defendants posting nearly $700 million in bonds or cash. [Bankr.ECF No. 723]. The Transeastern Lenders' aggregate

bond amount was $531,182,705. [*Id.* at 8]. On May 28, 2010, the Bankruptcy Court entered an order changing the judgment against the Transeastern Lenders to extend the date through which prejudgment interest would accrue from October 13, 2009 to May 28, 2010, and it simultaneously entered final judgment directing the disgorgement of specific amounts of money from certain Defendants. [Bankr.ECF Nos. 985, 986]. The Transeastern Lenders assert that this seven-and-a-half month extension increased the prejudgment interest award against them by nearly $23 million. [ECF No. 18 in Case No. 10–61478].

## III. THE NATURE OF THESE APPEALS

In the instant primary appeal proceeding concerning liability (Case No. 10–60017), the Transeastern Lenders present the following questions:

• Whether the Transeastern Lenders can be compelled to disgorge to the Conveying Subsidiaries funds paid by TOUSA to satisfy a legitimate, uncontested debt, where the Conveying Subsidiaries did not control the transferred funds.

• Whether the Transeastern Lenders are liable for disgorgement as the entities "for whose benefit" the Conveying Subsidiaries transferred the Liens to the New Lenders, where the Transeastern Lenders received no direct and immediate benefit from the Lien Transfer.[FN39]

[Transeastern Lenders' Br., p. 5].

In addition, the Transeastern Lenders challenge several of the Bankruptcy Court's pretrial orders and orders following its findings of liability. In particular, the Transeastern Lenders appeal the following orders: (1) Order Granting the Debtor's Motions to Strike their Counterclaim and Third Party Complaint; (2) Order Granting the Committee's Motion for Summary Judgment on the Defendant's Affirmative Defenses of Substantive Consolidation, Single Business Enterprise, and Alter Ego; (3) Order Granting in Part the Committee's Motion to Set

Payment Amounts as Against the Senior Transeastern Lenders; and (4) Order Granting Final Judgment on Counts VII–XVIII of the Third Amended Complaint. [Bankr.ECF Nos. 508, 513, 985, 986].

A subset of the First Lien Term Lenders also filed a Motion to Intervene in these proceedings, which I have granted. [ECF Nos. 74, 109 in Case No. 10–60017]. The Intervenors present the following three issues for appeal:

• Whether the Bankruptcy Court had jurisdiction to order the distribution of property of the estate recovered from a defendant in an action for fraudulent conveyance under Section 548 of the Bankruptcy Code.

• Whether the Bankruptcy Court had the power under the Bankruptcy Code to order distribution of property of the estate to the Term Lenders as equitable credit for the hundreds of millions of dollars they had previously transferred to the estates.

**\*20** • Whether the Bankruptcy Code's remedial scheme relies on a clear error of judgment or erroneous legal standard sufficient to qualify as an abuse of discretion.

[Intervenor's Br., p. 5].

Because I reverse the Bankruptcy Court on the issue of liability as to the Transeastern Lenders, I need not address the issues raised on appeal as they relate to remedies. [Transeastern Reply Br., p. 23 n. 29 ("If this Court reverses the bankruptcy court's findings of liability against the Transeastern Lenders, it need not consider the issues relating to remedies.") ].[FN40] Likewise, by reversing the Bankruptcy Court's Order in all aspects as it relates to the liability of the Transeastern Lenders, this Order also renders the Transeastern Lenders' appeals concerning the Bankruptcy Court's pretrial orders also moot.[FN41]

For these reasons, I confine my analysis to the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

first two issues raised by the Transeastern Lenders, namely (1) whether the Transeastern Lenders can be compelled to disgorge to the Conveying Subsidiaries funds paid by TOUSA to satisfy a legitimate, uncontested debt, where the Conveying Subsidiaries did not control the transferred funds, and (2) whether the Transeastern Lenders are liable for disgorgement as the entities "for whose benefit" the Conveying Subsidiaries transferred the Liens to the New Lenders, where the Transeastern Lenders received no direct and immediate benefit from the Lien Transfer. As discussed in more detail below, I answer both of these questions in the negative.

### IV. LEGAL STANDARD

[1] In bankruptcy appeals, a district court conducts a *de novo* review of the bankruptcy court's legal determinations. *Trusted Net Media Holdings, LLC v. The Morrison Agency, Inc. (In re Trusted Net Media Holdings, LLC),* 550 F.3d 1035, 1038 n. 2 (11th Cir.2008); *Cohen v. United States,* 191 B.R. 482, 484 (Bankr.S.D.Fla.1995). This includes "conclusions regarding the legal significance accorded to the facts." *Cohen,* 191 B.R. at 484.

[2][3] In contrast, district courts apply the "clearly erroneous" standard of review on a bankruptcy court's findings of fact. FED. R. BANKR.P. 8013; *Trusted Net Media,* 550 F.3d at 1038 n. 2. The "clearly erroneous" standard requires reversal "when the record lacks substantial evidence to support [the factual findings] such that an appellate court's review of the evidence results in a firm conviction that a mistake has been made." *Blohm v. Comm'r,* 994 F.2d 1542, 1548 (11th Cir.1993). Whether a transfer was made for reasonably equivalent value is generally a question of fact to be reviewed under the "clearly erroneous" standard. *Nordberg v. Arab Banking Corp. (In re Chase & Sanborn Corp.),* 904 F.2d 588, 594 (11th Cir.1990); 2 COLLIER BANKRUPTCY MANUAL ¶ 548.05[1][b], at 548–18 (Henry J. Sommer & Lawrence P. King, 3d ed. rev. 2002).

This case presents a distinct issue on appeal because the Bankruptcy Court's Order is practically a verbatim adoption of the Committee's Proposed Findings of Fact and Conclusions of Law submitted after the trial. As the Appellants have pointed out, "of the Committee's 448 proposed findings and conclusions, the Bankruptcy Court adopted 446 in whole or in part, while adopting *none* of the defendants' over 1,600 proposed findings.... The Bankruptcy Court also added approximately 10 new paragraphs and removed a few of the Committee's footnotes." [First Lien Br., p. 23 & n. 21 (emphasis in original) ].

**\*21** The Appellants have submitted "redline" comparisons between the Committee's Proposed Findings of Fact and Conclusions of Law and the Bankruptcy Court's Order, which demonstrate that "[o]f the more than 53,000 words in the Decision, approximately 92% directly overlap with the Proposed Findings." [2d Lien Reply Br., p. 2 n. 3]. Even though the Bankruptcy Court had a Joint Stipulation of Facts from the Parties that it could have relied on in its Order, it chose instead to adopt the facts submitted by the Committee. [Bankr.ECF No. 542; Op., pp. 1–128; *see also* Transeastern Lenders' Br., p. 53 ("The Defendants collectively submitted over 500 pages of post-trial submissions, yet *not a single* case, exhibit or other piece of evidence cited by them appears in the Opinion unless and to the extent it was also cited by the Committee.") (emphasis in original) ].

[4] The "clearly erroneous" standard of review for factual findings is relaxed in circumstances where a lower court adopted one party's proposed order verbatim. *Amstar Corp. v. Domino's Pizza, Inc.,* 615 F.2d 252, 258 (5th Cir.1980). This practice has been heavily criticized and discouraged by the U.S. Supreme Court and by the Eleventh Circuit. *See, e.g., Anderson v. Bessemer City,* 470 U.S. 564, 572, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985) ("We, too, have criticized courts for their verbatim adoption of findings of fact prepared by the prevailing parties...."); *United States v. El Paso Nat'l Gas Co.,* 376 U.S. 651, 656 n. 4, 84 S.Ct. 1044, 12 L.Ed.2d 12 (1964) ("Many courts simply decide the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

case in favor of the plaintiff or the defendant, have him prepare the findings of fact and conclusions of law and sign them. This has been denounced by every court of appeals save one. This is an abandonment of the duty and the trust that has been placed in the judge by these rules. It is a noncompliance with Rule 52 specifically and it betrays the primary purpose of Rule 52—the primary purpose being that the preparation of these findings by the judge shall assist in the adjudication of the lawsuit. I suggest to you strongly that you avoid as far as you possibly can signing what some lawyer puts under your nose. These lawyers, and properly so, in their zeal and advocacy and their enthusiasm are going to state the case for their side in these findings as strongly as they possibly can. When these findings get to the courts of appeals they won't be worth the paper they are written on as far as assisting the court of appeals in determining why the judge decided the case.") (citing J. SKELLY WRIGHT, SEMINARS FOR NEWLY APPOINTED UNITED STATES DISTRICT JUDGES 166 (1963)); *Chudasama v. Mazda Motor Corp.,* 123 F.3d 1353, 1373 & n. 46 (11th Cir.1997) ("frowning upon" bankruptcy court for issuing order with verbatim adoption of one party's findings and ordering case to be re-assigned on remand because of "utter lack of an appearance of impartiality" that "belie[s] the appearance of justice to the average observer"); *Colony Square Co. v. Prudential Ins. Co. of Am. (In re Colony Square Co.),* 819 F.2d 272, 274–76 (11th Cir.1987) ("The dangers inherent in litigants ghostwriting opinions are readily apparent.... The quality of judicial decisionmaking suffers when a judge delegates the drafting of orders to a party; the writing process requires a judge to wrestle with the difficult issues before him and thereby leads to stronger, sounder judicial rulings."); *see also S. Pac. Commc'n Co. v. AT & T Co.,* 740 F.2d 980, 995 (D.C.Cir.1984) (discussing the practice of "extensively copying the proposed findings of fact and conclusions of law prepared by counsel" and stating that "[c]onfidence in the integrity of the judicial process inevitably suffers when judges succumb wholesale to this practice").

**\*22** [5] It is also well-established that when the factual record allows but one "resolution of the factual issue," remand is unnecessary. *Pullman–Standard v. Swint,* 456 U.S. 273, 292, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982) ( "[W]here findings are infirm because of an erroneous view of the law, a remand is the proper course unless the record permits only one resolution of the factual issue."); *Media Servs. Grp., Inc. v. Bay Cities Commc'n, Inc.,* 237 F.3d 1326, 1330 (11th Cir.2001) (same); *Nix v. WLCY Radio/Rahall Commc'ns,* 738 F.2d 1181, 1187 (11th Cir.1984) (same); *see also Reynolds v. Giuliani,* 506 F.3d 183, 197 (2d Cir.2007) (same); *S. Indus. of Clover, Ltd. v. Kattan,* 148 Fed.Appx. 5, 7 (2d Cir.2005) (same); *United States. v. Microsoft Corp.,* 253 F.3d 34, 94 (D.C.Cir.2001) (same).

**V. DISCUSSION**

The Transeastern Lenders were paid an outstanding debt by the party that owed it. As acknowledged at oral argument, "there was no dispute in this litigation that the amounts paid by TOUSA to the Transeastern Lenders, were, in fact, owed," and "[n]obody has contended that the guarantees [on the Revolver debt] weren't valid obligations of TOUSA that arose to at least the level that was paid." [Appeal Hr'g Tr. 20:23–21:2]. Because TOUSA entered bankruptcy more than ninety days after payment, the payment is not an "avoidable preference" under 11 U.S.C. § 547(b)(4)(A), and the Bankruptcy Court did not conclude that it was. Instead, the Bankruptcy Court concluded the payment was a "fraudulent transfer" under § 548.

Section 548 authorizes avoidance of "fraudulent transfers," defined to include—as relevant here—the transfer "of an interest of the debtor in property" if the debtor "received less than a reasonably equivalent value in exchange for such transfer," and "was insolvent on the date that such transfer was made." § 548(a)(1). In arguing to the Bankruptcy Court, the Committee lumped all Appellees together under the "fraudulent transfer" umbrella, although this case actually involved different trans-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

fers involving different parties with different legal implications. It is undisputed that TOUSA's repayment to the Transeastern Lenders was made in one of a series of multi-party transactions that took place on July 31, 2007. Those transactions involved three distinct asset transfers:

1. TOUSA caused certain of the Conveying Subsidiaries to convey the liens on their real property assets and become obligated to a collection of financial entities referred here as the New Lenders.

2. In exchange for the liens and the obligations, the New Lenders loaned funds and provided credit facilities, the New Loans, to TOUSA; and

3. TOUSA used the funds from the New Lenders in part to satisfy its $421 million debt to the Transeastern Lenders.

The Bankruptcy Court found the Transeastern Lenders liable under Section 548 on *two* different bases of liability, *for two distinct fraudulent transfers:* (1) as direct transferees of the New Loan proceeds paid in satisfaction of a valid antecedent debt; and (2) as entities "for whose benefit" the Conveying Subsidiaries transferred the liens to the New Lenders. In essence, the Bankruptcy Court found that the Conveying Subsidiaries had a property interest in the New Loan proceeds that TOUSA transferred to the Transeastern Lenders, received only minimal value in exchange for relinquishing that property, and were insolvent. Accordingly, the Bankruptcy Court voided the entire transfer and ordered the Transeastern Lenders to disgorge the funds received in satisfaction of the undisputed debt they were owed. [Op., p. 180–81]. The Bankruptcy Court's Opinion adopted both of the Committee's theories of liability in the same language used in the Committee's post-trial papers with only the barest of word changes, and without attempting to harmonize these two mutually exclusive theories.

**A. The Bankruptcy Court's "Direct Transferee" Theory of the Transeastern Lender's Liability Is**

**Legally Incorrect**

**\*23** Addressing the "direct transferee" theory of liability, the Transeastern Lenders argue that the Conveying Subsidiaries did not have a property interest in the New Lenders' loan proceeds because they had no control over those proceeds, and even if they did have a minimal interest—as the Bankruptcy Court concluded—the benefits they received from the debt repayment were reasonably equivalent in value to that minimal interest.

[6] The Transeastern Lenders correctly point out that Section 548 applies only to a transfer "of an interest *of the debtor* in property." 11 U.S.C. § 548(a)(1). The threshold question under this provision is whether each transfer was in fact property of the debtor. *United States v. Kapila,* 402 B.R. 56, 60 (S.D.Fla.2008) (discussing how § 548 requires the trustee to show a transfer of an interest *of the debtor* in property). For purposes of Section 548, the fraudulent conveyance claimed against the Transeastern Lenders applied only to "property" the Conveying Subsidiaries had in the New Loan proceeds which were transferred by TOUSA to the Transeastern Lenders in settlement of the antecedent debt.

The Transeastern Lenders contend on appeal that the Conveying Subsidiaries never had any property interest in the New Loan proceeds, and thus transferred nothing to the Transeastern Lenders. They are correct as a matter of law based on the undisputed record below. The Bankruptcy Court could not find that the Conveying Subsidiaries received the proceeds of the New Loans, or had power to distribute them, or designate who would receive the loan proceeds. The factual record establishes without contradiction that the power lay *exclusively* with TOUSA, as the New Loan Agreements expressly provided.

Without any factual dispute in the record, both the First and Second Lien Term Loan Agreements directed that the proceeds of the New Loans be used to satisfy the Transeastern Settlement. Specifically, Section 4.12 of the agreements required

the proceeds of the loans to be used to fund the "Acquisition," defined as "the contribution by the 'Administrative Borrower' [TOUSA] to the Transeastern JV Entities of an amount necessary to discharge all amounts of outstanding indebtedness of the Transeastern JV Entities." [Trial. Exh. 360 §§ 1.1, 4.12]. Under the totality of the circumstances, the Bankruptcy Court's findings and legal conclusions were neither "logical" nor "consistent with the equitable concepts underlying bankruptcy law." *Nordberg v. Societe Generale (In re Chase & Sanborn Corp.),* 848 F.2d 1196, 1199 (11th Cir.1988).

The Eleventh Circuit has made clear that "our court adopted the control test to determine whether a debtor had possession of property allegedly recoverable under section 548." *Id.* Referring to its earlier ruling in *Nordberg v. Sanchez (In re Chase & Sanborn Corp.),* 813 F.2d 1177 (11th Cir.1987), the court stated: "We agree that *In re Chase & Sanborn Corp.,* establishes a general framework for analysis that can be utilized in this case." *In re Chase & Sanborn Corp., 848 F.2d at 1199.* The court noted that the issue which troubled it was not whether the property in question went to the alleged transferee, but whether it came *from* the debtor, the alleged transferor. *Id.* It ruled "that the trustee could not recover the funds because, '[a]lthough the debtor corporation had possession of the funds in controversy by virtue of the transfer to the account, *the record demonstrates that the debtor corporation did not have sufficient control over the funds to warrant a finding that the funds were the debtor corporation's property.'" Id.* (emphasis added). The Eleventh Circuit explained that "the test articulated by our court is a very flexible, pragmatic one; in deciding whether debtors had controlled property subsequently sought by their trustees, courts must look beyond the particular transfers in questions to the entire circumstances of the transaction." *Id.* (citing *In re Chase & Sanborn Corp.,* 813 F.2d at 1181–82) (internal quotation marks omitted).

**\*24** In the earlier *Chase* decision, the Eleventh

Circuit held that a transfer is avoidable under Section 548 *only* if the debtor exercised *actual control* over the property transferred. *In re Chase & Sanborn Corp.,* 813 F.2d at 1181–82 ("For these reasons, we conclude that where a transfer to a noncreditor is challenged as fraudulent, more is necessary to establish the debtor's control over the funds than the simple fact that a third party placed the funds in an account of the debtor with no express restrictions on their use. In determining whether the debtor had control of funds transferred to a noncreditor, the court must look beyond the particular transfers in question to the entire circumstance of the transactions."). The rationale was that, without the requisite control, the subject property could not have been used by the debtor to pay another creditor, and the transfer thus did not decrease the value of the debtor's estate.

[7][8][9] The Eleventh Circuit's control test encompasses two elements: (1) the power to designate which party will receive the funds, and (2) the power to actually disburse the funds at issue to that party. In other words, control means control over identifying the payee, and control over whether the payee will actually be paid. *Tolz v. Barnett Bank of S. Fla. (In re Safe–T–Brake of S. Fla., Inc.),* 162 B.R. 359, 365 (Bankr.S.D.Fla.1993). In determining the totality of the circumstances, control does not exist where the loan from the third party was conditioned on payment to a particular creditor. *Howdeshell of Ft. Myers v. Dunham–Bush, Inc. (In re Howdeshell of Fort Myers),* 55 B.R. 470, 474–75 (Bankr.M.D.Fla.1985).

The Bankruptcy Court erred by failing to apply the Eleventh Circuit's control test to the totality of the circumstances as established by the actual documents governing the transactions. Rather, it dismissed the test, expressly rejecting as "clearly wrong" the proposition that "control" is an essential element of any property interest under Section 548. [Op., p. 157]. The Bankruptcy Court expressed the view that a control test "would negate the paradigmatic example of a fraudulent transfer, in which the

owner of an insolvent corporation transfers corporate funds to a personal account for his personal use" because the owner's *de facto* control over the funds cannot vitiate the corporation's control over, and property interest in, the funds. [*Id.* at 158].

The Bankruptcy Court compounded its error in not applying the "control test" by relying on the Bankruptcy Code's definition of "transfer" and fraudulent transfers as including "involuntary" and "indirect transfers." [*Id.* (citing 11 U.S.C. §§ 101(54)(D), 548(a)(1)) ]. According to the court, "[t]hese definitions leave no doubt that a debtor may own property even if the debtor has no power to prevent some other party from transferring the property." [*Id.*]. The Bankruptcy Court is legally incorrect in its interpretation, and further incorrect in concluding that the Conveying Subsidiaries had a property interest sufficient for the Code requirements because they were co-borrowers on the New Loans. [*Id.* at 156]. The Bankruptcy Court reasoned that "each of the co-borrowers has a property interest in the funds," because if that were not true, then the "property would belong to no one." *Id.* (quoting *United States v. Craft,* 535 U.S. 274, 285, 122 S.Ct. 1414, 152 L.Ed.2d 437 (2002) (internal quotation marks omitted)). [FN42]

**\*25** Here, the circumstances of the transactions clearly demonstrate that the Conveying Subsidiaries did not control the funds transferred to TOUSA. The record on appeal establishes without contradiction that the property involved did belong to someone, *i.e.,* TOUSA, who, as the primary borrower, was the only party with actual authority under the New Loan documents to control the loan proceeds' distribution. The New Loans made this clear in specifying that proceeds were to be used in satisfying the Transeastern Settlement. TOUSA's Executive Vice President and Chief of Staff confirmed the same:

> Q Now, is it your understanding that the conveying subsidiaries had any control over where the funds that were lent from Citibank actually went?

> A No. I mean this was a corporate decision.

> Q And is it also accurate to say that the funds could not have been used by the conveying subs for any purpose other than funding the settlement? Is that right?

> A No, they had no control over them.

> [Bankr.Hr'g Tr. 1711:22–1712:7].

Without dispute, the Conveying Subsidiaries lacked any right to retain the New Loans in their estates, and clearly the funds were not intended to pay off any debt of the Conveying Subsidiaries.

The eventual use of the New Loan Proceeds was to repay the earlier Transeastern Loans incurred by TOUSA and owed as a valid, antecedent debt to the Transeastern Lenders. The transfer was part of a larger, complicated scheme involving numerous entities. In this context, there was no payment of funds to the Conveying Subsidiaries, and they could not use the funds for their own purposes. The overwhelming evidence was that TOUSA, and not the Conveying Subsidiaries, controlled the transfer at issue. *See In re Chase & Sanborn,* 813 F.2d at 1182 (finding no control by the debtor under similar circumstances). Accordingly, I conclude that the funds were not the property of the debtor and the transfer is not avoidable under a "direct transfer" theory. To conclude otherwise would confer on the Committee a windfall at the expense of a valid antecedent lender who was innocent of any intent to diminish the assets of the debtor. *See id.*

In its Appeal Brief, the Committee offered no substantive response to the Transeastern Lenders' position that the Conveying Subsidiaries never had any property interest in the New Loan proceeds, and thus transferred nothing to the Transeastern Lenders. Indeed, the Committee conceded in its brief:

> The Conveying Subsidiaries did not directly receive any of the borrowed funds, as the credit agreements expressly required that the funds be

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

paid out to settle the Transeastern litigation against their parent. Rather than going to the Conveying Subsidiaries, the money was transferred by the lenders to Universal Land Title, Inc. (which is a TOUSA subsidiary, but not one of the Conveying Subsidiaries) which disbursed the funds to the various parties to the settlements.

[Committee's Br., p. 94 (citing Op., p. 105) ].

**\*26** The Transeastern Lenders claim in their Reply Brief that the Committee has abandoned its first theory of liability. The Appellants state this "retreat" undermines the Bankruptcy Court's adoption of the Committee's position "as if the bankruptcy court's opinion—drafted by the Committee—did not even make such a ruling." [Transeastern Reply Br., p. 1]. At oral argument, the Committee stated that it had not abandoned its argument, although it conceded it did not spend "a lot of time trying to justify [this] alternative ground." [Appeal Hr'g Tr. 92:20–22]. Instead, the Committee urges consideration of its main argument in support of the Bankruptcy Court's ruling that the Transeastern Lenders are the entities "for whose benefit" the Conveying Subsidiaries transferred the Liens to the New Lenders. While I find merit in the Transeastern Lenders' position that the Committee has abandoned its first theory, I need not decide the issue on this basis alone. This is because I already have concluded that the Bankruptcy Court committed clear error by incorrectly applying the Eleventh Circuit's "control test" to the totality of the circumstances and finding that the Conveying Subsidiaries lacked the requisite property interest in the New Loan proceeds.

However, before turning to the Committee's "for whose benefit" theory of liability, I still must consider the Transeastern Lenders' alternative position that even assuming the Conveying Subsidiaries had an interest in the New Loan proceeds, there is still no Section 548 liability because it is clearly erroneous that the Conveying Subsidiaries did not receive reasonably equivalent value in exchange for the transfer of that interest. This issue raises sub-

stantial arguments which overlap with positions taken by the First and Second Term Lenders on appeal.

**B. The Bankruptcy Court Committed Clear Error, and Legally Erred, in Finding No Reasonably Equivalent Value for Any Direct Transfer of the Conveying Subsidiaries' Interest in the New Loan Proceeds to the Transeastern Lenders or in the Transfer of the Liens to the First and Second Lien Holders**

[10] Section 548 of the Bankruptcy Code *excludes* avoidance of any transfers made of an interest of the debtor in property that was incurred on or within two years before the date of the filing of the petition, *if the debtor "received less than a reasonably equivalent value in exchange for such transfer or obligation."* 11 U.S.C. § 548(a)(1)(B)(i) -(ii) (emphasis added). Under Section 548(a)(1), the party alleging a fraudulent transfer bears the burden of proving that the debtor did not receive reasonably equivalent value in exchange for the property transferred and obligations incurred. *See In re Chase & Sanborn Corp., 904 F.2d at 593–94* ("The burden of proving lack of 'reasonably equivalent value' under 11 U.S.C.A. § 548(a)(2)(A) rests on the trustee challenging the transfer."). I conclude that the Bankruptcy Court erred in finding that the Committee had met its burden applying both a *de novo* and clear error standard of review.

**i. The Bankruptcy Court Erred by Not Finding Reasonably Equivalent Value When It Found that the Conveying Subsidiaries Had a Property Interest in the Proceeds of the Term Loans, and, Alternatively, by Not Measuring "Reasonable Equivalent Value" Against the Conveying Subsidiaries' So–Called "Minimal Interest" in the Loan Proceeds**

**\*27** The Bankruptcy Court held that "the Conveying Subsidiaries had a property interest in the loan proceeds ... but the *value* of that property interest to the Conveying Subsidiaries was *minimal* because they had been forced to enter into a contractual commitment that the borrowed funds would

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

be paid to others, principally the Senior Transeastern Lenders." [Op., p. 159 (emphasis added) ]. The Bankruptcy Court further held that "the Conveying Subsidiaries did not receive reasonably equivalent value in exchange for the transfer [and] ... did not receive either 'property' or the 'satisfaction of securing of a present or antecedent debt *of the debtor.* ' " [*Id.* (citing 11 U.S.C. § 548(d)(2)(A)) (emphasis added) ]. The Bankruptcy Court then stated:

> Because Plaintiff demonstrated the absence of any direct benefits to the Conveying Subsidiaries, the Senior Transeastern Lenders had the burden of producing evidence that the Conveying Subsidiaries received "indirect" benefits that were tangible and concrete, and to quantify their value with reasonable precision. The Senior Transeastern Lenders failed to produce such evidence. However, regardless of which party had the burden of producing evidence of indirect benefits, the evidence taken as a whole clearly established that there were no significant indirect benefits.... [T]he Conveying Subsidiaries did not receive reasonably equivalent value in exchange for the transfer to the Senior Transeastern Lenders.

[*Id.* at 159–60].

To begin with, it is difficult to reconcile the Bankruptcy Court's holding that the "Conveying Subsidiaries did not receive any *direct benefits* in exchange for the value they gave up in the July 31 Transaction because they received none of the proceeds of the loans they became obligated to repay," [*Id.* at 105], with the further parallel holding in connection with the Transeastern Claims that the Conveying Subsidiaries actually *did* receive the proceeds of the loans they became obligated to repay. [ *Id.* at 155–56]. In particular, observing that the Conveying Subsidiaries were co-borrowers of the Term Loans, the Bankruptcy Court held, "[i]f the funds are lent to co-borrowers (rather than to a single borrower), each of the co-borrowers had a property interest in the funds." [*Id.*]. The Bankruptcy Court further observed that "[t]here can be

no serious doubt that if the Conveying Subsidiaries had retained the borrowed funds ... those funds would have been included within the debtors' estate when the petition was filed." [*Id.* at 155].

[11] Given the Bankruptcy Court's express finding that the "Conveying Subsidiaries had a property interest in the loan proceeds," [*Id.* at 159], it was error to conclude that reasonably equivalent value did not exist as a matter of law. To avoid this result, the Bankruptcy Court reasoned that the "value of that property interest to the Conveying Subsidiaries was *minimal* because they had been *forced* to enter into a contractual commitment that the borrowed funds would be paid to others, principally to the Senior Transeastern Lenders." [*Id.* at 159 (emphasis added) ]. But given the finding that there was a property interest, the *use* of the proceeds is irrelevant under the statute. *Beemer v. Heller & Co. (In re Holly Hill Med. Ctr., Inc.),* 44 B.R. 253, 256 (Bankr.M.D.Fla.1984) ("The criterion for whether a debtor received reasonably equivalent value cannot in any instance be whether the debtor used sound judgment in exploiting what it received to the best advantage.... Whether borrowed money is used brilliantly or wasted by the recipient does not inflate or reduce its value from the lender's standpoint....").

**\*28** Furthermore, the record fails to establish that the Conveying Subsidiaries were "forced" to do anything, in that the Board of Directors of each Conveying Subsidiary—all of which had directors that were not on the TOUSA Parent board—approved the use of the loan proceeds to fund the Transeastern Settlement because they concluded that the settlement was in the best interests of the TOUSA enterprise. As TOUSA's Executive Vice President and Chief of Staff testified during the bench trial:

> Q Now, in signing those resolutions—we are going to get back to the resolutions themselves—but in signing those resolutions, did you conclude that the transaction was in the best interest of each of those subsidiaries?

A Yes, I thought the transaction was in the best interest of the company as a whole and each of its subsidiaries.

Q And you believed that the financing that was associated with the transaction was in the best interest of each of the subsidiaries; is that right?

A Yes, sir.

Q And is it your belief that each of the TOUSA subsidiaries benefitted from the transaction?

A Yes, sir.

[Bankr.Hr'g Tr. 1718:10–1719:22; *see also id.* at 527:1–29:25, 1592:1–25; Trial Exhs. 374–76, 501–31, 2163 (resolutions or consents approving the July 31 Transaction on behalf of the Conveying Subsidiaries as co-borrowers)]

[12] If the Conveying Subsidiaries did receive a property interest, and a direct benefit from the transfer of the full New Loan proceeds as a result, the analysis need not go further. But assuming that the Bankruptcy Court was correct that the *use* of the proceeds was relevant, it is necessary to next consider whether, as claimed by the Senior Transeastern Lenders, the Bankruptcy Court erred by comparing *the total value of the loan proceeds* —rather than the Conveying Subsidiaries' "minimal" interest therein—to the benefits received by the Conveying Subsidiaries. Specifically, the Bankruptcy Court decided that to the extent the Conveying Subsidiaries received any value at all, it was *minimal* and did not come anywhere near the $403 million of obligations they incurred collectively. [Op., p. 105].

[13] In essence, the Transeastern Lenders argue with merit that if the value of the property interest transferred from the Conveying Subsidiaries to the Transeastern Lenders was "minimal," then the measure of reasonably equivalent value must be whether the Conveying Subsidiaries received "minimal" value in return. This is because reasonably equivalent value must be measured in terms of

the value of the *debtors' interest in the property conveyed. See Kittay v. Peter D. Leibowits Co., Inc. (In re Duke & Benedict, Inc.),* 265 B.R. 524, 531 (Bankr.S.D.N.Y.2001) (noting that the relevant inquiry for analyzing reasonably equivalent value is not "the value of the property that was conveyed, but the value of the *debtor's interest in the property conveyed* " (emphasis added)). Accordingly, the Transeastern Lenders argue that *the bar, for purposes of "reasonably equivalent value" is lower* as to them than as to the First and Second Lien Lenders because the Transeastern Lenders had received property from the Conveying Subsidiaries that was of "minimal" value. [Appeal Hr'g Tr. 107:19–21 ("You said it exactly right. Wherever their bar is, ours is much lower. That's what we're saying, and so we accept all of their arguments.") ]. It follows that if the Transeastern Lenders received valuable property from the Conveying Subsidiaries, then the value of this very same property could not have been deemed "minimal" when it was previously transferred from the New Lenders to the Conveying Subsidiaries as part of the July 31 Transaction.

**\*29** But even assuming the Bankruptcy Court further erred in not measuring "reasonably equivalent value" correctly as to the Transeastern Lenders (in terms of the transfer of the loan proceeds to the Transeastern Lenders), this does not end the inquiry. This is because the Bankruptcy Court further found the Transeastern Lenders liable for the transfer of the Liens to the New Lenders under Section 550 of the Bankruptcy Code as being the "entity for whose benefit such transfer was made." [Op., p. 151]. Thus, the Transeastern Lenders still could be liable under Section 550 unless the Conveying Subsidiaries also received "reasonably equivalent value" *in exchange for the transfer of the Liens to the New Lenders.* At oral argument, the Transeastern Lenders acknowledged that, absent other circumstances, Section 550 could be triggered if the Lien Transfer was avoided as to the New Lenders, even if the Transeastern Lenders did not engage in a fraudulent transfer themselves. [Appeal

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Hr'g Tr. 109:21–23 (Mr. Leblanc: "Your Honor, there are circumstances, to be sure, where you are a direct recipient of a transfer where there still can be liability under 550.") ].

Therefore, there is reason to examine the "reasonably equivalent value" issue in depth. Regardless if the bar is lower or is the same as between the Transeastern Lenders and the New Lenders, *if* the Conveying Subsidiaries received a reasonably equivalent value in exchange for each such transfer, there is *no* fraudulent transfer for Section 548 purposes. If there is no fraudulent transfer under Section 548, then the condition precedent to 11 U.S.C. § 550(a) is not met, and the Bankruptcy Court erred for this reason alone in finding the Transeastern Lenders liable for disgorgement under Section 550(a) as "the entity for whose benefit" such transfer (*i.e.,* the transfer of liens or New Loan proceeds) was made. [Appeal Hr'g Tr. 111:10–21 ("[I]f it's determined that the First and Second Lien Holders are not held to have committed a fraudulent transfer under 548 ... [i]t is completely over for us....") ].

[14] Section 550 spells out the condition precedent. It provides: "Except as otherwise provided in this section, *to the extent that a transfer is avoided under section ... 548 ... of this title,* the trustee may recover, for the benefit of the estate, the property transferred...." This means that, if the transfer is *not* avoided, the trustee may not recover under Section 550. The Eleventh Circuit made this clear in *IBT International, Inc. v. Northern (In re International Administrative Services, Inc.),* 408 F.3d 689, 703 (11th Cir.2005) when it held:

> In fraudulent transfer actions, there is a distinction between avoiding the transaction and actually recovering the property or the value thereof. By its language, 11 U.S.C. § 544(b) indicates that the transaction must first be avoided before a plaintiff can recover under 11 U.S.C. § 550. This demarcation between avoidance and recovery is underscored by § 550(f), which places a separate statute of limitations on recovery actions; it

provides that a suit for recovery must be commenced within one year of the time that a transaction is avoided or by the time the case is closed or dismissed, whichever occurs first.

**\*30** *Id.* at 703 (internal citations omitted) (emphasis added).

As discussed in detail below, the Bankruptcy Court erred as a matter of law and fact in refusing to recognize as reasonably equivalent value the indirect benefits to the Conveying Subsidiaries from the July 31 Transaction. Thus, I conclude that Section 550 is not triggered as to the Transeastern Lenders.

## C. The Bankruptcy Court Erred as a Matter of Law and Fact in Refusing To Recognize as Reasonably Equivalent Value the Indirect Benefits to the Conveying Subsidiaries from the July 31 Transaction
### i. The Bankruptcy Court's Ruling on Indirect Benefits

[15] Initially, the Bankruptcy Court found that "the Defendants failed to carry their burden of producing evidence of indirect benefits that were tangible and concrete, and of quantifying the value of those benefits with reasonable precision." [Op., p. 145]. In so ruling, the Bankruptcy Court improperly shifted the burden of proof to the Senior Transeastern Lenders and other Defendants. Under established case law, "the burden of proving lack of 'reasonably equivalent value' under [Section 548(a)(2)(A) ] rests on the trustee challenging the transfer." *In re Chase & Sanborn Corp.,* 904 F.2d at 593–94 (citing *Gen. Elec. Credit Corp. v. Murphy (In re Duque Rodriguez),* 895 F.2d 725, 726 n. 1 (11th Cir.1990)).

Next, the Bankruptcy Court held that, under the language of Section 548(a)(1)(B)(1), an indirect benefit is cognizable only if three requirements are satisfied. First, the benefit must be received, even if indirectly, by "the debtor," *i.e.,* by an individual Conveying Subsidiary. Second, the "value" received must only encompass "property," which is

limited to some kind of enforceable entitlement to some tangible or intangible article. Third, property must have been received "in exchange for" the transfer or obligation, such that any "property that a Conveying Subsidiary would have enjoyed regardless of the July 31 Transaction cannot be regarded as property 'in exchange for' the transfer or obligation." [Op., pp. 146–47].

[16][17][18][19] While I conclude that the Bankruptcy Court erroneously disregarded the Appellants' factual and legal arguments concerning the "identity of interest doctrine" in analyzing reasonably equivalent value, FN43 I need not reach that issue or resort to conflating all of the TOUSA entities for the purpose of assessing "value," because the record establishes beyond dispute that the Conveying Subsidiaries *themselves*, as compared to only the TOUSA Parent, received indirect economic benefits, constituting reasonably equivalent "value," in exchange for their lien transfers. Accordingly, for purposes of this analysis, I accept the Bankruptcy Court's conclusion that the indirect benefit must be received by *each debtor*. Nonetheless, I conclude that the Bankruptcy Court committed legal error in holding that the "avoidance of default and bankruptcy by the Conveying Subsidiaries" is as a matter of law "not property and therefore is not cognizable as 'value' " under Section 548 of the Bankruptcy Code. [Op., p. 148].FN44 This holding—which raises pure questions of law regarding the interpretation of Section 548 of the Bankruptcy Code —is subject to *de novo* review. *See United States v. Andino,* 148 Fed.Appx. 828, 829 (11th Cir.2005) (reviewing a district court's interpretation of statutory definition contained in criminal statute under *de novo* standard); *Miami Police Relief & Pension Fund of Coral Gables, Ltd. v. Tabas (In re Fla. Fund of Coral Gables, Ltd.),* 144 Fed.Appx. 72, 74 (11th Cir.2005) (holding that the standard of review regarding the meaning of certain portions of the Bankruptcy Code "is properly characterized as a mixed question of law and fact") (citing *Matter of Holloway,* 955 F.2d 1008, 1014 (5th Cir.1992) (calling the same "ultimately [a] question of law"));

*Official Labor Creditors Comm. v. Jet Fla. Sys., Inc. (In re Jet Fla. Sys., Inc.),* 80 B.R. 544, 546 (S.D.Fla.1987) (noting that definition of term under the Bankruptcy Code is subject to *de novo* review). FN45

### ii. The Bankruptcy Court Erred in Narrowly Limiting the Meaning of "Value" Under the Bankruptcy Code

**\*31** [20] The Bankruptcy Code does not define "reasonably equivalent value." Instead, it defines the term "value" for purposes of the fraudulent transfer provision as "property, or satisfaction or securing of a present or antecedent debt of the debtor." 11 U.S.C. § 548(d)(2)(A). In order to determine whether a debtor received "reasonably equivalent value," a court must look at what "value" the debtor received in return for the transfer. *See Mellon Bank, N.A. v. Official Comm. of Unsecured Creditors of R.M.L., Inc. (In re R.M.L., Inc.),* 92 F.3d 139, 149 (3d Cir.1996) ("[B]efore determining whether the value was 'reasonably equivalent' to what the debtor gave up, the court must make an express factual determination as to whether the debtor received any value at all."). A court must then determine whether the value received is reasonably equivalent; this will depend on the facts of each case. *See In re Chase & Sanborn Corp.,* 904 F.2d at 593 (addressing guarantee as reasonably equivalent value for loan and noting reasonably equivalent value is largely a question of fact).

[21][22] The compelling legal error here is that the Bankruptcy Court, citing no case law FN46 relied (in a footnote) on the definition of property in WEBSTER'S DICTIONARY, to conclude that the Conveying Subsidiaries could not have received "property" unless they obtained some kind of enforceable entitlement to some tangible or intangible article. [Op., p. 148 n. 55]. Based on this dictionary definition of property, the Bankruptcy Court concluded that "avoiding default" and "bankruptcy" does not constitute "property" and, therefore, cannot constitute "value." [Op., p. 148]. The Bankruptcy Court's interpretation and definition of a

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

term in the Bankruptcy Code is subject to *de novo* review. *See Morgan v. United States (In re Morgan),* 182 F.3d 775, 777 (11th Cir.1999) (per curiam) (noting that the interpretation, meaning, and application of Bankruptcy Code are questions of law subject to *de novo* review); *Affordable Bail Bonds, Inc. v. Sandoval (In re Sandoval),* 541 F.3d 997, 1000 (10th Cir.2008) (same); *Gitto v. Worcester Tel. & Gazette Corp. (In re Gitto Global Corp.),* 422 F.3d 1, 8 (1st Cir.2005) (same); *Travelers Prop. Cas. Corp. v. Birmingham–Nashville Express, Inc. (In re Birmingham–Nashville, Exp., Inc.),* 224 F.3d 511, 514 (6th Cir.2000) (same); *In re Lewis,* 199 F.3d 249, 251 (5th Cir.2000) (same); *Arnold & Baker Farms v. United States (In re Arnold & Baker Farms),* 85 F.3d 1415, 1421 (9th Cir.1996) (same); *In re Jet Fla. Sys., Inc.,* 80 B.R. at 546 (same).

But it is not a dictionary definition that controls. Rather, Congress has left it to the courts to determine the scope and meaning of "reasonably equivalent value." This guidepost has been succinctly addressed in *In re R.M.L., Inc.,* 92 F.3d at 148, where the Third Circuit agreed that "[t]he mere 'opportunity' to receive an economic benefit in the future constitutes 'value' under the Code." The court further explained:

**\*32** Accordingly, we turn first to the appropriate method of determining reasonably equivalent value. The concept of reasonably equivalent value unfortunately has not been defined in the Code. As the Supreme Court noted in *BFP v. Resolution Trust Corp.*, "[o]f the three critical terms 'reasonably equivalent value', only the last is defined: 'value' means, for purposes of § 548, 'property, or satisfaction or securing of a ... debt of the debtor'...." 511 U.S. 531, 114 S.Ct. 1757, 128 L.Ed.2d 556(1994) (quoting 11 U.S.C. § 548(d)(2)(A)). **Thus, "Congress left to the courts the obligation of marking the scope and meaning of [reasonably equivalent value]."** *In re Morris Commc'ns NC, Inc.,* 914 F.2d 458, 466 (4th Cir.1990).

The lack of a more precise definition has led to considerable difficulty. This definitional problem is exacerbated in cases where, as here, the debtor exchanges cash for intangibles, such as services or the opportunity to obtain economic value in the future, the value of which is difficult, if not impossible, to ascertain. Because such intangibles are technically not within § 548(d)(2)(A)'s definition of "value," courts have struggled to develop a workable test for reasonably equivalent value. *See generally In re Young,* 82 F.3d 1407 (8th Cir.1996) (determining whether debtors obtained "value" in exchange for charitable contributions to church); *In re Chomakos,* 69 F.3d 769 (6th Cir.1995) (examining whether debtors obtained "value" in exchange for $7,710 in gambling losses), *cert. denied,* 517 U.S. 1168, 116 S.Ct. 1568, 134 L.Ed.2d 667 (1996); *In re Morris Commc'ns NC, Inc.,* 914 F.2d at 458 (attempting to determine "value" of shares in corporation whose only asset was a license application pending before the FCC that had a one in twenty-two chance of approval); *In re Fairchild Aircraft Corp.,* 6 F.3d 1119, 1125–26 (5th Cir.1993) (deciding whether money debtor spent in failed attempt to keep commuter airline afloat conferred "value" on the debtor).

*Id.* at 148 (emphasis added).

[23] In addition, the Bankruptcy Court's narrow dictionary definition of property is contrary to the meaning of the term in the Bankruptcy Code. The legislative history for the Bankruptcy Reform Act of 1978 provides that "[a]lthough 'property' is not construed in [Section 102 of the Code], it is used consistently throughout the Code *in its broadest sense,* including cash, all interests in property, such as liens, *and every kind of consideration* including promises to act or forbear to act as in section 548(d)." Statements by Legislative Leaders, 124 CONG. REC. 11,089 (1978), *reprinted in* 1978 U.S.C.C.A.N. 6439, 6508.[FN47] The Bankruptcy Court's narrow definition of "property" is also contrary to Supreme Court precedent holding that

"property" is broadly defined to include "all legal or equitable interests of the debtor," and that "[t]he term 'property' has been construed most generously and an interest is not outside its reach because it is *novel or contingent* or because enjoyment must be postponed." *Segal v. Rochelle,* 382 U.S. 375, 379, 86 S.Ct. 511, 15 L.Ed.2d 428 (1966) (emphasis added); *see also Kokoszka v. Belford,* 417 U.S. 642, 646, 94 S.Ct. 2431, 41 L.Ed.2d 374 (1974) (same); *Perry v. Sindermann,* 408 U.S. 593, 601, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972) (" '[P]roperty' denotes a broad range of interests that are secured by 'existing rules or understandings.' "); *Lines v. Frederick,* 400 U.S. 18, 19, 91 S.Ct. 113, 27 L.Ed.2d 124 (1970) (same); *Kapila v. United States (In re Taylor),* 386 B.R. 361, 368 (Bankr.S.D.Fla.2008) (citing *Segal* and noting that "[s]ubsequent Court of Appeals decisions have confirmed the continuing vitality of *Segal* under the Bankruptcy Code").

**\*33** The Bankruptcy Court's Order is contrary to well-established case law which holds that indirect benefits may take many forms, both tangible and intangible. *See Ministries v. Hayes (In re Hannover Corp.),* 310 F.3d 796, 801 (5th Cir.2002) (holding that the "arc of § 548 easily encompasses as 'value' " an exchange of cash for a right to buy or sell property at a future point in time); *Christians v. Crystal Evangelical Free Church (In re Young),* 82 F.3d 1407, 1415 (8th Cir.1996) (holding that district court correctly "did not define 'value' only in terms of tangible property or marketable financial value"), *vacated on other grounds,* 521 U.S. 1114, 117 S.Ct. 2502, 138 L.Ed.2d 1007 (1997); *Cordes & Co., LLC v. Mitchell Co., LLC,* 605 F.Supp.2d 1015, 1022 (N.D.Ill.2009) ("Indirect benefits can include a wide range of intangibles."); *Creditors' Comm. of Jumer's, Castle Lodge, Inc. v. Jumer (In re Jumer's Castle Lodge, Inc.),* 338 B.R. 344, 354 (C.D.Ill.2006) ("[I]ndirect benefits constitute 'value' and can include a wide range of intangibles such as: corporation's goodwill or increased ability to borrow working capital; the general relationship between affiliates or 'synergy' within a corporate group as a whole; and a corporation's

ability to retain an important source of supply or an important customer."); *see also* 5 COLLIER ON BANKRUPTCY ¶ 548.05, at 548–67 (Alan N. Resnick & Henry J. Sommer eds, 16th ed. 2006) ("The nature of the value that is received need not be a tangible, direct economic benefit. An indirect economic benefit can suffice, so long as it is 'fairly concrete.' "); 4 COLLIER ON BANKRUPTCY ¶ 548.09, at 548–111 (Lawrence P. King ed., 15th ed. rev. 1996) ("Whether value has been given for a transfer depends on all the circumstances of the case.").

The Bankruptcy Court's narrow definition of "value" also purports to exclude "economic benefits" from being considered. It stated that "section 548 does not refer to 'benefits,' whether direct or indirect." [Op., p. 147]. While Section 548 does not use the word "benefits," that does not mean that "economic benefits" may not be considered in determining whether the debtor received "value" in a complicated, multiple-party transaction. This conclusion is directly supported by the Eleventh Circuit's clear pronouncement, in *In re Duque Rodriguez,* that Section 548(a)(2) "does not authorize voiding a transfer which confers an *economic benefit upon the debtor, either directly or indirectly.*" *In re Duque Rodriguez,* 895 F.2d at 727 (emphasis added) (citing *Rubin v. Mfr. Hanover Trust Co.,* 661 F.2d 979, 991 (2d Cir.1981)). Quoting from *Rubin,* the Eleventh Circuit recognized that in such a situation, "the debtor's net worth has been preserved, and the interests of the creditors will not have been injured by the transfer." *Id.* at 726.

Of importance, and contrary to the Bankruptcy Court's legal conclusion, *Rodriguez* recognized that in a three-party transaction, that, among other things, a debtor's reprieve from foreclosure, with the accompanying right to continue its operations, *could* confer an indirect "economic benefit." *Id.* at 728 ("Only if Domino [the debtor] shared in the enjoyment of either of these benefits can the payments have conferred an 'economic benefit' upon Domino such that its net worth was preserved by the pay-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

ment.") (citing *Rubin,* 661 F.2d at 987).[FN48]

**\*34** As recognized in *Rubin,* and addressed on a limited basis in *Rodriguez,* "three-sided transactions such as those at issue here present special difficulties." *Rubin,* 661 F.2d at 991. The standard laid down by the Second Circuit in *Rubin* when dealing with such indirect benefit cases is that the consideration given to the third person must ultimately land in the debtor's hands or otherwise confer an economic benefit upon the debtor—provided that the value of the benefit received by the debtor approximates the value of the property transferred by the debtor. *Id.* at 991–92.

In *Rubin,* the bankruptcy trustee of two debtor corporations sought to recover as a fraudulent transfer under § 67d of the Bankruptcy Act certain funds and securities pledged to secure loans made to affiliates of the debtor corporations. *Id.* at 980–81. The general rule regarding transfers by a bankrupt for the benefit of a third party was stated by the Second Circuit in that case as follows:

Accordingly, courts have long recognized that "[t]ransfers made to benefit third parties are clearly not made for a 'fair' consideration," and, similarly, that "a conveyance by a corporation for the benefit of an affiliate [should not] be regarded as given for fair consideration as to the creditors of the conveying corporations." 4 COLLIER ON BANKRUPTCY ¶ 67.33, at 514.1–514.2 (14th ed. 1978) (citing cases).

*Rubin,* 661 F.2d at 991.

Yet, there is a well-recognized exception to the general rule:

The cases recognize, however, that a debtor may sometimes receive "fair" consideration even though the consideration given for his property or obligation goes initially to a third person. As we have recently stated, although "transfers solely for the benefit of third parties do not furnish fair consideration" under § 67(d)(1)(e), the transaction's benefit to the debtor "need not be direct; it

may come indirectly through benefit to a third person."

*Id.* (citing *Klein v. Tabatchnick,* 610 F.2d 1043, 1047 (2d Cir.1979); *accord Williams v. Twin City Co.,* 251 F.2d 678, 681 (9th Cir.1958); *McNellis v. Raymond,* 287 F.Supp. 232, 238–39 (N.D.N.Y.1968), *aff'd in relevant part,* 420 F.2d 51 (2d Cir.1970)).

The Eleventh Circuit has not yet had the opportunity to consider the application of the "reasonably equivalent value" test to the intricacies and complexities of the factual circumstances like the July 31 Transaction at issue. Nonetheless, other circuits, such as the Third Circuit, have rejected the notion that a debtor must receive a direct, tangible economic benefit in order to receive "value" for purposes of *Section 548(a)(2)*. In two opinions, the Third Circuit reconfirmed that indirect potential, *intangible* benefits, although incapable of precise measurement and quantification, can confer "value" for purposes of *Section 548(a)(2)* of the Code. *See Mellon Bank, N.A. v. Metro Commc'ns, Inc.,* 945 F.2d 635 (3d Cir.1991), *cert. denied,* 503 U.S. 937, 112 S.Ct. 1476, 117 L.Ed.2d 620 (1992); *see also In re R.M.L., Inc.,* 92 F.3d at 151 ("Significantly, the court in *Metro Communications, Inc.,* went on to discover several potential, intangible benefits, that, although incapable of precise measurement, conferred value on Metro despite their failure to materialize.").

**\*35** Likewise, the Seventh Circuit, in *Leibowitz v. Parkway Bank & Trust Co. (In Re Image Worldwide, Ltd.),* 139 F.3d 574 (7th Cir.1998), applied a similar analysis in a comparable case involving an "upstream" guarantee, where a subsidiary guarantees the debt of its parent. The Seventh Circuit recognized that requiring a direct flow of capital to a cross-guarantor subsidiary (or, such as in this case, Conveying Subsidiary co-borrowers) to avoid a finding of a fraudulent transfer, may well be inhibitory of contemporary financing practices, and that often such guarantees (or co-borrowing practices) are legitimate business transactions, and are not

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

made to frustrate creditors. *See id.* at 578. Under such circumstances, courts performing a fraudulent transfer analysis have been increasingly willing to look at whether a guarantor, or co-borrower transferor, received indirect benefits from the transfer or obligation. As noted by the Seventh Circuit:

> However, requiring a direct flow of capital to a cross-guarantor to avoid a finding of a fraudulent transfer is inhibitory of contemporary financing practices, which recognize that cross-guarantees are often needed because of the unequal abilities of interrelated corporate entities to collateralize loans. Often, these guarantees are legitimate business transactions, and not made to frustrate creditors. In recognition of this economic reality, courts have loosened the old rule that transfers primarily for the benefit of a third party invariably give no consideration to the transferor. Thus, even when there has been no direct economic benefit to a guarantor, courts performing a fraudulent transfer analysis have been increasingly willing to look at whether a guarantor received indirect benefits from the guarantee if there has been an indirect benefit. [O]ne theme permeates the authorities upholding guaranty obligations: that the guaranty at issue was the result of arm's length negotiations at a time when the common enterprise was commercially viable.

Generally, a court will not recognize an indirect benefit unless it is fairly concrete. The most straightforward indirect benefit is when the guarantor receives from the debtor some of the consideration paid to it. But courts have found other economic benefits to qualify as indirect benefits. For example, in *Mellon Bank, N.A. v. Metro Communications, Inc.,* the court found reasonably equivalent value for a debtor corporation's guarantee of an affiliate's debt when the loan strengthened the corporate group as a whole, so that the guarantor corporation would benefit from synergy within the corporate group. The Mellon court stated that indirect benefits included intangibles such as goodwill and an increased ability

to borrow working capital. *Telefest* indicated that indirect benefits to a guarantor exist when the transaction of which the guaranty is a part may safeguard an important source of supply, or an important customer for the guarantor. Or substantial indirect benefits may result from the general relationship between affiliates. In *Xonics,* we recognized the ability of a smaller company to use the distribution system of a larger affiliate as an indirect benefit as well.

**\*36** *Id.* at 578–79 (internal citations and quotation marks omitted).

[24][25] Contrary to the Bankruptcy Court's legal conclusion, the weight of authority supports the view that indirect, intangible, economic benefits, including the opportunity to avoid default, to facilitate the enterprise's rehabilitation, and to avoid bankruptcy, even if it provided to be short lived, may be considered in determining reasonable equivalent value. An expectation, such as in this case, that a settlement which would avoid default and produce a strong synergy for the enterprise, would suffice to confer "value" so long as that expectation was legitimate and reasonable. The touchstone is whether the transaction conferred *reasonable* commercial value on the debtor. Again, resort to *In re R.M.L., Inc.,* is helpful in formulating the correct legal analysis:

> The question, then, is how to determine whether an investment that failed to generate a positive return nevertheless conferred value on the debtor. We think our decision in *Metro Communications, Inc.* answers this question implicitly. *We held there that the mere expectation that the fusion of two companies would produce a strong synergy (an expectation that turned out to be inaccurate in hindsight) would suffice to confer "value" so long as the expectation was "legitimate and reasonable." Thus, so long as there is some chance that a contemplated investment will generate a positive return at the time of the disputed transfer, we will find that value has been conferred.*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

3

*We think our analysis appropriately balances a creditor's interest in estate preservation against a debtor's legitimate, pre-bankruptcy efforts to take risks that, if successful, could generate significant value and, possibly, avoid the need for protection under the Code altogether.* As we noted above, requiring that all investments yield a positive return in order to find that they conferred value on the debtor would be unduly restrictive. But so, too, would a rule insulating from § 548's coverage investments that, when made, have zero probability of success. *The best solution, therefore, is to determine, based on the circumstances that existed at the time the investment was contemplated, whether there was any chance that the investment would generate a positive return. In this way creditors will be protected when an irresponsible debtor invests in a venture that is obviously doomed from the outset.*

*In re R.M.L., Inc.,* 92 F.3d at 152 (emphasis added) (internal citations omitted).

What is key in determining reasonable equivalency then is whether, in exchange for the transfer, the debtor received in return the continued opportunity to financially survive, where, without the transfer, its financial demise would been all but certain. Where such indirect economic benefits are provided, *"the debtors' net worth has been preserved, and the interests of the creditors will not have been injured by the transfer." Kipperman v. Onex Corp.,* 411 B.R. 805, 837 (N.D.Ga.2009) (citing *In re Rodriguez,* 895 F.2d at 727) (emphasis added). Significant other authority supports such an analysis. *See Rubin,* 661 F.2d at 993 (collateral benefits of debtor's guarantees of loans to affiliated corporation might support finding of fair consideration); *Williams v. Twin City Co.,* 251 F.2d 678, 681 (9th Cir.1958) ("Consideration can run to a third party, so long as it is given in exchange for the promise sought to be enforced. This was done here. There was indirect benefit to Elliff by giving him a further chance to avoid bankruptcy—further

time."); *see also Geron v. Palladin Overseas Fund, Ltd. (In re AppliedTheory Corp.),* 330 B.R. 362, 364 (S.D.N.Y.2005) (holding that financing that provided debtor the ability to avoid bankruptcy, even if it "proved to be short-lived," provides reasonable equivalent value); *Whitaker v. Mortg. Miracles, Inc. (In re Summit Place, LLC),* 298 B.R. 62, 73 (Bankr.W.D.N.C.2002) ("Summit Place received 'reasonably equivalent value' because part of the 'value' it received was the avoidance of foreclosure and the chance to survive until it had an opportunity to refinance its project. As noted above, that chance had substantial value to the debtor and creditors because it represented the difference between immediately losing nearly a half-million dollars in equity through foreclosure and in having a chance to refinance and complete the project. The court finds that based on all the circumstances surrounding the transaction, the transfer was not in exchange for less than reasonably equivalent value."); *Jones v. Williams (In re McDonald),* 265 B.R. 632, 637 (Bankr.M.D.Fla.2001) (finding economic benefit where transaction "secur[ed] a future opportunity for Debtor to enhance his net worth and *possibly* escape from insolvency" (emphasis added)) (citing *Official Comm. of Unsecured Creditors v. Florida (In re Tower Envtl., Inc.),* 260 B.R. 213, 226–27 (Bankr.M.D.Fla.1998)); *Pembroke Dev. Corp. v. Commonwealth Sav. & Loan Ass'n (In re Pembroke Dev. Corp.),* 124 B.R. 398, 400–01 (Bankr.S.D.Fla.1991) ( "This Court recognizes that an indirect benefit to the transferor may be sufficient to establish reasonably equivalent value where the debtor and third party 'are so related or situated that they share an identity of interests because what benefits one will, in such case benefit the other to some degree.' Therefore, the creditor's forebearing of foreclosure on its loan with Pembroke Charter Corporation indirectly benefitted the debtor since it was liable as a guarantor on the loan.") (citations omitted); *Holly Hill,* 44 B.R. at 254–55 (interest payments made by debtor on loan to affiliated corporation were supported by a reasonably equivalent value when affiliate voluntarily used the loan to advance the debtor's operations); *In re Jones,* 37 B.R.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

969, 975 (Bankr.N.D.Tex.1984) (trickle-down benefits to debtor-guarantor from loan made to affiliated corporation constituted a reasonably equivalent value).

**\*37** [26] Having concluded that the Bankruptcy Court erred in its legal definition of value, and in its determination that the Conveying Subsidiaries did not receive value in the transaction, the Bankruptcy Court further legally erred by not considering the "totality of the circumstances" in measuring reasonable equivalency. This test, as adopted by the Third Circuit in *In re R.M.L., Inc.,* has been applied in this Circuit by U.S. District Courts and US Bankruptcy Courts in Florida. *See Wiand v. Waxenberg,* 611 F.Supp.2d 1299, (M.D.Fla.2009) ("In assessing whether value was given, the totality of the circumstances are examined...."); *Goldberg v. Chong,* Case No. 07–20931, 2007 WL 2028792 (S.D.Fla. July 11, 2007);[FN49] *Cuthill v. Kime (In re Evergreen Sec., Ltd.),* 319 B.R. 245, 253 (Bankr.M.D.Fla.2003) (citing *In re R.M.L.* as establishing the test for determining if reasonably equivalent value was provided); *In re Tower Envtl. Inc.,* 260 B.R. at 226 ("As set forth by the Third Circuit Court of Appeals, this second step of the two-step analysis [for measuring reasonably equivalency] requires application of the 'totality of circumstances' test.").

[27] The totality of the circumstances test is not strictly a mathematical formula. Courts have generally considered three factors: (1) whether the transaction was at arm's length, (2) whether the transferee acted in good faith, and (3) the degree of difference between the fair market value of the assets transferred and the price paid. *In re R.M.L.,* 92 F.3d at 145. Certainly, the fact that a transaction occurred at arm's length is one considerable factor in the determination. But a court "must examine all aspects of the transaction to measure carefully the value of the benefits received by the plaintiff." *BCPM Liquidating LLC v. PricewaterhouseCoopers LLP (In re BCP Mgmt.),* 320 B.R. 265, 280 (Bankr.D.Del.2005) (citing *Mellon Bank,* 92

F.3d at 154).

[28] Admittedly, this can be a difficult task. But, to paraphrase the Eleventh Circuit's inquiry in *Rodriguez,* the decisive inquiry can be simplified to whether, based on the totality of the circumstances at the time of the transfer, the result was to preserve the debtor's net worth by conferring realizable commercial value on the debtor. Otherwise stated, *but for the transfer,* was there a realistic risk that the Conveying Subsidiaries and the enterprise would not financially continue to survive?

While such an analysis is often fact intensive, and significant deference is to be accorded on appeal to the Bankruptcy Court's findings, no such deference is warranted here given the undisputed record as supported by the underlying legal documents. Here, the Conveying Subsidiaries themselves, unlike the debtor in *Rodriguez,* had a vital stake in the Transeastern Settlement as a result of their own guarantees on the Revolver and bond debt. The Conveying Subsidiaries' very existence was contractually tied through their pre-existing guarantees to the outcome of the claims in the Transeastern Litigation against the TOUSA parent which had guaranteed the debt. Without dispute in the record, an adverse judgment in excess of $10 million against the TOUSA parent would have caused it to be in default under both the Bond Debt and the Revolver. At least $421 million in hard money was owed to the Transeastern Lenders, which had to be paid back, and which was subject to adverse judgment,[FN50] while the remaining litigation fight was over the Transeastern Lenders' additional damage claims of over $2 billion under the Carve Out and Completion Guarantees. [Appeal Hr'g Tr. 19:11–15].[FN51] Not only had the Transeastern Lenders' New York action survived a motion to dismiss, but the record overwhelmingly established, and it was acknowledged at oral argument, that an adverse judgment in the Transeastern Litigation was virtually certain for the monies actually borrowed—being far in excess of $10 million. [Trial Exhs. 3094–98].[FN52]

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

**\*38** Such default by virtue of an adverse judgement, and any filing of bankruptcy by the TOUSA parent, would have triggered the Conveying Subsidiaries' guarantees to both the bond creditors and the Revolver lenders. Thus, eliminating the threat of these claims against the Conveying Subsidiaries' parent, and indirectly against each of them, constituted an enormous economic benefit to these subsidiaries in terms of their viability as going concerns and their continued access to financing through the TOUSA parent, which, in turn, allowed them, for a period of time, to continue to pay interest to the bondholders, the very creditors at issue. The fact that TOUSA was in distress or that the July 31 Transaction did not negate all significant risks to the enterprise, and assure long-term viability for either the TOUSA parent or the Conveying Subsidiaries, is not controlling. As the case law supports, it is enough that the July 31 Transaction left the Conveying Subsidiaries in a better position to remain as going concerns than they would have been without the settlement.

Reduced to its essence, besides the evidence of the integrated nature of TOUSA's business, and the reliance of the various TOUSA affiliates on each other, the underlying documents in evidence and the testimony presented at trial overwhelming established, and the Bankruptcy Court clearly and erroneously ignored, that an adverse judgment in the Transeastern Litigation would have resulted in: (1) TOUSA and the Conveying Subsidiaries having to file for bankruptcy which, in turn, raised major concerns about the whole enterprise's ability to continue operating as a going concern and reorganize under Chapter 11 protection; (2) the consequent disappearance of the Conveying Subsidiaries' existing source of financing, the Revolver; and (3) under the terms of the bond debt and the Revolver loan agreements, which the Conveying Subsidiaries guaranteed, the Conveying Subsidiaries becoming liable for more than $1 billion in obligations enforceable against them directly by the Revolver Lenders and the holders of the TOUSA bond debt. [*See* Background, Sections on Bonds, Revolver, and

Transeastern Litigation].

The totality of these circumstances, as patently ignored by the Bankruptcy Court in its virtually *verbatim* adoption of the Committee's proposed findings of fact, established a direct link between the financial net worth of the Conveying Subsidiaries and the fate of the TOUSA parent. A review of the documents regarding TOUSA's funding practices establishes this direct link. In particular, under the legally binding default and guarantee provisions in the TOUSA bond debt and the Revolver agreements and amendments, the Conveying Subsidiaries were both guarantors and co-borrowers of over a billion dollars worth of corporate debt. The Conveying Subsidiaries' dependence on the viability of the TOUSA enterprise as a whole is especially evidenced by the Conveying Subsidiaries' reliance on the Revolver as their primary source of liquidity. As is clear from the structure and language of the Revolver agreements and their amendments, the credit facility was in place for the benefit of and at the expense of *the entire TOUSA network*. Not only were the Conveying Subsidiaries dependent on TOUSA, the parent, to request funding for each "borrowing procedure," but their global borrowing "cap" was also expressly determined by the "Borrowing Base," which was calculated using *all assets of the TOUSA enterprise.*

**\*39** This "Borrowing Base" was also increased by the acquisition of assets from the Transeastern JV as part of the Transeastern Settlement. As described in Section II.D of the background facts above, the liquidated Transeastern assets resulted in proceeds that went into a centralized cash management system available for all subsidiaries. TOUSA's former Executive Vice President and CFO believed that these acquisitions increased the Revolver "Borrowing Base" by $150 million, which was especially valuable to the Conveying Subsidiaries at that time because they relied so heavily on the Revolver and could not have obtained independent financing. [Bankr.Hr'g Tr. 545:9–547:1; Trial Exh. 362, p. 7]. Similarly, the Transeastern

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Settlement provided TOUSA and the Conveying Subsidiaries with the right to future tax benefits totaling approximately $74.8 million. [Trial Exh. 5404 ¶ 40; Trial Exh. 3000, p. 147]. As with all TOUSA receipts, those funds were expected to be placed into the TOUSA centralized cash management system, on which all TOUSA subsidiaries could draw. [Bankr.Hr'g Tr. 1675:17–21].

In addition, and as established by the bond Prospectuses that were not even considered by the Bankruptcy Court, the same unsecured creditors that make up the Committee in this proceeding were given notice when they decided to invest in TOUSA as far back as 2002 that the corporate structure consisted of a *highly integrated and consolidated enterprise.* Based on the information provided in the Prospectuses, these bondholders directly relied on the integrated nature of the company to repay interest on the bond debt owed to them by TOUSA and guaranteed by the Conveying Subsidiaries. The Prospectuses directly told the Committee's unsecured creditors that TOUSA's ability to service the debt was dependent upon the cash flow of the Conveying Subsidiaries, which, in turn, depended upon the continued funding from the Revolver loans disbursed to the Conveying Subsidiaries by the TOUSA parent. [Appeal Hr'g Tr. 13:24–16:25; Trial Exh. 3296, p. 18].

Because such legally binding obligations directly tied the fate of the Conveying Subsidiaries to the outcome of the Transeastern Litigation, the resolution of the Transeastern Litigation as part of the July 31 Transaction conferred reasonably equivalent economic benefits on the Conveying Subsidiaries that fit squarely within the case law (a) recognizing that cross-stream guarantees may provide reasonably equivalent value "when the transaction strengthens the viability of the corporate group," *In re Image Worldwide,* 139 F.3d at 581, and (b) recognizing that the "opportunity" to facilitate its rehabilitation, and to avoid default and bankruptcy, including even if "this 'breathing room' may have ultimately proved to be short-lived," *In re Applied-*

*Theory Corp.,* 330 B.R. at 364.

By virtue of the Transeastern Settlement, the Conveying Subsidiaries' "net worth" was preserved and imminent default was avoided, thereby preserving, at that point of time, the interests of the Committee's unsecured creditors by allowing the enterprise to continue to meet its bond interest obligations and Revolver loan payments. As such, additional Revolver payments were paid out in excess of $65 million following the Transeastern Settlement, that allowed the enterprise's business to continue until the real estate industry totally collapsed later that year in a manner that was not foreseen at the time of the settlement.

**\*40** [29] Under such circumstances, no further proof of "quantification" was required to establish reasonably equivalent value, and the Bankruptcy Court further erred as a matter of law in requiring the same.FN53 Even the Committee concedes in its brief that "courts *sometimes can,* without precise mathematical quantification, decide that particular facts and circumstances show that a debtor received reasonably equivalent value." [Committee's Br., p. 109 (emphasis in original) ]. Thus, a *per se* rule, as applied by the Bankruptcy Court, that indirect benefits must be mathematically quantified is error. [Op., p. 144 ("The burden on Defendants includes a requirement to show that the 'indirect benefits' were tangible and concrete, and to *quantify their value with reasonable precision.*") (emphasis added) ]. As noted above, this is exactly the kind of case, as supported by applicable case law, that shows that a debtor's opportunity to avoid default, to facilitate its rehabilitation, and to improve its prospects of avoiding bankruptcy are precisely the kind of benefits that, by definition, are not susceptible to exact quantification but are nonetheless legally cognizable under Section 548. Inherently, these benefits have immense economic value that ensure the debtor's net worth has been preserved, and, based on the entirety of this record, were not disproportionate between what was given up and what was received. While scenarios of "massive disparit-

ies" can be envisioned, this is not what happened here.

[30] In fact, much of what the Bankruptcy Court did was to review the transactions at issue through the lens of retrospection to point out that bankruptcy ultimately was not avoided. But whether a debtor received reasonable equivalent value must be evaluated as of the date of the transaction. *Daley v. Chang (In re Joy Recovery Tech. Corp.),* 286 B.R. 54, 75 (Bankr.N.D.Ill.2002) ("Courts will not look with hindsight at a transaction because such an approach could transform fraudulent conveyance law into an insurance policy for creditors."); *see also Cooper v. Ashley Commc'ns, Inc. (In re Morris Commc'ns, NC, Inc.),* 914 F.2d 458, 466 (4th Cir.1990) ("Neither subsequent depreciation in nor appreciation in value of the consideration affects the value question whether reasonable equivalent value was given."). This point is well-articulated in *In re R.M.L., Inc.,* 92 F.3d at 152, which rejected a "hindsight" test. In doing so, the Court stated:

> Furthermore, were we literally to apply the highlighted statement from *Metro Communications, Inc.* as the categorical test for value under § 548(a)(2), we would announce a rule for this Circuit that only successful investments can confer value on a debtor. This would permit a court viewing the events with the benefit of hindsight to conclude that any transfer that did not bring in the actual, economic equivalent of what was given up fails to confer reasonably equivalent value as a matter of law. Such an unduly restrictive approach to reasonably equivalent value has been soundly rejected by other courts, and with good reason. Presumably the creditors whom § 548 was designed to protect want a debtor to take some risks that could generate value and, thus, allow it to meet its obligations without resort to protection under the Bankruptcy Code....

**\*41** *Id.* at 151 (citing *Chomakos,* 69 F.3d at 771 (gambling losses conferred value on debtor); *Fairchild Aircraft Corp.,* 6 F.3d at 1119 (money

spent in failed attempt to keep commuter airline afloat conferred value on debtor)).

In sum, the Bankruptcy Court's holding that the Conveying Subsidiaries did not receive reasonably equivalent value in the July 31 Transaction is a clearly erroneous holding that must be reversed. Further, due to the overwhelming evidence of indirect benefits to the Conveying Subsidiaries that directly linked their own survival as a going concern to that of TOUSA, reversal without remand is appropriate. *Media Servs. Grp., Inc.,* 237 F.3d at 1330 (reversing judgment without remand because "the record permit[ted] only one resolution of the factual issue") (quoting *Pullman–Standard,* 456 U.S. at 292, 102 S.Ct. 1781).

In addition, reversal is further supported by additional and significant factual errors made by the Bankruptcy Court, as included in the Committee's virtual *verbatim* adopted findings, which undermine the Bankruptcy Court's factual and legal conclusions. [*See* Transeastern Reply Br., p. 65 ("This was not a routine adoption of a two-page order on a motion after a hearing. What the bankruptcy court did here was to adopt, uncritically and near verbatim, a 182–page Proposed Opinion that was simultaneously submitted with the proposed conclusions of law and findings of fact of three separate groups of defendants, without any apparent regard for the submissions of any party other than the Committee.") ]. These errors are discussed below.

### D. The Bankruptcy Court Committed Clear Error in Finding that the Indirect Benefits to the Conveying Subsidiaries Had Little or No Value

The most valuable indirect benefit received by the Conveying Subsidiaries is that their participation in the July 31 Transaction, which financed the settlement of the Transeastern Litigation, prevented a default by the Conveying Subsidiaries on $1.06 billion dollars of bond debt (plus the triggering of their Revolver guarantees) for which a vast majority of the Conveying Subsidiaries were jointly and severally liable. The overwhelming evidence at trial showed that the viability of the entire TOUSA en-

terprise, including the Conveying Subsidiaries, was threatened by the Transeastern Litigation. The evidence established that a judgment of just $10 million, which no one disputed was imminent in that litigation, would have triggered default on more than $1 billion of TOUSA bond debt (from six different bond offerings) and on hundreds of millions of dollars of secured Revolver debt. The Conveying Subsidiaries were jointly and severally liable to pay the entirety of this debt upon a default. Moreover, the Revolver was a critical liquidity source for the Conveying Subsidiaries, who relied on the Revolver to meet working capital needs and to finance home construction. In the face of such defaults, the Conveying Subsidiaries would have needed to line up hundreds of millions of dollars in alternative financing and negotiated forebearance and subordination agreements with the six different groups of bond lenders as well as the secured Revolver lenders.

**\*42** [31] Given these circumstances, and anticipating that its definition of "value," may well be legally at issue, the Bankruptcy Court's holding on "reasonably equivalent value" turned on its alternative holding that these indirect benefits, "even if legally cognizable" were actually of little "value (if any)." [Op., p. 149]. The Bankruptcy Court reasoned that,

> even assuming the Transaction did prevent (or postpone) a TOUSA Parent bankruptcy, it still conferred no substantial benefits on the Conveying Subsidiaries because ... Tousa, Inc.[']s bankruptcy would not *necessarily have caused* the Conveying Subsidiaries to declare bankruptcy, [and even if an adverse result in the Transeastern Litigation resulted in a default on the Bond Debt triggering the Conveying Subsidiaries guarantees, the] Conveying Subsidiaries *could have* come to an accord with the bondholders *possibly* obtaining their own financing to refinance the bonds, which would have allowed them to continue as going concerns despite the default.

[*Id.* at 109 (emphasis added) ].

In short, the Bankruptcy Court took the view that because disastrous harm to the Conveying Subsidiaries was "not necessarily" inevitable but "could" at least "possibly" be averted, the Conveying Subsidiaries received no material benefit at all.

The Bankruptcy Court's conclusions about the Conveying Subsidiaries' ability to survive as standalone entities is reversible clear error. These findings were contrary to the overwhelming weight of the evidence at trial to the contrary,[FN54] and were in direct conflict with its parallel finding that the Conveying Subsidiaries were *insolvent as of July 31, 2007.* [*Id.* at 130]. If, as found by the Bankruptcy Court, the Conveying Subsidiaries were insolvent, there is nothing of record which in any way could support that the same entities could have convinced lenders to provide them with hundreds of millions of dollars of new financing or allow renegotiation of bond debt.

Of note, the Bankruptcy Court hedged on the issue, as suggested by the Committee's *verbatim* adopted findings, by never directly concluding that the Conveying Subsidiaries could survive if the TOUSA Parent was forced into bankruptcy in absence of the July 31 Transaction. Rather, the Opinion simply concluded that disastrous harm to the Conveying Subsidiaries was "not necessarily" inevitable absent the July 31 Transaction but "could" at least "possibly" be averted. [*Id.* at 109]. This speculative conclusion is tied to the Bankruptcy Court's further erroneous resort to "hindsight" reasoning that because the July 31 Transaction did not prevent TOUSA, Inc.'s bankruptcy—at most it delayed the inevitable—and it could not have given rise to any purported benefits to the Conveying Subsidiaries predicated on the avoidance of such a bankruptcy. [*Id.* at 108–09].

Equally fundamental, and directly contrary to the undisputed documents of record, is the Bankruptcy Court's incorrect but critical finding that the Conveying Subsidiaries' assets would have been *unencumbered* but for the July 31 Transaction. [*Id.* at 113]. In point of fact, given the existing security

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

interests on the Revolver debt, the Conveying Subsidiaries assets *were already pledged.* [Stip., p. 9; Trial Exh. 3062 § 2; Bankr.Hr'g Tr. 3615:17–25 ("[The] revolvers had taken collateral in the fall, so we [the New Lenders] needed their approval in order to share that collateral with any other lenders.") ]. They just were not pledged to the Transeastern deal. But, the fact that the Conveying Subsidiaries assets were pledged to the Revolver debt implicated the Bankruptcy Court's finding on alternative "standalone" financing.

**\*43** The only evidence referenced by the Bankruptcy Court in support of the finding that the Conveying Subsidiaries could have obtained alternative standalone financing was the conclusory testimony of two of the Committee's experts, William Derrough and Charles Hewlett. [Op., p. 109]. Their testimony can only be characterized on appellate review as "rank speculation." Their opinions were predicated on their claim to have seen other subsidiaries survive bankruptcies of their parents, or negotiate around bond defaults, or obtain independent financing. None of these opinions were tied to, or addressed, the specific circumstances of this case. [FN55] The Bankruptcy Court erred in not conducting an analysis of these opinions, as required by FED.R.EVID. 702, to determine if either were qualified to render such opinions, and, alternatively, to determine their factual sufficiency or reliability, particularly given the overwhelming contrary evidence that these entities did not have, and could not have reasonably obtained independent financial statements; needed consents from the Revolver lenders to take on new debt and encumber assets on which the Revolver lenders already had security interests; and needed waivers by the holders of the TOUSA bond debt of the new liability to repay immediately the $1 billion in obligations triggered by an adverse judgment in the Transeastern Litigation. *See Gorelik v. Holder,* 339 Fed.Appx. 70, 73 (2d Cir.2009) (noting that "little weight" should be given to an expert's testimony where the expert's reasoning is "speculative"); *Jenkins v. Astrue,* 250 Fed.Appx. 645, 647 (5th Cir.2007) (holding that

"hypothetical testimony" by a vocational expert, which is unsupported by the evidence, may be properly disregarded); *Velander v. Garner,* 348 F.3d 1359, 1371 (Fed.Cir.2003) (according little weight to broad conclusory statements in expert testimony). In fact, counsel for the Committee even conceded at oral argument on this appeal that the risks and implications of obtaining credit as a stand-alone entity are entirely different than those of a subsidiary in a large enterprise. [FN56]

For all of these reasons, I conclude that the Bankruptcy Court erred in concluding that the Conveying Subsidiaries did not receive "reasonably equivalent value" as a result of the July 31 Transaction.

### E. The Bankruptcy Court Erroneously Compelled The Senior Transeastern Lenders To Disgorge Under Section 550 the Value of the Liens as the Parties "For Whose Benefit" the New Loans Were Made

I turn now back to the second theory of liability adopted by the Bankruptcy Court, that is, that the Transeastern Lenders were liable as the entities "for whose benefit" the Conveying Subsidiaries transferred the liens to the New Lenders because the liens were used by the New Lenders to satisfy TOUSA's debt to the Transeastern Lenders. Because I have concluded that the Conveying Subsidiaries received reasonably equivalent value for the July 31 Transaction under § 548, I could simply decline to address any arguments concerning the Conveying Subsidiaries' right to recovery under § 550. The Parties do not dispute this point. *See* Appeal Hr'g Tr. 97:7–9 (counsel for the Committee agreeing that "[Section] 548 is the prerequisite that has to be met before you get to [Section] 550"); *id.* at 111:10–21 (counsel for the Transeastern Lenders stating that if the Court determines that the First and Second Lien Holders are not held to have committed a fraudulent transfer under § 548, then "it is completely over for us").

**\*44** But, for purposes of full analysis, and given the complexity of issues that will be further re-

viewed by the Eleventh Circuit, I elect to address the Section 550 issues directly. Thus, even if the Bankruptcy Court's finding on reasonably equivalent value was ultimately sustained, reversal is nonetheless required because, as a matter of law, the Conveying Subsidiaries cannot recover from the Transeastern Lenders pursuant to § 550. The linchpin of the Committee's argument under this provision of the Bankruptcy Code was not that the Conveying Subsidiaries ever held a property interest in the New Loans, but rather that they could recover because the transfer of the liens to the New Lenders was avoidable and was for the "ultimate benefit" of the Transeastern Lenders. The Bankruptcy Court erroneously adopted the argument and stated:

The Senior Transeastern Lenders were "entities for whose benefit" the transfer of liens to the First and Second Lien Lenders was made. The plain meaning of the statutory language encompasses the Senior Transeastern Lenders. The new loans, and the liens securing those loans, were undertaken for the express purpose of resolving the claims of the Transeastern Lenders against TOUSA, Inc. and Holmes L.P. Execution of the settlement with the Transeastern Lenders was expressly required by the loan agreements, and all parties to the July 31 Transaction understood that the Senior Transeastern Lenders would immediately receive more than $421 million of the loan proceeds. The Senior Transeastern Lenders directly received the benefit of the Transaction and the Transaction was undertaken with the unambiguous intent that they would do so.

[Op., p. 151].

[32][33] The Bankruptcy Court's overly broad interpretation of Section 550(a) erroneously neglects to analyze the specific text of that provision. There are three types of entities from whom or from which a trustee may recover an avoidable transfer: (1) an initial transferee, (2) an entity for whose benefit the initial transfer was made, or (3) a subsequent transferee. See 11 U.S.C. § 550(a); FN57 In re Int'l Admin. Servs., Inc., 408 F.3d at 703; Christy

v. Alexander & Alexander (In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey), 130 F.3d 52, 56 (2d Cir.1997); Bowers v. Atlanta Motor Speedway, Inc. (In re SE Hotel Prop. Ltd. P'ship), 99 F.3d 151, 154 (4th Cir.1996). The statute clearly separates "(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made" from "(2) any immediate or mediate transferee of such initial transferee," otherwise known as the subsequent transferee, see 11 U.S.C. § 550(a)(1)-(2); In re Finley, Kumble, 130 F.3d at 57; Danning v. Miller (In re Bullion Reserve), 922 F.2d 544, 547 (9th Cir.1991); Bonded Fin. Servs., Inc. v. European Am. Bank, 838 F.2d 890, 895 (7th Cir.1988), because the liability to the estate of the initial transferee or the entity for whose benefit the initial transfer was made is absolute, see In re Finley, Kumble, 130 F.3d at 57; SE Hotel, 99 F.3d at 154; Bullion, 922 F.2d at 547, whereas the liability of the subsequent transferee to the estate is not strict but subject to the "good faith purchaser for value" defense contained in § 550(b). See 11 U.S.C. § 550(b); In re Int'l Admin. Servs., Inc., 408 F.3d at 703 ("If there is not an affirmative good faith defense, then [section] 550(a) allows recovery from subsequent transferees as well."); SE Hotel, 99 F.3d at 154; Bullion, 922 F.2d at 548; John E. Theuman, What Constitutes 'Initial Transferee' Under § 550(a) of the Bankruptcy Code, 92 A.L.R. FED. 631 § 2 (1989) ("The characterization of a potential defendant as an initial, immediate, or mediate transferee may make a substantial difference in a trustee's ability to make a case under § 550....").

**\*45** With regard to Section 550(a), the Eleventh Circuit has recognized that the paradigm case of a benefit under that provision is the benefit to a guarantor by the payment of the underlying debt of the debtor. Reily v. Kapila (In re Int'l Mgmt. Assoc.), 399 F.3d 1288, 1292 (11th Cir.2005) (stating that the phrase "entity for whose benefit such transfer was made" usually has been "employed when the trustee attempts to recover from a guarantor of an underlying debt") (citing In re Coggin, 30 F.3d

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

1443, 1453 (11th Cir.1994)); 5 COLLIER ON BANKRUPTCY ¶ 550.02[4], at 550–17 (Lawrence P. King ed., 15th ed. 1996); *see also In re Finley, Kumble,* 130 F.3d at 57 (stating that the phrase "entity for whose benefit such transfer was made" usually "references entities that benefit as guarantors of the debtor, or otherwise, without ever holding the funds"); *Bonded Fin. Servs., Inc.,* 838 F.2d at 895 (stating that "the paradigm 'entity for whose benefit such transfer was made' is a guarantor or debtor"). In this case, the Transeastern Lenders clearly do not fit the "paradigm" classification as an entity for whose benefit a transfer was made because they were not guarantors of the debtor Conveying Subsidiaries. Rather, they were the holders of a valid antecedent debt from TOUSA that was incurred substantially prior to the preference period.

To properly analyze Section 550 and determine if the Transeastern Lenders qualify in any category of entities exposed to liability under Section 550, it is first necessary to ask which "transfer" was at issue. Under the plain statutory language of Section 550(a)(1), the phrase "*such transfer,*" with reference to the *initial transferee,* is the *same* transfer for purposes of the "entity for whose benefit *such transfer* was made." In essence, this is the "transfer [that] is avoided." § 550(a). The Bankruptcy Court's Order makes it clear that "*such transfer,*" that is, the transfer at issue for Section 550(a) purposes, *was the transfer of the liens to the New Lenders.* Counsel for the Committee also confirmed that this was the relevant transfer during oral argument:

Judge Gold: And you're talking about—let me ask this—in your "for whose benefit theory is," you're talking about the fraudulent transfer being the *conveyance of the lien interest* in this respect.

Mr. Robbins: *Precisely.*

Judge Gold: Okay. So if you look at the language, "Any transfer of an interest of the debtor in property," *the transfer of the interest of the*

*debtor is solely the liens.*

Mr. Robbins: *That's true.*

[Appeal Hr'g Tr. 96:3–7 (emphasis added) ].

[34] The Bankruptcy Court did not (and could not) find that the Transeastern Lenders were liable for this transfer of liens as either "initial" or "subsequent" transferees. As the Eleventh Circuit has noted, the "term 'initial transferee' is a term of art whose meaning in any given transaction is not always straightforward." *Andreini & Co. v. Pony Express Delivery Serv., Inc. (In re Pony Express Delivery Serv., Inc.),* 440 F.3d 1296, 1300 (11th Cir.2006). The court went on to establish a "control" test to determine if a person or entity is an "initial transferee" under § 550(a): "[A] recipient of an avoidable transfer is an initial transferee only if they exercise legal control over the assets received, such that they have the right to use the assets for their own purposes, and not if they merely served as a conduit for assets that were under the actual control of the debtor-transferor or the real initial transferee." *Id.* Here, it is undisputed that the initial transfer for statutory purposes, was the transfer of liens from TOUSA and the Conveying Subsidiaries to the New Lenders *who exercised full legal control over the liens.* Therefore, only the New Lenders, and not the Transeastern Lenders, could qualify as "initial transferees" under the Eleventh Circuit's "control test." It is further undisputed that the liens remained at all times *with the New Lenders* and were never transferred to the Transeastern Lenders. Therefore, the Transeastern Lenders could not qualify as "subsequent transferees." FN58

***46** [35] The Bankruptcy Court appears to acknowledge that the Transeastern Lenders could not be categorized as "subsequent transferees." Instead, it held that the Transeastern Lenders were both initial transferees and entities "for whose benefit" the transfer was made. [Op., p. 176 ("Because both the First and Second Lien Lenders and the Senior Transeastern Lenders are initial transferees (and the

Senior Transeastern lenders are beneficiaries) of an avoidable transfer, Section 550 would permit recover from either set of Defendants.") ]. Essentially, the Bankruptcy Court's theory is that the Transeastern Lenders received a benefit *flowing from the use to which the initial lien transfer was put; namely, the further transfer of proceeds to TOUSA which, in turn, transferred the proceeds to the Transeastern Lenders in settlement and payment of a valid, antecedent debt.*

The Committee attempts to avoid the direct implication of applicable case law by contending that the Transeastern Lenders benefitted from the lien transfer because although there were in fact multiple transactions that occurred, they were all part of a "single integrated transaction" that took place of July 31, 2007. [Committee's Br., p. 94, 96, 131, 146, 152; *see also* Op., p. 8 (referring to the "single integrated transaction") ]. This attempt to lump all transactions into a "single integrated transaction" for purposes of the analysis under § 550 is problematic for several reasons. It is contrary to the Bankruptcy Court's own analysis where the court broke down the transfers into separate transactions for Section 548 purposes. [Op., p. 105 ("The Conveying Subsidiaries received none of the proceeds of the loans they became obligated to repay. The money was transferred by the lenders to Universal Land Title, Inc. ... which disbursed the funds to the various parties to the settlement."); *see also id.* at 147 ("The statute entirely refutes Defendants' attempt to lump all of the TOUSA entities together for purposes of determining reasonably equivalent value.") ]. Having split the transactions for Section 548 purposes, it is now error to then "lump" them together for Section 550(a) purposes, when the overwhelming record of evidence on appeal establishes that the lien and proceeds transactions had different transferors and transferees and, in recognition of this, the Committee had brought multiple claims alleging that both transfers were fraudulent for completely different reasons.

In addition, the Parties' stipulation concerning

the phrase "single integrated transaction" is not controlling for the analysis under Section 550. The actual stipulation between the Parties was that the "July 2007 Credit Agreements"—which are made up of (1) the Amended Revolver Agreement dated July 31, 2007; (2) the First Lien Term Credit Agreement; and (3) the Second Lien Term Credit Agreement—were "executed as part of a single integrated transaction." FN59 As the Transeastern Lenders correctly argue in their Reply Brief, this phrase taken from the Joint Stipulated Facts is not "talismanic" in terms of legal significance for the Bankruptcy Court's application of § 550 to the facts of this case. [Transeastern Reply Br., p. 12]. More importantly, this stipulation refers only to the *credit agreements* governing the Parties on July 31, 2007, and it *does not* refer to the separate payment of proceeds made from Universal Land Title, Inc. to the Transeastern Lenders. At most, the transactions concerning the credit arrangements *going forward in the future* with the New Lenders and the Revolver Lenders could possibly be viewed as part of a "single integrated transaction," but the payment to the Transeastern Lenders in order to effectuate settlement for a separate, previous debt could not be viewed as part of that same transaction.

**\*47** [36] Because Section 550(a) explicitly links the initial transferee with the entity "for whose benefit" the initial transfer was made, "only a person (or entity) who receives a benefit from the initial transfer" can be an entity "for whose benefit" the initial transfer was made. *Bonded Fin. Serv., Inc.,* 838 F.2d at 896 (cited with approval by the Eleventh Circuit in *In re Int'l Mgmt. Assoc.,* 399 F.3d at 1293). Therefore, "a subsequent transferee cannot be the 'entity for whose benefit' the initial transfer was made." *Id.* at 897. This is because "the structure of the statute separates the initial transferees and beneficiaries, on the one hand, from 'immediate or mediate transferee[s]' on the other." *Id.* at 895. According to the Seventh Circuit in *Bonded Financial,* "[T]he implication is that the 'entity for whose benefit' is different from a transferee, 'immediate' or otherwise." *Id.* As the court ex-

plained: *"Someone who receives the money later on is not an 'entity for whose benefit such transfer was made.' "* *Id.* at 896 (emphasis added); *see also SE Hotel,* 99 F.3d at 155 (citing *Bonded* for the point that an entity "for whose benefit" a transfer was made cannot be a subsequent transferee); *Bullion,* 922 F.2d at 548 (noting that a subsequent transferee cannot be an entity for whose benefit the initial transfer was made, even if the subsequent transferee actually receives a benefit from the initial transfer); *Lippi v. City Bank,* 955 F.2d 599, 611 (9th Cir.1992) (same); *Lowry v. Sec. Pac. Bus. Credit, Inc. (In re Columbia Data Prod., Inc.),* 892 F.2d 26, 28 (4th Cir.1989) (same); *Merrill v. Dietz (In re Universal Clearing House),* 62 B.R. 118, 128 n. 12 (D.Utah 1986) ("A reading of subsection (a)(1) in conjunction with the remainder of section 550 leads to the conclusion that the phrase 'or the entity for whose benefit such transfer was made' refers to those who receive a benefit as a result of the initial transfer from the debtor—not as the result of a subsequent transfer.").

[37] Simply put, the "for whose benefit" language does not apply where the "benefit" is not the immediate and necessary consequence of the initial transfer, but flows from the manner in which the initial transfer is *used* by its recipient—the "benefit must derive directly from the [initial] transfer, not from the use to which it is put by the transferee." *Turner v. Phoenix Fin., LLC. (In re Imageset, Inc.),* 299 B.R. 709, 718 (Bankr.D.Me.2003) ("As explained in *Bonded Financial,* the paradigmatic 'entity for whose benefit the transfer was made' is the debtor or guarantor, whose own liability is reduced or extinguished by the payment made, as a result of the payment itself. The benefit must derive directly from the transfer, *not from the use to which it is put by the transferee."* (emphasis added)); *Peterson v. Hofmann (In re Delta Phones, Inc.),* Adversary Case No. 05 A 1205, 2005 WL 3542667, at *5 (Bankr.N.D.Ill., Dec.23, 2005) (same). Thus, because the Transeastern Lenders were "subsequent transferees" of the proceeds backed by the liens, the Senior Transeastern Lenders do not qualify as

"entities for whose benefit" the transfers were made within § 550(a)(1)'s meaning.

**\*48** The Bankruptcy Court further erred by imposing strict liability on the Transeastern Lenders under the "whose benefit" language without considering whether the Transeastern Lenders were subsequent "transferees" under the statute, and, therefore, whether the Trustee was precluded from recovering under Section 550(a) by virtue of the language of Section 550(b)(1) which, in turn, precludes recovery from "a transferee that takes for value, including satisfaction ... of a ... antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided," *or* by virtue of Section 550(b)(2) which precludes recovery from "any immediate or mediate good faith transferee of such transferee."

[38] I nonetheless conclude that remand to consider the status of the Transeastern Lenders as a "transferee," and the application of the Section 550(b) two exceptions, is unnecessary on this appellate record. Even assuming under some theory FN60 that the Transeastern Lenders could be considered the "immediate transferee of the proceeds," they nevertheless were a transferee that took "for value," that is, the payment of a valid antecedent debt. As made clear in *Bonded Financial,* "the statute does not say 'value to the debtor'. It says 'value.' ... [A] natural reading looks to what the transferee gave up rather than what the debtor received." *Bonded Fin. Serv., Inc.,* 838 F.2d at 897. Thus, it is sufficient if the "value," as was the case here, was the satisfaction of TOUSA's valid antecedent debt.

[39] Furthermore, the Committee offered no evidence that sufficiently established that the Transeastern Lenders acted in bad faith to obtain repayment of their antecedent debt, or to settle the Transeastern Litigation, and that the Transeastern Lenders accepted payment of the valid debt with knowledge of the voidability (if any) of the lien transfer to the New Lenders. Notwithstanding, the Bankruptcy Court determined that the Transeastern

Lenders acted in bad faith and were grossly negligent because they knew of or should have known on the basis of publically available information that TOUSA and the Conveying Subsidiaries were insolvent on July 31, 2007, or were precariously close to insolvency. [Op., pp. 116, 124]. In other words, the Bankruptcy Court held that it is "bad faith" for a creditor of someone *other than the debtor* to accept payment of a valid, tendered debt repayment outside of any preference period, through settlement or otherwise, if the creditor does not first investigate the debtor's internal re-financing structure and ensure that the debtor's subsidiaries had received fair value as part of the repayment, or that the debtor and its subsidiaries, in an enterprise, were not insolvent or precariously close to being insolvent.

This standard is patently unreasonable and unworkable. The 182–page Opinion contains no analysis or discussion of any duty of care under New York law (which governed the transaction) or under established bankruptcy law, that suggests that the Transeastern Lenders owed a duty of care to the Conveying Subsidiaries. Furthermore, the Bankruptcy Court provided no basis why a court could consider such a duty—if it even existed—as a factor for determining "good faith" under Section 550(b). Case law generally cautions against imposing exhaustive duties to investigate upon banks and other creditors. *See, e.g., McCarty v. Richard James Enter., Inc. (In re Presidential Corp.),* 180 B.R. 233, 239 (9th Cir. BAP 1995) ("A party who receives a subsequent transfer from the buyer's escrow account should not be required to investigate the source of the deposits, any more than a party receiving payment from someone's personal checking account should be required to investigate the source of the funds."); *N.Y. Assets Realization Co. v. McKinnon,* 209 F. 791, 793 (2d Cir.1913) ("It would be an exceeding great hardship on the debtor if the creditor had the right to refuse to accept payment of the debt after it was due, and at the same time retain the debtor's property or a lien upon it for the debt.").

**\*49** The net result of the Bankruptcy Court's improper finding is to impose extraordinary duties of due diligence on the part of creditors accepting repayment—duties that equal or exceed those imposed on lenders extending credit in the first place. To the contrary, the Transeastern Lenders, as recipients of a debt payment, had no reason or legal duty to conduct such extraordinary due diligence with respect to the provenance of the funds with which they were being repaid.

A wide range of authority suggests that Congress did *not* intend to use Section 550 as a means to expand liability in such a drastic manner as the Bankruptcy Court has done. The legislative history FN61 of the Bankruptcy Code makes it clear that Congress did *not* intend to expand liability in Section 550 beyond that which is available under Section 548. In particular, the legislative history of Section 550 provides that "[t]he words 'to the extent that' in the lead in to this subsection [550] are designed to incorporate *the protection of transferees* found in proposed 11 U.S.C. 549(b) and 548(c) ." S. REP. NO. 95–989, at 90 (1978), *reprinted in* 1978 U.S.C.C.A.N. at pp. 5787, 5876 (emphasis added). Early legislative materials also indicate that Congress was least concerned with imposing liability on entities "for whose benefit" a transfer was made because initial versions of the Bankruptcy Reform Bill contained no reference at all to recovery from such entities. *See* Larry Chek & Vernan O. Teofan, *The Identity and Liability of the Entity for Whose Benefit a Transfer Is Made Under Section 550(a): An Alternative to the Rorschach Test,* 4 J. BANKR.L. & PRAC. 145, 149 (1995) ( "It was not until the bill emerged from the conference committee in its final form that the 'entity for whose benefit' language [first] appeared."); *see also* Lara R. Sheikh, *Sections 548 and 550—Developments in the Law of Fraudulent Transfers and Recoveries,* 2010 NORTON ANN. SURV. BANKR.L.. § 2.B ("Initially, section 550(a)(1) did not contain the ability to recover from the 'entity for whose benefit such transfer was made.' ").

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Expanding liability under § 550 in the manner set forth by the Bankruptcy Court's Order would lead to unintended consequences because the traditional "theory of recovery" under fraudulent transfer law was "cancellation, not civil damages for any act of wrongdoing." *See* Chek & Teofan, *supra,* at 147–48, 151–52 (arguing that there is no precedent or indication that Congress contemplated "sweeping liability" under § 550); *see also id.* at 159 ("[U]nless courts are prepared to extend liability under Section 550(a)(1) to the remotest frontiers of benefit-in-fact, there must be some principle to confine liability to an immediate class of beneficiaries.").

Because the Bankruptcy Court's Opinion greatly expanded liability under § 548 and § 550, numerous scholarly articles have already been published criticizing the Opinion since it was issued. *See, e.g.,* Patricia A. Redmond, *et al., Clutching a Home–Run Recovery from a Shortstop Transferee and the Single–Satisfaction Umpire,* 28 AM. BANKR.INST. J. 18, 18 (2010) ("The lesson learned from cases involving multiple transferees and the entities for whose benefit the transfer was made is simple: Be wary of, and careful with, prebankruptcy transfers."); Marc Anthony Angelone, *The TOUSA Decision: A Lender's Nightmare?,* 127 BANKR.L.J. 863, 863 (2010) ("Th[e] laundry list of woes was the painful reality for the lenders in *In re TOUSA, Inc.*"); Douglas E. Deutsch, *et al., Top Business Bankruptcy Cases of 2009,* 29 AM. BANKR.INST. J. 40, 41 (2010) ("The outcome is greatly troubling to secured lenders."); Jo Ann J. Brighton, *TOUSA: Do Lenders Have the Responsibility To Protect Borrowers from Their Own Bad Judgment?,* 29 AM. BANKR.INST. J. 18, 20 (2010) ( "TOUSA provides a classic example of how bad facts make bad law.... [W]here was Citi's fiduciary obligation to protect the bondholders? ... The increased work that lenders will be forced to do [after the Bankruptcy Court's Order] to review a potential transaction will inevitably result in higher fees to borrowers.").

**\*50** The limited legislative history specifically concerning the phrase "good faith" in § 550(b) also does not indicate that Congress ever intended courts to use that phrase as a "gateway" to more expansive liability.FN62 The phrase was "intended to prevent a transferee from whom the trustee could recover from transferring the recoverable property to an innocent transferee, and receiving a retransfer from him, that is, 'washing' the transaction through an innocent third party." S. REP. NO. 95–989, at 90 (1978), *reprinted in* 1978 U.S.C.C.A.N. at p. 5876; *see also Friedman v. Vinas (In re Trauger),* 109 B.R. 502, 505 (Bankr.S.D.Fla.1989) ("[T]he good faith exception of 550(b)(1) was intended for those situations in which a bad faith transferee materially assists in, or in fact enables, the transferring of funds which can not then be recovered, and who derives some demonstrable benefit thereby."). Here, there is no evidence that the Transeastern Lenders ever "washed" any part of the July 31 Transaction or "materially assisted" any kind of improper scheme, but rather they accepted payment for a valid antecedent debt.

In a recent Eleventh Circuit decision regarding 550(a), the court surveyed the law on the issue of "initial transferees" for purposes of Section 550(a)(1) and discussed the application of a conduit or control test to initial transferees. *Martinez v. Hutton (In re Harwell),* 628 F.3d 1312, 1317–23 (11th Cir.2010). The Eleventh Circuit stated that "in effect, we have tempered literal application of Section 550(a)(1), examining all the facts and circumstances surrounding a transaction to prevent recovery from a transferee innocent of wrongdoing and deserving of protection." *Id.* at 1322. Among other reasons to adhere to a "tempered" application of § 550, the court took note of important public policy concerns. For example, if a court "were to require banks to examine the source of a wire transfer and determine its solvency, then it would pose an unfair burden on the banks and would severely impair the wire transfer system." *Id.* at 1320 (citing *In re Chase & Sanborn,* 848 F.2d at 1202).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Drawing upon this analogy, if the Bankruptcy Court's ruling were to stand, it would pose an unfair burden on creditors to investigate all aspects of their debtors and the affiliates of those debtors before agreeing to accept payments for valid debts owed. The Bankruptcy Court's legal definition of what constitutes "good faith" is contrary to any "tempered" application of Section 550(a)(1)-(2). To adopt the Bankruptcy's Court's position would have a profoundly chilling effect on acceptance of payment by lenders of valid antecedent debts—a result not contemplated by the Bankruptcy Code or supported by any direct legal authority. It would place an impossible burden on holders of antecedent debt that would undermine their ability to settle valid debts outside any preference period, and, instead, would encourage the proliferation of wasteful debt-resolution litigation.

**F. The Bankruptcy Court Erroneously Relied on the Eleventh Circuit's Decision in *In re Air Conditioning, Inc.* To Establish Liability Under Section 550(a)**

*51 In determining that the Transeastern Lenders were liable under § 550, the Bankruptcy Court also relied on the Eleventh Circuit's decision in *American Bank of Martin County v. Leasing Service Corp. (In re Air Conditioning, Inc.),* 845 F.2d 293 (11th Cir.1988).[FN63] The facts in that case involved a debtor who provided security to an undersecured creditor through a bank letter of credit, which the debtor then secured through a certificate of deposit at the bank. *Id.* at 295. When the creditor filed for bankruptcy within one month of this transaction, the Eleventh Circuit held that the transfer of the collateral to the bank was an avoidable preference under Section 547(b) and that although the transfer went directly to the bank, it was "for the benefit of" the creditor because it "secured payment of an undersecured antecedent debt owed by [the debtor]." *Id.* at 295–96.

The Bankruptcy Court below held that the facts of this case "fall squarely" within the Eleventh Circuit's holding in *Air Conditioning.* [Op., p. 151.] A

closer analysis of that case demonstrates otherwise. Most importantly, *Air Conditioning* was a case about an avoidable preference governed under 11 U.S.C. § 547, which has no application to the Transeastern Lenders in this dispute. Because the focus of the Eleventh Circuit in *Air Conditioning* was on Section 547 —not Section 550—of the Bankruptcy Code, that case does not control the outcome in the instant matter. *See Air Conditioning,* 845 F.2d at 296–97 ("We hold therefore that LSC did receive a benefit *under section 547(b)(1).* ") (emphasis added).

The Committee argues that the distinction between Code provisions is irrelevant because § 547 permits avoidance of preferential transfers that are undertaken "to or for the benefit of the creditor." I find this argument unpersuasive. As the Committee recognized at oral argument, it is obligated under the facts of this case to establish liability pursuant to § 548 before reaching the question of recovery under § 550. [Appeal Hr'g Tr. 97:7–8]. The Committee further conceded that the phrase "for the benefit of" as used in § 548 of the Code only applies to employment contracts. *See id.* at 95:10–16; 11 U.S.C. § 548(a)(1)(B)(iv) (prohibiting certain transfers "to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business"). As is clear from the text of these two provisions, the "for the benefit of" *substantive liability provision* of § 547(b) differs from that of § 548, and both of those provisions differ from the "for whose benefit" *recovery provision* contained in § 550. The Seventh Circuit has recognized that *Air Conditioning* did not "consider" the relation between § 547 and § 550. *See Levit v. Ingersoll Rand Fin. Corp.,* 874 F.2d 1186, 1196 n. 6 (7th Cir.1989).

In addition, the holdings in both *Air Conditioning* and *Kellogg v. Blue Quail Energy, Inc. (In re Compton Corp.),* 831 F.2d 586 (5th Cir.1988), which the Eleventh Circuit relied on in *Air Conditioning,* were limited to banking disputes concern-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

ing letters of credit or certificates of deposit. *See Air Conditioning, 845 F.2d at 299* (affirming the district court specifically because of its decision "to uphold the sanctity of letters of credit as vital instruments of commerce"); *In re Compton,* 831 F.2d at 594 ("The precise holding in this case needs to be emphasized.... The holding of this case fully allows the letter of credit to function. We preserve its sanctity and the underlying independence doctrine. We do not, however, allow an unsecured creditor to avoid a preference attack by utilizing a letter of credit to secure payment of an antecedent debt."). FN64 The *Air Conditioning* court even explicitly noted that "it has been clear from the outset what this dispute is about: The $20,000 certificate of deposit." *Air Conditioning,* 845 F.2d at 299. Here, there is no letter of credit or certificate of deposit that precludes claims against the recipient of the debtor's property, namely the liens. Therefore, *Air Conditioning* is not controlling.

**\*52** For all of these reasons, I find that the Bankruptcy Court erred in ordering recovery against the Transeastern Lenders under 11 U.S.C. § 550.

### G. Remedies

Having determined that the Bankruptcy Court's Order must be reversed on all grounds concerning the liability of the Transeastern Lenders, I must next consider the remedies imposed by the Bankruptcy Court. The Parties have spent considerable time briefing their arguments regarding these remedies. Because all of their arguments—including the arguments put forth by the Intervenors—concern the remedies scheme that the Bankruptcy Court adopted *based on its holdings as to liability,* I need not address these arguments. My decision to reverse the Bankruptcy Court on liability renders all of these arguments moot. [*See* Transeastern Reply Br., p. 23 n. 29 ("If this Court reverses the bankruptcy court's findings of liability against the Transeastern Lenders, it need not consider the issues relating to remedies.") ].

Traditionally, I would remand this case back to

the Bankruptcy Court for further proceedings consistent with this opinion, but this case presents unique circumstances, which warrant additional consideration. In particular, the Transeastern Lenders have raised compelling arguments concerning the near-*verbatim* opinion issued by the Bankruptcy Court and its ability to conduct further proceedings in this matter. FN65 I also consider the binding case law set forth in Section IV above regarding the standard of review. The U.S. Supreme Court and the Eleventh Circuit have strongly criticized trial courts for adopting proposed findings of fact and conclusions of law from litigants without conducting an independent analysis, and these two courts have also established that remand to a trial court is unnecessary where the record allows only one resolution of the factual issues at stake. Given the unique circumstances of this case and this binding case law, I conclude that remand of this case is unnecessary. FN66

Accordingly, it is **ORDERED AND ADJUDGED** that

1. The Bankruptcy Court's Order [Bankr.ECF No. 722] is **QUASHED** as it relates to the liability of the Transeastern Lenders.

2. The Bankruptcy Court's imposition of remedies as to the Transeastern Lenders is **NULL AND VOID.**

3. All bonds deposited by the Transeastern Lenders FN67 in response to the Bankruptcy Court's Order on Motion for Stay Pending Appeal [Bankr.ECF No. 723] are **DISCHARGED.** However, such funds shall not be discharged if any Party files an appeal of this decision in which case the bonds shall remain in effect pending resolution of any appeals.

4. The additional appeal proceedings before me filed by the Transeastern Lenders, all of which were contingent upon my decision concerning liability, are **DISMISSED AS MOOT.**

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

5. All appeal proceedings before me concerning the Transeastern Lenders [Case Nos. 10–60017, 10–61478, 10–62032, 10–62035, and 10–62037] are **CLOSED.**

**\*53 DONE AND ORDERED.**

FN1. The Appellants are a subgroup of Transeastern Lenders referred to in the Bankruptcy proceedings below as the "Senior Transeasatern Lenders." They are referred to in this order as the "Transeastern Lenders." The identities of the Transeastern Lenders are identified below in Section II.B.

FN2. TOUSA made its initial public offering in March 1998 under the name Newmark Homes Corp., and it changed its name to Technical Olympic USA, Inc. in June 2002. In May 2007, the company officially changed its name to TOUSA, Inc.

FN3. There are several pending appeal proceedings in this District related to the facts here, including Case Nos. 10–60017, 10–60018, 10–60019, 10–60589, 10–61478, 10–61681, 10–61731, 10–62032, 10–62035, 10–62037 and 10–62201. I refer to other related proceedings as necessary in this Order. The cases before me (10–60017, 10–61478, 10–62032, 10–62035, and 10–62037) all concern the Transeastern Lenders. After full consideration, I transferred Case Nos. 10–60018 and 10–61681 to the Honorable Adalberto J. Jordan because those cases concern the Second Lien Term Lenders and relate to appeals already pending before Judge Jordan concerning the First Lien Term Lenders. Likewise, I re-transferred Case No. 10–62201 to Chief Judge Moreno because that case involves an appeal from a separate underlying bankruptcy proceeding (09–1616), and the appeal concerns distinct legal questions of

Delaware law on the fiduciary duties of corporate officers and directors.

FN4. Because of the extraordinary size of this dispute involving several appeals and a voluminous docket below, I will use abbreviations when citing to certain relevant submissions, exhibits, and orders.

From the bankruptcy proceedings below (Adversary Proceeding No. 08–1435–JKO), I refer to the following documents: Joint Stipulated Facts [Bankr.ECF No. 542] ("Stip."); Plaintiffs' Proposed Findings of Fact and Conclusions of Law [Bankr.ECF No. 690] ("Plaintiffs' Proposed Findings"); Senior Transeastern Lenders' Proposed Findings of Fact and Proposed Conclusions of Law [Bankr.ECF No. 713] ("Transeastern Lenders' Proposed Findings"); First Lien Term Loan Defendants' Proposed Findings of Fact and Conclusions of Law [Bankr.ECF No. 728] ("First Lien Proposed Findings"); Second Lien Agent and Lenders' Proposed Findings of Fact and Conclusions of Law [Bankr.ECF No. 719] ("Second Lien Proposed Findings"). The Hearing Transcript from the bankruptcy proceedings below is referred to as "Bankr.Hr'g Tr.," and all trial exhibits from the proceedings below are referred to as "Trial Exh(s)." Depositions taken below are referred to as "[Last name of Deponent] Dep." Any other references to the bankruptcy proceedings or the docket below are preceded by "Bankr." (*e.g.,* "Bankr.ECF No.").

The briefs on appeal in Case No. 10–60017 before me are referred to in the following manner: Brief for Appellee Official Committee of Unsecured Creditors of TOUSA, Inc., *et al.* [ECF No. 111] ("Committee's Br."); Appellant

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Senior Transeastern Lenders' Brief [ECF No. 75] ("Transeastern Lenders' Br."); Appellant Senior Transeastern Lenders' Reply Brief [ECF No. 118] ("Transeastern Reply Br."); Intervenor Citicorp North America, Inc.'s and First Term Lenders' Brief [ECF No. 113] ("Intervenor's Br.").

Briefs from other appeal proceedings are referred to as follows: Appellant Wells Fargo Bank's Brief [ECF No. 71 in Case No. 10–60018] ("Second Lien Br."); Appellee TOUSA, Inc., *et al.*'s Brief [ECF No. 108 in Case No. 10–60018] ("TOUSA Br."); Appellant Wells Fargo Bank's Reply [ECF No. 112 in Case No. 10–60018] ("Second Lien Reply Br."); Appellant Citicorp North America, Inc. Monarch Master Funding Ltd., Trilogy Portfolio Company, LLC's Brief [ECF No. 69 in Case No. 10–60019] ("First Lien Br."); Appellant Citicorp North America, Inc. Monarch Master Funding Ltd., Trilogy Portfolio Company, LLC's Reply [ECF No. 119 in Case No. 10–60019] ("First Lien Reply Br.").

FN5. The Conveying Subsidiaries are the following entities: Engle Homes Commercial Construction, LLC; Engle Homes Delaware, Inc.; Engle Homes Residential Construction, L.L.C.; Engle Sierra Verde P4, LLC; Engle Sierra Verde P5, LLC; Engle/Gilligan LLC; Engle/James LLC; LB/TE # 1, LLC; Lorton South Condominium, LLC; McKay Landing LLC; Newmark Homes Business Trust; Newmark Homes Purchasing, L.P.; Newmark Homes, L.L.C.; Newmark Homes, L.P.; Preferred Builders Realty, Inc.; Reflection Key, LLC; Silverlake Interests, L.L.C.; TOI, LLC; TOUSA Associates Services Company; TOUSA Delaware, Inc.; TOUSA Funding, LLC; TOUSA Homes Arizona, LLC; TOUSA Homes Colorado, LLC; TOUSA Homes Florida, L.P.; TOUSA Homes Investment # 1, Inc.; TOUSA Homes Investment # 2, Inc.; TOUSA Homes Investment # 2, LLC; TOUSA Homes Mid–Atlantic Holding, LLC; TOUSA Homes Mid–Atlantic, LLC; TOUSA Homes Nevada, LLC; TOUSA Homes, Inc.; TOUSA Investment # 2, Inc.; TOUSA Mid–Atlantic Investment, LLC; TOUSA Realty, Inc.; TOUSA, LLC; and TOUSA/West Holdings, Inc. [Stip., Exhibit A].

FN6. Each of these indentures was amended by supplemental indentures. [Trial Exhs. 2444–49]. None of these amendments alters the analysis as it pertains to this appeal.

FN7. The Prospectuses in the record were issued after the bond indentures, and provided twenty days for holders to exchange notes for identical new notes under the Securities Act. [Trial Exhs. 3296–3300].

FN8. The Prospectuses provided: "Revolving Credit Facility: On March 9, 2006, we entered into a new unsecured credit facility, which we refer to as our New Credit Facility, with the lenders and issuers party thereto, and Citicorp North America, Inc., as agent, replacing our previous $600 million revolving credit facility.... Our obligations under the New Credit Facility are guaranteed by our material domestic subsidiaries, other than our mortgage and title subsidiaries." [Trial Exh. 3296, p. 18].

FN9. For each of the six indentures, the Parties jointly stipulated as to the names of each of the subsidiaries that was liable as of July 31, 2007. [Stip., pp. 3–8]. For all six indentures, all of the Conveying subsi-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

diaries were liable except for the following four entities: (1) Engle Sierra Verde P4, LLC; (2) Engle Sierra Verde P5, LLC; (3) Engle/Gilligan LLC; LB/TE # 1, LLC; and (4) Reflection Key, LLC. In addition, two TOUSA subsidiaries, which were not "Conveying Subsidiaries," were liable under all six indentures: (1) TOUSA Homes, L.P. and (2) TOUSA Ventures, LLC.

FN10. Of the Conveying Subsidiaries, the entities listed in bold were guarantors under the March 9, 2006 Revolver: Engle Homes Commercial Construction, LLC; **Engle Homes Delaware, Inc.**; **Engle Homes Residential Construction, L.L.C.**; Engle Sierra Verde P4, LLC; Engle Sierra Verde P5, LLC; Engle/Gilligan LLC; Engle/James LLC; LB/TE # 1, LLC; Lorton South Condominium, LLC; **McKay Landing LLC**; Newmark Homes Business Trust; **Newmark Homes Purchasing, L.P.**; **Newmark Homes, L.L.C.**; **Newmark Homes, L.P.**; **Preferred Builders Realty, Inc.**; Reflection Key, LLC; **Silverlake Interests, L.L.C.**; **TOI, LLC**; **TOUSA Associates Services Company**; **TOUSA Delaware, Inc.**; **TOUSA Funding, LLC**; TOUSA Homes Arizona, LLC; TOUSA Homes Colorado, LLC; TOUSA Homes Florida, L.P.; **TOUSA Homes Investment # 1, Inc.**; **TOUSA Homes Investment # 2, Inc.**; **TOUSA Homes Investment # 2, LLC**; TOUSA Homes Mid–Atlantic Holding, LLC; TOUSA Homes Mid–Atlantic, LLC; TOUSA Homes Nevada, LLC; **TOUSA Homes, Inc.**; **TOUSA Investment # 2, Inc.**; TOUSA Mid–Atlantic Investment, LLC; TOUSA Realty, Inc.; **TOUSA, LLC**; **and TOUSA/West Holdings, Inc.**

FN11. The Parties dispute whether the transactions that occurred on July 31, 2007 could be considered part of a "single integ-

rated transaction." As discussed in further detail below, I conclude that the transactions that occurred on July 31 were *not* a "single integrated transaction." Nevertheless, I refer to these transactions in the singular as "the July 31 Transaction" for purposes of consistency because that is how the Parties and the Bankruptcy Court referred to them.

FN12. Of the Conveying Subsidiaries, the entities listed in bold pledged assets as security under the October 23, 2006 Revolver: **Engle Homes Commercial Construction, LLC**; **Engle Homes Delaware, Inc.**; **Engle Homes Residential Construction, L.L.C.**; Engle Sierra Verde P4, LLC; Engle Sierra Verde P5, LLC; Engle/Gilligan LLC; **Engle/James LLC**; LB/TE # 1, LLC; **Lorton South Condominium, LLC**; **McKay Landing LLC**; Newmark Homes Business Trust; **Newmark Homes Purchasing, L.P.**; **Newmark Homes, L.L.C.**; **Newmark Homes, L.P.**; **Preferred Builders Realty, Inc.**; Reflection Key, LLC; **Silverlake Interests, L.L.C.**; **TOI, LLC**; **TOUSA Associates Services Company**; **TOUSA Delaware, Inc.**; **TOUSA Funding, LLC**; TOUSA Homes Arizona, LLC; TOUSA Homes Colorado, LLC; TOUSA Homes Florida, L.P.; **TOUSA Homes Investment # 1, Inc.**; **TOUSA Homes Investment # 2, Inc.**; TOUSA Homes Investment # 2, LLC; TOUSA Homes Mid–Atlantic Holding, LLC; TOUSA Homes Mid–Atlantic, LLC; TOUSA Homes Nevada, LLC; **TOUSA Homes, Inc.**; **TOUSA Investment # 2, Inc.**; TOUSA Mid–Atlantic Investment, LLC; TOUSA Realty, Inc.; **TOUSA, LLC**; **and TOUSA/West Holdings, Inc.**

FN13. Of the Conveying subsidiaries, the entities listed in bold were guarantors under the January 30, 2007 Revolver: **Engle**

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

**Homes Commercial Construction, LLC**; **Engle Homes Delaware, Inc.**; **Engle Homes Residential Construction, L.L.C.**; Engle Sierra Verde P4, LLC; Engle Sierra Verde P5, LLC; Engle/Gilligan LLC; **Engle/James LLC**; **LB/TE # 1, LLC**; **Lorton South Condominium, LLC**; **McKay Landing LLC**; **Newmark Homes Business Trust**; **Newmark Homes Purchasing, L.P.**; **Newmark Homes, L.L.C.**; **Newmark Homes, L.P.**; **Preferred Builders Realty, Inc.**; Reflection Key, LLC; **Silverlake Interests, L.L.C.**; **TOI, LLC**; **TOUSA Associates Services Company**; **TOUSA Delaware, Inc.**; **TOUSA Funding, LLC**; **TOUSA Homes Arizona, LLC**; **TOUSA Homes Colorado, LLC**; **TOUSA Homes Florida, L.P.**; **TOUSA Homes Investment # 1, Inc.**; **TOUSA Homes Investment # 2, Inc.**; **TOUSA Homes Investment # 2, LLC**; **TOUSA Homes Mid–Atlantic Holding, LLC**; **TOUSA Homes Mid–Atlantic, LLC**; **TOUSA Homes Nevada, LLC**; **TOUSA Homes, Inc.**; **TOUSA Investment # 2, Inc.**; TOUSA Mid–Atlantic Investment, LLC; **TOUSA Realty, Inc.**; **TOUSA, LLC**; **and TOUSA/West Holdings, Inc.**

FN14. Bankr.Hr'g Tr. 2566:19–22 ("[T]he conveying subsidiaries as co-obligors had access, direct access, to the revolver, and that obviously had tremendous help and advantage to the conveying subsidiaries.").

FN15. Citibank succeeded DBTCA as Administrative Agent for the Senior Debt on March 13, 2007. [Stip., p. 13].

FN16. The Senior Transeastern Lenders are the following entities: 3V Capital Master Fund Ltd.; Atascosa Investments, LLC; Aurum CLO 2002–1 Ltd.; Bank of America, N.A.; Bear Stearns Investment Products Inc.; Black Diamond CLO 2005–1; Burnet Partners, LLC; Centurion CDO 10, Ltd.; Centurion CDO 8, Limited; Centurion CDO 9, Ltd.; Centurion CDO II, Ltd.; Centurion CDO VI, Ltd.; Centurion CDO VII, Ltd.; Centurion CDO XI, Ltd.; Deutsche Bank Trust Company Americas; Distressed High Yield Trading Ops. Fund Ltd; Eaton Vance Credit Opportunities Fund; Eaton Vance Floating–Rate Income Trust; Eaton Vance Grayson & Co.; Eaton Vance Limited Duration Income Fund; Eaton Vance Senior Debt Portfolio; Eaton Vance Senior Floating–Rate Trust; Eaton Vance Senior Income Trust; Eaton Vance VT Floating–Rate Income Fund; Farallon Capital Institutional Partners II, L.P.; Farallon Capital Institutional Partners III, L.P.; Farallon Capital Institutional Partners, L.P.; Farallon Capital Offshore Investors II, L.P.; Farallon Capital Offshore Investors, Inc.; Farallon Capital Partners, L.P.; Flagship CLO III; Flagship CLO IV; Flagship CLO V; Gleneagles CLO Ltd; Goldman Sachs Credit Partners, L.P.; Grand Central Asset Trust, CED Series; Grand Central Asset Trust, HLD Series; Grand Central Asset Trust, SOH Series; Hartford Mutual Funds, Inc., on behalf of The Hartford Floating Rate Fund by Hartford Investment Management Company, their Sub–Advisor; Highland CDO Opportunity Fund, Ltd.; Highland Credit Opportunities CDO Ltd.; Highland Floating Rate Advantage Fund; Highland Floating Rate LLC; Highland Legacy Limited; Highland Offshore Partners, L.P.; Jasper CLO, Ltd.; JPMorganChase Bank, N.A.; Liberty CLO, Ltd.; LL Blue Marlin Funding LLC; Loan Funding VII, LLC; Merrill Lynch Credit Products, LLC; Ocean Bank; The Quadrangle Master Funding Ltd.; Riversource Floating Rate Fund; Rockwall CDO, Ltd.; Sequils–Centurion V, Ltd.; Silver Oak Capital, LLC; Stedman CBNA Loan Funding LLC; The Foothills Group, Inc.; Tinicum Partners, L.P.; Van Kampen Dynamic

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Credit Opportunities Fund; Van Kampen Senior Income Trust; Van Kampen Senior Loan Fund; and Wells Fargo Bank, N.A. [*Id.* at 26].

FN17. The Senior Mezzanine Lenders are the following: DBTCA; Highland CDO Opportunity Fund, Ltd.; Highland Floating Rate Advantage Fund; Highland Floating Rate Limited Liability Company; Highland Legacy Limited; Highland Offshore Partners, L.P.; Jasper CLO, Ltd.; Loan Funding VII LLC; and Quadrangle Master Funding Ltd. [*Id.* at 27].

FN18. The Junior Mezzanine Lender was DBTCA. [*Id.*].

FN19. DBTCA alleged a variety of misrepresentations and defaults on the Transeastern Loans. [Trial Exh. 3089, p. 3 (alleging violations of "completion guaranties" on the basis that the "joint venture borrowers have indisputably not paid material Project Costs relating to the Florida Projects and have otherwise failed to complete those critical Development Activities necessary to preserve the value of the Collateral"); *id.* (alleging violations of the "carve out guarantees" on the basis that the joint venture borrowers filed "false reports and certifications" which "effectively hid [their losses]") ].

FN20. The Transeastern entities also merged into TOUSA Homes Florida LP, one of the Conveying Subsidiaries that now held the assets of the Joint Venture. [Trial Exh. 5069, pp. 2–3].

FN21. *See* First Lien Proposed Findings, p. 58 (noting the dispute between the Parties where the Committee asserts that the assets were worth $28,187,521 whereas the First Lien Term Lenders valued the assets as worth at least $160 million).

FN22. Pursuant to the Senior Mezzanine Settlement Agreement, new Subordinates Notes were issued dated July 31, 2007. [Stip., p. 16]. Pursuant to the Junior Mezzanine Settlement Agreement, TOUSA agreed to issue to Junior Mezzanine Lenders $16.25 million in warrants to purchase shares of its common stock. [*Id.* at 17].

FN23. On January 28, 2008, CNAI resigned as Administrative Agent under the Second Lien Term Loan and was replaced by Wells Fargo Bank, N.A. ("Wells Fargo"). [*Id.* at 18].

FN24. Certain lenders served as both Transeastern Lenders and First or Second Lien Term Loan Lenders. The Parties dispute which entities were on both sides of the July 31 Transaction and the effect or relevance of this overlap. [*See* Committee's Proposed Findings, p. 21; Transeastern Proposed Findings p. 46; Second Lien Proposed Findings, p. 16; First Lien Proposed Findings, pp. 19, 21; Committee's Br., p. 27; Transeastern Reply Br., p. 40–41 & nn. 41–42; Second Lien Reply Br., p. 12 n. 10]. This dispute has no bearing on my ultimate conclusion about the liability of the Transeastern Lenders.

FN25. The New Loans specifically defined the "Acquisition" as "the contribution by the Administrative Borrower to the Transeastern JV Entities of an amount necessary to discharge all amounts of outstanding Indebtedness of the Transeastern JV Entities listed on Schedule 1.l(a) on terms and conditions set forth in the Settlement Documents and (ii) the cancellation of Falcone/Ritchie's membership interests in TE/TOUSA, LLC as contemplated in Section 1 of the Falcone Settlement Agreement resulting in TE/TOUSA, LLC becoming a Wholly–Owned Subsidiary of the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Administrative Borrower [TOUSA]." [Trial Exhs. 360, 361 §§ 1.1, 4.12]. TOUSA also explained in its 8–K that the "proceeds from the [term loans] were used to satisfy claims of the senior lenders against the Transeastern JV." [Trial Exh. 3273, p. 4].

FN26. The actual credit available at any particular time remained limited by the value of the "Borrowing Base" assets as defined in the previous Revolver agreements. [Trial Exh. 362, p. 6].

FN27. The remainder of the net New Loan proceeds went to fees for financing, legal, and professional services. [Plaintiffs' Proposed Findings, p. 6 n. 4; Transeastern Lenders' Proposed Findings pp. 50–56; First Lien Proposed Findings, p. 22; Transeastern Lenders' Br., p. 12; Committee's Br., p. 3].

FN28. The Debtors are TOUSA, Homes LP, and the Conveying Subsidiaries.

FN29. The Committee consists of seven entities: Wilmington Trust Co., as indenture trustee; HSBC Bank USA, N.A., as indenture trustee; Trapeza CDOX, Ltd.; Capital Research and Management Company; SMH Capital Advisors, Inc.; Geotek, Inc./Geotek Insite, Inc.; and SelectBuild Arizona. In its Brief, the Committee notes that "[b]ecause the Conveying Subsidiary debtors here labored under a conflict of interest and therefore could not bring the case in their own right, the bankruptcy court empowered the Committee to file it on their behalf." [Committee's Br., p. 5 n. 3].

FN30. The Adversary Complaint was amended three times, with the final operative document, the Third Amended Adversary Complaint, filed on February 4, 2009. [Bankr.ECF No. 243].

FN31. The Committee brought the adversary proceeding on behalf of the Conveying Subsidiaries, not including TOUSA or Homes LP, but TOUSA was named as a plaintiff in respect to the Tax Refund preference count of the Complaint.

FN32. The Committee also asserted claims for fraudulent conveyance under New York and Florida state law pursuant to 11 U.S.C. § 544. The Bankruptcy Court held that there were "no material differences" between the legal standards under the Bankruptcy Code and Florida or New York law. [Op., p. 129 n. 47].

FN33. Besides the fraudulent transfer claims, the Committee also brought claims against the First and Second Lien Term Lenders to avoid certain tax refunds as unlawful preferences under 11 U.S.C. § 547. All appeals relating to the First and Second Lien Term Lenders on appeal are before the Honorable Adalberto J. Jordan.

FN34. As discussed further below, I do not ultimately address the Bankruptcy Court's conclusions on either of these pretrial orders because my conclusion as to the liability of the Transeastern Lenders renders the appeals concerning these orders moot. *See supra* note 41. The Parties have not briefed the issues relating to the pretrial orders on appeal because I have stayed the appeals concerning those orders. Although I have not heard the Parties' arguments concerning the merits of the Transeastern Lenders' appeals relating to the pretrial orders, I note that the orders present additional significant concerns about the proceedings below and could potentially provide independent grounds for remand and a new trial below.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

**FN35.** The Committee also provided one extra day of rebuttal after completion of the trial on August 28, 2009.

**FN36.** The minutes demonstrating unanimous approval are in the record. [Trial Exh. 255].

**FN37.** Among other things, the Defendants noted that Hewlett was not licensed or certified as an appraiser or expert in real estate valuation in any state and had concluded that 83 percent of the TOUSA Group's lots with raw land parcels had zero or negative value. The Defendants also expressed concerns that Derrough acknowledged that there were no authoritative treatises, training manuals, or textbooks that recognized his valuation methodology and that Derrough had never offered an opinion on the solvency of any company or homebuilder before testifying in this case.

**FN38.** The Bankruptcy Court originally issued its Findings of Fact and Conclusions of Law on October 13, 2009, [Bankr.ECF No. 658], and then it issued an Amended Findings of Fact and Conclusions of Law on October 30, 2009. [Bankr.ECF No. 722]. The original order granted judgment against the Revolver Lenders who had been dismissed from the case and did not appear at trial. [Bankr.ECF No. 658, pp. 163–70; Bankr.ECF No. 659, p. 4].

**FN39.** In the same appeal concerning liability, the Transeastern Lenders also challenge certain aspects of the Bankruptcy Court's imposition of remedies after issuing its Order regarding liabilities. [Transeastern Br., p. 5 (listing five additional questions for appeal concerning remedies) ]. As discussed below, I need not address these questions because I reverse the Bankruptcy Court as to its holdings on liability.

**FN40.** The Transeastern Lenders have also requested that this case should be reassigned to another judge if remand is warranted. [Transeastern Lenders' Br., p. 53–55; Transeastern Reply Br., pp. 64–68].

**FN41.** The Transeastern Lenders challenge the Bankruptcy Court's pretrial Order Granting the Committee's Motion for Summary Judgment on its Affirmative Defenses of Substantive Consolidation, Single Business Enterprise, and Alter Ego. [Bankr.ECF No. 513]. These affirmative defenses are moot now given my conclusion that the Bankruptcy Court erred in holding the Transeastern Lenders liable under all advanced theories of liability. The Transeastern Lenders also challenge the Bankruptcy Court's pretrial Order Striking their Counterclaim and Third–Party Complaint. [Bankr.ECF No. 508]. The Counterclaim and Third–Party Complaint at issue was raised by the Transeastern Lenders *in the alternative* to all of their substantive defenses, and it consisted of one count that the Transeastern Lenders would have a right of indemnification and recoupment against certain borrowers under the Transeastern Credit Agreements *in the event of any judgment against the Transeastern Lenders.* [Bankr.ECF Nos. 259, 260]. Again, because I hold that the Bankruptcy Court erred in entering judgment against the Transeastern Lenders, these issues are moot on appeal.

**FN42.** *Craft* is distinguishable because it dealt with whether tenants by the entirety each possess property within the meaning of the federal tax law and does not address or overrule the Eleventh Circuit's "control test." *United States v. Craft,* 535 U.S. 274, 285, 122 S.Ct. 1414, 152 L.Ed.2d 437 (2002).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN43. The "identity of interest rule" recognizes that "if the debtor and the third party are so related or situated that they share an 'identity of interests,' " then "what benefits one will, in such case, benefit the other to some degree." *Garrett v. Falkner (In re Royal Crown Bottlers, Inc.),* 23 B.R. 28, 30 (Bankr.N.D.Ala.1982). The Bankruptcy Court failed to consider whether the "identity of interest doctrine" applied to this case, or whether such identity of interest existed sufficient to establish reasonably equivalent value. In fact, notwithstanding extensive trial testimony and briefing on the issue, the term "identity of interest" is nowhere to be seen in the Bankruptcy Court's 182–page Opinion. An analysis of whether a parent and subsidiary share an identity of interest is frequently undertaken in cases involving upstream guarantees or financing, which occur when a subsidiary corporation loans its parent money or guarantees its parent's obligations. The identity of interest doctrine recognizes that the facts may suggest that a corporate group has purposely availed itself of the benefits of an enterprise and should be treated as one borrowing unit even though each member of the enterprise is a separate entity. *See Leibowitz v. Parkway Bank & Trust Co. (In re Image Worldwide, Ltd.),* 139 F.3d 574, 578 (7th Cir.1998) ("[C]ourts have loosened the old rule that transfers primarily for the benefit of a third party invariably give no consideration to the transferor. Thus, even when there has been no direct economic benefit to a guarantor, courts performing a fraudulent transfer analysis have been increasingly willing to look at whether a guarantor received indirect benefits from the guarantee if there has been an indirect benefit."); *Telefest, Inc. v. VU–TV, Inc.,* 591 F.Supp. 1368, 1378 (D.N.J.1984) (holding that a subsidiary re-

ceived reasonably equivalent value even though it did not receive the proceeds of a loan guaranteed for its parent); *Goveart v. Capital Bank (In re Miami Gen. Hosp., Inc.),* 124 B.R. 383, 393 (Bankr.S.D.Fla.1991). Although this case does not involve "intercorporate guarantees," the July 31 Transaction raises the same kinds of issues because the Conveying Subsidiaries were co-borrowers with the TOUSA Parent on the Term Loans.

FN44. The Bankruptcy Court stated: "To the extent that the Defendants' claims of indirect benefits rest on the avoidance of default and bankruptcy by the Conveying Subsidiaries, those claims are equally flawed." " 'Avoiding default' is not 'property' and therefore is not cognizable as "value" under the statute." [Op., p. 148].

FN45. The Bankruptcy Court alternatively held that any indirect benefits received, "even if legally cognizable," were actually of little "value (if any)." [*Id.* at 149]. I address this issue separately later in this Opinion under the clear error standard of review.

FN46. The Bankruptcy Court also generally cites to the definition of property under Section 541(a) of the Bankruptcy Code and an Eleventh Circuit case interpreting this definition. [*Id.* at 148 n. 55]. Neither the general statutory reference nor the citation to Eleventh Circuit authority is helpful. The Eleventh Circuit's decision in *Bracewell v. Kelley (In re Bracewell),* 454 F.3d 1234 (11th Cir.2006) addressed only the issue of whether payments that Congress had not yet authorized were "property." This issue has no bearing here. *See generally* 2 DAVID G. EPSTEIN, BANKRUPTCY § 9–49 (1992) ("The courts have made clear that *value* also includes other kinds of intangible considera-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

tion that economically benefits the debtor without returning a leviable assets to [its] estate. Common examples are services that the debtor buys and the consideration [it] gets in exchange for a transfer that settles a disputed claim or releases [it] from future obligations.") (emphasis added).

FN47. Under Eleventh Circuit case law, I am prohibited from looking to legislative history unless the statutory language is ambiguous or inconclusive. *See United States v. Mount Sinai Med. Ctr. of Fla., Inc.,* 486 F.3d 1248, 1251–52 (11th Cir.2007). Here, the section 102 of the statute is inconclusive as to the meaning of the word *property,* but the legislative history sheds light on the use of this term. Therefore, I consider the legislative history to supplement the inconclusive statutory text.

FN48. Under the facts of *Rodriguez,* the Eleventh Circuit concluded that, absent the piercing of the corporate veil, the debtor was not liable for the Parent's corporate debt and, therefore, did not benefit from the reducing of that debt. While *Rodriguez* considered the "reasonably equivalent value" standard under Section 548(a)(2), the Eleventh Circuit concluded that decisions applying the relevant section of the Bankruptcy Act of 1898, using the term "fair consideration," have been adopted as applicable to the 1978 Bankruptcy Reform Act. *Rodriguez,* 895 F.2d at 727 n. 2. In creating the "indirect benefit rule," the Second Circuit in *Rubin* specifically noted that an indirect benefit constitutes "fair consideration." *Rubin,* 661 F.2d at 991–92; *see also* 4 COLLIER ON BANKRUPTCY ¶ 548.09, at 548–112, 548–113, 548–117 & n. 16 (Lawrence P. King ed., 15th ed. 1996) ("When the consideration is difficult to measure precisely, the courts have not been too exacting in applying the criterion

of 'fair consideration.' ... Settlement of a suit can be fair consideration.... Cancellation of future indebtedness ... has been held correctly to be a good and valuable consideration for a transfer.").

FN49. As relevant here, the District Judge in *Goldberg* concluded as follows:

The Court engages in a two-part inquiry to determine whether reasonably equivalent value was provided in a transfer. *Tower Envtl., Inc.,* 260 B.R. at 225 (citing *In re R.M.L., Inc.,* 92 F.3d 139, 148 (3d Cir.1996)). "First, was any value received by the debtor in exchange for the transfer.... Second, if value was given, was the value given reasonably equivalent of the funds transferred." *In re Evergreen Sec., Ltd.,* 319 B.R. 245, 253 (Bankr.M.D.Fla.2003) (citing *Tower Envtl., Inc.,* 260 B.R. at 225). "[V]alue must be assessed on a 'case by case basis' by looking at the surrounding circumstances and by focusing on the precise nature of the transfer." *Id.* Finally, the Eleventh Circuit has counseled that "a determination of whether value was given under Section 548 should focus on the value of the goods and services provided rather than on the impact the goods and services had on the bankrupt enterprise." *In re Fin. Federated Title & Trust, Inc.,* 309 F.3d 1325, 1332 (11th Cir.2002).

With respect to the first prong, the inquiry is whether the debtor obtained "any benefit" without regard to the cost of services, the nature of the transaction or the good faith of the transferee. *Tower Envtl., Inc.,* 260 B.R. at 225. This determination involves whether the debtor received any "realizable commercial value" as a result of the transaction. *Id.* (citing *R.M.L., Inc.,* 92 F.3d at 149). If it

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

is determined that value was in fact conferred, the Court must undertake the second prong by determining whether the value was reasonably equivalent to the transferred funds. In making this determination, the Court applies a "totality of the circumstances" test. *Id.* That test includes a consideration of factors including "the fair market value of the item or service received compared to the price paid, the arms-length nature of the transaction, and the good faith of the transferee."

*Goldberg v. Chong,* Case No. 07–20931, 2007 WL 2028792, at * 5 (S.D.Fla. July 11, 2007).

FN50. As noted at oral argument: "Mr. Leblanc: In addition to that, there was no dispute in this litigation [meaning before the bankruptcy court] that the amount paid by TOUSA to the Transeastern lenders were, in fact, owed. That is not a subject of dispute here. Nobody has contended that the guarantees weren't valid obligations of TOUSA that arose to at least the level that was paid...." [Appeal Hr'g Tr. 20:22–21:2].

FN51. As noted at oral argument: "Mr. Leblanc: And just to be clear, the fear of the parent was that the judgment against it would be far in excess of what it paid ultimately to resolve the Transeastern litigation." [*Id.* at 21:11–21:14].

FN52. The Committee argues without merit that the July 31 Transaction did not have material value to the Conveying Subsidiaries because an adverse judgement in the Transeastern Litigation (and the defaults that such a judgment would trigger) was not "imminent." [Committee's Br., pp. 119–20]. The record establishes without contradiction that a judgment in excess of $10 million dollars was virtually assured

because much more than that amount was actually owed on a valid antecedent debt. The record establishes without contradiction that the TOUSA parent, through its management, was advised by its expert advisers and attorneys that there was a substantial risk of an adverse judgment, that a more favorable settlement of the Transeastern Litigation was not possible, and that "time was of the essence." *See supra,* Section II.C.

FN53. The Bankruptcy Court further committed clear and prejudicial error by repeatedly sustaining the Committee's hearsay objections to testimony elicited by the Transeastern Lenders and other Appellants to the testimony elicited by them from Paul Berkowitz, Executive Vice President and Chief of Staff of TOUSA, and an officer of many of the Conveying Subsidiaries, regarding the negative effects of the Transeastern Litigation on the Conveying Subsidiaries and the benefits received by the Conveying Subsidiaries in the Transeastern Settlement. [*E.g.,* Bankr.Hr'g Tr. 1588:19–22; 1590:23–1591:10; 1633:24–1637:11 (Mr. Berkowitz's testimony as to his position in TOUSA and his signatory authority for the Conveying Subsidiaries and the Bankruptcy Court's decision to sustain objections regarding his testimony) ]. Mr. Berkowitz was uniquely qualified to offer such testimony. His testimony was directly supported by relevant resolutions or consents of the Conveying Subsidiaries approving the July 31 Transaction as co-borrowers and concluding that the Transaction was in the best interest of, and benefitted, each Subsidiary. [Trial. Exhs. 374–76, 501–31, 2163]. As such, his testimony was admissible under FED.R.EVID. 801(d)(2)(D) as statements by an agent or officer of the Conveying Subsidiaries who were the real parties to

the avoidance action. The Committee merely acted on their behalf in prosecuting the action. [Bankr.ECF No. 243, p. 4 (Third Amended Complaint) ]. If allowed, Mr. Berkowitz's testimony would have directly corroborated and strongly supported that the Conveying Subsidiaries did, in fact, receive substantial indirect benefits from TOUSA's payment of the New Loan proceeds to the Transeastern Lenders.

FN54. *See, e.g.,* Bankr.Hr'g Tr. 1877:5–18 (confirming that the Conveying Subsidiaries "absolutely [could] not" obtain their own financing). This followed from the fact that: (a) the Conveying Subsidiaries' assets were already pledged to secure up to $800 million of existing Revolver debt; (b) none of the Conveying Subsidiaries had its own audited financial statements as a predicate to obtain independent financing, and (c) the TOUSA intercompany accounts were an irreconcilable "pile of tangled spaghetti." [*Id.* at 1401:7–8 (Committee's expert admitting that TOUSA's intercompany accounts were "a huge pile of tangled spaghetti") ].

FN55. Mr. Derrough concluded the following without further analysis: "I believe these companies could have been able to get financing on their own, and there's plenty of examples of companies in bankruptcy with meaningful, major subsidiaries that are not in bankruptcy continuing to operate, cash management systems with cash flowing back and forth between debtor and non-debtor subsidiaries, *so I don't think it is a given at all that a bankruptcy of the parent would necessarily be the death knell for these subsidiaries.* " [Bankr.Hr'g Tr. 1302:11–20. (emphasis added) ]. Likewise, Mr. Hewlett opined that "[b]ased on the evidence and my knowledge of the home building industry, there's

no reason to think that TOUSA's home building subsidiaries, namely TOUSA Homes, Inc. and Newmark Homes, LP, would have been unable to secure financing on their own." [Bankr.Hr'g Tr. 854:7–855:2]. Mr. Hewlett admitted that although he arrived at this conclusion, he did not "specifically recall going into a subsidiary-level analysis relative to them obtaining individual financing." [*Id.* at 575:16–18]. He further conceded during cross examination that when he arrived at this conclusion, he never considered the actual circumstances of the Conveying Subsidiaries. Specifically, he did not take into account any of the Conveying Subsidiaries' obligations under the Revolver or the bond debt. [*Id.* at 855:25–856:14]. When asked whether those obligations of the Conveying Subsidiaries would have prevented them from obtaining separate financing, he replied: "That's not my area of expertise, no." [*Id.* at 856:10–20].

FN56. Appeal Hr'g Tr. 42:4–15 ("Judge Jordan: I mean, if you're a standalone company and you have only your own debt and the company decides—a bank decides to lend you money because it thinks you're a good credit risk and you're a good bet on a going forward basis, it analyzes what you owe, what your prospects are, et cetera. But then you're bought by someone else and because of intercorporate transactions, you now guarantee the other side's debt. Your balance sheet doesn't look that good anymore. So now a bank who's looking at you is saying, 'Hummm. If they were a standalone company, I'd lend them money again,' but you're not a standalone company anymore. Mr. Robbins: *That's true, Judge Jordan.*") (emphasis added).

FN57. It is only to the extent the "transfer" is avoided under section 548, may the

trustee recover the value of "such property" from "(1) the initial transferee of *such transfer* or the entity for whose benefit *such transfer* was made [Section 550(a)(1) ]; or (2) any immediate or mediate transferee of such *initial* transferee [ Section 550(a)(2) ]." 11 U.S.C. § 550(a)(1) -(2). Section 550(b) goes on to say that the trustee may *not* recover under Section 550(a)(2) from "(1) a transferee that takes for value, including satisfaction or securing of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided; or (2) any immediate or mediate good faith transferee of such transferee." *Id.* § 550(b).

FN58. The Committee also provided an additional ground to reject the theory that the Transeastern Lenders could have been "subsequent transferees" because it abandoned its claims under this theory in the proceedings below. [*See* Bankr.ECF No. 243].

FN59. The July 2007 Credit Agreements can be found in Trial Exhibits 360–62.

FN60. The Bankruptcy Code does not define "transferee" and "there is no legislative history on that term." *Martinez v. Hutton (In re Harwell),* 628 F.3d 1312, 1317 (11th Cir.2010) (discussing at length the "control" or "conduit tests" under § 550 and reaffirming that the statute should not be construed in a rigid manner).

FN61. As noted above, I am required under Eleventh Circuit case law to first determine if the text of a statute is ambiguous or inconclusive before considering its legislative history. *Mount Sinai,* 486 F.3d at 1251–52. In this instance, the text of § 550 does not shed light on whether Congress intended to expand liability through this recovery provision. Therefore, I look to le-

gislative history.

FN62. Again, I look to legislative history on this point because the text of the statute provides no indication of congressional intent concerning the phrase *good faith.* The legislative history is helpful in supplementing the inconclusive statutory text because it provides an example where a party could not rely on this defense.

FN63. In fact, although the Parties devote considerable attention in their briefs to *In re Air Conditioning,* the Bankruptcy Court addressed the case in only three sentences in its Order. [Op., p. 151] ("The facts of this case also fall squarely within the Eleventh Circuit's holding in *American Bank of Martin County v. Leasing Service Corp. (In re Air Conditioning, Inc. of Stuart),* 845 F.2d 293 (11th Cir.1988).* In *Air Conditioning,* a creditor was paid with funds provided by a bank in exchange for a security interest in the debtor's property. The Eleventh Circuit held that the creditor was an entity for whose benefit the transfer of the security interest to the bank was made.")

FN64. The Transeastern Lenders also correctly note that the Fifth Circuit has retreated from *Compton,* and the decision has been the subject of criticism. [*See* Transeastern Lenders' Br., p. 29 n. 17; Transeastern Reply Br., p. 18 n. 17].

FN65. As noted above, the Transeastern Lenders have requested that this case be reassigned to another bankruptcy judge if remand is warranted on the basis that they have "serious doubts about [Judge Olson's] ability to approach the Defendant's evidence and arguments fairly." [Transeastern Lenders' Br., p. 53–55; Transeastern Reply Br., pp. 64–68]. Among other things, the Transeastern Lenders note that the Bank-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

ruptcy Court did the following below: it granted summary judgment to the Committee on one issue even after the Committee acknowledged that it withdrew its motion requesting summary judgment on that same issue; it questioned witnesses for the Defendants in a "belligerent and dismissive" manner; it allowed rebuttal testimony by two of the Committee's expert witnesses in order to "know what the truth is" even though it "refused to allow any testimony from a single fact witness identified by the Defendants as rebuttal to the new testimony"; and it directed that "each of the two Transeastern Lender defendant groups [ ] make a $10,000 'voluntary contribution' to a pro bono organization or be sanctioned in exchange for his agreement to vacate a fundamentally flawed dismissal of this very same appeal." [Transeastern Lenders' Br., pp. 53–55; Transeastern Reply Br., pp. 64–68]. Although I consider these arguments persuasive, I must not address these issues because I quash the Bankruptcy Court's Order. The Eleventh Circuit may consider these arguments as it deems necessary.

FN66. To avoid confusion for the Parties, I note that my decision not to remand this case will in no way affect the parallel appeal proceedings currently pending before the Honorable Adalberto J. Jordan. Specifically, the First and Second Lien Term Lenders in those proceedings also argue, as the Transeastern Lenders did here, that the Bankruptcy Court erred in holding that the July 31 Transaction did not confer reasonably equivalent value upon the Conveying Subsidiaries. Whether or not Judge Jordan affirms or reverses the Bankruptcy Court on this point under § 548 is irrelevant to the ultimate liability of the Transeastern Lenders because I hold that the Bankruptcy Court *independently erred* in concluding

that the Conveying Subsidiaries could recover from the Transeastern Lenders under *§ 550 even if the Bankruptcy Court had not erred in its § 548 analysis.*

FN67. The Parties have noted that certain of the Transeastern Lenders also served as New Lenders for the July 31 Transaction. [*See* Plaintiffs' Proposed Findings, p. 21; Transeastern Proposed Findings p. 46; Second Lien Proposed Findings, p. 16; First Lien Proposed Findings, pp. 19, 21; Committee's Br., p. 27; Transeastern Reply Br., pp. 40–41 & nn. 41–42; Second Lien Reply Br., p. 12 n. 10]. To the extent that any of the lenders that have served in both capacities have deposited bonds, this Order only relates to those funds deposited by lenders acting in their capacity as Transeastern Lenders.

S.D.Fla.,2011.
In re TOUSA, Inc.
--- B.R. ----, 2011 WL 522008 (S.D.Fla.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

# Exhibit M



Slip Copy, 2010 WL 1193151 (E.D.N.Y.)
**(Cite as: 2010 WL 1193151 (E.D.N.Y.))**

C

Only the Westlaw citation is currently available.

United States District Court,
E.D. New York.
The ROBERT PLAN CORPORATION and the
Robert Plan of New York Corporation, Appellees,
v.
LIBERTY MUTUAL INSURANCE COMPANY
and Liberty Mutual Fire Insurance Company, Appellants.

No. 09-CV-1930 (JS).
Bankr.Case No. 09-08027.
March 23, 2010.

Marshall T. Potashner, Esq., Dennis J. Loiacono, Esq., Jaffee & Asher LLP, New York, NY, for Appellants.

Michael S. Amato, Esq., Ruskin Moscou Faltischek, P.C., Uniondale, NY, for Appellees.

*MEMORANDUM AND ORDER*
SEYBERT, District Judge.
*INTRODUCTION*
**\*1** Appellants are creditors Liberty Mutual Insurance Company and Liberty Mutual Fire Insurance Company (collectively, "Appellants" or "Liberty Mutual"). Appellees are debtors The Robert Plan Corporation and The Robert Plan of New York Corporation (collectively, "Appellees" or "Debtors").

On March 19, 2009, United States Bankruptcy Judge Robert E. Grossman granted Appellees' motion for a preliminary injunction enjoining Appellants' contempt action against third party nondebtors Philbert Nezamoodeen and Jasper J. Jackson (collectively, "Officers"). Appellants now appeal that decision. For the foregoing reasons, the Appeal is DENIED and the Bankruptcy Court's Order is AFFIRMED.

*BACKGROUND*
The Robert Plan Corporation ("Robert Plan") is a Delaware corporation with its principal place of business in New York. *See* Appellee's Compl. ¶ 5. Robert Plan's wholly owned subsidiary, the Robert Plan of New York Corporation ("Robert Plan of New York") is a New York corporation. *Id.* at ¶ 6. Nezamoodeen and Jackson are Robert Plan officers. *Id.* at ¶ 15. Appellants are both Massachusetts corporations, operating as stock insurance companies. *Id.* at ¶¶ 7, 8.

In August 2007, Liberty Mutual obtained a $236,989.36 judgment in the New York Supreme Court, Queens County, against Robert Plan. A balance of $173,313 is still owed. Seeking to enforce its judgment, Liberty Mutual served restraining notices on the Debtors, prohibiting Debtors from transferring their property. In addition, in April 2008, Liberty Mutual subpoenaed Robert Plan for a deposition and certain documents. Robert Plan failed to produce documents or appear for the deposition. Robert Plan contends that these failures were not willful, but resulted from the company being in distress and thus unable to comply with Liberty Mutual's demands.

Despite the restraining notices, Robert Plan paid out $322,597.51 of its assets. Most of this sum went to payroll and related expenses, such as payroll taxes and unemployment insurance. But a small portion went to third parties, including a settlement of a wrongful discharge claim.

On August 25, 2008, the Debtors filed Chapter 11 petitions in the United States Bankruptcy Court for the Eastern District of New York. Due to this filing, on September 2, 2008, the New York Supreme Court stayed proceedings, including the contempt proceedings that Liberty Mutual commenced against the Debtors. Liberty Mutual then commenced a contempt action in New York Supreme Court, Kings County against the Officers for violating the restraining notices by paying out Robert

Plan's assets rather than satisfying the outstanding judgment. In this action, Liberty Mutual sought $173,313 in sanctions against the Officers. On January 22, 2009, the Debtors filed a motion in the Bankruptcy Court seeking to stay the contempt action against the Officers.

Judge Grossman conducted two days of hearings to decide if he should stay the Kings County action against the Officers. After the first hearing, Judge Grossman requested further briefing on three specific issues: (1) did the Officers have a right to seek indemnification from the Debtors?; (2) if the Officers were found in contempt, would that negate their right to indemnification?; and (3) is indemnification an administrative claim against the estate or a general unsecured claim? *See* Jan. 29, 2009 Hearing Tr. at 42.

**\*2** Judge Grossman received this briefing and then conducted another hearing, where he listened to oral arguments. Judge Grossman then granted the Debtors' motion to extend the automatic stay to the Officers, finding that "unusual circumstance warrant the extension of the automatic stay as to the contempt action Liberty Mutual commenced against the officers." March 4, 2009 Tr. at 37. In so ruling, Judge Grossman held that the "the identity of The Robert Plan and Officers is identical" because "the debtors agree that The Officers are entitled to indemnification" for any judgment rendered against them. *Id.* at 43.

Appellants contend that Judge Grossman erred in granting the Debtors' motion for a stay. *See* Appellant's Br. at 13. Appellants posit that an injunction is only proper if there is an "absolute" right to indemnification, which—Appellants contend—Delaware law does not provide for. *Id.* at 13-14. Furthermore, Appellants argue that Judge Grossman improperly based his decision on Debtors' declaration that they would indemnify the Officers. *Id.* at 14. On the contrary, Appellants insist, the Officers could not legally receive indemnification because they did not act in good faith when they supposedly engaged in contempt of court.

*DISCUSSION*

I. *Standard of Review*

"On an appeal the district court ... may affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings." FED. R. BANK. P. 8013. The Bankruptcy Court's "finding [s] of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous...." *Id.; see also In re Momentum Mfg. Co.,* 25 F.3d 1132, 1136 (2d Cir.1994); *In re PCH Assoc.,* 949 F.2d 585, 597 (2d Cir.1992). "A finding of fact is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.... Factual findings must be upheld if plausible in light of the record viewed in its entirety. *Robbins Int'l, Inc. v. Robbins MBW Corp. (In re Robbins Int'l, Inc.),* 275 B.R. 456, 464-65 (S.D.N.Y.2002)* (internal quotations, citations omitted). The Bankruptcy Court's legal conclusions are reviewed *de novo. See In re Momentum Mfg. Co.,* 25 F.3d at 1136.

II. *Subject Matter Jurisdiction*

Appellants argue that Judge Grossman lacked subject matter jurisdiction to enjoin the contempt proceeding under *Johns-Manville Corp. v. Chubb Indem. Ins. Co. ( In re Johns Manville Corp.),* 517 F.3d 52 (2d Cir.2008). The Court notes that the Supreme Court has since reversed *Johns-Manville,* based on its finding that the Second Circuit improperly entertained a collateral attack to subject-matter jurisdiction. *See Travelers Indem. Co. v. Bailey,* ---U.S. ----, ---- - ----, 129 S.Ct. 2195, 2198-2205, 174 L.Ed.2d 99 (2009). In any event, Appellants' subject matter jurisdiction argument incorrectly conflates the merits with jurisdiction. *See, generally, Arbaugh v. Y & H Corp.,* 546 U.S. 500, 511, 126 S.Ct. 1235, 1242, 163 L.Ed.2d 1097 (2006); *see also In re Trusted Net Media Holdings, LLC,* 550 F.3d 1035, 1043 (11th Cir.2008) (finding that 11 U.S.C. § 303 is not jurisdictional). 28 U.S.C. § 1334 empowers the Bankruptcy Court with "comprehensive jurisdiction" to "enjoin other ac-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

tions whether against the debtor or third-parties and in whatsoever court." *See A.H. Robins Co. v. Piccinin,* 788 F.2d 994, 1003 (4th Cir.1986). Appellants believe that a stay is improper, because the Officers have not met the criteria set forth in 11 U.S.C. §§ 105 and 362. But, if true, that only goes to the merits of Appellees' case, not the Court's jurisdiction.

**\*3** That being said, even if §§ 105 and 362 are jurisdictional in nature, the Bankruptcy Court still had subject matter jurisdiction. For, as discussed below, the Bankruptcy Court properly stayed the action against the Officers.

### III. *The Merits*

A. *"Adverse Economic Consequences" and "Unusual Circumstances"*

The filing of a Chapter 11 bankruptcy petition automatically stays any judicial proceeding or other act against the estate's property that was or could have been commenced before the petition was filed. 11 U.S.C. § 362. By its terms, § 362 applies only to actions against debtors, debtor's property, or estate property, and does not stay proceedings against non-debtors. But in *A.H. Robins Co.,* the Fourth Circuit held that § 362 could be extended to enjoin civil proceedings against non-debtors in "unusual circumstances." 788 F.2d at 999. Likewise, in *Queenie Ltd. v. Nygard International,* 321 F.3d 282, 287 (2d Cir.2003), the Second Circuit held that "the automatic stay can apply to non-debtors, but normally does so only when a claim against the non-debtor will have an immediate adverse economic consequence for the debtor's estate." The Second Circuit then provided several "examples" of such an immediate adverse impact, including "where 'there is such identity between the debtor and the third-party defendant that the debtor may be said to be the real party.' " *Id.* at 288 (citing *A.H. Robins Co.*). Although citing *A.H. Robins Co.,* the Second Circuit did not comment on that decision's "unusual circumstances" standard. But, post-*Queenie,* at least some Second Circuit district and

bankruptcy cases have applied it. *See, e.g., In re Pitts,* Bankr.Case No. 808-74860, 2009 WL 4807615, \*6 (E.D.N.Y.Bankr.2009); *DeSouza v. PlusFunds Group, Inc.,* 05-CV-5990, 2006 WL 2168478, \*2 (S.D.N.Y.2006).

The Court finds that both the Second Circuit's and Fourth Circuit's standards are satisfied here. The crux of the Second Circuit's standard focuses on whether a pending litigation against a non-debtor would have "an immediate adverse economic consequence to the debtor's estate." Appellants' contempt suit against the Officers has such an impact. If Appellants lose their contempt suit, Delaware law requires Robert Plan to indemnify the Officers for their attorneys' fees, thereby creating a claim (and hence, an "adverse economic consequence") for the estate. 8 Del. C. § 145(c) .[FN1] Alternatively, even if Appellants win, Robert Plan's By-Laws still require it to indemnify the Officers, if they acted in good faith. *See* By-Laws Art. VI, Sec. 1; 8 Del. C. § 145. And, under Delaware law, Robert Plan's board of directors is authorized to decide whether the Officers in fact acted in good faith. 8 Del. C. § 145(d). Robert Plan has preemptively done so, informing Judge Grossman that it would indemnify the Officers from any judgment based on their board's finding of good faith.

> FN1. The Court is aware that the plain text of the Second Circuit's holding discusses "claim[s] against the non-debtor," not claims adjudicated in the non-debtor's favor. But the Second Circuit's focus concerned the estate's potential liability, not the non-debtor's success-on-the-merits. Here, even if the Officers prevailed on the merits, the legal obligation to indemnify the Officers for their attorneys' fees would still burden the estate.

Given these facts, the only way that a decision in the contempt litigation would not impose "adverse economic consequences" to the Debtors' estate is if: (1) the Officers lose; and (2) Appellants prove that Robert Plan's directors did not act in

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

good faith when they found that the Officers acted in good faith. *See, generally, Levy v. Hayes Lemmerz Intern., Inc.,* 2006 WL 985361, *1 (Del.Ch.2006)* (board of directors must "make a good faith judgment as to whether the putative indemnitees are entitled to be indemnified"). This is a totally speculative scenario, which requires Appellants to meet a doubly high burden of showing, essentially, that there can be no good faith disagreement regarding whether the Officers acted in good faith.[FN2] And any such litigation would pose the significant prospect of draining the estate even more because, if Appellants lose or otherwise can't demonstrate the directors' lack of good faith, the Debtors would then be obligated to indemnify the directors for the legal fees they incurred defending their decision to indemnify the Officers. Moreover, because the Debtors have already pledged to indemnify the Officers, a claim against the Officers will, when entered, constitute a claim (and hence, an "immediate adverse economic consequence") against the estate. *Queenie Ltd.,* 321 F.3d at 287. The fact that Appellants could sue to nullify this negative economic consequence does not eliminate the fact that it would still continue to exist for at least the duration of Appellants' suit-thereby potentially complicating the pending bankruptcy proceedings.

> FN2. In this regard, the Court rejects Appellants' argument that the Officers, *ipso facto,* did not act in good faith because they engaged in contempt of court. Adopting this argument would require the Court to decide the underlying merits of a case not before it. Furthermore, there may be instances in which a corporation is subject to conflicting and contradictory legal demands. In such a situation, a corporate officer's failure to comply with a court order might be the "least bad" option.

**\*4** Consequently, Judge Grossman correctly determined that the contempt suit against the Officers would pose an "immediate adverse impact"

on the Debtors' estate, and that "unusual circumstances" therefore justified enjoining it. March 4, 2009 Tr. at 40; *See also e.g., Gulfmark Offshore, Inc. v. Bender Shipbuilding & Repair Co., Inc.,* 09-CV-0249, 2009 WL 2413664, *1-2 (S.D.Ala.2009); In re Philadelphia Newspapers, LLC,* 407 B.R. 606, 616 (E.D.Pa.2009).

**B.** *The Officers' "Absolute" Right To Indemnification*

Appellants also argue that a stay is only appropriate if the non-debtors have an "absolute" right to indemnification. Appellants Br. at 17 (citing *A.H. Robins,* 788 F.2d at 999). Here, Appellants contend that the Officers supposedly lack such an "absolute" right because they may, or may not, have acted in good faith. The Court disagrees. The Officers' good faith is not a speculative future event that may, or may not, happen. The Officers' have already dispersed funds, supposedly in violation of the restraining notices. Thus, the Officers' good faith (or lack thereof) is something that has already happened. If the Officers did not act in good faith, they have no indemnification rights. But if the Officers *acted* (past tense) in good faith, then the Robert Plan's By-Laws provide them with an "absolute" right to indemnification. And, given the possibility that the Officers had such an absolute right, the Bankruptcy Court properly protected the estate by staying the contempt case.

*CONCLUSION*

For the reasons set forth herein, the Order of the Bankruptcy Court is AFFIRMED.

SO ORDERED.

E.D.N.Y.,2010.
Robert Plan Corp. v. Liberty Mut. Ins. Co.
Slip Copy, 2010 WL 1193151 (E.D.N.Y.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.